IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| **JUAN ESTRADA, JR., ROSITA ESTRADA, CELIA TREVINO, CRISELDA VILLARREAL, ADMINISTRATRIX OF THE ESTATE OF MARICELA TREVINO AND AS NEXT FRIEND OF S.M.L., N.T.L., AND R.L., JR., AND FRANCISCO TREVINO** *Plaintiffs,*<br><br>vs.<br><br>**CITY OF WESLACO, ALFREDO MORENO, JR., ALBERT PONCE, WESLACO POLICE CHIEF JOHN DANIEL MARTINEZ, AND JAIL COMMANDER TED WALENSKY** *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 09-158<br><br>(JURY DEMANDED) |



═══════════════════════════════════════

**PLAINTIFFS' FIRST AMENDED COMPLAINT
& DEMAND FOR JURY TRIAL**

═══════════════════════════════════════

**- Introduction -**

1.01    This is an action for money damages brought by all of the Texas Wrongful Death Act statutory beneficiaries and intestate heirs of Maricela Trevino, deceased, for violations of her federal civil rights committed by all of the defendants. Defendants' civil rights violations caused the death of Ms. Trevino while a pretrial detainee at the Weslaco Police Department lockup. During her confinement, Ms. Trevino suffered from serious mental health illness, including conduct indicative of suicidal tendencies, which was obvious and known to Weslaco Police Department high-ranking police officers,

patrol officers, jailers, dispatchers and staff.   Despite suffering from known serious mental health illness, Defendants failed to properly observe Ms. Trevino, and provide her with reasonable medical/psychiatric care.   Ms. Trevino hung herself from the bunk bed frame using an Ace bandage, and ultimately, died at a local hospital.   The medical examiner classified Ms. Trevino's death as a suicide.

## II.

## - Parties -

2.01   Plaintiff, Juan Estrada, Jr., resides in Weslaco, Hidalgo County, Texas.  He is the adult biological son of Maricela Trevino, deceased.

2.02   Plaintiff, Rosa Estrada, resides in Weslaco, Hidalgo County, Texas. She is the adult biological daughter of Maricela Trevino.

2.03   Plaintiff, Criselda Villarreal, is the sister Maricela Trevino and is the Administratrix of the Estate of Maricela Trevino.   She brings suit on behalf of the Estate of Maricela Trevino and the three minor biological children of Maricela Trevino, S.M.L., N.T.L. and R.L., Jr.  See Exhibit A, Letters of Administration.

2.04   Plaintiff, Celia Trevino, resides in Weslaco, Hidalgo County, Texas.  She is the mother of Maricela Trevino.

2.05   Plaintiff,  Francisco Trevino, resides in California.  He is the father of Maricela Trevino.

2.06   Defendant, City of Weslaco, is a duly incorporated home rule city and political subdivision of the State of Texas, and is capable of being sued in this Court. Defendant, City of Weslaco, is responsible for the policies, practices, and customs of its police department, as well as the hiring, training, supervision, control and discipline of its police officers, detectives, and jailors. Defendant, City of Weslaco, is and was the employer of the police personnel named herein as individual defendants. Defendant,

City of Weslaco, is also responsible for the operation, practices, and totality of conditions of its jail facility. Defendant has filed an Answer. No service is required.

2.07 Defendant, Alfredo Moreno, Jr. (hereafter "Jailer Moreno"), is a resident of Hidalgo County, Texas. At all times material to this suit, he was employed as a booking officer/jailor by the Weslaco Police Department. Each of the acts complained of arises from the conduct of Defendant while acting under color of state law, and was committed within the scope of his employment with the Weslaco Police Department. Defendant Alfredo Moreno, Jr. Has filed an answer.

2.08 Defendant, Albert Ponce (hereafter "Officer Ponce"), is a resident of Hidalgo County, Texas. At all times material to this suit, he was employed as a booking officer/jailor by the Weslaco Police Department. Each of the acts complained of arises from the conduct of Defendant while acting under color of state law, and was committed within the scope of his employment with the Weslaco Police Department. Defendant Albert Ponce has filed an answer.

2.09 Defendant, Weslaco Police Chief John Daniel Martinez (hereafter "Police Chief Martinez"), is a resident of Weslaco, Hidalgo County, Texas. At all times material to this suit, based on information and belief, he was responsible for the Weslaco Police Department and its Jail. Based on information and belief, he is and was responsible for the conditions and practices of the Weslaco jail facility as he is the final policy-maker for the City. Moreover, he is and was responsible for maintaining the jail facility in conformity with constitutional requisites. Defendant, Police Chief Martinez, is and was charged with furnishing safe conditions for all persons detained in the jail facility. Each of the acts complained of arises from the conduct of Defendant while acting under color of state law, and was committed within the scope of his employment with the Weslaco Police Department. Defendant Chief John Daniel Martinez has filed an Answer. No

service is required.

2.10    Defendant, Weslaco Jail Commander Ted Walensky (hereafter "Jail Commander Walensky"), is a resident of Weslaco, Hidalgo County, Texas.  At all times material to this suit, based on information and belief, he was responsible for the Weslaco Police Department lockup. Based on information and belief, he is and was responsible for the conditions and practices of the Weslaco lockup facility as he share final policy-making authority with Chief Martinez.  Moreover, he is and was responsible for maintaining the jail facility in conformity with constitutional requisites.  Defendant, Jail Commander Walensky is and was charged with furnishing safe conditions for all persons detained in the jail facility.  Each of the acts complained of arises from the conduct of Defendant while acting under color of state law, and was committed within the scope of his employment with the Weslaco Police Department.  Defendant Jail Commander Walensky may be served at 901 North Airport Drive, Weslaco, Texas 78596.

III.

### - Jurisdiction and Venue -

3.01    Pursuant to 28 U.S.C. § 1331, the Court has original, federal question jurisdiction over Plaintiffs' 42 U.S.C § 1983 claims against all of the defendants.   The Court has supplemental jurisdiction over the state law claims in this suit pursuant to 28 U.S.C. § 1367(a) because such claims are so related to the federal claims in that all of such federal and state claims form part of the same case or controversy under article III of the United States Constitution.

3.02    Venue is proper in this district because it is a district in which a substantial part or the events or omissions giving rise to the claims occurred. 28 U.S.C.§ 1391(b).

IV.

## - Background -

4.01  At all times material, Maricela Trevino was a U.S. citizen and resident of Weslaco, Texas.  At all times material, Ms. Trevino suffered from co-occurring mental illness and drug dependency.  At all times material, Ms. Trevino was homeless.

4.02  The majority of Plaintiffs' allegations regarding Ms. Trevino's arrest history and May 17th, 2007, suicide attempt which led to her death are based on records provided by Defendants in response to discovery requests.

