IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| JUAN ESTRADA, JR., ROSITA ESTRADA, CELIA TREVINO, CRISELDA VILLARREAL, ADMINISTRATRIX OF THE ESTATE OF MARICELA TREVINO AND AS FRIEND OF S.M.L., N.T.L., AND R.L., AND R.L., JR., AND FRANCISCO TREVINO<br>　　　　　　*Plaintiffs,*<br><br>VS.<br><br>CITY OF WESLACO, ALFREDO MORENO, JR., ALBERT PONCE, & WESLACO POLICE CHIEF JOHN DANIEL MARTINEZ,<br>　　　　　　*Defendants* | § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 09-158<br><br>(JURY DEMANDED) |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**(CONDITIONS OF CONFINEMENT CLAIM)**

Plaintiffs file the following Motion for Summary Judgment as to their conditions of confinement claim.

I. BACKGROUND

This is an action for money damages brought by all of the Texas Wrongful Death Act statutory beneficiaries and intestate heirs of Maricela Trevino, deceased, for violations of her federal civil rights committed by all of the defendants. Defendants' civil rights violations caused the death of Ms. Trevino while a pretrial detainee at the Weslaco Police Department lockup.

While in the custody of Weslaco Police Department, on May 17, 2007, Ms. Trevino bled from cuts to her wrist and forearm. Her behavior was consistent with that of a person experiencing a destabilizing or a crisis situation. See Exhibit B p.110-115, Lydia Olalde. Despite her obvious serious mental health illness, Defendants failed to properly screen and observe Ms. Trevino, and provide her with reasonable medical/psychiatric care. Ms. Trevino hung herself from the bunk bed frame using an ACE bandage, and ultimately, died at a local hospital. The medical examiner classified Ms. Trevino's death as a suicide.

## II. ELEMENTS OF CONDITIONS OF CONFINEMENT CLAIM

Plaintiffs' § 1983 lawsuit challenges the City of Weslaco Police Department jail's system of providing medical care to detainees suffering from mental illness. To succeed, a pretrial detainee must demonstrate a pervasive pattern of serious deficiencies in providing for his or her basic human needs. See *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996). When a pretrial detainee brings a due process challenge concerning the conditions of confinement, the plaintiff is not required to prove the jail official's deliberate indifference as their state of mind are not a disputed issue in such a case. See *Hare*, 74 F.3d at 643-645. Official intent to punish may be presumed when a pre-trial detainee brings a due process attack against general conditions, practices rules or restrictions of pretrial confinement. See *Hare*, 74 F.3d at 643-645.

The failure to take any steps to save a suicidal detainee from injuring herself may also constitute a due process violation. See *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1187 (5th Cir. 1986) citing to *Bell v. Wolfish*, 441 U.S. 520 (1979). The Fifth Circuit's *Partridge* opinion also held that inadequate training of police personnel may be the basis for

finding a municipal custom of deliberate indifference to the constitutional rights of citizens with known suicidal tendencies. See *Partridge,* 791 F.2d at 1187.

### III. MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

In *Monell v. New York City Department of Social Services,* 436 U.S. 658 (1978), the Supreme Court determined that a municipality can be liable under section 1983 only for its constitutional violations, not for those of its employees. In the Fifth Circuit, *Monell* has been distilled into three elements: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a violation of constitutional rights whose "moving force" is the policy or custom." See *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002), cert. denied, 537 U.S. 1110 (2003).

Plaintiffs' partial motion for summary judgment addresses the first and second elements of Monell liability.

### (1) CUSTOM

The first *Monell* element can be satisfied either with a (1) "policy statement, ordinance, regulation or decision" that is officially adopted by the lawmaking body or by an official to whom the lawmakers have delegating policy-making authority, or (2), as here, by a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom the fairly represents municipal policy." *Id.,* at 328 (emphasis added).

### (2) ACTUAL OR CONSTRUCTIVE KNOWLEDGE

To satisfy the second *Monell* element, a claimant must show "actual or constructive knowledge of [the] custom that is attributable to the governing body of the municipality or


to an official to whom that body [has] delegated policy-making authority." *Id.* Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities..." *Id.* at 330. Courts in the Southern District of Texas are clear that policymaking power can be delegated and, therefore, that there may be multiple policymakers for purposes of meeting *Monell's* second element. See *Lopez v. City of Houston*, 2008 WL 437056, n. 47 (S.D. Tex.). Thus, Plaintiffs' burden under *Monell's* second element is to "show that *a* policymaker had actual or constructive knowledge of the relevant custom or policy." See *Lopez*, 2008 WL 437056 at p. 13 (emphasis added).

