UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

JUAN ESTRADA, JR., ROSA )(
ESTRADA, CRISELDA VILLARREAL, )(
ADMINISTRATRIX OF THE ESTATE )(
OF MARICELA TREVINO AND AS )(
NEXT FRIEND OF S.M.L., N.T.L. )(
AND R.L., JR., AND FRANCISCO )(
TREVINO )(
                     )(
VS.                   )(    CIVIL ACTION NO. 09-158
                     )(
CITY OF WESLACO, ALFREDO )(
MORENO, JR., ALBERT PONCE )(
WESLACO POLICE CHIEF JOHN )(
DANIEL MARTINEZ, ONE UN-NAMED )(
WESLACO EMS MEDIC, ALEX )(
CAVAZOS AND CHRISTOPHER )(
CUELLAR )(



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

TED WALENSKY

July 13 and July 14, 2010

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

       ORAL AND VIDEOTAPED DEPOSITION OF TED

WALENSKY, produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 13th and 14th day

of July, 2010, from 10:41 a.m. to 4:38 p.m., before

TERRI L. HILL, CSR in and for the State of Texas,

reported by stenograph, at the City Manager's office,

City of Weslaco, 255 South Kansas, Weslaco, Texas,

pursuant to the Federal Rules.

Page 2

```
 1              APPEARANCES
 2  FOR THE PLAINTIFFS:
 3      MAURO F. RUIZ
        RUIZ LAW FIRM, P.L.L.C.
        200 East Cano
 4      Edinburg, Texas 78539
 5  FOR THE DEFENDANT CITY OF WESLACO:
        ALISON D. KENNAMER
 6      COLVIN, CHANEY, SAENZ & RODRIGUEZ, L.L.P.
        1201 East Van Buren
 7      Brownsville, Texas 78522
 8  ALSO PRESENT:
        MIKE HERNANDEZ, Videographer
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 16 | Weslaco Police Department call sheet | 253 |
| 17 | Apprehension by Peace Officer Without Warrant | 260 |
| 18 | Internal Memo | 261 |
| 19 | Jailer Daily Activity | 276 |
| 20 | Booking Medical Sheet | 299 |
| 21 | Booking Medical Sheet | 301 |
| 22 | Weslaco Police Department Jail Card | 307 |
| 23 | Weslaco Police Department Jail Card | 313 |
| 24 | Weslaco Police Department Jail Card | 315 |
| 25 | Weslaco Police Department Jail Card | 317 |
| 26 | Weslaco Police Department Jail Card | 319 |
| 27 | Weslaco Police Department Jail Card | 320 |
| 28 | Weslaco Police Department Jail Card | 322 |
| 29 | Weslaco Police Department Jail Card | 323 |
| 30 | Weslaco Police Department Jail Card | 324 |
| 31 | Weslaco Police Department Jail Card | 325 |
| 32 | Weslaco Police Department Jail Card | 327 |
| 33 | Weslaco Police Department Jail Card | 328 |
| 34 | Weslaco Police Department Jail Card | 329 |
| 35 | Weslaco Police Department Jail Card | 330 |
| 36 | Weslaco Police Department Jail Card | 331 |
| 37 | Weslaco Police Department Jail Card | 332 |

Page 3

INDEX

|  | PAGE |
|---|---|
| Appearances | 2 |
| TED WALENSKY | |
| Examination by Mr. Ruiz | 6 |
| Changes and Signature Page | 350 |
| Reporter's Certificate | 352 |
| Attached to the end of the transcript: Stipulations | |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Jail and Detention Procedures | 17 |
| 2 | Criminal History Reporting Form | 165 |
| 3 | Supplemental Criminal History Reporting | 165 |
| 4 | Weslaco document | 165 |
| 5 | Weslaco Police Department Jail Card | 165 |
| 6 | Weslaco document | 165 |
| 7 | Criminal History Reporting Form | 165 |
| 8 | Hidalgo County Sheriff's Arrest/Booking Report | 165 |
| 9 | Weslaco Police Department Jail Card | 165 |
| 10 | Photograph | 165 |
| 11 | Weslaco City Jail Booking Medical Sheet | 182 |
| 12 | Order for Issuance of Mental Health Warrant | 215 |
| 13 | Weslaco Police Department call sheet | 229 |
| 14 | Weslaco Police Department call sheet | 236 |
| 15 | Weslaco Police Department call sheet | 243 |

Page 5

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 38 | Weslaco Police Department Jail Card | 334 |
| 39 | Weslaco Police Department Jail Card | 334 |
| 40 | Weslaco Police Department Jail Card | 335 |
| 41 | Weslaco Police Department Jail Card | 336 |
| 42 | Weslaco Police Department Jail Card | 337 |
| 43 | Job vacancy announcement | 341 |
| 44 | Job vacancy announcement | 343 |
| 45 | Weslaco Police Department Jail Card | 346 |
| 46 | Weslaco Police Department Jail Card | 346 |
| 47 | Weslaco Police Department Jail Card | 347 |

2 (Pages 2 to 5)

Page 6

1      TED WALENSKY,
2  having been duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. RUIZ:
5      Q.  Good morning.
6      A.  Good morning.
7      Q.  Could you please state your full name for the
8  record?
9      A.  Yes.  Ted Walensky.
10     Q.  What is your rank?
11     A.  Lieutenant.
12     Q.  Lieutenant.  Lieutenant Walensky, my name is
13  Mauro Ruiz, and I represent the family of Maricela
14  Trevino, her five kids, her two parents in a lawsuit
15  against the City of Weslaco and other individuals.  Is
16  that your understanding?
17     A.  That is.
18     Q.  Okay.  And so you understand that we are on
19  opposite sides of this case?
20     A.  (Moving head up and down)
21     Q.  Is that a yes?
22     A.  Yes.
23     Q.  Okay.  I am going -- I am going to need you
24  just to verbalize your answers so that she can get it on
25  the record.

Page 7

1      A.  Sure.
2      Q.  Lieutenant Walensky, have you ever been
3  involved in a deposition like this before?
4      A.  No.
5      Q.  Okay.  So this is the first time you have given
6  deposition testimony with a court reporter and a
7  videographer?
8      A.  I have seen one, but the first time I have
9  given.
10     Q.  Okay.  Have you ever testified in court?
11     A.  Yes.
12     Q.  Okay.  Have you ever testified in arbitrations?
13     A.  Yes.
14     Q.  Okay.  How many times have you testified in
15  court?
16     A.  Criminal?
17     Q.  Criminal or civil.
18     A.  Including municipal court?
19     Q.  Well, let's -- maybe state court and federal
20  court.  How is that?
21     A.  Over the last 13, 14 years, it would be hard to
22  put a number on it, but maybe 10, 12 times.
23     Q.  Okay.  And --
24     A.  Ballpark figure.
25     Q.  -- those would include criminal and civil

Page 8

1  matters.  Correct?
2      A.  Yes.
3      Q.  And so you understand that your testimony here
4  today has the same force and effect as if it were being
5  given in a courtroom with a judge and a jury?
6      A.  Absolutely.
7      Q.  Okay.  And that is why you took an oath to tell
8  the truth?
9      A.  Yes.
10     Q.  Okay.  And you understand that because you are
11  being videotaped I may have -- I may use your testimony,
12  your videotaped testimony here today at court?
13     A.  That's my understanding, yes.
14     Q.  All right.  Lieutenant Walensky, you said that
15  you testified in court.  How many times approximately?
16     A.  Just as a guess, 10, 12 times.
17     Q.  10, 12 times.  And have you also -- you have
18  also testified in arbitrations.  Correct?
19     A.  Yes.  Back in probably 1997, '98, I was
20  interviewed.
21     Q.  Okay.  How many times was that?
22     A.  Just the once.
23     Q.  Just one.  Okay.  Your -- I asked your attorney
24  to provide me with a representative of the City of
25  Weslaco Police Department that has knowledge of certain

Page 9

1  areas.  I am going to -- I am going to provide you a
2  list of those areas, and let me know whether you have
3  knowledge concerning the following areas.  Okay?
4      A.  Okay.
5      Q.  Would you have knowledge of the City of
6  Weslaco's policies and practices concerning the handling
7  of female detainees?
8      A.  Yes.
9      Q.  The handling of -- the handling of detainees
10  with mental illness?
11     A.  As far as the policy goes?
12     Q.  Yes, sir.  Yes, sir.
13     A.  Yes.
14     Q.  Do you have knowledge of the City of Weslaco's
15  policies concerning the handling of detainees with
16  mental illness and drug dependency?
17     A.  And I would like to refer to this question as
18  well as the previous.  Whether we exactly have a policy
19  as that is handled, is this for the jail procedures or
20  the department in whole?
21     Q.  Well, for purposes of jail procedures.
22     A.  Okay.
23     Q.  And, I mean, in the Weslaco Police Department.
24     A.  Yes.
25     Q.  Do you have knowledge of Weslaco Police

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 10

1  Department booking procedures and -- including
2  sectioning and involuntary commitment of detainees?
3     A.  Yes.
4     Q.  Do you have knowledge of the policies and
5  practices of the City of Weslaco as they pertain to the
6  documentation of detainees including but not limited to
7  booking -- to the booking medical sheet, jail cards,
8  medical questionnaires, and the completion of
9  computer-generated reports?
10    A.  Yes.
11    Q.  Lieutenant Walensky, do you have knowledge of
12  the City of Weslaco's policies and practices concerning
13  cell selection for detainees?
14    A.  Yes.
15    Q.  Do you have knowledge of the City of Weslaco's
16  policies and practices concerning pre-incarceration
17  pat downs of detainees?
18    A.  Well, technically if they come into the jail,
19  they are already under arrest, but --
20    Q.  During booking?
21    A.  Yes.
22    Q.  Do you have knowledge, Lieutenant Walensky,
23  concerning City of Weslaco's policies concerning suicide
24  screening and identification of suicidal detainees?
25    A.  As a patrol function, yes.

Page 11

1     Q.  And as a jail function?
2     A.  Actually that observation would be made by the
3  police officer prior to being brought into the jail.
4     Q.  Okay.  So -- and it is -- well, so you --
5     A.  And actually somebody meeting that criteria
6  wouldn't be brought to a jail facility.
7     Q.  Okay.  Well, sir, if I wanted to ask a
8  representative of the City of Weslaco questions
9  concerning suicide screening once at -- at the booking
10  department --
11    A.  Uh-huh.
12    Q.  -- who would have the most knowledge of that
13  area?
14       MS. KENNAMER:  Objection.  First of all,
15  that is not the standard, and Lieutenant Walensky is
16  being offered as the corporate representative for the
17  city with knowledge of the city's policies and
18  procedures as to how that would be done.
19       MR. RUIZ:  Oh, okay.  That is fine.
20    Q.  And you are saying, Lieutenant Walensky, that
21  your knowledge is limited to the functions of patrol
22  officers on the field, as I understand it?
23       MS. KENNAMER:  Objection, form.
24    Q.  Have I understood your -- well, let me ask you
25  the question.  Because I asked you whether you have

Page 12

1  knowledge of the City of Weslaco Police Department's
2  suicide screening and identification of suicidal
3  detainees.  And as I understood your answer, you said,
4  yes, as to a patrol function?
5     A.  Uh-huh.
6     Q.  Did I hear you correctly?
7     A.  Yes.
8     Q.  Okay.  Are --
9        MS. KENNAMER:  Objection.
10       MR. RUIZ:  What's your objection?  I
11  am just -- I mean --
12       MS. KENNAMER:  Sure.
13       MR. RUIZ:  -- I can't ask a more basic
14  question than that, Alison.  What do you want me to do?
15       MS. KENNAMER:  Well, because you are
16  misinterpreting his testimony.  He is saying because it
17  is a patrol function, not that he does not have any
18  knowledge about what happens in the jail.
19       MR. RUIZ:  Okay.
20       MS. KENNAMER:  And I just want to clarify
21  that.
22       MR. RUIZ:  Okay.  That's fine.
23    Q.  Okay.  Lieutenant Walensky, you also have
24  knowledge of the City of Weslaco's policies concerning
25  the handling of detainees' personal belongings?

Page 13

1     A.  Yes.
2     Q.  And you have knowledge of the City of Weslaco's
3  policies and practices concerning jail logs?
4     A.  Yes.
5     Q.  And do you also have knowledge concerning the
6  Weslaco Police Department's policies and practices
7  concerning jailer staffing during the month of May in
8  2007?
9     A.  I would rely on the documentation, other than
10  just memory.
11    Q.  Okay.  And I will have some documents for you.
12  So that would be a yes?
13    A.  As to the documentation.
14    Q.  Okay.  And, Lieutenant Walensky, would you have
15  knowledge of the City of Weslaco Police Department's
16  policies and practices concerning jailer training,
17  supervision, and performance evaluations?
18    A.  Yes.
19    Q.  And, Lieutenant Walensky, would you have
20  knowledge of the City of Weslaco's practices and
21  policies concerning emergency aid and CPR practices and
22  protocols at the jail or lockup?
23    A.  At the jail or lockup.  As for the department
24  personnel, police officers, yes.
25    Q.  Okay.  And Lieutenant Walensky, you would have

4  (Pages 10 to 13)

Electronically signed by Terri Hill (201-390-152-8303)                                   2c2ed275-adae-476d-8430-69873ef8f5b8

Page 14

1  knowledge concerning the City of Weslaco's policies and
2  practices concerning the medical needs of detainees?
3      A.  I am sorry.  The question one more time.
4      Q.  Sure.  Would you have knowledge of the City of
5  Weslaco's policies and practices concerning the medical
6  needs of detainees?
7      A.  Yes.
8      Q.  Would you also have knowledge, sir, of the City
9  of Weslaco's policies and practices concerning
10  post-injury scene investigation?  And I guess that area
11  is if a detainee is injured at the jail.  Would you have
12  knowledge of what is supposed to be done, what the
13  policies and practices are in those instances?
14      A.  I mean, yes.
15      Q.  Lieutenant Walensky, would you know about the
16  City of Weslaco's policies and practices concerning jail
17  credits, fees, and fines?
18      A.  No.
19      Q.  Thank you, sir.  If at any point you don't
20  understand any of my questions, please -- you are doing
21  a fine job.  Let me know and I will try to rephrase the
22  question.
23      A.  Okay.
24          MS. KENNAMER:  And just for the record,
25  Lieutenant Walensky is being offered on the last

Page 15

1  category as well, because I think you will find what he
2  will tell you is there is no City of Weslaco Police
3  Department policy on that.  It refers to the municipal
4  court, but we are offering him to provide that
5  testimony.
6      Q.  Lieutenant Walensky, in May of 2007, were you
7  the jail administrator for the City of Weslaco?
8      A.  2007.  Yes.
9      Q.  What was the title?  What was your formal title
10  in May of 2007?
11      A.  If I can refer to the policy --
12      Q.  Yes.
13      A.  -- I can -- jail commander.
14      Q.  Jail commander.  Okay.
15      A.  I am going to get a little slack here.  Thanks.
16      Q.  And as jail commander in 2000 -- in May
17  of 2007, what were your job duties and functions?