4.03  For example, between February 2001 and May 17, 2007, Ms. Trevino was the subject of approximately 59 documented incidents involving Weslaco Police Department (hereafter "Weslaco PD") officers.  According to Weslaco PD records, over 50 different Weslaco police officers and approximately 22 dispatchers responded to calls involving Ms. Trevino during this time.  Weslaco PD officers and staff were on a first-name basis with Ms. Trevino, referring to her in official police reports as "Maricela."

4.04  A review of the 59 documented incidents shows Ms. Trevino was arrested, booked and jailed 29 times.  To pay the fines assessed by the municipal court, Ms. Trevino would agree to be jailed at the Weslaco PD lockup (hereafter "lockup"), receiving "jail credit" based on the number of hours she spent incarcerated. Based on information and belief, for every eight (8) hours jailed, detainees would receive $100's worth of jail credit towards the fine.  Ms. Trevino would also perform community service (sometimes at the lockup) as a way of paying the fines.

4.05  Ms. Trevino spent approximately 64 calendar days incarcerated at the Weslaco PD lockup.  In some instances, Ms. Trevino would be jailed for several hours.  For most arrests, she would be jailed two (2) to three (3) consecutive days.  Records from April

2007, however, show Ms. Trevino was jailed at the Weslaco lockup for six (6) consecutive days.

### - Weslaco's Lockup: More Than a Holding Cell -

4.06    The Weslaco lockup is managed by the Weslaco PD.  It is comprised of five (5) cells, holding up to 23 persons.   In addition to holding residents of Weslaco, the lockup has housed state and federal detainees.   Contrary to the City of Weslaco's and Jail Commander Ted Walensky's (hereafter "Jail Commander Walensky") best efforts at characterizing the Weslaco lockup as a mere "temporary" holding facility that houses detainees for a couple of hours so as to avoid the expense and duty to provide medical and mental health care, Weslaco lockup records tell a much different story:   Some detainees, like Ms. Trevino, who violated Weslaco ordinances were jailed up to 6 continuous days and possibly even more.

4.07  Despite having custody of detainees for numerous consecutive days, at all times material, the Weslaco PD lockup did not have a budget for expenses associated with the medical or mental health care of detainees.   Thankfully, though, the Weslaco PD has set aside some money for lockup laundry expenses.

4.08 At all times material, the Weslaco PD has never had a medical staff screening detainees at the lockup.  The Weslaco PD has never employed medically-trained jailers or staff.   Instead, the Weslaco PD has relied on Weslaco Fire Department (hereafter "Weslaco FD") medics for treatment of detainees' physiological medical care only.  The Weslaco EMTs and paramedics, however, would not screen or provide mental health care to detainees.

4.09    Unless ambulance transport to a local hospital was required, Weslaco FD medics would not document medical treatment provided to detainees at the Weslaco lockup

despite state regulations mandating documentation for each patient contact made by EMTs/paramedics.

### - Weslaco's Jailers -

4.10   The Weslaco jailers were hired and screened by high-ranking officers of the Weslaco PD, including Jail Commander Walensky and the Chief of Police's administrative secretary.

4.11   Based on information and belief, it was the policy, custom, and practice of the Weslaco PD to hire jailers lacking TCLEOSE-certification.

4.12   Based on information and belief, it was the policy, custom, and practice of the Weslaco PD to hire jailers lacking first aid-certification, including CPR training, despite a Weslaco Jail Procedure policy that required jailers to "immediately render first aid" to detainees when faced with medical emergencies.

4.13   Despite a written policy that prohibited jailers from patting down detainees of the opposite sex, the Weslaco PD had a custom, policy and practice of not hiring females to jailer positions until *after* Ms. Trevino's suicide.   At all times material, it was a policy, custom and practice by Weslaco jailers to incarcerate female detainees without first thoroughly patting them down for contraband.

4.14   It was also the custom, policy and practice of the Weslaco PD to only have 1 jailer on duty during the 3:00 p.m. - 11:00 p.m and 11:00 p.m. - 7:00 a.m. shifts, leaving detainees unsupervised under certain circumstances, including immediately prior to dinner when jailers were required to leave the lockup premises to pick up detainees' meals.

4.15   Weslaco jailers were responsible (during the booking process) for identifying a detainee suffering from mental illness and whether the detainee presented a danger to

herself or others as per written policy. Only after a Weslaco jailer has identified a suicidal detainee or a detainee suffering from mental illness, the determination as to whether the detainee would be "sectioned" to a local mental health hospital would be made by the Weslaco PD shift supervisor, an officer who would routinely be on patrol, was not stationed at the lockup, and would not personally observe or assess the detainee.

### - Inconsistent Medical Screening & Zero Suicide Screening: A History of Recklessness -

4.16  Weslaco jailers booking a detainee are required to complete certain documents during the booking process. Jailers, as per Policy #4 of the City of Weslaco Jail Procedures (hereafter "Jail Procedures"), are required to:

> **[Complete the booking card and arrest/detention report fields accordingly. Complete the medical questionnaire (WPD-23) as well.]**

4.17  The medical questionnaire form (WPD-23) referenced by Policy #4, however, does not expressly screen detainees for mental health issues or suicide risk.

4.18  A review of 20 medical questionnaires pertaining to Ms. Trevino's arrests between August 31, 2005 to May 17, 2007, reflects, at best, a spotty record of caring for the detainees' medical conditions:

> (a) 6 medical questionnaires were completed (arrest dates of Aug. 31, 2005, Nov. 7, 2005, Nov. 27, 2005, Dec. 6, 2005, Dec. 12, 2005, and Apr. 11, 2007);
>
> (b) 6 medical questionnaires were partially complete (arrest dates of Aug. 21, 2005, Sept. 8, 2005, Feb. 4, 2006, Dec. 18, 2006, Mar. 20, 2007, and May 13, 2007 (only general questions - no response to medical questions; and
>
> © 8 medical questionnaires (Nov. 4, 2005, Dec. 18, 2005, Dec. 30, 2006, Jan. 20, 2007, Mar. 22, 2007, Apr. 21, 2007, May 15, 2007, and May 17, 2007) were entirely blank/unanswered.

4.19  At all times material, in addition to booking cards and medical questionnaires, jailers at the Weslaco PD utilize a computerized Jail Management System (i.e. "CAD")

---

*Estrada, et. al. v. City of Weslaco, et. al*

during the booking process.

4.20   The Jail Management System or "CAD" system includes a formated screen that when printed is called the "Booking Medical Sheet." It has two components: (1) a Visual Assessment consisting of 10 questions for jailers to answer and (2) section called Medical Question consisting of 11 questions for jailers to ask the detainee.

4.21   The Booking Medical Sheet is the only Weslaco booking form incorporating a minimal level of mental health and suicide risk assessment.