### (3) MOVING FORCE

Under *Monell's* third element, to establish that the custom at issue is the "moving force" behind the constitutional violation, a claimant must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." See *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997).

### IV. PLAINTIFFS' CLAIMS

In this case, Plaintiffs allege that the above-described practices at the Weslaco Police Department lockup constitute facially unconstitutional customs. Thus, even assuming that the City's *written* jail policies/procedures are facially constitutional, the actual practices and customs, i.e. the City's unwritten policies for providing (and not providing medical care to suicidal detainees), are unconstitutional on their face and manifest deliberate indifference to the known or obvious consequences of such practices, as the

tragic fact of Maricela Trevino demonstrates.

Plaintiffs are prepared to show the City of Weslaco engaged in a custom of inaction in that known suicidal detainees were not screened or monitored during incarceration, resulting in the denial of medical care.

### V. NO GENUINE ISSUE OF MATERIAL FACT

While the Fifth Circuit recognized in *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc) that "some courts have found custom or policy to exist where there is a single violation," in this matter there is substantial evidence of a "pattern" of flagrant and severe conduct in failing to screen detainees for suicide during booking procedures at the Weslaco lockup so as to establish the lack of suicide screening was a municipal custom. Moreover, there is also substantial evidence of a "pattern" of flagrant and severe conduct in failing to monitor detainees for suicide after incarceration so as to establish the lack of suicide monitoring was a municipal custom. The City's policymaker, Ted Walensky, had constructive knowledge of said policies, which served as the moving forces behind the constitutional violations of Ms. Trevino's civil rights.

A. <u>Policymaker Ted Walensky</u>.

City of Weslaco communication dispatchers, jailers and police officers were well acquainted with Ms. Maricela Trevino. Based on dispatch and jail records, Ms. Trevino was booked and incarcerated 39 times. See Exhibit D, Chief John Daniel Martinez, pp. 59,69-70; 198-200. See also Exhibit F. In May 2007, the day-to-day operation of the Weslaco jail was handled by the Jail Supervisor or Jail Commander, Capt. Ted. Walensky. See Exhibit D, Chief John Daniel Martinez, pp. 59, 71-73. As Jail Supervisor or Jail Commander, Capt.

Walensky, according to Chief John Daniel Martinez, would know of Weslaco jailer practices and policies in May 2007. See Exhibit D, Chief John Daniel Martinez, pp. 69-71; 198-200 (monitoring).

B. <u>Knowledge Ms. Trevino Was a Suicide Risk</u>

Plaintiffs will show that, based on Weslaco police, jail and municipal court records, the Weslaco Police Department was aware of Ms. Trevino's suicidal tendencies since 2005.

In early November 2005, the family of Ms. Trevino sought and obtained a mental health warrant from Judge Melinda G. Farias, the Weslaco municipal judge at the time. Ms. Trevino's family sought the mental health warrant *while* Ms. Trevino was jailed at the Weslaco lockup. The application was completed by Ms. Trevino's brother, who in a sworn affidavit, noted Ms. Trevino posed a substantial risk of serious harm to herself or others. His application further explained that Ms. Trevino was talking of committing suicide and had suicidal thoughts. Ms. Trevino was sectioned as per the Court's mental health warrant. See Exhibit A, Walensky Deposition, pp. 215 - 229; See Exhibit A.1.

On January 30, 2006, Weslaco Police Officer Xenia Yarrito responded to a call and had Weslaco EMS transport Ms. Trevino from her mother's home to Knapp Medical Center after she attempted to overdose on medication. Weslaco PD records show that Officer Yarrito was assisted on this call by three Weslaco Police Officers (Officers Dolores Gandy, David Garcia and Carlos Servantes) and one dispatcher (Israel Trevino). See Exhibit A, Walensky Deposition, pp. 229 - 236; See Exhibit A.2.