18      A.  May I refer to --
19      Q.  Sure.  If you could just give me a little
20  heads-up, so I can pull out a copy.
21      A.  Sure.  What I have here in front of me is the
22  Weslaco Police Department jail and detention procedures.
23  And as listed here, the jail is to be overseen by the
24  jail commander and is accountable to the chief of
25  police.  In the absence of the jail commander, the

Page 16

1  patrol watch commander would be responsible.
2      Q.  Okay.  Where is that section you just
3  mentioned?
4      A.  That is section II, command and responsibility.
5      Q.  II.  And can I compare yours, sir?
6      A.  Sure.
7      Q.  Okay.  And let me show you my -- my copy.
8      A.  This must be an older -- and this may be the
9  other revision.
10          MS. KENNAMER:  I was going to say, we may
11  have found it.
12      A.  Yes.  And this may be the -- the issue of the
13  bailiff.
14      Q.  So what you are holding is --
15      A.  This --
16      Q.  Yes, sir.
17      A.  -- would have been the original from July
18  of '05 or effective 5-1-05.
19      Q.  Okay.  Let me mark it with an exhibit so we
20  can -- and if it is an -- if it is the original from
21  '05 --
22      A.  Not -- and not having that --
23      Q.  Uh-huh.
24      A.  -- when the jail procedures were updated --
25      Q.  Okay.

Page 17

1      A.  -- not being able to have that -- because when
2  that was updated, that was submitted to the
3  administration.  Here is the update, and then they put
4  it out to all the officers, but that very well may be
5  the change that I am seeing on the current --
6      Q.  Okay.
7      A.  -- jail compared to the copy you provided.
8      Q.  Okay.  So this is the older -- this could be
9  the older version of --
10      A.  Yes.
11      Q.  -- the Weslaco Police Department jail and
12  detention procedures?
13      A.  Yes.
14      Q.  Okay.  And -- and I am going to mark this as
15  Exhibit No. 1.  And I will hand you a copy of Exhibit
16  No. 1 --
17      A.  Okay.
18      Q.  -- Lieutenant Walensky, and I will give you an
19  opportunity to review Exhibit No. 1.
20      A.  That does appear to be the change.
21      Q.  Okay.  So Exhibit No. 1, those -- those
22  policies were the Weslaco Police Department policies --
23  jail and detention procedures that were in effect
24  starting on May 1st of 2005.  Would that be correct?
25      A.  I believe that to be, yes.

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 18

1    Q.   And up until what point were those -- up until
2  what point in time were those the Weslaco Police
3  Department policies concerning jail and detention
4  procedures?
5    A.   I believe until the two changes of 2008 and
6  2009.
7    Q.   Okay.  So if I want to -- so the policies that
8  were in effect during May of 2007 would be those
9  policies that you were looking at in Exhibit No. 1 that
10 are before you?
11   A.   That would be my understanding, yes.
12   Q.   Okay.  Thank you.  So then I can avoid asking
13 you -- we just saved a lot of time.  Okay?
14   A.   Okay.
15   Q.   Thank you, lieutenant.
16   A.   Uh-huh.
17   Q.   Now, if we look at these policies, does -- does
18 this -- do these policies, do they refer or do they
19 mention the title of -- what did you say?  Jail
20 commander?
21   A.   Yes.
22   Q.   Okay.  Where, sir?
23   A.   You are saying --
24   Q.   Okay.  That would be under Roman Numeral III,
25 responsibilities of personnel?

Page 19

1    A.   That would be the jailers themselves.
2    Q.   Okay.
3    A.   Command and responsibility under II would be
4  for the jail supervision.
5    Q.   Okay.  Well, and the reason I am asking, if you
6  look at Roman Numeral II on the first page of Exhibit
7  No. 1 --
8    A.   Uh-huh.
9    Q.   -- it says, A, command.  "The Weslaco city jail
10 is commanded by the assigned lieutenant and is
11 accountable to the chief of police."  Did I read that
12 correctly?
13   A.   Correct.
14   Q.   Were you the assigned lieutenant in May
15 of 2007?
16   A.   I believe so, yes.
17   Q.   Okay.  And you were assigned to command the
18 Weslaco jail or lockup by the chief of police who was
19 Chief Martinez; is that correct?
20   A.   He was the chief at the time, yes.
21   Q.   Okay.  Did anybody else share the
22 responsibility with you in May of 2007 over jail and
23 detention procedures?
24   A.   Of 2007.  I would have to confirm that by going
25 through -- because there is a time when Officer Ponce

Page 20

1  was assigned back there, and some time after that there
2  was two sergeants and one corporal over a period of
3  time, but I would have to --
4    Q.   Okay.  Well, let me ask you some questions
5  concerning -- so you are not sure if at any point you
6  shared the responsibilities?
7    A.   If anything, it would have been I may have
8  assigned somebody, a corporal or the chief may have
9  assigned a sergeant to be back there, but --
10   Q.   Okay.
11   A.   -- I believe it would have been after that.
12   Q.   Well, and Chief Martinez when he testified,
13 he -- he testified that he had assigned you to operate
14 and run the jail.  Would that -- was that a fair --
15   A.   Yes.
16   Q.   Would that be correct?
17   A.   Yeah.
18   Q.   Okay.  And you had the job function of
19 operating the jail -- the City of Weslaco Police
20 Department jail in November of 2007?
21   A.   Yes.  I would have been the jail commander.
22   Q.   The jail commander.  And -- and the reason I am
23 asking, were there any other -- did any other employee
24 of the Weslaco Police Department share in the
25 responsibilities of jail commander in May of '07?

Page 21

1    A.   Jail commander, no.
2    Q.   Yes.
3    A.   They may have been a supervisor below me
4  appointed --
5    Q.   Okay.
6    A.   -- to overseeing it.
7    Q.   Okay.
8    A.   Because I had a multitude of
9  responsibilities --
10   Q.   Okay.
11   A.   -- besides the jail, so --
12   Q.   So there was only one jail commander in May
13 of 2007 and that was --
14   A.   Correct.
15   Q.   And you were --
16   A.   Me.
17   Q.   And you were a captain at that point?
18   A.   The captain is an appointed position, and I am
19 going to say that was made in November of, boy, '06 or
20 '07.  I would -- I would have to refer to some
21 documentation for that exact date.
22   Q.   Okay.  And just your best guess.
23   A.   I believe so.
24   Q.   Okay.
25   A.   I don't --

6 (Pages 18 to 21)

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 22

1    Q.  When were you first assigned by the chief as
2  jail commander?
3    A.  You are saying assignment.  It was more of a
4  these are going to be your duties.
5    Q.  Right.  When did he say, you are now -- part of
6  your duties include handling the city -- the Weslaco
7  Police Department jail and its issues?
8    A.  That is a good question.  Well, if I can refer
9  to --
10   Q.  Sure.
11   A.  -- any of these evaluations, that will give me
12  some indication --
13   Q.  Sure.
14   A.  -- if I may.  Okay.  I completed this jailer
15  evaluation in September of 2007 as indicated by my
16  signature here as a captain.  This is '04.  '06 -- and
17  in '06.  So, yes, as far back as 2006.
18   Q.  Okay.  And you were jail commander as far back
19  as 2006 to what time frame?
20   A.  Until -- I think they had Lieutenant
21  Hernandez -- actually had a sergeant back there in '0 --
22  '08, '09.
23   Q.  And I don't need the exact date, lieutenant.
24  Month, year is fine.
25   A.  Year was going to be good, but month.  Probably

Page 23

1  in November of '09.
2    Q.  Okay.
3    A.  Best guess.
4    Q.  So we can -- we can -- we can safely say that
5  between 2006 and November of 2009 --
6    A.  I was the jail commander.
7    Q.  -- you were the jail commander?
8    A.  Uh-huh.
9    Q.  And if we look at your rank, though, your
10  Weslaco Police Department rank or position was that of
11  captain throughout this entire time?
12   A.  Yes.
13   Q.  Okay.  Because now earlier we discussed that
14  you were a lieutenant.  Right?  That you are --
15  currently you are a lieutenant?
16   A.  Yes.
17   Q.  But during the time that you were the jail
18  commander --
19   A.  Uh-huh.
20   Q.  -- between 2000 -- from 2006 to November
21  of 2009, you were a captain with the Weslaco Police
22  Department?
23   A.  Yes.
24   Q.  Okay.  And if we look at Exhibit No. 1, the
25  policies that you have before you on the second page,

Page 24

1  there is a section titled Roman Numeral III,
2  responsibilities of personnel.  Do you see that, sir?
3    A.  Yes, I do.
4    Q.  And then section A reads, "In addition to the
5  rules and regulations and the general orders of the
6  Weslaco Police Department, personnel assigned to the
7  jail will be responsible for the duties specified in any
8  applicable job description for their position."  Did I
9  read that correctly?
10   A.  Yes.
11   Q.  Okay.  Under A, we have section B, jail
12  commander.  That would be you for --
13   A.  Yes.
14   Q.  -- the time frame of 2006 to -- through
15  November 2009?
16   A.  Uh-huh.
17   Q.  Okay.  And at least until 2008, when you
18  testified earlier that there had -- there were some
19  changes --
20   A.  Uh-huh.
21   Q.  -- to the policies, these were your duties as
22  jail commander of the Weslaco Police Department jail or
23  lockup; is that correct?
24   A.  Yes.
25   Q.  Let's review them.  Number one under jail

Page 25

1  commander, one, "Oversee all jail operational activities
2  during his/her tour of duty, ensuring that all
3  operations are in accordance with departmental rules,
4  regulations and any applicable laws."  Did I read that
5  correctly?
6    A.  Yes.
7    Q.  Two, "Ensure that necessary supplies are
8  available."  Did I read that correctly?
9    A.  Uh-huh.  Yes.
10   Q.  Three, "Conduct weekly facility inspections for
11  sanitation and security reasons."  Did I read that
12  correctly?
13   A.  Yes.
14   Q.  "Oversee jail personnel, scheduling and
15  supplies necessary for daily operation."  Did I read
16  that correctly?
17   A.  Yes.
18   Q.  Okay.  Now, if we look at your first -- were
19  these your job duties as jail commander?
20   A.  Yes.
21   Q.  If we look at the first one, it is pretty
22  broad, and it says, "Oversee all jail operational
23  activities."  Do you see that, sir?
24   A.  Yes.
25   Q.  Okay.  Does that language -- does that

7  (Pages 22 to 25)

Page 26

1  language -- did it also -- as subsets of all operational
2  activities, of all jail operational activities, would
3  that language also include the -- providing for the
4  medical care of detainees at the Weslaco -- at the
5  Weslaco jail during incarceration?
6      A.  Okay.  So -- so that I understand it
7  correctly --
8      Q.  Sure.
9      A.  -- would it be my responsibility to be there to
10 ensure that during my --
11     Q.  Well, not -- not physically be there, because I
12 understand from reading these policies that you have
13 people that assist you --
14     A.  Uh-huh.
15     Q.  -- like jailers and --
16     A.  Right.
17     Q.  -- and other Weslaco Police Department
18 personnel.  But as -- where would the buck stop with
19 respect to the medical care of detainees?
20     A.  As it pertains to --
21     Q.  Affording them medical care, determining the
22 need for medical care.
23     A.  Well, that would be the jailer.
24     Q.  The jailer.  Okay.  Now, as jail commander, did
25 you have a budget for the jail?

Page 27

1      A.  Other than laundry, no.  Budgeting, everything
2  pretty much comes out of the admin office.
3      Q.  The admin office.
4      A.  Uh-huh.
5      Q.  And the only -- the only budgetary aspect that
6  you were involved in was the laundry aspect of the jail
7  operations?
8      A.  Well, if there was anything needed in the jail,
9  I would have to go to admin and say, can we get this
10 done, and they would pull it out of whatever account.
11 But was I actually given, you have X amount of dollars
12 to spend, no.
13     Q.  Right.  Well, and when it came to -- was there
14 any specific amount -- specific amount of money
15 allocated for medical care of detainees for -- for those
16 detainees incarcerated at the jail?
17     A.  No.  We don't -- we do not provide medical
18 care.  We are not EMTs or doctors.
19     Q.  Okay.  And so it is your -- if I am
20 understanding you correctly, Lieutenant Walensky, as
21 jail commander you had no control and did not have a
22 budget for medical care of detainees incarcerated at the
23 Weslaco jail; is that correct?
24     A.  No.
25     Q.  Am I correct in saying that?

Page 28

1      A.  With the understanding that -- to what extent,
2  I mean.
3      Q.  Right.  Well, was there a specific budget
4  amount of money --
5      A.  For medical supplies?
6      Q.  -- on a yearly basis for medical care of
7  detainees, medical supplies that are going to be used on
8  detainees?
9      A.  I don't know.  I don't know where the billing
10 is for anybody who requires medical attention, whether
11 it be from EMS or at a hospital, where the -- where that
12 money comes out of, what line item, what budget.  I
13 don't know.  We provide the care.
14     Q.  Right.
15     A.  And when I say we provide the care, we contact
16 EMS if anybody has a need for medical attention.
17     Q.  So that is the extent of the medical care that
18 was afforded at the Weslaco jail?
19     A.  Yeah.
20     Q.  Calling EMS?
21     A.  Yes.
22     Q.  Your jailers do not have any medical training.
23 Correct?
24     A.  I don't know if they have medical training.
25 We -- the officers have certifications, but if the

Page 29

1  jailer had medical training --
2      Q.  Well, and the reason I am asking you these
3  questions is because there is going to be medical issues
4  that your jailers, your police officers are going to
5  face on a daily -- on a daily basis.
6      A.  Yes.
7      Q.  And my question was concerning the budget for
8  medical care and treatment.  Were you ever given an
9  amount of money as jail commander from your higher-ups,
10 from either the chief or the city commission, that said,
11 you know, Jail Commander Walensky, you have X amount of
12 dollars to spend on caring for individuals who are
13 jailed at our jail?
14     A.  No.
15     Q.  And have you -- and you have never from between
16 2006 and two -- from the period of 2006 through 2009,
17 you have never had -- tell me if I am correct.  As jail
18 commander, you have never had a specific amount of money
19 allocated for detainee medical care and treatment; is
20 that correct?
21     A.  I don't handle budget.
22     Q.  Okay.  But as jail commander, are you aware --
23 have you ever been aware of a budget specifically for
24 the medical care and treatment of persons incarcerated
25 at the Weslaco jail between 2006 and 2009?

8  (Pages 26 to 29)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 30

1    A.  No.
2    Q.  Thank you.  As jail commander, I know you have
3  provided some -- and I don't want to get them out of
4  order -- some certificates and diplomas.  Prior to 2006,
5  Lieutenant Walensky, were you certified to operate a
6  jail?
7    A.  In what way?
8    Q.  Do you have a license as a jail administrator?
9    A.  I am not aware that one exists, but no.
10    Q.  Okay.  You have never gone through TCLEOSE
11  training for purposes of administering a jail?
12    A.  For administering a jail, no.
13    Q.  Yes, sir.  Okay.  And I know I don't have --
14  okay.  Have you ever trained jailers during your --
15  during your tenure as jail commander?