4.22   Under the Visual Assessment component, jailers are asked to determine the following questions:

> **[7. Does the inmate's behavior suggest the risk of suicide or assault?]**
>
> **[10. Does the inmate appear to have psychiatric problems?]**

4.23   Under the Medical Question component, jailers are to ask the detainee the following question:

> **[17. Have you ever attempted suicide or are you thinking about it now?]**

4.24   Weslaco lockup records reflect that, out of Ms. Trevino's 27 arrests and bookings between March 3, 2003 and May 17, 2007, not a single Booking Medical Sheet was ever completed by Weslaco jailers.

4.25   At all times material, from 2003 to May 2007 and possibly beyond, there was no written or verbal policy requiring that Weslaco jailers conduct mental health  screening prior to incarceration.

4.26   Based on information and belief, between 2003 and May 2007 and possibly beyond, Weslaco jailers did not assess detainees' vulnerability to suicide during booking procedures.

---

4.27  Based on information and belief, Weslaco jailers were aware of suicide attempts by detainees of the Weslaco lockup before Ms. Trevino's May 17th suicide.  These suicide attempts were recorded in the Weslaco jailer's daily activity log(s).   Even with the knowledge of detainees' suicide attempts, Weslaco jailers would not screen for suicidal detainees prior to their incarceration.

4.28   The Weslaco jailers' spotty record of compliance with regard to answering the medical questionnaire coupled with their total disregard towards completion of the Booking Medical Sheet reflects a systematic reckless disregard for Ms. Trevino's right to medical and mental health care while in the custody at the Weslaco lockup.

### - Weslaco Dispatch/Communications -

4.29   Like the lockup, the Weslaco Dispatch/Communications department (hereafter "Weslaco Dispatch") is part of the Weslaco PD.  It is located inside the same building that contains the Weslaco lockup, police department and municipal court.

4.30  As part of their job duties and upon request by jailers, Weslaco dispatchers would video-monitor detainees who posed a danger to themselves or others. Dispatchers would also monitor detainees when the jailer on duty left the lockup premises. In violation of a policy by the Chief of Police (Martinez) that prohibited their presence at the lockup, female dispatchers would conduct pat downs of female detainees when asked by jailers.

4.31   Since 2002, the Weslaco PD policymakers had been aware of dispatchers' concerns regarding their inability to effectively monitor suicidal detainees at the Weslaco lockup.   Video monitors allowing dispatchers to observe detainees inside their cells, were (and continue to be) located behind the dispatchers, making it difficult to effectively and continuously monitor detainees.   Their job duties with regard to answering 911 and

other calls interfered with and/or prevented dispatchers from effectively and continuously monitoring detainees' cells.

4.32 Based on information and belief, Weslaco dispatchers were aware of detainees' suicide attempts pre-dating Ms. Trevino's May 17, 2007, suicide. Based on information and belief, Weslaco dispatchers were aware of three or four attempted suicides by detainees in 2009 alone at the lockup.

4.33 Weslaco dispatchers asked the jailer have video monitoring equipment installed at the booking counter. Detainees jailed in the female cell were not visible to jailers manning the booking counter at the Weslaco lockup. Weslaco did not equip their jailers with video monitoring equipment capabilities for their booking counter until *after* Ms. Trevino's suicide in May 2007.

### - Knowledge of Ms. Trevino's Suicidal Tendencies -

4.34 According to Weslaco police, jail and municipal court records, the Weslaco PD was aware of Ms. Trevino's suicidal tendencies since 2005.

4.35 In early November 2005, the family of Ms. Trevino sought and obtained a mental health warrant from Judge Melinda G. Farias, the Weslaco municipal judge at the time. Ms. Trevino's family sought the mental health warrant *while* Ms. Trevino was jailed at the Weslaco lockup. The application was completed by Ms. Trevino's brother, who in a sworn affidavit, noted Ms. Trevino posed a substantial risk of serious harm to herself or others. His application further explained that Ms. Trevino was talking of committing suicide and had suicidal thoughts. Based on information and belief, before Ms. Trevino was sectioned as per the Court's mental health warrant, Jail Commander Walensky learned of her suicidal tendencies and approved the use of a Weslaco patrol unit to transport Ms. Trevino to a mental health hospital.

4.36   On January 30, 2006, Weslaco PD Officer Xenia Yarrito responded to a call and had Weslaco EMS transport Ms. Trevino from her mother's home to Knapp Medical Center after she attempted to overdose on medication.   Based on information and belief, Officer Yarrito was certified as a mental health officer at the time.   Weslaco PD records show that Officer Yarrito was assisted on this call by three Weslaco Police Officers (Officers Dolores Gandy, David Garcia and Carlos Servantes) and one dispatcher (Israel Trevino).

4.37   Later that year, on November 6, 2006, Officer Yarrito again responded to a call involving Ms. Trevino.   According to Weslaco PD reports and dispatch documents, Ms. Trevino had cut her left wrist three times.   Due to the urgent nature of Ms. Trevino's injuries,   Officer Yarrito responded to the call by apprehending Ms. Trevino without a warrant. Officer Yarrito transported Ms. Trevino to a local mental health hospital. Police and dispatch records show that Weslaco senior dispatcher, Lydia Olalde, assisted Officer Yarrito with the call.    Based on information and belief, Officer Yarrito was a certified mental health officer at the time.

### - May 17th 2007: Ms. Trevino's Suicide Attempts -

4.38 Six months later, on May 17th, 2007, at approximately 6:19 p.m., Weslaco dispatch records show Ms. Trevino was the focus of a "suspicious subject" call.   According to senior dispatcher Lydia Olalde's notes, Ms. Trevino was described as "disoriented." Weslaco PD Officer Pedro Cortez responded to the call.    Ms. Trevino, however, was picked up by her mother.

4.39   Just an hour and a half later, at 7:46 p.m., Ms. Trevino was arrested by Defendant, Weslaco PD Officer Albert Ponce. Dispatchers, Lydia Olalde, Jose Ferrer, and Jesus Garza were on duty at the time.   While en route to the Weslaco lockup,

Defendant Ponce asked that Weslaco FD medics treat Ms. Trevino's cuts at the lockup. As a trained police officer, Officer Ponce knew or should have known the cuts and scars on Ms. Trevino's upper extremities were consistent with suicidal behavior.

4.40  According to Defendant Ponce's report, Ms. Trevino was so desperate to avoid jail that, she "begged" him not to take her to jail.  As a trained police officer, Officer Ponce knew or should have known that Ms. Trevino was experiencing a textbook example of a detainee in a crisis situation - a situation where she showed the first signs that she was an obvious danger to herself.

4.41   According to Weslaco PD records, Defendant Ponce delivered Ms. Trevino to the Weslaco lockup's booking counter at approximately 8:00 p.m.

4.42  Defendant, Alfredo Moreno, was the only jailer on duty that evening.

4.43  It is undisputed that when Ms. Trevino arrived at the Weslaco lockup's booking counter, she had a bloody right forearm and a bloody left wrist.

4.44  At the lockup, Weslaco FD medics treated Ms. Trevino's right forearm and left wrist with small (e.g. 4 in. x 4 in.) bandages.