Later that year, on November 6, 2006, Officer Yarrito again responded to a call

involving Ms. Trevino. According to Weslaco police reports and dispatch documents, Ms. Trevino had cut her left wrist three times. Due to the urgent nature of Ms. Trevino's injuries, Officer Yarrito responded to the call by apprehending Ms. Trevino without a warrant. Officer Yarrito transported Ms. Trevino to a local mental health hospital. Police and dispatch records show that Weslaco senior dispatcher, Lydia Olalde, assisted Officer Yarrito with the call. See Exhibit A, Walensky Deposition, pp. 237 - 242; See Exhibit A.3.

Ms. Olalde, the dispatcher on duty on May 17, 2007, admitted that she had knowledge of Ms. Trevino's suicide six months earlier in November 2006. See Exhibit B, Olalde Deposition, pp. 110-115.

B. <u>Pervasive Pattern of Lack of Screening (Physiological and Mental Health)</u>.

Despite knowing of Ms. Trevino's suicidal history and the fact Ms. Trevino had cuts on her wrist, Weslaco police personnel, including Officer Ponce, Jailer Moreno and Dispatcher Olalde failed to screen Ms. Trevino on May 17, 2007.

Weslaco jailers booking a detainee are required to complete certain documents during the booking process. Jailers, as per "VII. Booking Procedures Policy #4" (hereafter "Policy 4") of the City of Weslaco Jail Procedures are required to:

> **[Complete the booking card and arrest/detention report fields accordingly. Complete the medical questionnaire (WPD-23) as well.]**

See Exhibit A, Walensky Deposition, p. 302; See also Exhibit C, Jail & Detention Policies.

The medical questionnaire form (WPD-23) referenced by Policy #4, however, does not expressly screen detainees for mental health issues or suicide risk.

A review of 20 medical questionnaires pertaining to Ms. Trevino's arrests between August 31, 2005 to May 17, 2007, reflects, at best, a spotty record of caring for the

detainees' medical conditions:

(a) 6 medical questionnaires were completed (arrest dates of Aug. 31, 2005, Nov. 7, 2005, Nov. 27, 2005, Dec. 6, 2005, Dec. 12, 2005, and Apr. 11, 2007);

(b) 6 medical questionnaires were partially complete (arrest dates of Aug. 21, 2005, Sept. 8, 2005, Feb. 4, 2006, Dec. 18, 2006, Mar. 20, 2007, and May 13, 2007 (only general questions - no response to medical questions); and

© 8 medical questionnaires (Nov. 4, 2005, Dec. 18, 2005, Dec. 30, 2006, Jan. 20, 2007, Mar. 22, 2007, Apr. 21, 2007, May 15, 2007, and May 17, 2007) were entirely blank/unanswered.

In addition to the jail card, See Exhibit A, Walensky Deposition, pp. 302-347; See also Exhibits A.4-A.24.

The Weslaco jail's computerized Management System or "CAD" system includes a formatted screen that when printed is called the "Booking Medical Sheet." It has two components: (1) a Visual Assessment consisting of 10 questions for jailers to answer and (2) section called Medical Question consisting of 11 questions for jailers to ask the detainee.

The Booking Medical Sheet is the *only* Weslaco booking form incorporating a minimal level of mental health and suicide risk assessment. Under the Visual Assessment component, jailers are asked to determine the following questions:

**[7. Does the inmate's behavior suggest the risk of suicide or assault?]**

**[10. Does the inmate appear to have psychiatric problems?]**

Under the Medical Question component, jailers are to ask the detainee the following question:

**[17. Have you ever attempted suicide or are you thinking about it now?]**

Weslaco lockup records reflect that, out of Ms. Trevino's 27 arrests and bookings between March 3, 2003 and May 17, 2007, not a single Booking Medical Sheet was ever completed by Weslaco jailers in violation of Weslaco policy (No. 7). See Exhibit A, Walensky Deposition, pp. 296-302. See Exhibit C, Jail & Detention Policies. See Exhibit A.25-A.46, Jail Medical Sheets for July 4, 2004 - May 17, 2007).

It is undisputed that it was the custom of the City of Weslaco Police Department to **not** screen detainees for mental health illness or suicide **before** incarceration.