16    A.  Trained jailers?
17    Q.  Yes, sir.
18    A.  As far as --
19    Q.  Jail standards and practices.
20    A.  Jail standards and practices.  As to our
21  department policy and our booking system and things like
22  that, yes.
23    Q.  Okay.  And is that training -- was that
24  specifically done by you, or did you assign someone to
25  train new hires who are jailers?

Page 31

1    A.  It would have been an experienced jailer.
2    Q.  And the training that you -- that was provided,
3  were there any documents that would go along with that
4  training, reference books or materials?
5    A.  No.  It was --
6    Q.  On-the-job training?
7    A.  Yes.
8    Q.  Okay.  And in -- who were the most
9  experienced jailers during your tenure as jail commander
10  from 2006 through 2009?
11    A.  It would depend.  At one point, a lot of the
12  jailers left for various reasons.  One went to Border
13  Patrol.  One got a law enforcement job with another
14  agency.  I would have to review and have some --
15    Q.  Does any name --
16    A.  -- to see an exact time.  Well, Edward Zuniga
17  left.  He was probably our most experienced jailer.
18    Q.  When -- what year did he leave?
19    A.  I wouldn't have that.
20    Q.  Did you hire him?
21    A.  No.
22    Q.  Were these -- were any of the -- I know you
23  don't remember.  I know it has been a while, that you
24  don't remember exact dates and stuff, but were any of
25  the jailers that were the more experienced jailers were

Page 32

1  any of them certified by TCLEOSE to train new jailers?
2    A.  Certified by TCLEOSE, I don't believe so.
3    Q.  And you understand -- and what is TCLEOSE,
4  Lieutenant Walensky?
5    A.  Texas Commission on Law Enforcement Officer
6  Standards and Education.
7    Q.  Okay.  And what is the purpose or function of
8  TCLEOSE in Texas?
9    A.  TCLEOSE is mandated training and -- to make
10  sure officers are up to date with required training,
11  schools, and they are the state agency that actually
12  holds your peace officer's license for peace officers.
13    Q.  And they issue other licenses as well.
14  Correct?
15    A.  Yes.  For those required to meet jail
16  standards.
17    Q.  And so they also -- so TCLEOSE also issues
18  licenses to jailers.  Correct?  Basic jailer's license?
19    A.  For certified jails, yes.
20    Q.  Well, I mean, it is not a license to the jail.
21  Right?  It is a license to a person?
22    A.  Yes.
23    Q.  Okay.  And, I mean, you can be a jailer and not
24  be working at a certified jail and still attain a
25  jailer's license from TCLEOSE; is that correct?

Page 33

1    A.  I -- that, I am not sure what the rules are.
2    Q.  Okay.  And TCLEOSE also issues licenses for
3  dispatchers or telecommunications officers?
4    A.  It is my understanding they have to meet a
5  certification, yes.
6    Q.  Okay.  And they also issue licenses for
7  intermediate level jailers.  Is that your understanding?
8    A.  It may be.
9    Q.  Okay.  And what is your understanding
10  concerning the issuance of licenses by TCLEOSE to
11  intermediate level dispatchers or telecommunications
12  officers?
13    A.  That, I don't -- I don't handle
14  telecommunications.
15    Q.  Okay.  Now, as -- as an employee of the Weslaco
16  Police Department, the telecommunications or dispatch,
17  is that a department within the Weslaco Police
18  Department?
19    A.  Department -- a division or --
20    Q.  I mean, what would you call it?
21    A.  Communications.
22    Q.  Okay.  And who supervises the individuals that
23  make up the communications of the City of Weslaco?
24    A.  Their immediate supervisor would be Israel
25  Trevino.

9 (Pages 30 to 33)

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 34

1    Q.   Okay.  And Israel Trevino is a dispatcher or a
2  law enforcement officer?
3    A.   Dispatcher.
4    Q.   Okay.  And who is his direct supervisor?
5    A.   I believe it is going to be the administrative
6  assistant Martha Saenz.
7    Q.   Okay.  And she is administrative assistant for
8  what department of the City of Weslaco?
9    A.   The Weslaco Police Department.
10   Q.   Okay.  So the -- would it be fair to say that
11  the Weslaco Police Department oversees the operations
12  and functions of the dispatch -- of dispatch here in
13  Weslaco?
14   A.   That would be a fair statement.
15   Q.   Okay.  And the Weslaco Police Department also
16  oversees the functions of the Weslaco jail?
17   A.   Yes.
18   Q.   Do you call this, the Weslaco jail -- there are
19  so many different names for different types of
20  facilities.
21   A.   It is a holding facility.
22   Q.   Okay.  It is a holding facility.
23   A.   Uh-huh.
24   Q.   And -- but it is not called the Weslaco holding
25  facility.  Right?

Page 35

1    A.   Its common reference is it is the jail, the
2  Weslaco jail.
3    Q.   Okay.  And as a holding facility, what
4  distinguishes this facility from a jail or from -- is
5  there a difference between a holding facility and a
6  jail?
7    A.   It is my understanding a county jail or a
8  private prison or jail has to meet certain standards.
9  We are a holding facility for people who are pending
10  arraignment and Class C misdemeanors, and we are not an
11  institution where people are sent after sentencing other
12  than for Class C misdemeanors by the municipal judge.
13   Q.   Okay.  Okay.  So when -- as a -- as a holding
14  facility, is there any limit on the amount of time that
15  you can hold or jail or incarcerate an individual at
16  your Weslaco facility?
17        MS. KENNAMER:  Objection, form.
18   Q.   Do you want me to rephrase the question or --
19   A.   That would be up to the judge.
20   Q.   Well, I guess this is my question.  If someone
21  is in a very -- if someone is in a month-long trial here
22  in Hidalgo County --
23   A.   Uh-huh.
24   Q.   -- can that individual be held at the Weslaco
25  jail during that month?

Page 36

1    A.   No.
2    Q.   No.  So what is the maximum amount of time that
3  an individual can be incarcerated at the Weslaco jail,
4  or is there any?
5    A.   Like I said, a judge makes that decision for
6  Class C misdemeanors.  Class Bs and above, which go to
7  the county court you are referring to, I am assuming,
8  those people are arraigned and sent over to the county
9  jail.
10   Q.   Okay.
11   A.   We don't hold people in our facility for
12  pending court.
13   Q.   Okay.  So what is the -- what is your
14  understanding as to the most amount of time that an
15  individual can be held at the Weslaco jail or lockup?
16   A.   For what?
17   Q.   For a misdemeanor.
18   A.   Type of misdemeanor, Class C, the judge sets
19  that.  If the person does not have enough money to pay
20  the fine and the judge is going to say, well, you-all
21  have to serve time in lieu of payment of whatever fine,
22  that is set by the judge, so --
23   Q.   Okay.  And so the -- the person who is arrested
24  gets like a jail credit for every number of hours that
25  they spend at the Weslaco --

Page 37

1    A.   Correct.
2    Q.   -- jail or lockup?
3    A.   (Moving head up and down)
4    Q.   And do you know how much credit an arrest -- an
5  incarcerated person receives for a block of eight hours?
6    A.   Eight hours -- I believe it is $100 a day, but
7  the court changes that periodically depending --
8    Q.   Okay.
9    A.   -- and it is also the judge's discretion.
10   Q.   Okay.  And so the length of stay for a person
11  incarcerated at the Weslaco jail can depend on the type
12  of offense?
13   A.   Only for Class C misdemeanors.
14   Q.   Okay.  Only for Class C misdemeanors.  And
15  really it depends on, like you said, the judge's
16  decision to either make this individual get jail credit
17  based on the amount of fine that he is issuing to that
18  arrested individual?
19   A.   Correct.
20   Q.   Okay.  Does that -- and customarily what is --
21  what have you seen -- as jail commander of the Weslaco
22  jail, what are the times or how many days do judges
23  commonly or routinely require persons to fulfill for
24  purposes of jail credit?
25   A.   Depending on the amount of the fine or whatever

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 38

1    the judge wants to set.  Do I sit through the
2    arraignments?  No.
3        Q.  No.  But -- so can fines get up to -- what is
4    the maximum fine?  What is your understanding as to the
5    maximum fine?
6        A.  (Moving head side to side)
7        Q.  So the judge can impose a thousand dollar fine,
8    and if the individual can't afford to pay that fine --
9        A.  If you have traffic fines for a thousand
10   dollars --
11       Q.  Okay.
12       A.  -- the judge will make a decision on you owe
13   this, how can you do it.  Sometimes he says, can you
14   bring up this much money and then time.  However he --
15       Q.  Okay.
16       A.  He is the judge.
17       Q.  So the judge has the discretion to set the
18   fine.  Correct?
19       A.  Uh-huh.
20       Q.  And depending on the fine and the economic
21   resources of an individual, you can have -- it is pretty
22   much left and it is unlimited how many days someone can
23   stay at the Weslaco jail.  Correct?
24           MS. KENNAMER:  Objection, form.
25       A.  The --

Page 39

1        Q.  Well, the larger the fine -- if someone cannot
2    afford to pay --
3        A.  Uh-huh.
4        Q.  -- I mean, the people -- the type of
5    individuals who routinely get arrested here at the
6    Weslaco jail, are they people of wealthy -- with
7    financial resources to pay off the fines?  That is a bad
8    question.
9        A.  I don't know this -- their --
10       Q.  Okay.  Let me -- some of the --
11       A.  -- monetary --
12       Q.  Some of the people that get arrested for Class
13   Cs -- that is what we are talking about.  Correct?
14       A.  Yes.
15       Q.  They can't afford to pay their fines.  Correct?
16       A.  I don't know what their financial situation
17   would be.
18       Q.  But you have had persons who have been arrested
19   who can't afford it in the past, right, is your
20   experience as jail -- as jail commander?
21       A.  Whether they can or can't or just don't want
22   to.
23       Q.  Right.  Well, would it be unheard of for an
24   individual to spend three full days at the Weslaco jail
25   lockup?

Page 40

1        A.  Three full days?
2        Q.  Yes.
3        A.  That is possible.
4        Q.  That is possible?
5        A.  Uh-huh.
6        Q.  Day and night?
7        A.  Correct.
8        Q.  24/7?
9        A.  Correct.
10       Q.  Okay.  Is it possible -- have you had persons
11   incarcerated at the Weslaco jail who have spent a week
12   at the Weslaco jail?
13       A.  I would only -- I would have to go through jail
14   cards to see the length of somebody's stay.
15       Q.  So three to five days, that wouldn't surprise
16   you?
17       A.  I don't know if it would surprise me.  Whatever
18   the judge said.  And if that is the length of time it
19   took, would it surprise me if I saw somebody there for
20   five days?  I don't know that I would be surprised if
21   that is the amount of the fine that they had pending and
22   the judge said, you know, pay or stay.  That is just --
23       Q.  And so back in May of 2007, the amount of fines
24   were set by -- by whom?
25       A.  That is ultimately up to the judge.

Page 41

1        Q.  The judge.  Do they have like a list --
2        A.  Yes.
3        Q.  -- for the type of offense and the amount of
4    the fine?
5        A.  Yes.
6        Q.  Okay.  What are the -- which offenses carry the
7    heftier fines?
8        A.  There is multiple.
9        Q.  Based on your experience here at the Weslaco
10   Police Department.
11       A.  I would have to see a list.  There is a
12   multitude of traffic violations and Class C misdemeanors
13   that are punishable by a fine only, so --
14       Q.  Okay.  Now, as the -- as a holding facility,
15   how many people, your best guess, are -- have been
16   housed at the Weslaco jail for any portion of time
17   total?  Let's say in 2007.
18           MS. KENNAMER:  Are you talking about at any
19   one time?
20       Q.  Yeah.  Well --
21       A.  I don't understand your question.
22       Q.  Bad question.  Bad question.  In 2007, how many
23   people were housed at the Weslaco jail for any amount of
24   time, in other words, from ten minutes to days?
25           MS. KENNAMER:  Objection, form.

11 (Pages 38 to 41)

Electronically signed by Terri Hill (201-390-152-8303)                                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 42

1    Q.   How many people in 2007 were processed through
2    the Weslaco jail? Do you know, Lieutenant Walensky?
3    A.   I don't know.
4    Q.   Okay.  How many people were processed through
5    the Weslaco jail in 2006?
6    A.   I don't know.
7    Q.   Are there any records that would show --
8    A.   Yes.
9    Q.   What would you call that record?
10   A.   I would go to the booking card of the last
11   calendar date of whatever year you were looking at, and
12   that would give you a running number of the total of
13   people who have been booked and processed through the
14   Weslaco Police Department.
15   Q.   Okay.  Do you have a guess of --
16   A.   No.
17   Q.   Okay.  How many persons -- strike that
18   question.  How many cells make up the Weslaco jail?
19   A.   Total cells?
20   Q.   Yes, sir.
21   A.   Five.
22   Q.   Five.  And what is the maximum number of people
23   that those five cells can hold?
24   A.   You have a single cell, one person, single
25   cell, one person.  You have bunk space for I believe it

Page 43

1    is four in the female cell and seven in the main cell,
2    and then you have what is referred to as the drunk tank.
3    It is large holding --
4    Q.   And --
5    A.   -- facility for intoxicated persons.
6    Q.   Persons.  So how many can you fit in the drunk
7    tank?
8    A.   You could probably get -- there has been times
9    when we have had ten people in there.
10   Q.   So if I add them up, that is the most that you
11   are aware of, ten people in the drunk tank?
12   A.   As far as capacity?
13   Q.   Yes, sir.
14   A.   (Moving head up and down)
15   Q.   So as far as capacity of the Weslaco jail, we
16   are looking at 23?
17   A.   That would be fair.
18   Q.   Okay.  Does the Weslaco jail receive any
19   prisoners from out of state or detainees from out of
20   state?
21   A.   No.
22   Q.   Does the Weslaco jail receive detainees from
23   federal agencies?
24   A.   At one time and on occasion, we will get a
25   call. But since the Border Patrol facility has been

Page 44

1    in --
2    Q.   Okay.
3    A.   -- all their detainees are taken there.
4    Q.   Okay.  And what -- what year was that?  Did you
5    have -- because, see, I looked at the jail logs --
6    A.   Uh-huh.
7    Q.   -- for -- from 2005 through 2007.
8    A.   Uh-huh.
9    Q.   And I saw references to DPS detainees.
10   A.   Uh-huh.
11   Q.   That is the State of Texas.  Correct?
12   A.   Okay.
13   Q.   I saw references to federal 95s.  Would those
14   be --
15   A.   Uh-huh.  But when you said out of state, you
16   mean like do we take prisoners from another state here.
17   Q.   Oh, okay.
18   A.   Out of state to me means out of the State of
19   Texas.
20   Q.   Okay.  Right.
21   A.   You mean from the state?
22   Q.   Right.  No.  And let me rephrase.  Does the
23   Weslaco jail accept detainees that have been arrested by
24   DPS?
25   A.   Yes.

Page 45

1    Q.   Do they accept detainees who have been arrested
2    by the federal government, either the Border Patrol
3    or --
4    A.   ICE detainees --
5    Q.   -- ICE?
6    A.   -- yes.
7    Q.   Okay.  And you -- and the Weslaco jail
8    accepts -- has been accepting these prisoners during
9    your tenure as a jail commander?