4.45  The Weslaco FD medics did not document the treatment of Ms. Trevino's cuts.

4.46   Before being jailed, Defendant Moreno allowed Ms. Trevino used the booking department's phone to call her mother and a male friend.  Defendants Moreno and Ponce were present during Ms. Trevino's phone calls.

4.47  Based on information and belief, an employee of the Weslaco P.D. actively monitored and recorded Ms. Trevino's call to her mother and friend. In the addition to the unidentified person listening and recording her phone call, Defendant Ponce was next to Ms. Trevino during the call.  In fact, Defendant Ponce recalled observing Trevino in an obvious crisis situation, noting in his report she was in a "highly emotional state"

while on the phone.

4.48  Based on information and belief, Ms. Trevino was cried and repeatedly told her mother that she loved her.  Based on information and belief, Ms. Trevino was experiencing an emotional breakdown, becoming an obvious danger to herself.  Ms. Trevino's conduct was another red flag of Ms. Trevino's delicate emotional condition.

4.49  It is undisputed that Defendant Moreno was aware that Ms. Trevino had a bloody left wrist and a bloody right forearm when she first arrived a booking.  It is undisputed that Defendant Moreno witnessed the bandaging of the of the cuts to Ms. Trevino's left wrist and right forearm before he jailed her.  Defendant Moreno knew or should have known the cuts in Ms. Trevino's wrist and forearm were consistent with suicidal behavior.

4.50  It is unclear whether Defendant Moreno even formally booked Ms. Trevino  before her incarceration since, based on information and belief, there were too many detainees awaiting booking that evening.

4.51  According to Defendant Moreno's May 18th, 2007, affidavit, he "placed" Ms. Trevino in female cell at approximately 8:25 p.m.

4.52  Despite observing Weslaco FD medics treat Ms. Trevino's bloody cuts and seeing the bandages on Ms. Trevino's wrist and forearm, Defendant Moreno did not medically screen Ms. Trevino prior to incarcerating her. Every question in the medical questionnaire form for May 17, 2007, was unanswered by Defendant Moreno.

4.53  Despite observing Weslaco FD medics treat Ms. Trevino's bloody cuts and seeing the bandages on Ms. Trevino's wrist and forearm, Defendant Moreno also failed to assess Ms. Trevino's psychological state.  Defendant Moreno failed to inquire as to whether Ms. Trevino had suicidal thoughts prior to incarcerating her.  Every question,

including the mental health/suicide screening questions contained in the Booking Medical Sheet form for May 17, 2007, was unanswered by Defendant Moreno.

4.54    During the May 17th 2007, booking of Ms. Trevino, Jailer Moreno also failed to conduct a thorough search for contraband on Ms. Trevino's person.  Since he did not physically check Ms. Trevino's person for contraband, Defendant Moreno failed to notice that Ms. Trevino, a detainee with a known suicidal history, was wearing a 29 and ½ inch ACE bandage around her ankle.

4.55    Based on information and belief, sometime between 8:25 p.m. and 8:50 p.m. senior dispatcher, Lydia Olalde, as she video monitored the detainees, observed Ms. Trevino with a bra around her neck.  Olalde recognized Ms. Trevino's conduct was consistent with suicidal behavior and contacted Defendant Moreno, who removed the bra.

4.56 Notwithstanding Ms. Trevino's suicidal behavior as indicated by the placement of a "bra" around her neck, Defendant Moreno failed to (1) screen Ms. Trevino for suicide; (2) search her person for other items that could be used to commit suicide; (3) constantly monitor by personally observing Ms. Trevino; and (4) contact his shift supervisor to request that Ms. Trevino be sectioned/transported to a local mental health hospital.

4.57    Based on information and belief, Defendant Moreno failed to document the "bra" suicidal act in the Weslaco jail daily logs as required by the Jail Procedures.

4.58 Notably, Defendant Moreno also failed to mention Ms. Trevino's "bra" suicidal act in his May 18th, 2007, affidavit.

4.59    According to Defendant Moreno's May 18th affidavit, at approximately, 8:50 p.m., he checked the detainees before leaving to pick up the detainees' dinner and found Ms.

Trevino's body on the floor inside her cell with the Ace bandage around her neck.

4.60    It is not clear when Defendant Moreno removed the Ace bandage or what he did during the first 9 to 10 minutes after he found Ms. Trevino.

4.61    Instead of providing life-saving CPR, Jailer Moreno notified dispatch approximately 10 minutes after first finding Ms. Trevino.  A computerized phone dispatch record shows that the first call received by dispatcher Olalde concering Ms. Trevino's suicide occurred at approximately 8:59:55 p.m.  A note entry by Olalde shows that the reference to an attempted suicide was first recorded closer to 9:01 p.m. (i.e. 9:00:55 p.m.).  Dispatcher Olalde then transmitted the call for assistance over the Weslaco radio system.

4.62    Like the undocumented "bra" suicide attempt earlier that evening, there are no records detailing Defendant Moreno's activity between 8:50 p.m. and 9:00 - 9:01 p.m. Nonetheless, based on information and belief, Defendant Moreno failed to immediately render first aid as required by Weslaco Jail Procedures.  Based on information and belief, Defendant Moreno did not have first aid/CPR training in order to assist Ms. Trevino.

4.63    Run sheets from Weslaco FD medic, Alex Cavazos, show he was dispatched to the Weslaco lockup for a prisoner check close at 9:09 p.m., almost 10 minutes after the senior dispatcher Olalde's first suicide reference.

4.64 Medic Cavazos testified that he was told that Ms. Trevino had hung herself with a sports bra. This testimony, although contrary to the great majority of Weslaco PD reports, is consistent with Dispatcher Olalde's testimony that the bra incident could have happened on either May 17th or the day before, leading Plaintiffs to believe that the Ms. Trevino first attempted to commit suicide with her bra during her incarceration on May

17, 2007. Based on information and behalf, the incident with the Ace bandage was her second suicide attempt that evening.

4.65   Medic Cavazos arrived at the booking department at 9:09 p.m., according to his run sheet. At one point during his treatment of Ms. Trevino, medic Cavazos asked Defendant Moreno to assist him. Defendant Moreno, however, did not comply with his request, causing Cavazos to leave Ms. Trevino's side at a critical time.

4.66   At approximately 9:22 p.m., Ms. Trevino was en route to Knapp Medical Center.

4.67   Ms. Trevino died on May 24, 2007.

4.68   Hidalgo County Medical Examiner, Dr. Norma Jean Farley, conducted an autopsy of Ms. Trevino. Dr. Farley opined that the manner of Ms. Trevino's death was best classified as suicide.

### - Missing Physical Evidence/Information -

4.69 According to a Weslaco PD property receipt, Officer Alvino Flores recovered seven (7) items, including the ACE bandage used by Ms. Trevino to hang herself and a bloody napkin, from the booking area during the investigation into Ms. Trevino's suicide. The items were recovered by Officer Flores between 10: 26 p.m. and 10:54 p.m. Officer Flores delivered the evidence at approximately 11:10 p.m. in four packages. Based on information and belief, these seven (7) items are missing or have been destroyed.