C. <u>Pervasive Pattern of Not Observing/Monitoring Detainees</u>.

In addition to the custom of not screening the mentally ill before incarceration, the Weslaco jailer daily logs reflect the complete disregard for detainee monitoring. Jailers daily log entries starting from 4:00 p.m. on May 16th to May 18th at 8:00 a.m. were not recorded. There is not a single entry for May 17, 2007, contained on the sheet. Three jailers were scheduled to work from the evening of May 16th through the morning of May 18th. Pursuant to jail policies and procedures, these three jailers were required to complete the jailer daily logs. See Exhibit A, Walensky Deposition, pp. 276-283. See Exhibit E, Jailer Daily Logs.

It is apparent from the jail logs that the City of Weslaco also had a custom of not monitoring detainees, such as Ms. Trevino.

D. <u>Moving Force</u>.

Jail Commander Walensky candidly testified that there were no written policies requiring the completion of the jail Booking Medical sheet. See Exhibit A, Walensky

Deposition, p. 183.  Sugar coating the obvious, both Chief John David Martinez and Jail Supervisor/Commander Capt. Ted Walensky testified as to a so-called "verbal" directive issued to Weslaco jailers requiring the completion of the medical questionnaire sections of the jail card and the computer-formatted Booking Medical Sheet.  See Exhibit A, Walensky Deposition, p. 183. Chief John Daniel Martinez, p. 160.  Interestingly, Jail Commander Walensky testified that he did not know the effective date of the verbal directive.  See Exhibit A, pp. 192 - 193.

The records speak for themselves.  As shown above, not a single Booking Medical Sheet pertaining to Ms. Trevino was ever completed by Weslaco jailers.  See Exhibit A.25- A.46.  Jail Commander Walensky admitted that Jailer Moreno's failure to document checks of detainees and the failure to document Ms. Trevino's suicide of May 17th, 2007, violated Weslaco jail and detention policies. See Exhibit A, Walensky Deposition,  pp. 283-289.  Chief Martinez testified, however, that the jailers failure to complete the medical booking sheet violated Capt. Walensky's directive. See also Exhibit D, Chief John Daniel Martinez, pp. 157-160; 168-172; 185-187.

In short, the pervasive custom of not screening detainees coupled with the custom of not monitoring known suicidal detainees were the moving forces behind the City of Weslaco's denial of Ms. Trevino's basic right to medical/mental care.  The City is liable under Section 1983 for the resulting denial of proper medical care to Ms. Trevino.

## VI. EXHIBITS

Plaintiffs incorporate the following testimony and documents in support of this

motion:

| | | |
|---|---|---|
| Exhibit A | | Deposition of Ted Walensky; |
| | A.1 | Order for Issuance of Mental Health Warrant; |
| | A.2 | Weslaco P.D. Run Sheet Dated Jan. 30, 2006; |
| | A.3 | Weslaco P.D. Run Sheet Dated Nov. 6, 2006; |
| | A.4 | Medical Questionnaires Dates Aug. 21, 2005 - May 17, 2007; |
| | A.25 | Jail Booking Medical Sheets Dates July. 04, 2004 - May 17, 2007; |
| Exhibit B | | Deposition of Lydia Olalde; |
| Exhibit C | | Jail & Detention Polices; |
| Exhibit D | | John Daniel Martinez; |
| Exhibit E | | Jailer Daily Logs for May 16, 2007 - May 18, 2007; |
| Exhibit F | | Incident Log. |

## REQUESTED RELIEF

Therefore, based on the above, Plaintiffs request that the Court grant this Motion for Summary Judgment as to Plaintiffs' Conditions of Confinement claim under 42 U.S.C. § 1983.

Respectfully submitted,

**RUIZ LAW FIRM, P.L.L.C.**
200 East Cano
Edinburg, TX 78539
Telephone:    (956) 259-8200
Telecopier:   (956) 259-8203

BY: _____

Mauro F. Ruiz
State Bar No. 24007960

**ATTORNEY FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

I hereby certify that on **October 12, 2010,** a true and correct copy of the above and foregoing was delivered to opposing counsel, to-wit:

Alison D. Kennamer
**COLVIN, CHANEY, SAENZ & RODRIGUEZ, L.L.P.**
1201 East Van Buren
P.O. Box 2155
Brownsville, Texas 78522

/s/
Mauro F. Ruiz