10   A.   Yes.
11   Q.   Okay.  And do they still today accept prisoners
12   from federal agencies and state agencies?
13   A.   Not like we used to.  The Border Patrol
14   facility is next door now.  Any of those detainees are
15   obviously taken over there.  The Texas Department of
16   Public Safety still houses some of their prisoners until
17   they come pick them up the following morning for
18   arraignment --
19   Q.   Okay.
20   A.   -- much like ourselves.
21   Q.   Do you also house juveniles at the Weslaco
22   jail?
23   A.   No.
24   Q.   Okay.  And if I -- if I have seen jail logs
25   that reflect juvenile entries for juvenile 95s --

12  (Pages 42 to 45)

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 46

1    A.  Uh-huh.
2    Q.  -- what would that -- what would that mean to
3  you?
4    A.  You cannot have a juvenile in a jail facility
5  or a holding facility for adults.  Therefore there would
6  be no juveniles in the jail.
7    Q.  Okay.
8    A.  We have two detention facilities for juveniles
9  separate from the jail.
10    Q.  Okay.  And you have had -- what is that -- what
11  is that facility called?
12    A.  It is a juvenile detention, temporary detention
13  facility for juvenile offenders.
14    Q.  Okay.  And that is part of the Weslaco Police
15  Department also?
16    A.  Yes.
17    Q.  Is it staffed by how many jailers?
18    A.  Is it staffed?  The jailers or the arresting
19  officer would handle that, but those juveniles cannot be
20  held for status offenses and only for a term of no more
21  than four hours.  So do we hold them overnight, do we
22  hold them long-term, no.
23    Q.  Okay.  And during those four hours, does the
24  City of Weslaco have a jailer monitor those juveniles in
25  that temporary facility?

Page 47

1    A.  Yes.  It is on the same monitoring-type system
2  that we do have in place now.
3    Q.  Okay.  But it is at a separate building away
4  from the -- from the Weslaco jail.  Correct?
5    A.  No.
6    Q.  Am I right?
7    A.  It is in the same building that houses the
8  Weslaco Police Department, but it is separated from the
9  adult offender section.
10    Q.  Okay.  And -- and there are video cameras in
11  that facility?
12    A.  Correct.
13    Q.  And you-all -- there is also a person who is
14  assigned, an individual is assigned to observe these
15  juveniles for whatever length of time that they may be
16  incarcerated?
17    A.  They are observed by the video system that is
18  monitored at that time by the dispatchers.
19    Q.  Okay.  So the dispatchers -- would it be fair
20  to say that the dispatchers monitor the juvenile
21  temporary facility of the City of Weslaco?
22    A.  Yes.  But usually when dealing with juveniles
23  detained, during the process, contact the parents.  They
24  are either going home with their parents or they are
25  going to the Juvenile Detention Center for Hidalgo

Page 48

1  County.
2    Q.  And the -- you said the longest amount of time
3  that the City of Weslaco can house these juveniles is
4  how long?
5    A.  Four hours.
6    Q.  Four hours.
7    A.  And that is a standard set by the county.
8  Juveniles are completely different from adult.
9    Q.  By the county, by Hidalgo County?
10    A.  Yes.
11    Q.  So Hidalgo County has some -- has standards
12  concerning the supervision of juveniles?
13    A.  No.  The detention of juveniles.
14    Q.  Detention.  Does Hidalgo County have a
15  requirement concerning the supervision of juveniles in
16  this type of facility?
17    A.  Just how -- they are handled a little bit
18  differently than adults.
19    Q.  Okay.
20    A.  Like I said, you can't put somebody in secured
21  custody for a status offense.
22    Q.  What is a status offense?  What do you mean?
23    A.  A runaway.
24    Q.  Okay.
25    A.  If you can't be charged for it as an adult, it

Page 49

1  is usually a status offense.  Runaway, curfew.
2    Q.  Okay.  And does Hidalgo County set out any
3  other standards for purposes of detainees that may apply
4  to the City of Weslaco besides juveniles?
5    A.  No.  Just the amount of time that they can
6  actually be put in secured custody.  Now, there may be
7  some other guidelines, but you can't have them in view
8  of adult offenders, things like -- of that nature.
9    Q.  And those guidelines are -- are set by what
10  agency?
11    A.  The county and state.
12    Q.  County and state.  And what -- what agency at
13  the state would set those guidelines?
14    A.  I would have to look into that to give you a
15  correct answer.
16    Q.  Okay.  And what department of Hidalgo County
17  sets the standards for these juveniles?
18    A.  The -- the name escapes me at this point.
19    Q.  So the City of Weslaco does not have any
20  medical staff assigned to either the temporary juvenile
21  facility or detention area or the Weslaco jail.  Am I
22  correct?
23    A.  Medical staff, no.
24    Q.  Okay.  And has it ever had any medical staff
25  during your tenure?

13  (Pages 46 to 49)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 50

1    A.  No.  We -- EMS is right next door.  Any medical
2  requirement or need is handled by the EMS personnel
3  right there at Station 1, which we share the building
4  with.
5    Q.  Okay.  And so if the need is a medical need --
6    A.  Uh-huh.
7    Q.  -- a physiological --
8    A.  Not necessarily.
9    Q.  -- issue --
10    A.  We have had people complain of -- I have had a
11  21-year-old guy complain of chest pains.
12    Q.  Okay.
13    A.  I am not a doctor.  We contact EMS.  They come
14  check him out.
15    Q.  All right.  And so if it is a -- if it is a --
16  and I guess do you -- is there a distinction between a
17  medical need and a mental health need?
18    A.  Yes.
19    Q.  Okay.  And for purposes of the medical needs of
20  individuals who are detained at the Weslaco jail, if I
21  am understanding you correctly, those medical needs
22  are -- those medical needs are addressed and -- by the
23  City of Weslaco EMS or EMTs and paramedics --
24    A.  Yes.
25    Q.  -- is that correct?

Page 51

1    A.  Uh-huh.
2    Q.  Now, just like you may have a medical need,
3  some individuals may be suffering from mental health
4  issues?
5    A.  Uh-huh.
6    Q.  Correct?
7    A.  Uh-huh.
8    Q.  Who addresses --
9    A.  I should say yes.
10    MS. KENNAMER:  Yes.  There you go.
11    Q.  Who addresses -- what -- who are the medical
12  providers that address those individuals that have
13  serious mental health issues during the time that they
14  are incarcerated at the City of Weslaco jail?
15    A.  If they have issues or anything that would lead
16  an officer to believe that someone is suffering some
17  mental illness, they have made some overt act as far as
18  to harm themselves or someone else, an officer would
19  take that as this may be a person in crisis and may be
20  in need of an emergency mental evaluation.
21    Q.  And so the -- what type of employee of the City
22  of Weslaco Police Department is charged with knowing
23  whether a detainee may be suffering from a serious
24  mental health concern?
25    MS. KENNAMER:  Objection, form.

Page 52

1    Q.  Did you understand my question?
2    A.  Not --
3    Q.  Okay.  There are different classifications of
4  employees at the Weslaco Police Department.  Correct?
5    A.  Uh-huh.  Uh-huh.
6    Q.  You have the chief of police?
7    A.  Uh-huh.
8    Q.  You have captains, lieutenants.  You have
9  patrol officers.
10    A.  Correct.
11    Q.  You have dispatchers.  You have jailers.
12  Correct?
13    A.  (Moving head up and down)
14    Q.  They are all employees of the City of Weslaco;
15  is that -- is that correct?
16    A.  That is correct.
17    Q.  All those positions exist at the City of
18  Weslaco Police Department?
19    A.  That is correct.
20    Q.  Okay.  And as the jail commander, you are
21  familiar with the types of job classifications and the
22  types of duties that all those individuals have?
23    A.  For the most part, yes.
24    Q.  Okay.  Out of -- out of all of the job
25  positions at the City of Weslaco Police Department --

Page 53

1    A.  Uh-huh.
2    Q.  -- please identify for me those positions that
3  are charged with determining and identifying an
4  individual, an arrested individual, a detainee who is
5  suffering from serious mental health issues.
6    A.  It would be your police officer --
7    MS. KENNAMER:  Same objection.
8    A.  -- first contact.
9    Q.  Anyone else, Lieutenant Walensky?
10    A.  Your police officer is your first contact with
11  anybody.
12    Q.  Okay.  And so is there a directive that -- do
13  the police officers know that they are charged with
14  determining the mental -- determining -- identifying and
15  determining whether a detainee is suffering from a
16  serious mental health issue?  Do they know that?
17    MS. KENNAMER:  Objection, form.
18    A.  As part of an officer's job is if someone is
19  displaying signs of an issue with mental health, yes, we
20  address that issue.
21    Q.  Is that written down somewhere in their job
22  description, in the police -- the police officer's job
23  description?
24    A.  If you had to write everything an officer
25  should do in a job description, I would fill this room

14  (Pages 50 to 53)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 54

1 with paper. We do a lot of things that is part of our
2 training, part of our experience, but, yes, part of our
3 training is CIT training, crisis intervention training.
4 You also have officers who are mental health peace
5 officers.
6 Q. Oh, so the City of Weslaco has mental health
7 peace officers?
8 A. They have certification as a mental health
9 peace officer, yes.
10 Q. When did that start?
11 A. We have had at least two groups of people,
12 officers attend that training.
13 Q. Okay. And when did that start?
14 A. You would have to pull their training file. I
15 wouldn't be able --
16 Q. Well, see --
17 A. -- to provide you with a date.
18 Q. And this is how it works when we have a case.
19 If I just say, give me all the training files, then the
20 attorney for the city, they are going to say that I am
21 not being specific, that I am asking --
22 A. Okay.
23 Q. -- I am going on a fishing expedition. So that
24 is why when we have you --
25 A. Uh-huh.

Page 55

1 Q. -- the jail commander --
2 A. Uh-huh.
3 Q. -- that is why I am asking you if you can be a
4 little bit more specific with me in identifying the year
5 when that CIT training first became a part of the
6 training --
7 A. I believe it was --
8 Q. -- offered.
9 A. I belive it was mandated in 2006, 2007 for all
10 peace officers.
11 Q. Okay. Are there any other employees of the
12 Weslaco Police Department that are charged with
13 identifying individuals who are suffering from mental
14 health issues when they are arrested?
15 A. And I don't want to read anything into your
16 question.
17 Q. Well, if you don't understand it, tell me. I
18 will try to -- I will try to break it up.
19 A. Yeah. Can you break it?
20 Q. Sure. And I am trying to find out -- maybe if
21 I say it this way. I am trying to find out, Lieutenant
22 Walensky --
23 A. Uh-huh.
24 Q. You know a little bit about the suicide of
25 Maricela Trevino. Right?

Page 56

1 A. Yes.
2 Q. And you investigated that. Right? You were
3 involved in the post-incident investigation of it.
4 Right?
5 A. No.
6 Q. No. Okay. Well, you knew that there was a --
7 she -- there was a -- she showed suicidal behavior on
8 May 17th, 2007?
9 MS. KENNAMER: Objection, form.
10 Q. You have never -- you have never heard that
11 before today?
12 A. Could you --
13 Q. Sure.
14 A. -- repeat the question?
15 Q. Sure. What is your understanding concerning
16 Maricela Trevino -- Maricela Trevino's attempted suicide
17 on May 17th, 2007?
18 A. It is my understanding she attempted to take
19 her life.
20 Q. Okay. And she was incarcerated at the time.
21 Correct?
22 A. That is my understanding, yes.
23 Q. She was inside, locked up at the female cell?
24 A. That's my understanding, yes.
25 Q. Prior to arriving at the female cell inside the

Page 57

1 Weslaco jail, she came in contact with several persons.
2 Correct?
3 A. That's my understanding, yes.
4 Q. She came --
5 A. I would assume the arresting officer.
6 Q. She came in contact with an arresting officer.
7 She came into contact with a jailer. The arresting
8 officer was Albert Ponce and the jailer was Alfredo
9 Moreno. Am I stating -- is that correct?
10 A. That is my understanding, yes.
11 Q. Are you aware of Ms. Trevino coming in contact
12 with any other employee of the Weslaco Police Department
13 prior to her incarceration?
14 A. I don't know.
15 Q. Would those two individuals be the only ones
16 that you are aware of?
17 A. I wasn't there, so I couldn't say.
18 Q. Okay. Well, your name shows up on some
19 documents.
20 A. Okay.
21 Q. Do you know whether she came in contact with
22 anybody else that -- prior to incarceration besides
23 Ponce, Officer Ponce and Jailer Moreno?
24 A. I don't know.
25 Q. Okay. Well, and since we only have those

Hill & Romero
Certified Court Reporters

Page 58

1  two -- those two individuals, the job classification for
2  Albert Ponce is that of a patrol officer; is that
3  correct?
4      A.  Yes, it is.
5      Q.  And he was a patrol officer back in May -- on
6  May 17th, 2007?
7      A.  Yes.
8      Q.  And Alfredo Moreno was the jailer on duty
9  during the evening of May 17th, 2007?
10     A.  Yes.
11     Q.  Okay.  Earlier I asked you about the Weslaco
12 Police Department employees whose duties include
13 identifying detainees who suffer from serious mental
14 health issues.  Do you recall that question?
15     A.  Yes.
16     Q.  Okay.  You said the first contact, which is the
17 arresting police officer.  Correct?
18     A.  Yes.
19     Q.  Do you know of any other Weslaco Police
20 Department employee who also is charged with the duty of
21 identifying detainees who suffer from serious mental
22 health issues?
23     A.  Okay.  If I understand your question correctly,
24 if someone has an obvious need, whether it be for
25 medical attention or a mental health issue, it would be

Page 59

1  addressed by a jailer or a police officer.  A police
2  officer has a certification, crisis intervention
3  training, to identify those types of issues --
4      Q.  Okay.
5      A.  -- if that answers your question.
6      Q.  Okay.  So now you have also told me that a
7  jailer also shares in the responsibility for
8  determining --
9      A.  No.
10     Q.  No?
11     A.  That is not --
12     Q.  Then I am not understanding you.
13     A.  What I am saying is if someone makes an overt
14 act, if someone makes a statement that they intend to do
15 harm to themselves or others and it is a mental health
16 issue, that would be addressed.
17     Q.  By whoever witnesses that avert -- overt act or
18 statement?
19     A.  Yes.
20     Q.  Okay.  So -- so then depending on the act or
21 statement, correct, there may be more than just the
22 first contact or the first -- the police officer who has
23 a responsibility for identifying the serious mental
24 health care needs of a detainee?  Am I understanding you
25 correctly now?

Page 60

1      A.  If they have made an overt act or have
2  stated --
3      Q.  Okay.
4      A.  -- that is an issue, yes.
5      Q.  Okay.  And when it comes to an overt act, we
6  are talking about suicidal behavior, for example.
7  Right?  Suicidal behavior can be an overt act?
8      A.  Yes.
9      Q.  Okay.  And in -- just so that I am clear on
10 what you are telling me here, Lieutenant Walensky.  Is
11 there a Weslaco -- while we are on the topic, is there a
12 Weslaco Police Department policy, a written policy, that
13 directs law enforcement officers, jailers, dispatchers,
14 or any other type -- any other employee of the Weslaco
15 Police Department to act in a manner which identifies a
16 person's serious mental health issues after there is an
17 overt act?