4.70   Officer Flores also photographed the incident scene the evening of the incident. Based on information and belief, these photographs are missing or have been destroyed.

4.71   The City of Weslaco's Jailer Daily Activity logs are kept in a three-ring binder in the booking area. Entries for the dates of May 16th from 1:00 p.m. to 4:00 p.m. and May 18th, 2007, 8:00 a.m. to 1:30 p.m. were recorded on a single page. The entries reflect

each jailer's monitoring of detainees as required by the Weslaco jail procedures. Jailers daily log entries starting from 4:00 p.m. on May 16th to May 18th at 8:00 a.m. were not recorded. Conveniently, there is not a single entry for May 17, 2007, contained on the sheet.

4.72   According to Weslaco personnel records for May 2007, Jailer Alfredo Moreno was scheduled to work from 3:00 p.m. to 11:00 p.m. on Wednesday, May 16th and Thursday, May 17th. Jailers Alfredo Moreno, Alejandro Yanez and Arturo Sanchez were scheduled to work on May 17th during three different shifts. Neither Moreno, Yanez, or Sanchez recorded any entries for May 17th. In fact, the log sheet does not even contain a reference to "May 17th." There are no entries for the first 8 hours of May 18th either.

4.73   Despite having video monitoring equipment, the City does not have any recordings for the incident made the basis of this lawsuit.

4.74 Based on information and belief, the sports bra Ms. Trevino placed around her neck is missing or has been destroyed.

## V.

## Claims for Relief

## A.   Federal Claims - 42 U.S.C. § 1983 VIOLATIONS[1]

5.01   A constitutional claim brought under § 1983 can be framed as either a condition of confinement or an episodic act or omission. See *Gibbs v. H.M. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

---

[1]In order to establish Section 1983 liability Plaintiffs likely may be required to allege and prove deliberate indifference. The allegations, however, may not and should not be construed as judicial admissions of the state of mind. All of Plaintiffs' allegations herein are pleaded in the alternative. Plaintiffs trust that the jury will be able to judge from all the available evidence whether the respective Defendants behaved negligently or with deliberate indifference.

---

5.02   An "episodic act or omission" case, on the other hand, is one that attacks the acts or omissions of a state jail official, and the question is whether the jail official breached his constitutional duty to tend to the detainee's basic human needs. See *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996)

5.03   A "conditions case" is one where the pretrial detainee is attacking general conditions, practices, rules, or restrictions or pretrial confinement. See *Hare*, 74 F.3d at 648.

5.04   In the instant case, Plaintiffs allege both categories of constitutional claims.

### 1.   Episodic Act/Omission: Right to Medical Care

5.05   Plaintiffs incorporate by reference each of the allegations as if set forth Paragraphs 4.01 - 4.61.

5.06   Under the due process clause of the fourteenth amendment  to the United States Constitution, Maricela Trevino, as a pretrial detainee, was entitled to reasonable medical care, including necessary emergency mental health care.

5.07   At all times material herein, Ms. Trevino suffered from co-occurring mental illness and drug dependency, including but not limited to suicidal ideation.  At all times material herein, all of the defendants had actual or constructive knowledge of Ms. Trevino's long history of co-occurring mental illness, including suicidal ideation.  At all times material herein, defendants had actual or constructive knowledge of risk factors for suicide displayed by Ms. Trevino, including drug use, scars on her upper extremities, cuts on her upper extremities (wrist and forearm), past suicide attempts, highly emotional/state of crisis,  confusion/disorientation, and homelessness, which were ignored.

5.08   Ms. Trevino was never seen or evaluated by a mental health professional at any time during her May 17th incarceration at the Weslaco lockup, despite her past suicide

attempts, physical condition (bloody wrist and forearm) and other numerous risk factors (i.e. highly emotional state/state of crisis) which she displayed.

5.09   Defendants failed, or alternatively, refused to ask simple suicide screening questions.   Moreover, defendants failed, or alternatively, refused to transport Ms. Trevino to a mental health hospital to treat her obvious and serious mental health illness. Such conduct by the individual defendants, acting under color of state law, manifested deliberate indifference towards Ms. Trevino's serious mental health condition and violated her rights under the due process clause of the fourteenth amendment.   Therefore, pursuant to 42 U.S.C. § 1983, all of the defendants, in their individual capacities, are liable to Plaintiffs for the damages as set forth above.

5.10    Additionally, at all times relevant herein, there was a policy, custom and/or practice of inadequate medical care of detainees, like Ms. Trevino, with serious mental health illness.   Specifically, it was the policy, custom and/or practice at the Weslaco lockup to:

   (1) fail to identify and evaluate suicidal detainees;

   (2) fail to commit/transport detainees suffering from mental illness, including suicidal impulses;

   (3) fail to identify detainees suffering from mental health illness, who are in a confused or disoriented state and are unable to request medical care;

   (4) fail to screen detainees;

   (5) fail to conduct thorough searches of a suicidal detainee's person in order to remove items that may be used to carry out a suicide;

   (6) fail to monitor detainees vulnerable to suicidal tendencies;

   (7) fail to properly confine detainees vulnerable to suicidal tendencies;

---

(8) fail to safeguard detainees;

(9) fail to meet minimum state jail standards;

(10) fail to take, document and/or record suicidal behavior;

(11) fail to have proper emergency medical equipment at the lockup;

(12) fail to properly staff the Weslaco lockup with more than one jailer per shift and with female jailers;

(13) fail to provide training and oversight for jailers and police officers alike with respect to identification and evaluation of detainees suffering from mental health illness, including but not limited those who are suicide risks;

(14) employ inadequately trained jailers and police officers alike with respect to identification and evaluation of detainees suffering from mental health illness, including but not limited those who are suicide risks; and

(15) fail to implement policies for identifying and handling suicidal detainees

5.11    The above-referenced policies, customs, and/or practices were persistent and widespread and were actually or constructively known to defendant Martinez and defendant Walensky, in their capacities as Chief of Police and Jail Commander of the Weslaco PD, respectively.  Such policies, customs, and/or practices, which were so common and well-settled as to constitute a custom that fairly represents municipal policy, were a moving force behind the violations of Ms. Trevino's above-described rights under the due process clause of the fourteenth amendment.  In addition, as Chief of Police of the City of Weslaco and as Jail Commander of the Weslaco lockup, the official acts and edicts of defendants, Martinez and Walensky, with respect to the operation of the Weslaco lockup are the acts of the City of Weslaco under Texas law and, 42 U.S.C. § 1983.  Therefore, for these reasons, defendants Martinez and

Walensky, individually and defendant, City of Weslaco are liable to Plaintiffs, pursuant to 42 U.S.C. § 1983, for their above-described damages.