18     A.  Yes.
19     Q.  Okay.  And where is that policy, sir?
20     A.  I believe our general order has how to deal
21 with that, however, that may be a little outdated, but
22 the recent crisis intervention training that every
23 police officer was required to attend --
24     Q.  Okay.
25     A.  -- and complete.

Page 61

1      Q.  Okay.  And you said that that -- so let me talk
2  to you about the general order you mentioned.  Is
3  there -- those general -- is it one document or several
4  documents that make up this general order?
5      A.  I would have to review it to be sure.
6      Q.  Okay.  So Exhibit No. 1, is that a general
7  order?  What do you call Exhibit No. 1?
8      A.  This is a general order as stated here, general
9  order.
10     Q.  Okay.  So there is another document that is
11 called general order with a different number, with a
12 different -- with a different effective date?
13     A.  Yes.
14     Q.  And what is that called?  What is it called,
15 the one that contains these --
16     A.  I think it is dealing with mental subjects.
17     Q.  Okay.  And this is a Weslaco Police Department
18 general order?
19     A.  Yes, it is.  As stated --
20     Q.  Okay.
21     A.  -- on the top of the order.
22     Q.  Okay.  And it is a -- and that general order
23 addresses the policies and practices when a law
24 enforcement officer comes across an individual with
25 mental illness?

16  (Pages 58 to 61)

Hill & Romero
Certified Court Reporters

Page 62

1    A.  Yes.
2    Q.  Does that general order also apply to the
3  jailers and the dispatchers?
4    A.  I would have to -- like I said, I believe it is
5  dated, and I would have to review that.
6    Q.  What is the date of that, best -- your best
7  guess?
8    A.  I couldn't tell you right here.
9    Q.  Okay.  Is it -- was it before the year 2000?
10    A.  I would be guessing.
11    Q.  Okay.  Has that policy been amended at any
12  point?
13    A.  I don't know.  I don't know what the initial
14  date of it -- the effective date it was and what
15  amendments have followed, if any.
16    Q.  Okay.  And, Lieutenant Walensky, I am not
17  trying to ask you -- I am not trying to ask you these
18  questions --
19    A.  No.  I understand.
20    Q.  -- to be difficult.  I am just trying to find
21  out general information so that I can later identify
22  to --
23    A.  I understand.
24    Q.  -- opposing counsel and the court if I have to.
25  How long have you been with the Weslaco Police

Page 63

1  Department?
2    A.  13 years --
3    Q.  13 years.
4    A.  -- plus.
5    Q.  Okay.  Prior to being assigned -- where were
6  you employed before the City of Weslaco?
7    A.  JCPenney.
8    Q.  Okay.  In what city?
9    A.  I am sorry?
10    Q.  Where?  What JCPenney?
11    A.  In McAllen.
12    Q.  McAllen.  How long were you with JCPenney?
13    A.  It has been a while.  I would have to look.
14    Q.  Okay.  Prior to JC -- working at JCPenney --
15  can you give me your best estimate of how long you were
16  at JCPenney?
17    A.  Two years, maybe more.
18    Q.  Two years.  Prior to working --
19    A.  Around there.
20    Q.  -- at JCPenney, did you ever work in law
21  enforcement?
22    A.  Well, actually for JCPenney, I was working for
23  loss prevention.
24    Q.  Okay.
25    A.  I wasn't selling clothes.

Page 64

1    Q.  Okay.  And as a loss prevention employee of
2  JCPenney, did you have a gun and a badge?
3    A.  Badge.
4    Q.  A badge.
5    A.  Store identification, loss prevention
6  identification.
7    Q.  Okay.  And prior to that job at JCPenney, did
8  you -- were you employed in law enforcement?
9    A.  No.  I was a commissioned security officer.
10    Q.  Okay.  Where, sir?
11    A.  For, back then, it was TIS Security out of
12  Harlingen.
13    Q.  What does TIS stand for?
14    A.  That name doesn't exist anymore.  I believe --
15    Q.  Okay.
16    A.  -- they changed it to ITS, and I don't even
17  know if they are in existence any longer.
18    Q.  Who owned that business?
19    A.  Good question.
20    Q.  Okay.  So you were employed -- you have been
21  employed by the City of Weslaco Police Department for 13
22  years.  Would it be fair to say that your first job in
23  law enforcement was at the Weslaco Police Department?
24    A.  I was a reserve officer with Alton before that,
25  but it wasn't a paid position.  So first paid law

Page 65

1  enforcement --
2    Q.  First --
3    A.  -- full-time peace officer, yes, sir.
4    Q.  And what year was that?
5    A.  1997.
6    Q.  1997.  And -- and you said -- and your first
7  job was as a patrol officer, I am assuming?
8    A.  My first assignment with this department?
9    Q.  Yes, sir.
10    A.  Yes.
11    Q.  Okay.  And between 2006 when you were assigned
12  the job of jail commander, from between 1997 and 2006,
13  did you have any responsibilities over the jail?
14    A.  Prior to that?
15    Q.  During that time, between 1997 and 2006.
16    A.  Other than before there was jailers, it would
17  be the police officers' responsibility to do the booking
18  process, however, it was all handwritten at that time,
19  so --
20    Q.  Okay.  But you were not formally assigned jail
21  administration duties during that time frame?
22    A.  No.  And, in fact, and I notice on here, it
23  will actually go back to '05.
24    Q.  What, sir?
25    A.  Because that is the effective date of this

17  (Pages 62 to 65)

Electronically signed by Terri Hill (201-390-152-8303)                                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 66

1    general order.
2    Q.   Okay.
3    A.   So I would have been -- it would be back as far
4    as '05.
5    Q.   You are talking about the policy concerning --
6    A.   That you had --
7    Q.   -- contacts --
8    A.   Well, as far as being the jail commander and --
9    Q.   Oh.  Oh, okay.  So you are saying you were jail
10   commander in --
11   A.   Yes.
12   Q.   -- May of '05 is --
13   A.   As I see the date on here, yes.  I just --
14   Q.   Okay.  Well, then my question to you would be a
15   little bit different.  Between 1997 and May 1st of '05,
16   did you at any point have jail administration duties?
17   A.   No.
18   Q.   Okay.  Did you have -- okay.  Strike that
19   question.  So would it be fair to say that it was in
20   2005 when you first were assigned jail administration
21   duties as jail commander for the City of Weslaco Police
22   Department jail?
23   A.   Yes.
24   Q.   Okay.  And prior to 2005, you didn't have any
25   experience in operating or running a holding facility, a

Page 67

1    jail, or a prison.  Am I correct?
2    A.   You are correct.
3    Q.   Okay.  When we were -- when we were talking
4    about -- what would you -- how would you characterize
5    suicidal behavior?
6    A.   Anything that exposes a person to a risk of
7    harm for themselves or others or any kind of a statement
8    made to you that they intended to do harm to themselves
9    or others and it was of a nature of -- or a possibility
10   of being -- Having mental health issues.
11   Q.   Okay.
12   A.   Yes.
13   Q.   And what about if someone acts and their
14   behavior suggests the risk of self-injury?  Would you
15   also treat that as suicidal behavior?
16        MS. KENNAMER:  Objection, form.
17   A.   Again, the question.
18   Q.   Sure.  If someone acts in a manner that
19   suggests the risk of self-injury.
20   A.   I would say no.
21   Q.   So, for example, Lieutenant Walensky, if you
22   happen to be passing by a cell here at Weslaco --
23   A.   Uh-huh.
24   Q.   -- and a detainee has a rope around his neck --
25   A.   Uh-huh.

Page 68

1    Q.   -- would you treat that as suicidal behavior?
2    A.   Yes.
3    Q.   And you would treat that as suicidal behavior
4    because it suggests the risk of self-injury.  Correct?
5    A.   Yes.
6        MS. KENNAMER:  Objection.
7    (Interruption)
8        MR. RUIZ:  I am sorry.
9        MS. KENNAMER:  Why don't we take a quick
10   break.
11       MR. RUIZ:  Sure.  We can take a break.
12       (Off the record)
13   Q.   And these policies that we were talking about,
14   Lieutenant Walensky, you said that the policies
15   concerning first responders, patrol officers when they
16   come in contact with someone who may be suffering from a
17   mental illness or who may be suffering from serious
18   mental health issues, does it make a distinction in the
19   type of suicidal behavior that is supposed to be
20   addressed?  Does it say overt suicidal behavior?
21   A.   To take someone into custody in -- in dealing
22   with somebody like that, yes, they would have to meet
23   certain criteria.
24   Q.   Okay.  And that criteria is set out in that --
25   what did you call that general order?

Page 69

1    A.   I believe it is dealing with subjects with
2    mental illness.  Don't quote me, but I believe it stated
3    mentally ill subjects, but don't quote me on the exact.
4    Q.   Okay.  Well, would -- would you consider
5    someone sleeping on a street as suicidal behavior?
6    A.   No.
7    Q.   Okay.
8    A.   Not in itself.
9    Q.   No.  Isn't there a -- isn't there a -- isn't
10   that a potentially dangerous act, sleeping on a street?
11   A.   Sleeping on a street?
12   Q.   Yes.
13   A.   Depending on the circumstance.  It could be a
14   medical issue.
15   Q.   Okay.  And I am not saying a sidewalk.  I am
16   saying sleeping on a lane of travel on a street.
17   Wouldn't that be a potentially dangerous or
18   life-threatening act?
19   A.   Dangerous, yes.
20   Q.   Okay.  Could it be -- could there be imminent
21   risk of death?
22   A.   Yes.
23   Q.   Could there be serious injury?
24   A.   Under the right circumstances, yes.
25   Q.   All right.  And -- and all of those -- or

18  (Pages 66 to 69)

Electronically signed by Terri Hill (201-390-152-8303)                                         2c2ed275-adae-476d-8430-69873ef8f5b8

Page 70

1  wouldn't that example be overt suicide behavior?
2      A.  It could be.
3      Q.  Okay.  And the -- the general order on dealing
4  with subjects with mental illness, does it draw that
5  distinction of the types of suicidal behavior that there
6  can be?
7      MS. KENNAMER:  Objection, form.
8      Q.  Does it draw a distinction in the types of
9  suicidal behavior that a police officer is supposed to
10 address?
11     A.  It is obviously not normal, so further
12 investigation, it would, you know -- you would have to
13 find out what are the circumstances of why this person
14 is in the place that they are in.
15     Q.  Okay.  And does that general order set -- does
16 it set out the -- the procedures that the arresting
17 patrol officer should follow upon observing that kind of
18 not normal behavior?
19     A.  Yes.  It would be something that you as an
20 officer would look into.
21     Q.  When was the last time you took -- you read
22 that general order on dealing with subjects with mental
23 illness?
24     A.  It has been quite sometime.
25     Q.  Can you give me your best guess?

Page 71

1      A.  Years.
2      Q.  Two, three, four?
3      A.  Easy.
4      Q.  Okay.  Could it be over five?
5      A.  It could be.
6      Q.  Okay.  And that general order -- well, let's
7  talk about suicidal behavior again, Lieutenant Walensky.
8  If someone verbalizes a nonspecific plan to injure or
9  kill themselves, would that be suicidal behavior?
10     MS. KENNAMER:  Objection, form.
11     A.  If someone tells me?
12     Q.  If somebody verbalizes a nonspecific plan that
13 suggests risk of self-injury, would you treat that as
14 suicidal behavior?
15     MS. KENNAMER:  Objection, form.
16     A.  I would follow that up with more questions.
17     Q.  Okay.  Well, at least it raises a red flag.
18 Correct?
19     A.  In saying that in itself, yes.
20     Q.  Okay.  And that is why you said I would follow
21 up with more questions.  You would -- you would engage
22 that individual in a conversation that would shed more
23 light on your suspicion concerning that person's mental
24 health illness.  Would you agree?
25     A.  If a person made that statement to me, yes.

Page 72

1      Q.  And you would want to do that because you want
2  to err on the side of safety.  Correct?
3      A.  I would like some more information to make my
4  determination as to is this person exhibiting mental
5  health.
6      Q.  So is that a yes?
7      A.  Depending on the situation, yes, it could be.
8      Q.  Okay.  And if someone, for example, you come
9  across an individual who is in a vegetative state, does
10 that raise any red flags to you?
11     MS. KENNAMER:  Objection, form.
12     A.  That is something for emergency medical
13 people to --
14     Q.  Okay.  What if someone -- if you happen to pass
15 by the Weslaco -- one of the cells at the Weslaco jail
16 and you see that you -- you see a detainee with cuts to
17 their wrist area, both wrists, would that -- would you
18 treat that as suicidal behavior?
19     A.  Not necessarily, but --
20     Q.  Well, under what circumstances would you and
21 under what circumstances wouldn't you treat that as
22 suicidal behavior?
23     A.  Depending on how the -- the injury was
24 sustained.
25     Q.  And what would -- what steps does this

Page 73

1  general -- would the general order on dealing with
2  subjects with mental health illness, would that order
3  also apply to individuals who are in the booking area of
4  the Weslaco Police Department jail?
5      A.  Yes.
6      Q.  Okay.  Would it also deal -- would it also
7  control the treatment of persons who are incarcerated at
8  the Weslaco Police Department jail?
9      A.  Depending on the circumstance.
10     Q.  Okay.  And going back to the -- going back to
11 the example I gave you of a detainee who is already
12 incarcerated with cuts to his or her wrists, plural,
13 what would -- what does that general order tell you
14 should be done next after observing those cuts to the
15 wrist areas of that individual?
16     A.  I don't know if -- again without review of that
17 general order.
18     Q.  Okay.  But at a minimum, you would want to at
19 least inquire and investigate and communicate with that
20 detainee.  Would you agree with that statement?
21     A.  To ascertain how that injury occurred.
22     Q.  You would?
23     A.  If it was an obvious injury, yeah.
24     Q.  Okay.  Well, and are -- cuts to wrist areas, is
25 that an obvious injury?

19  (Pages 70 to 73)

Hill & Romero
Certified Court Reporters

Page 74

1      MS. KENNAMER:  Objection, form.
2      Q.  That is the example I gave you.
3      A.  Okay.  But still it is pretty vague.  Is it --
4  are they -- are they bleeding?  Is this --
5      Q.  Well --
6      A.  -- a recent injury, old injury?
7      Q.  Well, let's say they have Band-Aids and
8  bandages to their wrist areas and they are incarcerated
9  at -- and they are incarcerated at the Weslaco Police
10 Department jail.  Now?
11     A.  Yeah.
12     MS. KENNAMER:  Objection, form.
13     Q.  You would investigate further?
14     A.  I would like to know how did this injury occur.
15     Q.  Okay.  Would -- would you go and look at a
16 particular -- and -- strike that question.  Why would
17 you want to know how those injuries occurred?
18     A.  To make a determination if this is that type of
19 an issue or -- I have -- for instance, I have a pretty
20 good scar right here on my wrist, and I got this when I
21 was about 13 years old climbing over a very large
22 chain-link fence, but I would take it offensive if
23 somebody said, hey, was this an attempted suicide, other
24 than how did this -- how did, you know, this injury
25 occur.  But it would take somebody actually looking for

Page 75

1  it to say, you know, that is a pretty good scar on your
2  wrist.