### 2. Conditions

5.12   Plaintiffs incorporate by reference each of the allegations as set forth Paragraphs 4.01 - 4.61.

5.13   Pleading in the alternative, the conditions at the Weslaco lockup did not afford Maricela Trevino minimal levels of safety and security.

5.14   As a pre-trial detainee, Ms. Trevino was entitled to protection from adverse conditions of confinement  created by jail officials for a putitive purpose or with putitive intent.

5.15   Specifically, the City of Weslaco's policy of having only one jailer on duty does  not meet those minimal requirements.  Moreover, not having female jailers along with male jailers does not meet those minimal requirements either. The policy of not having female jailers on duty to search female detainees is also a condition of confinement that proximately caused the death of death of Maricela Trevino, depriving the Plaintiffs' of their constitutional rights.  Hence, the policy, custom and practice of understaffing the Weslaco lockup is a condition of confinement that proximately caused the death of Maricela Trevino, depriving the Plaintiffs' of their  constitutional rights.

5.16   Further, the City of Weslaco's policy of not following the minimum standards as set out by the Texas Commission on Jail Standards is also a condition of confinement that proximately caused the death of death of Maricela Trevino, depriving the Plaintiffs' of their constitutional rights. Lastly, the policy of hiring jailers without first aid or TCLOESE certification is also a condition of confinement that proximately caused the death of death of Maricela Trevino, depriving the Plaintiffs' of their constitutional rights.

5.17   These policies, practices or customs of the Weslaco lockup were sanctioned by Weslaco policymakers,  Police Chief Martinez, and Jail Commander Walensky, which were typical of the pervasive misconduct on their part having proximately caused the death of Ms. Trevino. These policies were not and are not reasonable related to any legitimate government purpose.

### 3.   Americans with Disabilities Act ("ADA") Claim Against The City of Weslaco

5.18   Plaintiffs incorporate by reference each of the allegations as set forth Paragraphs 4.01 - 4.61.

5.19   At all times material, Ms. Trevino suffered from mental illness, including depression and active schizophrenia with bipolar disorder.  She had been treated with Effexor and Zyprexa prior to her death,  and as such, is a qualified individual with a disability under the ADA.

5.20   Likewise, the Weslaco PD is a public entity that must comply with the ADA as it is a department and/or agency of the City of Weslaco.

5.21   The WPD was aware of its duties to provide services and benefits to mentally ill individuals and purports to provide specific services relating to the treatment, protection, and evaluation of such individuals.

5.22   Nonetheless, the WPD failed to provide Ms. Trevino with these services and/or benefits.

5.23   Among other things, the WPD failed to implement procedures to ensure that officers trained to handle situations involving the mentally ill would be dispatched to such situations.  Moreover, the WPD employed a dispatch system which did not inform officers about detainees' previous histories and/or disturbances. In addition, the

Weslaco PD would dispatched officers who were not qualified to evaluate mentally ill individuals, and failed to supervise and/or train officers it knew would be dispatched to handle calls involving the mentally ill. The Weslaco PD would also employ jailers who were not qualified to evaluate mentally ill individuals, and failed to supervise and/or train jailers or jailer that would be responsible for booking mentally ill detainees.

5.24　In addition, Officer Ponce and Jailer Moreno, who were at all times material acting in the course and scope of their employment with the WPD, failed to have Ms. Trevino committed to a mental health/psychiatric facility and failed to notify mental health officers within WPD about Ms. Trevino's mental condition. Moreover, Defendants, Officer Ponce and Jailer Moreno acted and/or failed to act even though they had knowledge about Ms. Trevino's mental disability, including her suicidal impulses, and her potential danger to herself.

5.25　In so doing, the WPD and its officers failed to reasonably accommodate Ms. Trevino's disability, intentionally discriminated against Ms. Trevino on the basis of her disability and/or were deliberately indifferent to her right to receive the services and benefits provided by the WPD.

5.26　As a direct result of the discrimination, Ms. Trevino was not removed from danger when Officer Ponce delivered her to the booking department and Jailer Moreno incarcerated her. Based on information and belief, Defendant, Jailer Moreno, did not remove Ms. Trevino after he removed the bra she had placed around her neck. Thus, the conduct alleged herein pertaining to the WPD and its officers violated the ADA, and directly and proximately caused Ms. Trevino's death and Plaintiffs' damages.

### 4. Right to Be Free From State-Created Danger

5.27　Plaintiffs incorporate by reference each of the allegations as set forth Paragraphs

4.01 - 4.61.

5.28 Pleading in the alternative, defendants are liable to Plaintiffs for violating Ms. Trevino's right to be free from state-created danger guaranteed by the fourteenth amendment to the United States Constitution.

5.29 The Weslaco lockup is operated by the Weslaco Police Department. Since 2005, Weslaco Police Officer Ted Walensky has been responsible for the Weslaco lockup. According to Weslaco lockup procedures, his official title is "Jail Commander." The Jail Commander is accountable to the Weslaco Chief of Police.

5.30 As the Weslaco policymaker sharing responsibility for the Weslaco lockup along with Chief Martinez, Jail Commander Walensky, increased the danger to Ms. Trevino and other detainees by failing to take appropriate measures to ensure detainees received minimum levels of medical and mental health care while incarcerated, creating recklessly dangerous conditions for detainees.

5.31 Jail Commander Walensky acted with deliberate indifference. At all times material, Jail Commander Walensky was not licensed to operate a jail. Walensky has not attended TCLEOSE jail administration training. Notwithstanding the mountains of information concerning jail suicides, neither Walensky or the City of Weslaco ever subscribed to journals, magazines, periodicals that focused on jail administration issues, including suicidal detainees. Shockingly, during his July 2010 deposition, Walensky testified that he was not aware that:

> (1) Suicide is the leading cause of death in jails;

> (2) Most jail suicides occur shortly after arrest;

> (3) The hours during and immediately following admission require the greatest amount of vigilance by jail staff;

---

(4)   29% of  jail suicides occur during the first three hours of confinement;

(5)   50 % of all suicides occur during the first 24 hours after confinement;

(6)   Hanging is the most common method of suicide by detainees; and

(7)   That hangings generally occur close to the floor, causing the detainee's feet to touch the ground.

Sadly, Ms. Trevino's suicide was consistent with what correctional studies have shown can happen if jail personnel are not trained or vigilant during a detainee's initial confinement period.

5.32   It is unclear whether Walensky retained the title or duties of Jail Commander during his suspension for misappropriation of a Weslaco detainee's money.