3      Q.  Right.
4      A.  How did that occur.
5      Q.  And -- and as law enforcement officers, y'all
6  are trained to observe.  Correct?  You are --
7      A.  To the best of our ability, yes.
8      Q.  You -- police officers are constantly observing
9  while they are driving their patrol units, make sure
10 that people are following traffic laws; is that correct?
11     A.  Uh-huh.
12     Q.  Patrol officers or police officers are always
13 observing to make sure that a crime is not being
14 committed within their --
15     A.  Immediate view.
16     Q.  -- immediate view; is that correct?
17     A.  Yes.
18     Q.  And, in fact, if you look at old police forms
19 or police report forms --
20     A.  Uh-huh.
21     Q.  -- don't they always ask the arresting officer
22 to identify markings such as scars and tattoos and other
23 types of deformities on individuals?
24     A.  Obvious ones, yes.
25     Q.  Okay.  And so that would also -- as individuals

Page 76

1  who are trained to observe the scars and other markings
2  on a person, you would want to investigate a little bit
3  more concerning the nature of cuts to two wrist areas.
4  Would you agree with that, sir?
5      A.  It could be reason for inquiry, yes.
6      Q.  And the reason for inquiry is because common
7  sense and your experience and training as a police
8  officer tells you that cuts in the general area of a
9  wrist suggest the risk of self-injury.  Correct?
10     A.  That's possible.
11     Q.  Okay.  And if -- and if someone is in a -- in
12 the -- someone is housed or incarcerated at the Weslaco
13 Police Department jail, it would be your job as a jail
14 commander and the arresting officer and the jailer --
15 strike that question.  And if individuals who have
16 contact, employees of the Weslaco Police Department,
17 such as police officers and jailers and dispatchers, who
18 come in contact with behavior that suggests a risk of
19 self-injury, they have a duty to act to prevent a future
20 more serious injury from happening.  Would you agree
21 with that?
22     MS. KENNAMER:  Objection, form.
23     A.  If it is known to them and inquiry reveals that
24 this is, you know, a reason for such injury, yes.
25     Q.  Okay.  And for it to be known, I am -- I am

Page 77

1  talking about an example where they can observe cuts on
2  both wrists of an individual.  That would be known.
3  Correct?
4      MS. KENNAMER:  Objection, form.
5      A.  If it is known.
6      Q.  Okay.  Well, if you see bandages and a Band-Aid
7  on the wrists of an individual, would -- does that
8  suggest a known risk of self-injury?
9      MS. KENNAMER:  Objection, form.
10     Q.  You can answer it.
11     A.  An inquiry of the injury, yes.
12     Q.  Okay.  Well, but if -- and you are inquiring
13 because you want to make sure that that individual
14 doesn't hurt him or herself in the future.  Correct?
15     A.  Yeah.  That is --
16     Q.  While in -- while in the custody of the Weslaco
17 Police Department.  Correct?
18     A.  At any time.
19     Q.  And especially in a jail.  Correct?
20     A.  Your question again.
21     Q.  Sure.
22     A.  I am trying to follow the --
23     Q.  Right.  Well, the -- I am using -- and I am
24 using your words, Lieutenant Walensky.
25     A.  Okay.

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                2c2ed275-adae-476d-8430-69873ef8f5b8

Page 78

1    Q.  If the cuts are known -- remember you said
2  that?
3    A.  Yes.
4    Q.  If the cuts are known, that would warrant
5  further inquiry and investigation.  Correct?
6    A.  That's fair.
7    Q.  Okay.  And cuts with a bandage and a Band-Aid
8  in the wrist area, okay, would that be a known -- a
9  known injury that suggests risk of potentially suicidal
10  behavior?
11    A.  I think that could.
12    Q.  Okay.  And because it could, someone that is
13  housed at the Weslaco lockup --
14    A.  Uh-huh.
15    Q.  -- the arresting officer, the jailer who know
16  about and has -- and have knowledge of the cut and the
17  Band-Aid or bandages and the cuts on the other wrist, on
18  both wrists, they should take action to prevent further
19  injury.  Correct?
20      MS. KENNAMER:  Objection, form.
21    A.  If they believe this was a result of mental
22  illness.
23    Q.  Oh, okay.  And in order for them to be accurate
24  about their beliefs, they need to be trained in suicide
25  prevention and mental illness.  Would you agree with

Page 79

1  that?
2      MS. KENNAMER:  Objection, form.
3    A.  Black and white, no.  And I understand what you
4  are saying, but I think hindsight is 20/20.  Is it --
5  are we able to as police officers in dealing with people
6  in day to day to completely identify an issue that says
7  this may be reason to believe that this person evidences
8  mental illness, I would say no, if that is an answer to
9  your question.
10    Q.  Okay.  But it boils down to the subject -- the
11  subjective belief of the arresting officer, jailer, or
12  dispatcher?
13    A.  Yes.
14    Q.  Would you agree with that?
15    A.  Yes.
16    Q.  And in order -- and you know that suicide is
17  the leading cause of death in jails.  Right?
18    A.  That may well be.
19    Q.  Okay.  Did you know that?
20    A.  No.
21    Q.  Had you ever heard that before I said that
22  right now?
23    A.  As a fact, no.
24    Q.  Okay.
25    A.  A reasonable assumption, yes.

Page 80

1    Q.  Okay.  And do you know why suicide is the
2  leading cause of death in jails?  Do you have any idea
3  why that may be?
4    A.  No.
5    Q.  Okay.  Could it be because there is a high
6  number of detainees who are mentally ill and who
7  compound their mental illness by intoxication --
8      MS. KENNAMER:  Objection, form.
9    Q.  -- substance abuse?
10    A.  I wouldn't have any data to confirm that one
11  way or another.
12    Q.  Okay.  And did you know, Lieutenant Walensky,
13  that most jail suicides occur shortly after arrest?
14    A.  No.
15    Q.  That is the first time you have heard that?
16    A.  Yes.
17    Q.  Okay.  And did you know, Lieutenant Walensky,
18  that the hours during and immediately following
19  admission are the hours which require the greatest
20  amount of vigilance by the lockup staff?  Did you know
21  that?
22    A.  No.
23      MS. KENNAMER:  Objection, form.
24    Q.  Okay.  Have you ever heard of the National
25  Center on Institutions and Alternatives?

Page 81

1    A.  No.
2    Q.  Okay.  Well, they did a study, this
3  organization did a study, and they found that 29 percent
4  of jail suicides occurred during the first three hours
5  of confinement.  Were you aware of that?
6    A.  No.
7    Q.  Okay.  So if -- if that is true, then would you
8  agree with me that the first three hours of confinement
9  are crucial for purposes of preventing suicides in
10  lockups?
11      MS. KENNAMER:  Objection, form.
12    A.  I don't know.  I don't know what the data is
13  that they have.
14    Q.  Okay.  Well, there is also -- the National
15  Center on Institutions and Alternatives also did a --
16  that study also found that 50 percent of jail suicides
17  occurred during the first 24 hours after confinement.
18  Were you aware of that prior to today?
19    A.  No.
20    Q.  Okay.  Knowing that, would you agree with me
21  that the hours surrounding admission of a detainee into
22  a jail are the most critical?
23      MS. KENNAMER:  Objection, form.
24    A.  No.  Again I don't know what the parameters are
25  of the data that these people compiled.  I know there is

21 (Pages 78 to 81)

Electronically signed by Terri Hill (201-390-152-8303)                          2c2ed275-adae-476d-8430-69873ef8f5b8

Page 82

1 as many studies as there are in one area for one thing
2 to prove something you can have a similar study and say,
3 well, our information and data that we got -- I don't
4 know.  I don't know the -- the information you are
5 providing.
6    Q.  Okay.  Would you agree with me that the method
7 most commonly used by jail detainees to end their lives
8 is hanging by using objects and materials available to
9 them in their cells?
10    A.  All I know is what you are reading.
11    Q.  Do you agree with that statement based on your
12 experience, training, and education and your tenure as a
13 jail commander for the Weslaco Police Department?
14    A.  This is the only in-custody death we have had
15 since I have been employed by the Weslaco Police
16 Department, so I --
17    Q.  Objection, nonresponsive.  Were you aware that
18 the majority of hangings -- that in the majority of
19 hangings the detainees' feet and often most of their
20 bodies are touching the floor?  Did you know that?
21    A.  No.
22    Q.  Do you subscribe to any type of correctional
23 facility literature, Lieutenant Walensky?
24    A.  No.
25    Q.  Has the City of Weslaco during your tenure of

Page 83

1 2006 through 2009 ever subscribed to magazines or
2 journals or periodicals that address issues of jail
3 administration?
4    A.  No.
5    Q.  Has the City of Weslaco Police Department ever
6 subscribed to journals, magazines, or periodicals that
7 address jail administration?
8    A.  Specifically, no.
9    Q.  Is there anything in Exhibit No. 1, in those
10 policies which were in effect in May of 2007, that would
11 tell us, tell me, the practices that an arresting
12 officer should take when coming across or coming in
13 contact with someone who shows some type of suicidal
14 behavior?
15    A.  In this policy?
16    Q.  Yes, sir.
17    A.  If I may review.
18    Q.  Sure.  Absolutely.
19    A.  As far as identifying persons with?
20    Q.  Yes, sir.
21    A.  No.
22    Q.  Okay.  This -- this jail and detention
23 procedures document, this Exhibit No. 1, who is this
24 handed to?  Is this -- is this Exhibit 1 that you are
25 holding --

Page 84

1    A.  Uh-huh.
2    Q.  -- is this something that is in every police
3 officer's --
4    A.  General orders.
5    Q.  -- general orders?
6    A.  Yes.
7    Q.  Okay.  Is it also provided to individuals who
8 are jailers at the Weslaco Police Department jail?
9    A.  Yes.
10    Q.  How about dispatchers?
11    A.  You would have to ask the administrative -- the
12 supervisor.
13    Q.  Okay.  So we know at least --
14    A.  But I --
15    Q.  -- patrol officers and jail --
16    A.  Yeah.  I believe the -- the supervisors have
17 access to a general order book.
18    Q.  The supervisor of the dispatch department?
19    A.  I believe so.
20    Q.  Okay.  And what about -- you can't be at the
21 jail 24 hours, seven days a week.  Correct?
22    A.  Correct.
23    Q.  What title -- and I am talking about the period
24 of -- in May of 2007.
25    A.  Okay.

Page 85

1    Q.  Who was responsible for dealing with jail
2 issues --
3    A.  In my absence?
4    Q.  -- in your absence?
5    A.  It would be the supervisor, highest-ranking
6 supervisor on duty, the patrol supervisor.
7    Q.  Okay.  And on May 17th, 2007, who was the
8 patrol supervisor?
9    A.  I would have to -- to look at the schedule --
10    Q.  Okay.
11    A.  -- and then confirm that they were there, but
12 as I remember after the fact it was, I believe, Sergeant
13 Meza.
14    Q.  And so the patrol supervisor changes every day
15 or every week or every month?
16    A.  Every shift.
17    Q.  Every shift?
18    A.  Every shift there is another supervisor.
19    Q.  Okay.  So there are three shifts a day?
20    A.  Yes, sir.
21    Q.  So there are three shift supervisors who have
22 responsibilities over the jail personnel.  Would that be
23 correct?
24    A.  Yes.
25    Q.  There are three shift supervisors who would

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 86

1  have responsibility concerning the health and safety of
2  detainees at the Weslaco jail --
3     A.  Well, first and fore --
4     Q.  -- on any given day?
5     A.  First and foremost, it would be the jailer,
6  but, yes, the supervisor for the patrol.
7     Q.  Okay.  And who identifies or what is the
8  process for identifying a shift supervisor?
9     A.  The highest-ranking supervisor in charge during
10 that shift.
11    Q.  Okay.  And what percentage of the duties of
12 that shift supervisor pertain to handling or dealing
13 with detainees?
14    A.  Persons already incarcerated?
15    Q.  Yes, sir.
16    A.  Very little.  It is actually with the jailer,
17 unless the jailer contacts the on-duty supervisor with
18 an issue, a problem, or whatnot.
19    Q.  So if the jailer identifies an issue -- a
20 health and safety issue, a life-threatening issue that a
21 detainee is facing, who is the first person that the
22 jailer should contact?
23    A.  The supervisor on duty.
24    Q.  Okay.  Does that -- do the shift supervisors at
25 the City of Weslaco back in May of 2007, did they have

Page 87

1  any specialized training in jail administration?
2     A.  To my knowledge, no.
3     Q.  Would they have had any specialized training in
4  preventing suicides?
5     A.  I believe in that time frame, all officers
6  would have already completed their crisis intervention
7  training.
8     Q.  Okay.  Are you sure?  So what you are saying is
9  that on May 17th, 2007 in the evening Officer Meza --
10    A.  It would depend on when he actually attended
11 his mandated course and if that mandated course was
12 prior to the date you are providing.
13    Q.  So you are not sure if he had that --
14 what was the name of the course?
15    A.  Crisis intervention training or otherwise
16 referred to as CIT under TCLEOSE.
17    Q.  Okay.  And so as you sit here today, you don't
18 know if Officer Meza had completed his course, his CIT
19 course, in May of 2007?
20    A.  Not knowing those dates, no.
21    Q.  Right.  Was there a prerequisite to becoming a
22 shift supervisor that you had -- that you would have
23 completed that CIT course before actually being the
24 supervisor in charge of the jail and the detainees at
25 the jail?

Page 88

1     A.  No.  That was mandated training set forth by
2  TCLEOSE for all police officers.
3     Q.  Okay.  But for purposes of becoming a shift
4  supervisor or a -- is that what they are called, a --
5     A.  Yes.
6     Q.  -- shift supervisor?
7     A.  Yeah.
8     Q.  At the -- at the City of Weslaco, that was not
9  a prerequisite?
10    A.  To my knowledge, no.
11    Q.  Okay.  Am I -- am I correct in saying that?
12    A.  Yes.
13    Q.  Okay.  And -- okay.  So we talked about the
14 arresting officer as the first contact when coming in
15 contact with an individual with mental health issues.
16 We talked about that earlier.  Correct?
17    A.  Yes.
18    Q.  Would you say between the arresting officer,
19 the jailer, and dispatchers at the Weslaco Police
20 Department, which one has the largest share of the
21 responsibility for determining if a detainee is
22 suffering from serious mental health issues?
23    A.  The largest share.  I would say the first point
24 of contact, that being the police officer.  With his
25 experience and training, it would be the police officer.

Page 89

1     Q.  Okay.  And in May -- on May 17th, 2007,
2  Lieutenant Walensky, had Officer Albert Ponce completed
3  or had he -- had he taken a crisis intervention training
4  course that you mentioned earlier?