5.33   The employees of the City of Weslaco, including Defendants Moreno and Ponce, also increased the danger to Ms. Trevino by not transporting her to a mental health hospital and by not incarcerating her in a cell where she would be unable to harm herself. Defendants Moreno and Ponce wholly ignored Ms. Trevino's suicidal tendencies and her obvious serious medical need.   Defendants Moreno and Ponce were inadequately trained to handle and treat suicidal detainees like Ms. Trevino. Defendants Moreno and Ponce were aware of Ms. Trevino's suicidal impulses as a result of her confused/disoriented state of mind and her actions of May 17th, 2007. Moreover, the Weslaco PD was well aware of Ms. Trevino's vulnerability to suicidal thoughts based on their own incident reports, communications from Ms. Trevino's family members, and a Weslaco municipal judge's order for sectioning.

5.34   Ultimately, the defendants denied medical care to Ms. Trevino and failed to protect her from her known suicidal impulses. In doing so, defendants failed to provide Ms. Trevino with basic human needs during her incarceration.  *DeShaney v. Winnebago*

*County Dept. Of Social Services*, 489 U.S. 189, 200 (1989).

### 5. *Grandstaff v. City of Borger*

5.35  Plaintiffs incorporate by reference each of the allegations as set forth Paragraphs 4.01 - 4.61.

5.36 Defendant, City of Weslaco, is liable under under § 1983 for the deprivation of Ms. Trevino's life without due process of law under the Fifth Circuit's opinion in *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), cert denied, 480 U.S. 917 (1987).   In accordance with *Grandstaff*, liability can be imposed on the City of Weslaco based on inadequate training of Defendants and the City's policy/custom of dangerous recklessness.   According to the *Grandstaff* Court:

> Conscious indifference to widespread incompetence or misbehavior may be more than a matter of extreme negligence and more than a failure to instruct or train.  If it is deliberate police policy to demand instant compliance, heedless of rights and risks, abuses - i.e., incompetence and misbehavior - will occur when officers of varying judgment and stability encounter resistance.  If unconfined the policy ordains use of the ultimate compulsion, the firearm, upon any appearance of resistance and with only imagined justification.  That policy employs armed officers who subject the public to the deprivation of their constitutional rights. Where the city policymaker knows or should know that the city's police officers are likely to shoot to kill without justification and without restraint, so as to endanger innocent third parties, the city should be liable when the inevitable occurs and the officers do so.

### 6. Ratification

5.37 Plaintiffs incorporate by reference each of the allegations as set forth Paragraphs 4.01 - 4.61.

5.38 Defendant, City of Weslaco, ratified the unconstitutional violations of Ms. Trevino's rights in that it failed to discipline defendants, Moreno and Ponce, after the incident made the basis of this lawsuit.  By failing to discipline, defendant, City of Weslaco, has

shown that the conduct of defendants, Moreno and Ponce, complied or were in accordance with the policies, practices, procedures, and customs, of the City of Weslaco.

**B.    State Claims - Negligence: Texas Tort Claims Act.**

5.39   Plaintiffs incorporate by reference each of the allegations as set forth Paragraphs 4.01 - 4.61.

5.40   Defendant, City of Weslaco, acting by and through each of its employees and agents as set forth above, was negligent, proximately causing the death of Ms. Trevino and the damages claimed by Plaintiffs. To the extent that the defendant City of Weslaco is a governmental unit, immunity has been waived for its negligent conduct. Defendant City of Weslaco has waived immunity and is liable to Plaintiffs pursuant to Tex. Civ. Prac. & Rem. Code 101.021 (2) which provides as follows:

> A governmental unit in the state is liable for personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas Law.

5.41   The personal injuries and death claimed herein were "caused by a condition or use of tangible personal property." That tangible personal property includes the bunk bed's frame, which served as an instrument that allowed Ms. Trevino's to hang.

5.42   In the first instance, the Defendant City of Weslaco was negligent in furnishing the subject cell with tangible personal property – bed frame.

5.43   Defendant, City of Weslaco effectively permitted a condition to exist whereby Ms. Trevino had access to a bed frame, which she later used to commit suicide. The defendant City of Weslaco and defendants Police Chief Martinez and Jail Commander Walensky failed to implement and/or enforce jail policies and procedures which would

have prevented the furnishings in the subject cell from becoming available to Maricela Trevino. Moreover, the City of Weslaco, Police Chief Martinez and Jail Commander Walensky failed to implement and/or enforce jail policies and procedures which would have prepared defendants, Jailor Moreno and Officer Ponce, with the proper life-saving protocols. Absent precautions with respect to suicidal inmates and proper training of guards, the environment at the City of Weslaco jail was dangerous. Defendant, City of Weslaco's negligence, by and through its employees, agents, and assigns, who held Ms. Trevino in custody without first screening, searching or monitoring, was the proximate cause of the injuries and damages claimed herein.

5.44 Moreover, defendants should have kept life-saving emergency medical equipment on hand at its jail for emergencies such as suicides. Such failure on the part of the defendant, City of Weslaco, was the proximate cause of Plaintiffs' injuries and damages claimed herein.

### Negligence Per Se: Minimum Requirements

5.45 Plaintiffs incorporate by reference each of the allegations as set forth Paragraphs 4.01 - 4.61.

5.46 Defendants owed Plaintiffs a duty of care under Texas Administrative Code's jail standards. 37 TAC Chapter 265 (Texas Commission on Jail Standards). It is undisputed that Ms. Trevino was a member of the class of persons intended to be protected by the Jail Standards.

5.47 According to the Texas Commission on Jail Standards, the City of Weslaco, by and through its personnel, including but not limited to defendants, Jailer Moreno, Police Chief Martinez, and Jail Commander Walensky were required to take the following steps with respect to Ms. Trevino's detention at the Weslaco jail:

(1)   a thorough pat or frisk search...upon entry and prior to booking [37 TAC § 265.2(a)];

(2)   a thorough strip search for weapons and contraband....The strip search shall be conducted by corrections officer(s) of the same gender in a reasonable and dignified manner and place [37 TAC § 265.2(b)];

(3)   observation [37 TAC § 265.3];

(4)   intake...(showing)... record of injuries [37 TAC § 265.4 (a) (10)];

(5)   intake...(showing)... inmate property inventory [37 TAC § 265.4 a (11)];

(6)   intake...(showing)...disabilities warranting special accessibility consideration [37 TAC § 265.4(a) (12)];

(7)   intake...(showing)... creation of separate medical record of injuries [37 TAC § 265.4 (b)];

(8)   application of "health tags" which may identify the inmate as having special medical or health needs [37 TAC § 265.5]; and

(9)   recording of inmate's property [37 TAC § 265.10].

5.48   Upon Ms. Trevino's arrest and detention, none of the above minimum, mandatory requirements were met by the City of Weslaco and the defendants Moreno, Martinez, or Walensky.  These acts, omissions and conduct constitute official policies, practices, or customs of Defendant, City of Weslaco, which proximately caused Ms. Trevino's pain, suffering and death and Plaintiffs' damages.  The Defendants were well aware of Ms. Trevino's mental health issues as evidenced from her scars, past suicide attempts, and the Weslaco PD's own dispatch, police and jail records.