5     A.  I -- I don't know.
6     Q.  Okay.
7     A.  I don't know.
8     Q.  And if it turns out that he -- if it turns out
9  that Officer Ponce had not taken the CIT training course
10 when he was handling Maricela Trevino, would you agree
11 with me that he would not have had the requisite skills
12 and knowledge in order to properly evaluate
13 Ms. Trevino's mental health that day on May 17th?
14        MS. KENNAMER:  Objection, form.
15    A.  I can't speculate what he experienced, what he
16 saw.  It would just -- I can't put myself in someone
17 else's --
18    Q.  Okay.  But you are saying -- but we are talking
19 about the CIT course and how important it is.  Well, let
20 me ask you.  Why is the CIT course important, Lieutenant
21 Walensky?
22        MS. KENNAMER:  Objection, form.
23    A.  Why is it important?
24    Q.  Right.
25    A.  One, it is required by the state.  Two, it --

Hill & Romero
Certified Court Reporters

Page 90

1  it informs law enforcement officers that there are
2  consumers for mental health care out there and they may
3  come across these consumers of mental health care and
4  how to deal with people that may be suffering from
5  mental health issues.
6      Q.  Is there any other course that mandates -- that
7  requires a patrol officer to learn about individuals
8  with mental health issues?
9      A.  There may be.
10     Q.  Okay.
11     A.  Off the top of my head, I don't have any
12  knowledge of that.
13     Q.  Besides the CIT course that is mandated by
14  TCLEOSE --
15     A.  Uh-huh.
16     Q.  -- does the City of Weslaco -- did the City of
17  Weslaco in May 2007 require any other type of course as
18  a prerequisite for working at the Weslaco Police
19  Department that concerned the handling of consumers,
20  like you mentioned, with mental health issues?
21     A.  I don't believe so.  Just prior to the CIT
22  course, some of the officers did attend voluntarily a
23  mental health peace officer's course.
24     Q.  Was Officer Albert Ponce a mental health peace
25  officer in May of 2007?

Page 91

1      A.  I don't believe so, but I can't be for sure.
2      Q.  Okay.  Who -- who were the Weslaco police
3  officers who were mental health -- mental health peace
4  officers in May of 2007?
5      A.  Prior to that date?
6      Q.  On or before May 17th, 2007.  How is that?
7      A.  Okay.  On or before.  And I, to the best of my
8  recollection, believe it was before.  Myself, Officer
9  Yarrito, Officer Gandy, I believe.  I believe Officer
10  Coronado attended training.  I don't know if it was at
11  the same time that I attended the training or if it was
12  a course set up later on.  Those are the names --
13     Q.  Okay.
14     A.  -- of the officers that come --
15     Q.  So how long have you been a mental health peace
16  officer, Lieutenant Walensky?
17     A.  I attended that training '05, '06, but I would
18  have to --
19     Q.  Okay.  And --
20     A.  -- check to be sure.
21     Q.  And along with -- and during -- and who
22  sponsored that training?
23     A.  That was -- I know it was put on by a deputy
24  constable out of, I believe, the Houston area, but I
25  would have to look at --

Page 92

1      Q.  Did you --
2      A.  -- training records.
3      Q.  -- travel to Houston?
4      A.  No.  Actually it was put on here in Weslaco.
5      Q.  Did the City of Weslaco pay this deputy
6  constable from Houston to put on this training?
7      A.  I believe it was free training.
8      Q.  Free training.
9      A.  Okay.  I believe so, but I can't be sure.
10     Q.  Okay.  Did you receive a diploma or certificate
11  after completion of that training?
12     A.  If so, it is in the department file.
13     Q.  Okay.  And is the department file different
14  from a personnel file?
15     A.  Well --
16     Q.  See, because we have --
17     A.  Yes.  As I reviewed those, I can tell you just
18  after thumbing through those I have got more
19  certificates than that.
20     Q.  Was that one -- is that --
21     A.  I didn't see that one in there.
22     Q.  Okay.  And what was the name of the course that
23  you took, Lieutenant Walensky?
24     A.  It was a mental health peace officer's
25  training.

Page 93

1      Q.  How many hours did you have to --
2      A.  I believe it was a 24-hour --
3      Q.  -- complete?
4      A.  -- course, if memory serves.
5      Q.  One 24-hour course?
6      A.  Uh-huh.
7      Q.  And how many days did it take for you to
8  complete that course?
9      A.  Three days.
10     Q.  Three days.  Did -- were you tested at the end
11  of that course?
12     A.  I believe so.
13     Q.  Okay.
14     A.  And again I would have to pull the information,
15  and I believe I still have my resource book on that.
16     Q.  Was that a TCLEOSE-approved course that you
17  received credit for?
18     A.  Yes, it was.
19     Q.  Okay.  And -- and the other attendees from the
20  Weslaco Police Department were Officer Yarrito?
21     A.  To the best of my recollection.  Gandy, which
22  name is now -- married name is Salinas.
23     Q.  Salinas.
24     A.  But if you put both, I don't know if it is in
25  the system as Salinas or Gandy, so --

24  (Pages 90 to 93)

Page 94

1    Q.   Okay.  And Coronado is the other one?
2    A.   I believe Gabriel Coronado.
3    Q.   What prompted the City of Weslaco Police
4  Department to provide this mental health peace officer
5  training?
6    A.   Actually it was put on down here, and it wasn't
7  exclusive to the Weslaco Police Department as I
8  remember.
9    Q.   Okay.
10    A.   A lot of times we get calls for what we refer
11  to as the old sections, where someone will actually
12  call.  There has been an overt act.
13    Q.   Okay.
14    A.   An officer responds to a scene.  And it was the
15  opinion of myself and some other supervisors that we
16  should have some officers attend this type of training
17  for dealing with the callouts for people who have made
18  overt threats, actions, things like that, to go and
19  assess the situation, see if people meet certain
20  criteria, take them into custody, if need be, or if they
21  need direction help, I don't have anything overt here
22  that I can say, however, what you can do is seek an
23  order from a judge, or if you are going to take them or
24  if they want to voluntarily enter into mental health
25  services with Texas Tropical, San Antonio State

Page 95

1  Hospital, or any other mental health services.
2    Q.   Does the City of Weslaco have any -- does it
3  have a relationship with anyone at the San Antonio
4  health hospital?
5    A.   I guess if there was going to be a point of
6  contact it would be me.  I have met and dealt with
7  several of the doctors at the San Antonio State
8  Hospital, people at Texas Tropical, McAllen
9  Behavioral --
10    Q.   Okay.  Let me write this --
11    A.   -- Doctors Hospital at Renaissance Behavioral,
12  things like that.
13    Q.   So it was McAllen Behavioral.  Doctors
14  Hospital?  They have got --
15    A.   Renaissance has a behavioral unit, correct.
16    Q.   And what is it called?  The behavioral unit?
17    A.   Yeah.  They call it Doctors Hospital at
18  Renaissance Behavioral.
19    Q.   Okay.
20    A.   And then there is the McAllen Behavioral, and,
21  of course, Texas Tropical where the prescreening process
22  takes place.
23    Q.   And San Antonio -- it is called the San
24  Antonio --
25    A.   SASH, San Antonio State Hospital.

Page 96

1    Q.   State Hospital.  Thank you.  Okay.  And the
2  term sectioning that you used, sectioning for
3  individuals who committed overt acts -- you used that
4  language.  Right?
5    A.   Well, it is actually a throwback.  It is
6  apprehension by a peace officer without warrant, but it
7  is a whole lot easier to say section.
8    Q.   Okay.
9    A.   Because it referred to an old section 26 of the
10  mental health code.
11    Q.   Oh, okay.
12    A.   Which is now, I believe, 774.  Don't quote me
13  on that either --
14    Q.   Okay.
15    A.   -- but it is under the mental health code.
16    Q.   And so as a police officer, you also have
17  authority under the Health and Safety Code to prevent
18  someone from injuring -- someone with mental illness
19  from injuring themselves or others?
20    A.   If certain circumstances exist.
21    Q.   Okay.  Thank you.  Yeah, sectioning is a lot --
22    A.   Yeah.
23    Q.   -- quicker.  Would you like to take a break
24  to grab some water?
25    A.   I am fine, if everybody else is good.

Page 97

1       (Discussion off the record)
2    Q.   Okay.  Lieutenant Walensky, have there been --
3  before May 17th, 2007, have there been suicidal --
4  suicide attempts by detainees here at the Weslaco jail?
5    A.   I remember one case file prior to my employment
6  where there was an incident, but --
7    Q.   One.  So that would be before 2005?
8    A.   Before 1997.
9    Q.   Oh, I am sorry.  Employment.  I am sorry.  And
10  was that a suicide?
11    A.   I believe so.
12    Q.   Okay.  I was asking you about suicide attempts
13  by detainees.  Have there been suicide attempts by
14  detainees before May 17th, 2007?
15    A.   Attempts.  May have.
16    Q.   Have detainees displayed suicidal behavior
17  while incarcerated at the Weslaco jail before May 17th,
18  2007?
19    A.   I can only respond as detained people inside,
20  custodial, inside the cells have displayed a lot of
21  different behavior.
22    Q.   Okay.  And the only one I am concerned about --
23    A.   Right.
24    Q.   -- is suicidal, though.
25    A.   Suicidal, no.  We have had distraught.  We have

25  (Pages 94 to 97)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 98

1　had angry, upset. I mean, I am sure you can imagine.
2　We have had issues with people very distraught over
3　whatever their circumstances were.
4　　Q. Have -- before May 17th, 2007, have there been
5　detainees in custody at the Weslaco jail, incarcerated
6　at the Weslaco jail, who have displayed behavior of
7　self-mutilation or self-injury?
8　　A. Self-mutilation, self-injury, yes.
9　　Q. Okay. How about suicidal ideation? Before
10　May 17th, 2007, have there been detainees who have
11　displayed behavior consistent with suicidal ideation?
12　　A. I remember an account of a man who was very
13　intoxicated who did some very interesting things with
14　his shirt.
15　　Q. Okay.
16　　A. Yes.
17　　Q. Okay. That was during your tenure as jail
18　commander?
19　　A. I think it even was a little farther back than
20　that. Because as the jail commander, during that time,
21　my schedule was usually 8:00 to 5:00.
22　　Q. Okay.
23　　A. Things that you actually see going on in the
24　jail, or my experience as a patrol officer or patrol
25　supervisor when I was working evening shifts and

Page 99

1　whatnot. So it would have been prior to the time I was
2　a jail commander, but yeah. I do recall a -- yeah.
3　There was a gentleman in there tying his shirt up and
4　yelling some things out, highly intoxicated, in which we
5　ended up removing most of his clothing and the bedding
6　and putting him on a watch due to his actions and what
7　he was vocalizing.
8　　Q. Does the -- does the Weslaco Police Department
9　have -- does it have a written suicide watch policy and
10　procedure manual?
11　　A. If I can refer to Exhibit 1.
12　　Q. Yes, sir.
13　　A. And I believe it is going to be under cells.
14　Under booking procedures.
15　　Q. What section?
16　　A. I believe it is section VII, A, sub --
17　　Q. Do you see the little number at the bottom?
18　Can you reference that number?
19　　A. 00467.
20　　Q. 467. Okay. Thank you, sir.
21　　A. Uh-huh.
22　　Q. Booking procedures. Okay. Under VII.
23　　A. "Subjects believed to be suffering from mental
24　illness and presenting a danger to themselves or others
25　will be evaluated by a supervisor for possible

Page 100

1　section 26."
2　　Q. Okay. That is under number four?
3　　A. That is correct.
4　　Q. Okay. And it reads, "Subjects believed to be
5　suffering from mental illness and presenting a danger to
6　themselves or others will be evaluated by a supervisor
7　for possible section 26." Now, these are the booking
8　procedures that you were referencing. Correct?
9　　A. Yes, sir.
10　　Q. And who -- what type of employee at the Weslaco
11　Police Department is responsible for following these
12　booking procedures?
13　　A. The jailer.
14　　Q. So in order for the jailer to do his job
15　properly under -- under booking procedure section four,
16　in order to determine whether an individual is suffering
17　from mental illness and/or presenting a danger to
18　himself or others, he would have to have training on
19　suicide identification and prevention?
20　　　MS. KENNAMER: Objection, form.
21　　Q. Would you agree with that?
22　　A. No. I would not agree with that.
23　　Q. Okay. Would it benefit a jailer to have
24　suicide identification and prevention training in order
25　to fulfill this section that we just read under booking

Page 101

1　procedure number four?
2　　A. I think any training is beneficial.
3　　Q. Okay. Have any of your jailers ever -- prior
4　to May 17th, 2007, did any Weslaco Police Department
5　jailer take a course in suicide identification and
6　prevention?
7　　A. May have. Like I said, I believe during this
8　time, of the four jailers we had, two were military, one
9　was going to the police academy, one was a police
10　officer. So in keeping up with TCLEOSE-required hours,
11　Edward certainly could have had said training. I know
12　one of the jailers was going through the academy. He
13　may have actually had that training as well.
14　　Q. Okay.
15　　A. And I don't think Jimmy had started the academy
16　yet.
17　　Q. Okay.
18　　A. And the other -- no. He ended up going to
19　Border Patrol. He had not gone through the academy, but
20　he was military, so it is possible.
21　　Q. Okay. Do you know whether Alfredo Moreno had
22　received suicide identification and prevention training,
23　because he was the jailer on duty during the evening of
24　May 17th, 2007?
25　　A. He may have. I know he was attending the --

26　(Pages 98 to 101)

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 102

1    the police academy actually, but whether the times -- I
2    don't know.
3        Q.   Okay.  Would that -- would there be a document
4    in his file that would --
5        A.   No.
6        Q.   -- reflect that training?
7        A.   No.  Because he would have been attending the
8    police academy on his own.
9        Q.   And earlier you mentioned a -- or you used a
10   certain word to describe a file.  Is it a records -- did
11   you have a personnel file and do patrol officers also
12   have a different type of file?  Do you remember,
13   lieutenant?  I am sorry.  I was trying to remember.
14   You --
15       A.   A file pertaining to --
16       Q.   Well, you used a different word to describe
17   your --
18       A.   Oh, yeah.  I have my file.  Excuse me.  When I
19   complete training or when I go to a class or whatnot,
20   they will provide this.  Sometimes they will mail it to
21   the department.  Sometimes they will hand it to you
22   actually right there.  What I try to do is make a copy
23   of it, hold the original and get it so that it will go
24   into my file there.  But I can tell you, that stack
25   compared with the file over at the police department,

Page 103

1    yeah, those aren't all my certifications.
2        Q.   Okay.  And what is that file at the police
3    department called?
4        A.   That is just your personnel file there.
5        Q.   Okay.  And --
6        A.   Now, whether they send any -- everything to
7    your file over here as far as training goes, I don't
8    know.
9        Q.   And what file is kept over here at the
10   administration office?
11       A.   This would be your civil service file.
12       Q.   Civil service?
13       A.   (Moving head up and down)
14       Q.   Okay.
15       A.   Or your personnel file, I guess, but we have
16   one at the department and they have one here.
17       Q.   Okay.  The jailers are not part of the civil
18   service.  Correct?