5.49   The causal nexus between defendant, City of Weslaco's negligence and the use of tangible personal property (bed frame) cannot be disputed and the conditions at the Weslaco's lockup  in that it was understaffed and also employed untrained personnel were the proximate cause of Plaintiffs' damages.  Accordingly, sovereign immunity is waived and defendant, City of Weslaco, is liable for Plaintiffs' damages.

---

**Negligent Hiring, Training and Supervision.**

5.50    Plaintiffs incorporate by reference each of the allegations as set forth Paragraphs 4.01 - 4.61.

5.51    Plaintiffs further seek recovery from defendants, City of Weslaco, Police Chief Martinez, and Jail Commander Walensky based on their negligent hiring, training, and supervising of lockup personnel.

5.52    Defendants, Police Chief Martinez and Jail Commander Walensky had a duty to ensure the safety of all pre-trial detainees, including female detainees like Ms. Trevino, to ensure that all employees were properly hired, trained, and supervised, and to ensure that all appropriate local and state jail policies were implemented and followed in due care. Defendants, Police Chief Martinez and Jail Commander Walensky, breached all of these duties.

5.53    Defendants Police Chief Martinez and Jail Commander Walensky, failed to carefully screen, train, and supervise the employees of the City of Weslaco, and in particular, Jailor Moreno, and Officer Ponce. Defendants Martinez and Walensky failed to comply with state law by failing to hire female jailers.

5.54    Defendants Martinez and Walensky were further negligent in supervising and training the jailors and police officer regarding proper procedures for the handling of detainees suffering from mental illness, including suicidal detainees.

5.55    Defendants, Police Chief Martinez's and Jail Commander Walensky's, negligence and gross negligence is perhaps best exemplified by their failure to take proper steps to prevent Ms. Trevino's death despite knowing that Ms. Trevino suffered from mental illness and had attempted suicide in the past. The foregoing acts of negligence were a proximate cause of the injuries and death of Ms. Trevino and the

damages suffered and claimed by Plaintiffs herein.

VI.

**- Damages -**

6.01    Survival Damages.  Pursuant to § 71.021 of the Tex. Civ. Prac. & Rem. Code, and any applicable common law or federal law, including § 1983, Plaintiffs seek recovery of the available survival damages as heir and representative of the estate. Accordingly, Plaintiffs seek to recover for the loss of life of Maricela Trevino, all mental pain and anguish damages suffered before his death and funeral and burial expenses.

6.02    Wrongful Death Damages.  Plaintiffs further seek recovery pursuant to § 71.001-71.004  of the Tex. Civ. Prac. & Rem. Code, and all applicable common law and federal law, including § 1983, for wrongful death damages.  More specifically, Plaintiffs seek to recover all of their pecuniary losses, mental anguish, loss of companionship and society, and loss of inheritance.  Pecuniary losses include loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value. Plaintiffs further seek recovery for the mental anguish suffered as a result of the wrongful death of their daughter and mother.   Plaintiffs have suffered a loss of companionship and society, including love and comfort which she, in reasonable probability, would have experienced from Maricela Trevino had she lived.   Plaintiff further seek to recover  the loss of inheritance as a result of the wrongful death. Sovereign immunity for all of these claims and damages has been waived pursuant to the express terms of  § 71.001 and § 71.002 of the Code.  See *City of LaPorte v. Barfield*, 898 S.W.2d 288, 295 (Tex. 1995).

6.03    Exemplary Damages.  Pursuant to Article 16, § 26 of the Texas Constitution, Chapter 41 and Section § 71.009 of the Tex. Civ. Prac. & Rem. Code, and all other

applicable common law and statutory provisions, Plaintiffs further seek recovery of exemplary damages for the willful acts and omissions, malice or gross negligence of each of the Defendants. Defendants were consciously indifferent to the rights and welfare of Maricela Trevino. As shown above, Defendants knew that Maricela Trevino was suicidal and failed to act. Instead, in callous disregard to her welfare, Defendants provide the bandage(s) with which she later hung herself. The willful acts and omissions and gross neglect of the Defendants place Maricela Trevino in an extreme degree of rsik which ultimately took her life. Any deliberate indifference and/or malice exhibited by the Defendants may only remedies by an award of exemplary or punitive damages.

6.04   Attorneys' Fees. Plaintiffs request attorneys' fees pursuant to any applicable law and in accordance with the award of exemplary damages requested in the previous paragraph.   Plaintiffs further seek recovery, pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, as prevailing parties in  § 1983 litigation and are therefore entitled to recover its attorney's fees and costs.

6.05   Costs and Interests. Pursuant to applicable statues, including Chapters 71 and 101 of the Tex. Civ. Prac. & Rem. Code and 42 U.S.C. § 1983 and § 1988, Plaintiffs seek recovery of all their court costs and pre-judgment and post-judgment interest at the highest rate allowed by law.

VII.

**- Notice of Claim -**

7.01   Plaintiffs have provided written notice of their claim alleged herein by this Complaint. In the alternative, defendant, City of Weslaco, had actual notice of the death of Ms. Trevino as it happened in its jail while she was under the care and custody of the City of Weslaco.

VIII.

**- Jury Trial -**

8.01   Plaintiffs demand a trial by jury.

IX.

**- Prayer -**

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs, **JUAN ESTRADA, JR.**, **ROSITA ESTRADA**, **CELIA TREVINO**, **CRISELDA VILLARREAL, ADMINISTRATRIX OF THE ESTATE OF MARICELA TREVINO** AND **AS NEXT FRIEND OF S.M.L.**, **N.T.L.** and **R.L., JR., AND FRANCISCO TREVINO,** pray that Defendants be cited to appear and answer in this cause, and that upon final trial hereof, Plaintiffs recover judgment against Defendants, **CITY OF WESLACO, ALFREDO MORENO, JR. OFFICER ALBERT PONCE, TED WALENSKY, and ONE UN-NAMED WESLACO EMS MEDIC**, jointly and severally, for actual and punitive damages in amounts within the jurisdictional limits of this Court, for all damages respectively sustained by them as set forth above together with pre-judgment interest thereon at the maximum legal or equitable rate; for post-judgment interest on the amount of the judgment at the maximum rate allowed by law; for recovery of costs of court; attorney's fees, and for such other and further relief, at law or in equity, to which they may show themselves justly entitled.

Respectfully submitted,

**RUIZ LAW FIRM, P.L.L.C.**
200 East Cano
Edinburg, TX 78539
Telephone: (956) 259-8200
Telecopier: (956) 259-8203

BY: _____
      Mauro F. Ruiz
      State Bar No. 24007960

      **ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on **August _____, 2010,** a true and correct copy of the above and foregoing was delivered to opposing counsel, to-wit:

Alison D. Kennamer
**COLVIN, CHANEY, SAENZ & RODRIGUEZ, L.L.P.**
1201 East Van Buren
P.O. Box 2155
Brownsville, Texas 78522

_____
**Mauro F. Ruiz**