19       A.   Correct.
20       Q.   Dispatchers are not civil service employees?
21       A.   Correct.
22       Q.   Okay.  That would only pertain to --
23       A.   Peace officers.
24       Q.   -- peace officers?  Okay.  When I -- when we --
25   when I first asked you the question concerning suicide

Page 104

1    identification and prevention, I was asking you whether
2    there was a policy for a suicide watch, I think.  Has
3    the City of Weslaco Police Department ever had a
4    specific suicide watch policy on the books, Lieutenant
5    Walensky?
6        A.   I don't believe so.  It is a common term for
7    someone displaying all kinds of different whatever.  It
8    could be due to intoxication.  It could be they are very
9    upset due to the arrest.  Understandably incarcerated
10   people usually aren't real happy, and they vent that in
11   many ways.  But someone that draws the attention of the
12   arresting officer or the jailer that, you know, may need
13   to be -- would be placed in -- I believe it is in this
14   Exhibit 1, again, if I can --
15       Q.   Okay.
16       A.   -- thumb through here.  I believe it is
17   mentioned as far as cell selection.  I believe he
18   will -- 00468.
19       Q.   Okay.
20       A.   This may have changed.  I thought there was
21   something in here under the cell selection.
22       Q.   Okay.
23       A.   Okay.  Yeah.  Same page, if you look under B,
24   4.
25       Q.   B, 4.  Okay.

Page 105

1        A.   Yes.
2        Q.   "The single cells will be used for inmates who
3    are injured (medically cleared or preexisting), have
4    communicable diseases or conditions, suicidal, combative
5    or violent.  These two single cells may also be used for
6    the isolation of suspects prior to questioning after
7    arrest."  So this cell has a function of -- for the --
8    for detainees who are injured either physiologically or
9    mentally and also for suspects for questioning then.
10   Right?
11       A.   (Moving head up and down)
12       Q.   Is that a yes, sir?
13       A.   Yes.  I am sorry.  I forget.
14       Q.   Okay.  And so the use of single cells, would
15   that -- is that the extent to which the City of Weslaco
16   has a suicide watch policy in May of 2007?
17       A.   To my knowledge, yes.
18       Q.   Okay.  Okay.  Since you -- you took this mental
19   health peace officer course --
20       A.   Uh-huh.
21       Q.   -- several years back, Lieutenant Walensky,
22   would you agree with me that courts around the country
23   have established that jail personnel, including jail
24   administrators, police officers, jailers, and
25   dispatchers have an affirmative duty to protect

27 (Pages 102 to 105)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 106

1  detainees from themselves and other detainees?
2      A.   That goes for any incarcerated person.
3      Q.   So is that a yes?
4      A.   Yes.
5      Q.   Okay.  And would you agree with me, Lieutenant
6  Walensky, that these same courts have established that
7  jail personnel, including jail administrators, police
8  officers, jailers, and dispatchers, have an affirmative
9  duty to identify and respond to serious medical and
10  mental health concerns of a detainee?
11          MS. KENNAMER:  Objection, form.
12      A.   Can you read that again?
13      Q.   Sure.  Would you agree with me as jail
14  commander and based on your experience, training, and
15  education, Lieutenant Walensky, that courts throughout
16  this country have established that jail personnel,
17  including administrators, police officers, jailers, and
18  dispatchers, have an affirmative duty to identify and
19  respond to serious medical and mental health concerns of
20  a detainee?
21          MS. KENNAMER:  Objection.  Are you asking
22  him to agree that the courts have done this?  Are you
23  asking him to agree --
24      A.   I don't have that data.
25          MS. KENNAMER:  -- with what the legal

Page 107

1  standard is?
2      Q.   Okay.  I will rephrase it.  Would you agree
3  with me, Lieutenant Walensky, that jail personnel,
4  including jail administrators, police officers, jailers,
5  and dispatchers, have an affirmative duty to identify
6  and respond to the serious medical and mental health
7  issues faced by a detainee while in custody?
8          MS. KENNAMER:  Objection, form.
9      A.   Based on the knowledge at hand and their
10  experience and observations, yes.
11      Q.   So on May 17th, 2007, Lieutenant Walensky,
12  Officer Ponce, Jailer Alfredo Moreno, Dispatcher Lydia
13  Olalde, Dispatcher Jose Ferrer, and the shift supervisor
14  on duty that evening all had an affirmative duty and
15  responsibility to protect Maricela Trevino from injuring
16  herself?
17          MS. KENNAMER:  Objection, form.
18      A.   I would disagree.
19      Q.   With what part of that question do you disagree
20  with?
21      A.   Whether or not they had ample information to
22  act on anything.
23      Q.   So what you are saying is that you disagree
24  because they did not know that Maricela Trevino was
25  vulnerable to suicidal tendencies?

Page 108

1          MS. KENNAMER:  Objection, form.
2      A.   I don't know that they had that information or
3  not.
4      Q.   Okay.  Another question.  Isn't it true that on
5  May 17th, 2007, Officer Ponce, Jailer Alfredo Moreno,
6  Dispatcher Lydia Olalde, Dispatcher Jose Ferrer, and the
7  shift supervisor on duty that evening, they all had an
8  affirmative duty and responsibility to identify and
9  respond to Maricela Trevino's serious medical and mental
10  health concerns?
11          MS. KENNAMER:  Objection, form.  Assumes
12  facts not in evidence.
13      Q.   You can go ahead and answer.
14      A.   I believe they did provide her medical
15  attention.
16      Q.   But my question was, Lieutenant Walensky, did
17  they have an affirmative duty and responsibility to
18  identify Maricela Trevino's serious medical and mental
19  health issues on May 17th, 2007?
20          MS. KENNAMER:  Objection.  Same objection.
21      A.   I don't know that they did based on the
22  information that they had.
23      Q.   Okay.  Isn't it true that on May 17th, 2007
24  Officer Ponce, Jailer Alfredo Moreno, Dispatcher Lydia
25  Olalde, Dispatcher Jose Ferrer, and the shift supervisor

Page 109

1  on duty that evening all had an affirmative duty and
2  responsibility to provide Maricela Trevino with due
3  process protection under -- under the law?
4      A.   Your question indicates that they did not, and
5  I don't understand where that presumed failure would be.
6      Q.   I am not saying they didn't.  I am asking you
7  if they had a duty and responsibility to provide
8  Maricela Trevino with due process protection on
9  May 17th, 2007.
10      A.   Can you rephrase your question?
11      Q.   Sure.  Did Officer Ponce, Jailer Moreno,
12  Dispatcher Lydia Olalde, and Dispatcher Jose Ferrer, and
13  the jail supervisor, all of these individuals who were
14  on duty the evening of May 17, 2007 --
15      A.   Uh-huh.
16      Q.   -- did they have an affirmative duty and
17  responsibility to provide Maricela Trevino with due
18  process protection as a person incarcerated at the
19  Weslaco Police Department jail?
20      A.   Yes.
21      Q.   Let's take a look at your Exhibit No. 1,
22  Lieutenant Walensky.  Under Roman Numeral I -- and it is
23  Bates stamped number 459.  Roman Numeral I is purpose
24  and policy of the jail and detention procedures.
25  Correct?

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 110

1    A.  Correct.
2    Q.  And under that section it reads, "The Weslaco
3  Police Department operates a municipal jail for the
4  detention of adults charged with felonies and
5  misdemeanors until their release or their transfer to
6  the county jail or other criminal justice agency."  Did
7  I read that correctly?
8    A.  Yes.
9    Q.  Okay.  Earlier you had testified that the type
10  of offenses that were committed by the detainees at the
11  Weslaco jail were only misdemeanors.  Did I
12  misunderstand that?
13        MS. KENNAMER:  Objection, form.
14    A.  You did misunderstand.
15    Q.  Okay.  So the Weslaco jail also houses
16  individuals who have committed felony offenses?
17    A.  People are held there for those offenses above
18  a Class C misdemeanor until an arraignment --
19    Q.  Okay.
20    A.  -- as per the code of criminal procedure, and
21  then they are transported over to the Hidalgo County
22  jail.
23    Q.  Okay.  I just wanted to clarify that.  Thank
24  you.  It says, "The Weslaco Police Department also has
25  an agreement with the Texas Department of Public Safety

Page 111

1  as well as the U.S. Customs and Border Protection for
2  the temporary housing of their prisoners."  Did I read
3  that correctly?
4    A.  Yes.
5    Q.  And this agreement with DPS and with U.S.
6  Customs and Border Protection, was this a written
7  agreement?
8    A.  If it is, that is with the chief of police.
9    Q.  So you have never seen any of these agreements?
10    A.  No.
11    Q.  Lastly it reads, "Additionally, persons
12  convicted of Class C misdemeanors may be required to
13  serve time in jail as a means of paying off court
14  ordered fines and costs," and we discussed that earlier.
15  Correct?
16    A.  Yes, sir.
17    Q.  Under policy -- under B, policy, "The policies
18  set forth in the jail and detention procedures are
19  established to assist department employees in
20  determining appropriate practices in dealing with the
21  day-to-day operations of the facility."  Did I read that
22  correctly?
23    A.  Yes.
24    Q.  "The procedures are as complete as necessary,
25  however, since it is impossible to cover every

Page 112

1  conceivable incident that a member of this department
2  may encounter during the day-to-day activities, much is
3  left to the intelligence, common sense and discretionary
4  judgment of the individual."  Did I read that correctly?
5    A.  Yes, sir.
6    Q.  And in order -- in order for these department
7  employees to do their -- their job on a day-to-day
8  basis, would you agree with me, Chief Walensky, that in
9  order --
10    A.  Lieutenant.
11    Q.  I am sorry.  Lieutenant Walensky.  Would you
12  agree with me that training, specialized training,
13  informs these employees intelligence, common sense, and
14  discretionary judgment?
15    A.  Again any kind of training is good, but you
16  can't teach someone intelligence, common sense, and some
17  of the other things that just have to be utilized for
18  any given circumstance.
19    Q.  Okay.
20    A.  But, yes, training is always beneficial.
21    Q.  But I am assuming you hire people that do have
22  a certain -- a minimum level of intelligence, common
23  sense, and discretionary judgment?
24    A.  Yes.
25    Q.  And is that -- are those pre -- are there any

Page 113

1  prescreening questions during hiring that address their
2  intelligence, common sense, and discretionary judgment
3  when they are going to work at the jail or at the police
4  department?
5    A.  In the interviews that I have been actually at,
6  there are scenarios.  There are questions posed to
7  potential employees regarding that, so you can, but --
8    Q.  Does someone measure their responses or does
9  someone grade their responses?
10    A.  Yes.
11    Q.  Okay.  And would those questions be in a
12  written format?
13    A.  Yes.
14    Q.  I mean, are they part of a pre-hiring interview
15  process?
16    A.  No.  Actually those are during -- done during
17  the oral interview --
18    Q.  Okay.
19    A.  -- of the ones that I attended, yes.
20    Q.  C, standard operating procedures, "The jail and
21  detention procedures will be maintained and updated at
22  the discretion of the chief of police or the jail
23  supervisor."  Now, just to be clear, did I read that
24  section correctly, lieutenant?
25    A.  Yes.

                                      29  (Pages 110 to 113)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 114

1    Q.  In May of 2007, the chief of police was Chief
2  Martinez.  Correct?
3    A.  Yes.
4    Q.  And the jail supervisor, is that another title
5  for jail commander, or is that a different individual?
6    A.  It could be.  Again, as time went on, there was
7  actually personnel assigned to the jail that were
8  actually the jail supervisors, such as a corporal or a
9  sergeant charged with overseeing the jail.  Under
10  myself, but over the jail personnel.
11    Q.  Okay.  And in May of 2007, who was the jail
12  supervisor specifically?
13    A.  At that time, we did not have one, I don't
14  believe.  It was just myself.
15    Q.  Okay.  And it says, "The jail supervisor will
16  be responsible for updating the manual and distributing
17  the procedures to all jail employees."  Did I read that
18  correctly?
19    A.  Yes.
20    Q.  "Jail employees will maintain proficiency with
21  all jail and detention procedures."  Did I read that
22  correctly?
23    A.  Yes.
24    Q.  And so in May of 2007, there was no jail
25  supervisor assigned to the Weslaco Police Department

Page 115

1  jail.  Correct?
2    A.  To my knowledge, no.
3    Q.  Okay.
4    A.  I do not think we had a jail supervisor at that
5  point in time.
6    Q.  Okay.  And just so that I know who were the
7  persons that were responsible for the jail that evening,
8  you would have been responsible for jail operations on
9  May 17th, 2007?
10    A.  If that was a workday, until 5:00 p.m., yes.
11    Q.  Okay.  So after 5:00 p.m., your responsibility
12  for the jail operations for the detainees ceases; is
13  that correct?
14    A.  Well, as per our policy, it reverts to -- the
15  person in charge of the jail would be the on-duty shift
16  supervisor.
17    Q.  Okay.  And that is what I was trying to find
18  out.  So it would be incorrect to say that as jail
19  commander you had responsibilities over the jail and
20  over the detainees after 5 o'clock on May 17th of 2007.
21  Would that be correct?
22    A.  Yes.  It would be.
23    Q.  Your responsibilities shifted to the shift
24  supervisor on duty that evening?
25    A.  Yes.

Page 116

1    Q.  Okay.  So the responsibility for the operation
2  of the jail and for the health and safety of the
3  detainees on the evening of May 17th, 2007 rested on the
4  shoulders of the shift supervisor Officer Meza; is that
5  correct?
6    A.  If he was the supervisor in charge of the shift
7  that evening, the senior, the highest-ranking supervisor
8  in charge, yes.
9    Q.  Okay.  And as the highest-ranking officer in
10  charge during that shift, is there any requirement that
11  he spend any specific amount of time at the jail during
12  his shift?
13    A.  No.
14    Q.  How many times as jail commander have you
15  inspected the jail during your tenure after 5:00 p.m.,
16  Lieutenant Walensky?
17    A.  After 5:00 p.m.?  To conduct a facility
18  inspection or just to come in and --
19    Q.  To conduct any type of inspection.
20    A.  It would depend.  If I was coming off an
21  off-duty detail, if I was in the neighborhood, I might
22  just stop in, walk through.
23    Q.  Well, how many times have you done -- have you
24  done it in -- between 2005 and 2009?
25    A.  I wouldn't know.

Page 117

1    Q.  Okay.  Is that something that you do routinely
2  every week?
3    A.  To --
4    Q.  Inspect the jail after 5 o'clock, after
5  5:00 p.m.
6    A.  No.
7    Q.  Is that something that you do routinely every
8  month, to inspect the jail after-hours, after 5:00 p.m.?
9    A.  No.
10    Q.  Okay.  Is that something that you do every
11  quarter, to inspect the jail after 5:00 p.m.?
12    A.  I didn't do it on a set basis.  I would do it
13  when an opportunity presented itself or if there was an
14  issue that needed to be addressed.
15    Q.  Like an emergency?
16    A.  Yes.
17    Q.  Okay.  So once there is an emergency, then you
18  for sure get down to the jail to find out what is going
19  on?
20    A.  Yes.
21    Q.  Okay.  Absent an emergency, it was not your
22  practice --
23    A.  Incorrect.
24    Q.  Okay.
25    A.  When an opportunity presented itself.  If I was

30 (Pages 114 to 117)

Electronically signed by Terri Hill (201-390-152-8303)                                   2c2ed275-adae-476d-8430-69873ef8f5b8