Page 118

1  in Weslaco, if I was working an off-duty detail here and
2  they weren't expecting me to come through, I would make
3  it a point to come through the police department, walk
4  through, check the jail.
5      Q.  And, Lieutenant Walensky, do you reside in
6  Weslaco, Texas?
7      A.  No.
8      Q.  Where do you live?
9      A.  In Pharr.
10     Q.  In Pharr.  How far is your drive from Weslaco
11 to Pharr?
12     A.  17 miles.
13     Q.  17 miles.  How long does it take you?
14     A.  17 minutes.
15     Q.  Okay.  So by -- so after 5 o'clock, you are out
16 of the -- you are out of the city limits of Weslaco.
17 Correct?
18     A.  I live outside the city.
19     Q.  Okay.  And the jail -- the jail supervisor, in
20 other words, the shift -- I am sorry.  The shift
21 supervisor who is responsible for the jail when you are
22 not in Weslaco at the police department, does that -- do
23 the jail -- do these jail or shift supervisors, do they
24 have any specific training in jail administration?
25     A.  Not to my knowledge.

Page 119

1      Q.  Okay.  So there is three shift -- three shift
2  supervisors every day.  Correct?
3      A.  Yes.
4      Q.  How many shift supervisors are there in any
5  given week?
6      A.  You have three shifts, seven days a week, and
7  two supervisors per shift.
8      Q.  Okay.
9      A.  You have seven days a week.
10     Q.  Right.
11     A.  Sergeant has got to work five.  He can have two
12 days off.  Those two days off, there is going to be a
13 corporal there.  So you are going to have two
14 supervisors, three shifts, seven days a week.
15     Q.  So at most in any given week, there will be two
16 shift supervisors.  Correct?  During any -- during the
17 week, two different --
18     A.  Three days a week, because you have your three
19 days when they are all there, when there is a --
20     Q.  Okay.
21     A.  -- sergeant and corporal there.  When the
22 corporal has two days off, the sergeant is on.  The
23 sergeant will have two days off, then the corporal is
24 on, and then you start your week.
25     Q.  Okay.  So at most there are three shift

Page 120

1  supervisors a week.  Wouldn't that be fair?
2      A.  There is three shifts and there is two
3  supervisors per shift.  So there is --
4      Q.  Okay.
5      A.  And they work a five-day-a-week schedule.
6      Q.  Okay.
7      A.  So however you want to mix and work that
8  around.  You have got a total of six supervisors either
9  being a corporal or a sergeant.
10     Q.  Got it.  So out of the six supervisors, as a
11 prerequisite for becoming a shift supervisor, did the
12 City of Weslaco require that these shift supervisors
13 have jail administration training?
14     A.  No.
15     Q.  Does the City of Weslaco require that the shift
16 supervisors have -- have training on dealing with
17 persons with mental illness?
18     A.  CIT training.
19     Q.  Just CIT training?
20     A.  (Moving head up and down)
21     Q.  Okay.  How about on specific coursework on
22 preventing suicides?
23     A.  That would be covered in your CIT training.
24     Q.  But that is not a requirement of the City of
25 Weslaco in order to become a shift supervisor.  Correct?

Page 121

1      A.  To my knowledge, no.
2      Q.  And the shift supervisor is -- during any given
3  shift, are they stationed at the police department, or
4  are they acting -- are they out on the field as patrol
5  officers?
6      A.  In the field.
7      Q.  They are in the field.  Okay.  So on May 17th,
8  2007, there really wasn't a high-ranking Weslaco Police
9  Department officer supervising Jailer Moreno and the
10 detainees at the jail.  Correct?
11     A.  Just the jailer on duty.
12     Q.  Okay.  So is that correct?
13     A.  Yes.
14     Q.  The second page of Exhibit No. 1 talks about
15 supervision.
16     A.  Yes.
17     Q.  Do you see that at the top, lieutenant?
18     A.  Yes, sir.
19     Q.  It says, "The jail will be overseen by the
20 bailiff or jailer supervisor who reports directly to the
21 lieutenant assigned to command the jail."  Did I read
22 that correctly?
23     A.  Yes, sir.
24     Q.  Okay.  And here when we talk about the jail
25 supervisor, we mean -- when we talk about the jailer

31 (Pages 118 to 121)

Page 122

```
1   supervisor, we are talking about shift supervisors.
2   Correct?
3       A.  Well, actually --
4       Q.  For practical purposes?
5       A.  It could be the shift supervisor, if I am not
6   here, or it could mean the jail commander.  Whoever the
7   highest-ranking person --
8       Q.  Okay.
9       A.  -- on duty is usually how --
10      Q.  Okay.
11      A.  The rule of thumb.
12      Q.  Between the hours of 8:00 a.m. and 5:00 p.m.,
13  you would be the highest-ranking --
14      A.  If I was on duty, yes, sir.
15      Q.  -- officer over the jail.  Correct?
16      A.  That's correct.
17      Q.  But after 5:00 p.m., it would be -- most likely
18  would be the shift -- police department shift
19  supervisor?
20      A.  Yes.
21      Q.  Okay.  If something happens at the jail
22  during -- after 5 o'clock, who does that shift
23  supervisor report to?
24      A.  He would notify the chain of command, including
25  myself.
```

Page 123

```
1       Q.  Okay.  And who is on -- who does he contact
2   first?
3       A.  He would contact probably myself.
4       Q.  Okay.  And if he can't get ahold of you?
5       A.  It would probably be the other captain and then
6   the chief of police.
7       Q.  Okay.  And the other captain -- okay.  Who is
8   the other captain in May of 2007?
9       A.  Captain Vallejo.
10      Q.  Vallejo.  Did -- Captain Vallejo, is he a
11  mental health peace officer like you are?
12      A.  Not to my knowledge.
13      Q.  Okay.  Do his job duties include -- and I am
14  talking about -- does he have an 8:00 to 5:00 job like
15  you do?
16      A.  Yes.
17      Q.  Do his job duties between 8:00 and 5:00,
18  8:00 a.m. and 5:00 p.m., do they include any jail
19  administration issues?
20      A.  No, sir.
21      Q.  Okay.  Do they -- what are his specific job
22  duties, if you know?
23      A.  Much like myself, he had several.  He would be
24  in charge at that time of SWAT team, criminal
25  investigations division.  What else did he have there?
```

Page 124

```
1   Probably special crimes, grants.  I think he had
2   training.  I am not sure, but --
3       Q.  Okay.
4       A.  -- that is off the top of my head.
5       Q.  Okay.  Let me read you section C on the second
6   page of Exhibit No. 1.  It reads, "Jailers are the
7   primary providers of care and custody of inmates of the
8   Weslaco City jail."  Did I read that correctly?
9       A.  Yes.
10      Q.  Okay.  "They are responsible for the day-to-day
11  operations of the jail including the transporting of
12  prisoners to the county jail."  Did I read that
13  correctly?
14      A.  Yes.
15      Q.  Now, in May of 2007, the City of Weslaco had
16  one jailer per shift.  Am I -- is that correct?
17      A.  Depending on the shift.
18      Q.  Okay.  How about the evening shift, from 3:00
19  to 11:00?
20      A.  That would have been the norm, yes.
21      Q.  Are there more jailers during the earlier
22  shifts?
23      A.  Yes.  I believe in that term and as it is now
24  four jailers.  We would have one -- two jailers on the
25  day shift at times, depending on scheduling, vacation.
```

Page 125

```
1       Q.  Okay.  And so there are three shifts.  Correct?
2       A.  Yes.
3       Q.  From 8:00 a.m. to 3:00 p.m.?
4       A.  During that point in time, it was 3:00 to
5   11:00, 11:00 to 7:00, and 7:00 to 3:00.
6       Q.  3:00 to 11:00 p.m., 11:00 to 7:00 a.m., and --
7       A.  7:00 a.m. to 3:00 p.m.
8       Q.  3:00 p.m.  Okay.  And during the day shifts,
9   there would be more than one --
10      A.  On occasion --
11      Q.  -- jailer?
12      A.  -- yes.
13      Q.  But there were occasions when there was just
14  only one jailer per shift?
15      A.  Oh, yes.
16      Q.  Okay.  And if -- if, for instance, during day,
17  there is a need to transport a prisoner like we are
18  seeing right here under section C and there is only one
19  jailer, who would monitor the detainees at that time?
20      A.  Well, that is when our transports, we had
21  that -- where that fourth jailer, we would actually have
22  two in the day.  So one jailer could handle the
23  arraignments, taking the prisoners in to be arraigned by
24  the judge before they were sent over to the county jail
25  or the Class C misdemeanors, to have the judge hear that
```

32 (Pages 122 to 125)

Electronically signed by Terri Hill (201-390-152-8303)        2c2ed275-adae-476d-8430-69873ef8f5b8

Page 126

1  right there, and conduct the transports while leaving
2  another jailer at the jail.
3      Q.  Okay.  In the evening when there is only --
4  that was the norm, right, one jailer during the evening
5  shift --
6      A.  Yes.
7      Q.  -- from 3:00 p.m. to 11:00 p.m.?
8      A.  Correct.
9      Q.  Okay.  During that shift -- I looked at the
10  jail logs, and it seems like sometimes the jailer during
11  the evening shifts would leave to get food for the
12  detainees?
13      A.  Yes.
14      Q.  Okay.  And so when -- the Weslaco Police
15  Department does not have a cafeteria or a kitchen.
16  Correct?
17      A.  Correct.
18      Q.  Okay.  So the jailer -- evening shift jailers
19  would have to leave the premises.  They would have to
20  leave the jail in order to feed -- in order to get the
21  food for the detainees.  Correct?
22      A.  Yes.
23      Q.  When that would happen during the evening
24  shifts -- because I am assuming there is a dinnertime?
25      A.  Yes.

Page 127

1      Q.  Who would in that -- under that scenario
2  monitor the detainees?
3      A.  The dispatchers.
4      Q.  The dispatchers.  And so the dispatchers would
5  monitor when the evening jailer leaves the premises.
6  Correct?
7      A.  Yes.
8      Q.  Okay.  And they monitor by video only, or do
9  they go and physically observe the detainees inside
10  their cells?
11      A.  By video.
12      Q.  By video.  So every cell -- and I forgot how
13  many cells you told me.
14      A.  There is a total of five cells.
15      Q.  Okay.  Every cell has a video camera?
16      A.  At least one.
17      Q.  At least one.  Okay.  And back in -- was this
18  true back in May of 2007?
19      A.  Yes.
20      Q.  Okay.  And are the dispatchers, are they able
21  to --
22      A.  Excuse me.
23      Q.  Yes, sir.  Can they -- do they have audio
24  capabilities when they are monitoring?
25      A.  Only on one camera.

Page 128

1      Q.  And is this true in May of 2007?
2      A.  Correct.
3      Q.  Which camera -- where was that camera located?
4      A.  In the main booking portion.
5      Q.  Okay.  In the main booking portion.  So
6  where -- at the booking desk area?
7      A.  Yes.
8      Q.  And that is where the jailer first receives the
9  detainees --
10      A.  Yes.
11      Q.  -- the persons that are arrested?
12      A.  (Moving head up and down)
13      Q.  The dispatchers have audio capabilities?
14      A.  Yes.
15      Q.  They can actually hear what is going on in
16  booking?
17      A.  On camera eight, yes.
18      Q.  Okay.  And was that true back on May 17th,
19  2007?
20      A.  Yes.
21      Q.  Okay.  With the -- with the audio capabilities
22  via that camera number -- what did you call it?  Camera
23  eight?
24      A.  It is either eight or sixteen.  Actually it is
25  the camera that the Hidalgo County District Attorney's

Page 129

1  office provided for the visual and audio documentation
2  of DWI field sobriety testing.
3      Q.  Okay.  That's good to know, Lieutenant
4  Walensky.  Well, and had this camera -- was this camera
5  installed prior to May 17th, 2007 or after May 17th,
6  2007?
7      A.  That camera, to my knowledge, has been there
8  since I have been there.
9      Q.  13 years?
10      A.  It is actually hooked up to a VHS system.
11      Q.  Okay.  So that means that it records?
12      A.  Yes.
13      Q.  Okay.  And it records because the Hidalgo
14  County DA's office wants to use that video of the person
15  arrested for future court cases of --
16      A.  Prosecution of DWI.
17      Q.  Okay.  In May 17th of 2007, was that video
18  recording system operating?  Was it functional?
19      A.  I can't be sure.  We have had camera issues,
20  but to my knowledge -- it would be a guess.
21      Q.  Okay.  And the only reason I am asking you,
22  because it is one of the areas of inquiry that I have
23  to -- if you don't know, who would know?  Who would be
24  responsible for the maintenance and -- and repair of
25  that camera?

33  (Pages 126 to 129)

Electronically signed by Terri Hill (201-390-152-8303)                                   2c2ed275-adae-476d-8430-69873ef8f5b8

Page 130

1    A.  Technically, it is my understanding, it would
2  be the District Attorney's office.
3    Q.  Okay.  And where does it record, Lieutenant
4  Walensky?
5    A.  The camera that is actually in the processing,
6  booking area is wired to the dispatch area, and there is
7  a monitor.
8    Q.  Okay.
9    A.  And then there is a VCR that is actually hooked
10  up to it that you would put in a video, VHS tape, and
11  you would be able to record.
12    Q.  Are you aware of any video recording for
13  May 17th, 2007 that would show Maricela Trevino in the
14  booking area?
15    A.  No.  The process for that was -- at the time.
16  We now have a system that records all.  It was just that
17  one camera, and when you -- the trooper would come in or
18  the officer would come in, they would call up, put in a
19  tape, start recording.  You would read the DWI statutory
20  warning, and then you would go through that.  It was --
21    Q.  Okay.
22    A.  -- only recording for the prosecution of
23  intoxication --
24    Q.  For very specific purposes of having someone
25  who is --

Page 131

1    A.  DWI.
2    Q.  -- DWI.  Okay.
3    THE VIDEOGRAPHER:  Five minutes.
4    Q.  Five minutes.  So it is safe to say, would I be
5  correct, that you have never seen a video recording of
6  Maricela Trevino for the evening of May 17th, 2007?
7    A.  No.
8    Q.  Are you aware of one existing?
9    A.  No.
10    Q.  Okay.  Now, the dispatcher -- I took the
11  deposition of Dispatcher Ferrer yesterday, and I asked
12  him about audio capabilities.  And he said that whenever
13  there is a call made by a police officer, either on
14  their portable radio --
15    A.  Uh-huh.
16    Q.  -- or on their patrol unit, when they call
17  dispatch, that that conversation or that call is being
18  recorded.  Was that true on May 17th, 2007?
19    A.  I don't have access to that system, but it is
20  my understanding that radio transmission calls are
21  recorded.
22    Q.  Okay.  So if I look at the calls that were made
23  between the police officers and dispatch during the
24  evening of May 17th, 2007, it is your understanding that
25  those calls, the communications from the dispatch to the

Page 132

1  officers and from the officers to dispatch, that they
2  were recorded on that date, that there was recordings?
3    MS. KENNAMER:  Objection, form.
4    A.  I don't know if there are recordings.
5    Q.  Okay.
6    A.  I know that -- it is my understanding that all
7  radio transmissions on the primary radio channel the
8  department has the capability of recording those on one
9  of the computers.
10    Q.  Have you ever heard any recording from
11  May 17th, 2007?
12    A.  Any recording?
13    Q.  Any recording that concerned Maricela Trevino.
14    A.  Yes.
15    Q.  Okay.  And that is a recording -- how many
16  recordings are there?
17    A.  I don't know if it was one or two.
18    Q.  Okay.  And when did you first hear these
19  recordings?
20    A.  At some point after the incident.
21    Q.  Okay.
22    A.  I can't be --
23    Q.  How many days after the incident, or was it on
24  the day of the incident?
25    A.  No.  It was well after.  During the

Page 133

1  investigation at some point.
2    Q.  Okay.  And there were two recordings on -- on
3  those two recordings --
4    A.  It was one or two.
5    Q.  One or two?
6    A.  Yeah.
7    Q.  Okay.  And where did you go to hear these
8  recordings?
9    A.  I don't recall.  I believe it was on a disk.
10    Q.  Who else heard the recordings with you?
11    A.  It may have been the chief.
12    Q.  Besides the chief, are you aware of any other
13  employee of the Weslaco Police Department being privy to
14  these recordings?
15    A.  No.
16    Q.  Okay.  So just you and the chief?
17    A.  And I would assume the investigator.
18    Q.  And who was the investigator assigned to the
19  Maricela Trevino suicide?
20    A.  I am not sure.  Captain Vallejo was in charge
21  of criminal investigations division at the time, and
22  anything that is being investigated, whether it is an
23  incident like this or a criminal investigation, it will
24  be handled by the criminal investigations division.
25    Q.  Okay.  On these recordings, who did -- these

34  (Pages 130 to 133)

Electronically signed by Terri Hill (201-390-152-8303)                                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 134

1  recordings, the voices, who did you -- did you hear the
2  voice of Maricela Trevino on either one of these
3  recordings?
4     A.  I heard a female's voice.
5     Q.  Okay.  Tell me what you recall her saying.
6     A.  Not much as far as detail.  I believe it was
7  with -- somebody answered the phone and then called for
8  somebody else, and then I think it was -- it might have
9  been her mom.  She had a conversation, and then I
10  believe the other was with a male.
11     Q.  Okay.  And these are -- these recordings are of
12  Maricela Trevino using the phone at the booking counter
13  or booking area?
14     A.  I believe so.
15     Q.  Okay.
16     A.  I believe it was, yeah, a telephone.
17     Q.  Okay.  I was asking you about recordings of the
18  radio transmissions.
19     A.  Oh.
20     Q.  Have -- have you ever -- have you heard any
21  radio transmission recording from May 17th, 2007?
22     A.  No.
23     Q.  Okay.
24        THE VIDEOGRAPHER:  One minute.
25        MR. RUIZ:  Okay.  We are going to take a

Page 135

1  break so he can change.
2        (Off the record)
3     Q.  Lieutenant Walensky, who was responsible at the
4  City of Weslaco Police Department for drafting the jail
5  and detention procedures and the policies contained in
6  these procedures here in Exhibit No. 1?
7     A.  That was myself.
8     Q.  Yourself.  And when you -- since being assigned
9  to the position of jail commander in 2005, between 2005
10  and 2007, were you involved in the drafting or amending
11  of this document during that time frame?
12     A.  Yes.  The -- the one that we had was outdated,
13  and this is the one that I presented to the chief of
14  police.
15     Q.  Okay.  And what did you rely on in formulating
16  the jail and detention procedures that we have here as
17  shown in Exhibit No. 1?
18     A.  Actually much of this comes from the McAllen
19  Police Department.
20     Q.  Okay.  And -- okay.  And did you -- who
21  assisted you with the drafting of these jail and
22  detention procedures?
23     A.  Mainly myself.
24     Q.  Okay.  And you looked at the McAllen Police
25  Department jail and detention procedures that were in

Page 136

1  effect back in 2005?
2     A.  Correct.
3     Q.  Okay.  Did any of those procedures that the
4  City of McAllen had, did they -- did they address
5  special considerations at intake?
6     A.  I don't recall.
7     Q.  Did -- okay.  Well, did the -- do you recall
8  seeing from the McAllen jail and detention procedures
9  special considerations for suicide attempts or
10  statements about suicide?
11     A.  I don't recall.
12     Q.  Okay.  Okay.  Let's continue with this section
13  C under -- on page two of Exhibit No. 1.  Under Roman
14  Numeral III, responsibilities of personnel, C, jailers
15  back in -- back in May of 2007, the responsibilities of
16  jailers included, one, "Control access and egress to and
17  from the jail area."  Did I read that correctly?
18     A.  Yes.
19     Q.  Two, "Screen citizens prior to visitation with
20  metal detector and ensure noncontact visitation."  Did I
21  read that correctly?
22     A.  Yes.
23     Q.  Three, "Ensure that dispatcher maintains visual
24  observation of destructive or violent inmates via the
25  video system in dispatch."  Did I read that correctly?

Page 137

1     A.  Yes.
2     Q.  In May of 2007, specifically on May 17th, 2007,
3  could Jailer Moreno during his evening shift, could --
4  did he have video access to the cells in the jail?
5     A.  No.
6     Q.  The only persons that had access to -- video
7  access to the cells were in dispatch; is that correct?
8     A.  Yes.
9     Q.  And that would have been Jose Ferrer, Lydia
10  Olalde, and I believe Jesus Garza?
11     A.  I don't know.
12     Q.  Okay.  Who do you know for sure?
13     A.  I don't.  I don't know what the -- who the
14  dispatchers were on duty at that time.
15     Q.  Okay.  And so in May of 2007, May 17th, 2007,
16  in order for a jailer to monitor the detainees, he
17  needed to walk over to each individual cell and check in
18  and observe the detainee.  Would that be correct?
19     A.  Yes.
20     Q.  That would be the only way to supervise and
21  monitor detainees back in May of 2007 by the jailer?
22     A.  Unless he went to dispatch.
23     Q.  And looked at the cameras?
24     A.  (Moving head up and down)
25     Q.  Okay.  Was that common for them -- did they do

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 138

1  that?
2      A.  No.  The chief did not like that, but did they
3  go up there and converse with the dispatchers and have
4  the ability to see on the screens, yes --
5      Q.  Okay.
6      A.  -- if they had to pick up paperwork from them.
7  Oftentimes to complete the officer's report, they would
8  go up, pick up some of that paperwork right straight
9  down the hallway, and then back in to complete their
10 booking information.
11     Q.  Okay.  Thank you.  Would that count as -- as a
12 check on the detainees, going to dispatch?
13     A.  I would say no.
14     Q.  Okay.
15     A.  And it wouldn't -- not even that often.
16     Q.  Okay.
17     A.  In fact, walking past all the cells on your way
18 to dispatch would kind of defeat that purpose.
19     Q.  Okay.  Thank you.  And it says here for number
20 three that the jailer needs to, "Ensure that dispatcher
21 maintains visual observation of destructive or violent
22 inmates."  Destructive, is that self-destructive, you
23 know, self-injury, inmates who may injure themselves?
24     A.  No.  That is inmates who would be in there to
25 take wet toilet paper to block the view of the camera,

Page 139

1  to try to tear the commode out of the floor, to pull the
2  mattress off the bedding and tear it apart.
3      Q.  Okay.  The jailer under number four is also
4  responsible for storing and -- jailers must also store
5  and account for inmate personal property during their
6  incarceration.  Did I read that correctly?
7      A.  Yes.
8      Q.  Okay.  The jailer would also meet arresting
9  officer at the prisoner drop off for reception of the
10 prisoner.  Did I read that correctly?
11     A.  Yes.
12     Q.  Jailer would process and conduct booking
13 procedures as identified in this policy or as required.
14 Did I read that correctly?
15     A.  You are on number six?
16     Q.  Yes, sir.
17     A.  Okay.  It didn't say jailer.
18     Q.  Oh, I am sorry.  I will read it again.
19     A.  It just says, processes and conducts -- this
20 all falling under jailer.
21     Q.  Right.
22     A.  "Processes and conducts booking procedures as
23 identified in the policy or as required," yes.
24     Q.  Okay.  And the booking procedures that this
25 line references would be on what page of this exhibit?

Page 140

1      A.  Booking procedures.
2      Q.  On 467?
3      A.  Correct.
4      Q.  Okay.  And on 467 the only written policy
5  concerning the jailers' treatment of individuals
6  suffering from mental health illness and who may present
7  a danger to themselves is contained in number four of
8  the booking procedures.  Correct?
9      A.  Correct.
10     Q.  And right above -- right above the -- that last
11 sentence in number four, do you see where it says, "No
12 inmate will be denied medical attention," and that is
13 underlined for emphasis?
14     A.  Correct.
15     Q.  Okay.  And you decided to include that section
16 when you drafted these detention --
17     A.  Yes.
18     Q.  And why is that, Lieutenant Walensky?
19     A.  Even though an inmate's complaint of an ache,
20 illness, injury may not be able to be substantiated, it
21 is not for the jailer to take it upon themselves.  They
22 are to contact EMS.
23     Q.  Okay.  And so as you wrote this -- as you
24 drafted these procedures and policies, these jail
25 detention procedures and policies, under that sentence,

Page 141

1  "No inmate will be denied medical intention," was it
2  your intent to also include mental health and
3  psychological or psychiatric attention?
4      A.  My intent was just what is written.  They are
5  not to be denied medical attention.
6      Q.  And so a fair interpretation of that statement,
7  can it also be no inmate will be denied mental health
8  attention?
9          MS. KENNAMER:  Objection, form.
10     A.  All I can attest to is what I put in here, "No
11 inmate will be denied medical attention."
12     Q.  Okay.
13     A.  And then the following sentence refers to
14 issues with mental health.
15     Q.  So when you meant -- when you wrote medical
16 attention as shown in this section VII, booking
17 procedures, number four, you did not intend to include
18 mental health care or mental health treatment or
19 psychological or psychiatric treatment under the term
20 medical attention; is that correct?
21     A.  I intended it to mean medical attention, and
22 then I addressed the possible need for mental health
23 attention after.
24     Q.  Okay.  So the line that is underlined
25 emphasizes only -- its only purpose is to make it clear

36  (Pages 138 to 141)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 142

1  that the detainees at the Weslaco Police Department jail
2  will not be denied medical attention.  It does not
3  include mental health or psychiatric --
4     A.  Any medical attention --
5     Q.  Well --
6     A.  -- and that could be any medical attention.
7     Q.  So would that include mental health care?  Yes
8  or no?
9        MS. KENNAMER:  Objection, form.
10    Q.  You are the one who drafted it.
11    A.  Open to interpretation.  If you feel it needs
12 to be so, yes.  The mental health aspect was addressed
13 in the sentence right after that.  That is to be a call
14 and judgment made by the supervisor.  But as far as
15 medical, I don't know any other way -- it is what it is,
16 I guess.
17    Q.  Okay.  Well, but don't you want to be clear
18 about the policies and procedures that you have when you
19 have someone's health at issue?
20    A.  Right.  If I --
21       MS. KENNAMER:  Objection, form.
22    A.  If I wanted to be as clear as I wanted to be,
23 sir, this document would be 300 pages long --
24    Q.  Okay.
25    A.  -- and it still wouldn't suffice.

Page 143

1     Q.  Okay.  And I just -- but you said it would be
2  subject to interpretation.  Correct?
3     A.  Medical to somebody may mean medical to
4  somebody else.  Expansive, but medical attention is
5  medical attention.  If they have a pain, an ache --
6     Q.  Physiological pain.  You mean a physiological
7  injury?
8     A.  Any request for medical attention is not going
9  to be denied is what I meant.
10    Q.  Okay.
11    A.  And I think that carries through as you read
12 it.  Medical attention will not be denied.
13    Q.  And all I want to know is, did you -- did you
14 intend to include mental health care under that -- in
15 that sentence where it says, no inmate will be denied
16 medical attention, including mental health care?  Did
17 you intend that?
18    A.  I meant it to intend as followed up, "Inmates
19 requiring medical attention will be seen by EMS and
20 treated accordingly."  And as a finality to that, "No
21 inmate will be denied medical attention."
22    Q.  Okay.
23    A.  Now, EMS don't provide mental health attention.
24    Q.  That is what was going to be my next question.
25 Okay.  So EMS only addresses physiological --

Page 144

1     A.  Right.
2     Q.  -- medical care?
3     A.  And the mental issues covered under, "Subjects
4  believed to be suffering from mental illness and
5  presenting a danger to themselves or others will be
6  evaluated by a supervisor for possible 26."
7     Q.  Okay.  So that -- so I am clear, let me just
8  ask you a question about the second part concerning the
9  mental illness aspect to it.  Okay?
10    A.  Okay.
11    Q.  When it says here, "Subjects believed to be
12 suffering from mental illness and presenting a danger to
13 themselves or others will be evaluated by a supervisor
14 for possible section 26," that is the part of the
15 booking procedures that addresses mental illness.
16 Correct?
17    A.  Yes.
18    Q.  That is the only part -- that is the only
19 section in the booking procedure that addresses mental
20 health care.  Correct?
21    A.  Correct.
22    Q.  And that decision rests with the jailer?
23    A.  (Moving head up and down.)
24    Q.  Is that a yes?
25    A.  Yes.  I am sorry.

Page 145

1     Q.  The shift supervisor?
2     A.  Yes.
3     Q.  Okay.  Anyone else, Lieutenant Walensky?
4     A.  Those personnel that are in contact with her,
5  which would be the jailer.
6     Q.  Okay.  Now, the original policy where we were
7  looking at on the second page --
8     A.  Back on 460?
9     Q.  Yes, sir.  On 460 said, or as required.  What
10 does that mean, or as required?
11    A.  Or as required.  If an order is given, look, we
12 need to do this.  If it is a memo distributed that says,
13 hey, we need to -- it could be something regarding one
14 person.  What -- what this is meant to include is,
15 "Processes and conducts booking procedures as identified
16 in this policy or as required."  The Hidalgo County
17 Sheriff's office requires that you fill out their
18 booking form to be sent over there.  So it is not
19 necessarily the policy of the Weslaco Police Department
20 to do the Hidalgo County Sheriff's Office booking form,
21 however --
22    Q.  Okay.
23    A.  -- you are not going to be well received at the
24 Hidalgo County Sheriff's Office unless you have filled
25 out their form for processing into their facility.

37 (Pages 142 to 145)

Page 146

1    Q.  Okay.  I understand.
2    A.  That is a requirement they have.  Just things
3  like that, for an example.
4    Q.  Okay.  And so as part of the documents or forms
5  that are filled out by the jailers --
6    A.  Uh-huh.
7    Q.  -- they would include at times the Hidalgo
8  County Sheriff's booking form?
9    A.  Yes.  If it was for a Class B misdemeanor or
10  above, this person being transported on to the Hidalgo
11  County Sheriff's office after arraignment.
12    Q.  So it is Class B and above?
13    A.  Yes.
14    Q.  Okay.  And if it is a Class C, that would
15  require the jailer to complete a Weslaco Police
16  Department booking sheet or form?
17    A.  Okay.  Let me back up with you.  Anybody that
18  gets arrested by the Weslaco Police Department is still
19  going to have a booking process done, period, regardless
20  for what --
21    Q.  Okay.
22    A.  -- offense.  C, B, A, felony, it doesn't
23  matter.
24    Q.  Okay.
25    A.  If it is a Class B or above, you will also do a

Page 147

1  booking report as designed and accepted for by the
2  Hidalgo County Sheriff's office.  So we have our booking
3  procedures.  Yet, if it is somebody that is going to be
4  transported to the sheriff's office, they require as
5  part of the arraignment packet and all the paperwork you
6  deliver up there, something that their department
7  requires on a form that is authorized by that
8  department.  So that is the or as required that you were
9  referring to.
10    Q.  I -- I got it.
11    A.  It is not required by our department, but it is
12  required by Hidalgo County Sheriff's Office to intake a
13  prisoner that has been arraigned in our jurisdiction for
14  a crime committed in our jurisdiction into their
15  facility.
16    Q.  Okay.  And if it is a Class C misdemeanor, it
17  would -- that would only require the Hidalgo County --
18    A.  (Shaking head from side to side)
19    Q.  I mean, a Class C misdemeanor would require
20  only the Weslaco Police Department booking sheet
21  information?
22    A.  Correct.
23    Q.  Class B misdemeanors and above would require an
24  additional -- the Hidalgo County-approved or --
25    A.  Yes.  Basically it is their booking sheet, but

Page 148

1  it is something they can take and just plug in without
2  having to do -- going through the whole thing when --
3    Q.  Okay.
4    A.  -- we are booking them anyway.
5    Q.  Got it.  I understand.  And while we are on the
6  topic of booking, what was the -- can you articulate
7  what the intake procedure that was in place in -- on May
8  17th, 2007?
9    A.  Do you want me to read down through this?
10    Q.  What page are you on, sir?
11    A.  It is 467, booking procedures.
12    Q.  And these procedures, are they step by step --
13  the steps that the jailer would have to take every time
14  he would book a detainee?
15    A.  Yes.
16    Q.  Okay.  Go ahead, sir.
17    A.  Booking procedures as listed in article VII,
18  section A, subsection one, "Meet the
19  arresting/transporting officer, help secure the incoming
20  inmate and provide a holding cell if necessary."  Two,
21  "Search the inmate.  Place all property on the booking
22  counter.  Inmate or inmates should remain handcuffed
23  during the process.  Pat down on same sex inmates only."
24  Subsection two, being A, "Give located weapons or
25  contraband immediately to the arresting/transporting

Page 149

1  officer for disposition."
2    Q.  Lieutenant, before you go on, can I interrupt
3  you real quick --
4    A.  Sure.
5    Q.  -- and go back to that number two, the section
6  that is underlined where it says, "Pat down on same sex
7  inmates only"?
8    A.  Yes.
9    Q.  Okay.  What would happen when you have an
10  inmate of the opposite sex?  What was the policy there?
11    A.  At that time, try to get a female officer.  If
12  it is a male arresting officer with a female suspect,
13  try to get a female officer.  However, at this time, we
14  didn't have any female jailers, and on the road we
15  had --
16    Q.  You are talking about May 17th, 2007?
17    A.  Yes.
18    Q.  There were no female jailers employed at all.
19  Correct?
20    A.  I don't believe so.
21    Q.  Okay.  And during the evening shift on
22  May 17th, 2007, the only jailer that was on duty was a
23  male, correct, Alfredo Moreno?
24    A.  That is correct.
25    Q.  Okay.  When faced with a female detainee, what

Page 150

1   should he have done when coming in contact with Maricela
2   Trevino?
3       A.   Well, unfortunately there are times when there
4   is just not a female on duty.  We do have metal
5   detection devices to scan for weapons, which are
6   predominantly metallic.  You ask the female to remove
7   all property from their clothing, place it up on the
8   booking counter, and go through the process, remove
9   their shoes.
10          If you do have reason to believe that they
11  do have a weapon on them, you have the option of using a
12  scanning device or you can attempt to have a female
13  officer come in, if you have one on duty or one
14  available to come in and actually do a pat down, if you
15  believe that there is contraband.
16      Q.   Okay.  And what office -- strike that.  What
17  Jailer Moreno did, he did not contact a female officer
18  to assist him with the pat down of Maricela Trevino on
19  May 17th, 2007.  Correct?
20      A.   I don't know.
21      Q.   Okay.  Do you know whether he did a pat down on
22  Maricela Trevino on that day?
23      A.   I don't know.
24      Q.   Okay.  I guess I can show you his affidavit.
25  We will get to that.  But if the -- and if -- okay.

Page 151

1   Well, let's take that example.  On May 17th, 2007, there
2   is no female jailer and there are no female police
3   officers on duty.  What is Jailer Moreno who has to book
4   a female like Maricela Trevino who he has to book --
5       A.   Okay.
6       Q.   -- with respect to pat downs?
7       A.   If he has a reason to believe that there is
8   still further -- or any contraband to be found, a
9   variety of things.  You can empty your pockets, extend
10  them outwards, make sure there is no property.  You can
11  do a visual inspection.  If you had to, and really it
12  wasn't -- the chief of police didn't care much for it,
13  but a female dispatcher.  However, that was -- they
14  didn't want any -- and that is actually a violation of
15  our policy to have anybody unauthorized in the booking
16  area.
17      Q.   Okay.  So there was a policy back in May 17th,
18  2007 from the chief of police, Chief Martinez --
19      A.   (Moving head side to side)
20      Q.   No?
21      A.   No.
22      Q.   What was that policy?
23      A.   It is not a policy.  He just -- it was stated
24  he did not want civilian staff in the booking area, and
25  the policy says no unauthorized personnel to be in the

Page 152

1   booking area.
2       Q.   Okay.  Where is -- let's talk about the written
3   policy.
4       A.   If you will look to 0461.
5       Q.   Yes, sir.  I am there.
6       A.   Under jail security, V, "Only authorized
7   persons are allowed inside the jail facility.  It will
8   be generally limited to inmates and essential
9   personnel."
10      Q.   Okay.  So dispatchers, according to this
11  policy, are not authorized persons inside the jail
12  facility according to Chief Martinez's verbal policy.
13  Correct?
14      A.   Yes.  And this policy.
15      Q.   Okay.
16      A.   And if I can read it?
17      Q.   Sure.  Go ahead.
18      A.   "This includes jailers, police officers and
19  other law enforcement personnel from other agencies on
20  or for other legitimate reasons.  Civilians will not be
21  allowed inside the jail facility except for approved
22  visitation, legal counsel, and search of a female
23  prisoner or other legitimate reason as approved by the
24  jailer or supervisor on duty."  Again it was the chief's
25  expression that he did not want -- they have their

Page 153

1   duties up there and did not want them in the jail
2   facility.
3       Q.   And his policy would rule out this section
4   right here that would allow -- would cancel out this
5   section that would allow a female or a civilian from
6   searching a female prisoner.  Correct?
7       A.   And it had its -- you have somebody who has not
8   experienced the jail setting and how things are done and
9   how to conduct a pat down to come back and do that.
10  Now, if it is a weapon, as is with police officers out
11  on the road, if you discover what appears to be a weapon
12  on a female, a male police officer has every right to
13  remove that --
14      Q.   On the female?
15      A.   -- under those circumstances, yes.
16      Q.   Out on the field.  Okay.
17      A.   Anywhere actually, and especially in the jail
18  setting.
19      Q.   Okay.  So Chief Martinez had a policy that
20  prevented female civilians, in this case, dispatchers --
21      A.   Not a written policy.
22      Q.   Stated?
23      A.   (Moving head up and down)
24      Q.   Verbal policy that would prohibit these female
25  dispatchers from assisting the jailer --

39 (Pages 150 to 153)

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 154

1     A. He did not --
2     Q. -- with the pat down of a female prisoner; is
3 that correct?
4     A. Yes. He did not want the dispatchers to be in
5 the jail conducting pat down.
6     Q. Okay. Thank you. And so if -- what page were
7 we on when we were reading the booking? Oh, 467.
8     A. Yes.
9     Q. So would have -- Jailer Moreno, would he have
10 committed an offense by not patting down Maricela
11 Trevino on May 17th, 2007?
12     A. An offense?
13     Q. Uh-huh. Would he have violated a policy?
14     A. Well, you have what is in policy and you have,
15 you know, what was put out by the chief as he didn't
16 want the dispatchers back there doing that.
17     Q. What should he -- what should have Jailer
18 Moreno done?
19     A. Well, if there was a need for a pat down of her
20 beyond the scan, beyond the removal of obvious property,
21 he would have to make that judgment call, or he can call
22 in, as it says, a supervisor.
23     Q. Okay. Where does it say that?
24     A. "...and search of a female prisoner or other
25 legitimate reason as approved by the jailer or

Page 155

1 supervisor on duty." That would be under 0461,
2 section V, jail security.
3     Q. 461, jail security. Okay.
4     A. Towards the bottom under -- on number three.
5     Q. Number three. So he should have checked with
6 his shift supervisor?
7     A. It would have been an option.
8     Q. Okay. And the other option is just to scan her
9 and admit her?
10     A. If you have removed her property, there is
11 nothing that leads you to believe that she has any
12 contraband on her, a weapon --
13     Q. Okay.
14     A. -- narcotics, yes.
15     Q. Could contraband be hidden inside an ACE
16 bandage, lieutenant?
17     MS. KENNAMER: Objection, form.
18     A. We could be here all day. It could also be
19 hidden in a body cavity, but we don't conduct body
20 cavity searches on every inmate.
21     Q. Right. And that is why I wasn't asking about
22 body cavity. I was just asking about a regular --
23 regular pat down or search. Is -- a bandage, would it
24 allow someone to conceal contraband based on your
25 experience, training, and education in law enforcement?

Page 156

1     A. My experience is they hide it other places, but
2 it could be.
3     Q. Okay. Thank you. Well, because -- and the
4 reason I was asking, the booking procedure, number two,
5 says, "Search the inmate," period. Right?
6     A. Uh-huh.
7     Q. And in this instance, Jailer Moreno did not
8 search Ms. Trevino?
9     MS. KENNAMER: Objection, form.
10     A. I would disagree.
11     Q. He did search her?
12     A. He may have.
13     Q. If he says that he asked her to take stuff out
14 of her pockets, you would treat that as a search?
15     A. If I recover all obvious property that you have
16 on your person and I conduct a scan with a metal
17 detector or it is obvious that you have no other place
18 to put anything, yes.
19     Q. Do you know whether he did a scan of Maricela
20 Trevino with a metal detector?
21     A. I don't know.
22     Q. Did he have a metal detector as one of the
23 tools available to him to conduct a search back in May
24 of 2007?
25     A. Yes. A passive.

Page 157

1     Q. A what?
2     A. A passive detector.
3     Q. Passive detector. Okay. So after searching
4 the inmate -- I think I cut you off at A. "Give located
5 weapons or contraband immediately to the
6 arresting/transporting officer for disposition." Did I
7 read that correctly?
8     A. I am sorry. Where are you?
9     Q. We were at the booking procedures, 2, A.
10     A. Okay. "Give located weapons or contraband
11 immediately to the arresting/transporting officer for
12 disposition." B, "Document on a supplement report and
13 jail log if any deadly weapon or potential weapon is
14 found." C, "Scan the inmate with a metal detector. If
15 the inmate is combative or violent they will remain
16 handcuffed." D, "Instruct the inmate to remove his/her
17 shoes. Place shoes in the proper holding area."
18     Q. Why would you instruct the detainee to remove
19 his or her shoes, Lieutenant Walensky?
20     A. No inmates are allowed to have shoes at all.
21 They are all stored.
22     Q. But why? Why is that a policy?
23     A. If you see some of the things that people wear
24 on their feet, they could readily be used as a weapon.
25     Q. Okay. Could they also hurt themselves with

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 158

1   shoelaces?
2       A.   Very possible.
3       Q.   Could they also use shoelaces to hang
4   themselves and injure themselves?
5       A.   They can use a lot of things to hang or injure
6   themselves, yes.
7       Q.   Okay.  Go ahead, sir.
8       A.   Three, "Inventory the inmate's property, have
9   him/her sign for the property and secure in a property
10  bag in the presence of the inmate and staple shut.
11  Jailer will also sign the booking card indicating he/she
12  confirmed the contents."
13      Q.   Can I stop you right there real quick?
14      A.   Sure.
15      Q.   These steps one, two, and three that we have
16  gone through right now --
17      A.   Yes.
18      Q.   -- are these -- do these steps have to be taken
19  before placing the detainee inside a jail cell?
20      A.   No.
21      Q.   Okay.  Go ahead, sir.
22      A.   Four, "Complete the booking card and
23  arrest/detention report fields accordingly.  Complete
24  the medical questionnaire (WPD-23) as well.  Inmates
25  requiring medical attention will be seen by EMS and

Page 159

1   treated accordingly.  No inmate will be denied medical
2   attention.  Subjects believed to be suffering from
3   mental illness and presenting a danger to themselves or
4   others will be evaluated by a supervisor for possible
5   section 26."
6       Q.   Quick question here, Lieutenant --
7       A.   Uh-huh.
8       Q.   -- Walensky.  Number four, the part that reads
9   "Complete the booking card and arrest/detention report
10  fields accordingly.  Complete the medical questionnaire
11  (WPD-23) as well," when it says complete, should there
12  be any blanks left on either the booking card and
13  arrest/detention report or the medical questionnaire?
14      A.   Only if they are nonapplicable, but it should
15  be completed.
16      Q.   It should be completed 100 percent of the time?
17      A.   Yes.
18      Q.   Every time?
19      A.   Yes.
20      Q.   There is no -- the jailer has no discretion.
21  It is his duty to complete that booking card and
22  arrest/detention report and all of the fields contained
23  in it as well as the fields in the medical
24  questionnaire.  I just need to be clear on that.
25      A.   That are applicable, yes.

Page 160

1       Q.   And in order to complete the booking card and
2   the medical questionnaire, the jailer would have to
3   communicate and talk to the detainee?
4       A.   Yes.
5       Q.   Ask questions?
6       A.   Unless they just outright refuse.
7       Q.   And in that event, they can write something on
8   those documents that say, detainee refused to answer.
9   Would that be the proper procedure?
10      A.   That would be the best thing to do.
11      Q.   Okay.  Would that be the policy of the City of
12  Weslaco Police Department?
13      A.   Would it be the policy to write that in there?
14  Only if that is included in this, which it is not.
15  Would it be a good idea?  Yes.
16      Q.   Okay.  What would you require them, if there is
17  an instance where a -- something is not applicable to a
18  detainee?  What should they write on the card?
19      A.   Put a line through it, something indicating it
20  is not applicable.
21      Q.   And are they trained to do that?
22      A.   No.
23      Q.   Okay.
24      A.   That is not a requirement under these booking
25  procedures.

Page 161

1       Q.   Okay.  But we can say with 100 percent
2   certainty that they were required to completely fill out
3   100 percent all the fields in the booking card,
4   detention reports, and the medical questionnaire WPD-23.
5   Am I correct?
6       A.   Complete the booking card and arrest/detention
7   report fields accordingly.  Medical attention, on and
8   on.  Yes.
9       Q.   Okay.  Go ahead, sir.
10      A.   I believe we are at number five?
11      Q.   Yes, sir.
12      A.   "Ensure the arresting/transporting officer has
13  provided all specific charges for the inmate to be
14  booked in.  One inmate will be booked in per
15  jailer/officer.  Pending bookings will be searched,
16  property inventoried and secured in a holding cell
17  pending the booking process."
18      Q.   Okay.  Let me stop you right there.  Does
19  step -- does number four that we just -- that we just
20  discussed, does that have to be -- does that have to
21  take place before -- does that have to be done before
22  placing the detainee inside a jail cell?
23      A.   No.
24      Q.   Okay.
25      A.   And let me add to this.  In a perfect world, it

41  (Pages 158 to 161)

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 162

1   would go in somewhat this order. However, you get
2   somebody arrested and bring them into the facility and
3   they want to be noncooperative, a lot of times you are
4   going to secure their property from them and secure them
5   in a cell until -- and most times they sober up --
6       Q. Okay.
7       A. -- or they are not as combative as they were,
8   or some people you get in there and they are just
9   argumentative, accusatory, they are screaming things at
10  you, and a couple of hours later after they have calmed
11  down, more often than not, you bring them out and
12  continue that booking process.
13      Q. And if it is -- if it is one of these
14  situations where they are combative or if they are
15  intoxicated, should the jailer write something down on
16  the booking card that reflects that, combative?
17      A. That is --
18      Q. It doesn't --
19      A. That is day to day.
20      Q. Okay. The medical questionnaire, combative,
21  intoxicated, wasn't able to answer any of the questions,
22  should they -- was there a requirement that they write
23  something on these documents, on these forms that says
24  that they tried to complete it but they -- but they were
25  unable to because of these circumstances?

Page 163

1       A. No. Because it is not a finality. The person
2   is still in custody.
3       Q. Okay.
4       A. If for whatever reason they don't want to give
5   the information, they are not cooperating for whatever
6   reason, you have all of that time that they are still in
7   custody waiting to be arraigned by a magistrate to get
8   that information.
9       Q. Okay.
10      A. Some people don't get fingerprinted until the
11  following morning, however, they were arrested at
12  11:00 p.m.
13      Q. Okay.
14      A. And he was very agitated, he was very
15  intoxicated, he was noncooperative. A lot of times, you
16  will be surprised, six hours later it is a totally
17  different person you are talking with.
18      Q. Okay. So when they sober up, then is there a
19  requirement --
20      A. Sober up, calm down, rationalize things.
21      Q. Okay. But at that point, when those things
22  happen, then do these policies require the jailer to go
23  back and try to satisfy this number four by completing
24  the booking card and the arrest/detention report fields
25  accordingly and complete the medical questionnaire?

Page 164

1       A. Yes. Prior to that person being released or
2   magistrated --
3       Q. Okay.
4       A. -- yes.
5       Q. That -- those documents need to be completed
6   before that inmate is released?
7       A. Yes.
8       Q. Would that be a fair statement?
9       A. Yes.
10      Q. 100 percent of the time every time?
11      A. Yes.
12      Q. Okay. Now, let's --
13      A. To the best of that person's cooperation.
14  Sometimes you are going to get people who just they are
15  not going to give you anything.
16      Q. Okay.
17      A. But there is applicable charges for that as
18  well.
19          MR. RUIZ: Could you give me a second to
20  locate those forms myself here? Let's take a quick
21  break, Alison.
22          MS. KENNAMER: Sure.
23          (Off the record)
24      Q. Lieutenant Walensky, we have taken a short
25  break, and I want to ask you some questions concerning

Page 165

1   the types of forms or cards that are referenced in that
2   number four under A, booking procedures. I am going to
3   hand you Exhibits 2 through 10.
4       A. Okay.
5       Q. And if you could please take a look at those,
6   sir.
7       A. Yes, sir.
8       Q. Okay. Based on what you reviewed, these
9   Exhibits 2 through 10, if I can direct your attention to
10  section four of the booking procedures, under A, booking
11  procedures.
12      A. Yes, sir.
13      Q. It says, "Complete the booking card." Can you
14  show me which exhibit you have that is the booking card
15  that is referenced by this Exhibit 4?
16      A. Okay. You have what appears to be an example
17  on Exhibit No. 5.
18      Q. Okay. Could you show it to the jury, please?
19      A. Yes. This is Exhibit 5 indicating the Weslaco
20  Police Department jail card.
21      Q. Oh, okay. That is refer -- that is the --
22  referred to as the booking card in -- under section four
23  of the booking procedures. Correct?
24      A. That is correct.
25      Q. And all of the fields in Exhibit No. 5 need to

42 (Pages 162 to 165)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 166

1  be completed by a jailer during the booking of a
2  detainee. Correct?
3      A. Yes.
4      Q. Okay. And you said that it was -- you have to
5  fill out all of that 100 percent of the time every time?
6      A. Well, I am going to point out my observations
7  here.
8      Q. Sure.
9      A. And I understand this is a less than legible
10 copy.
11     Q. I have got one over here, sir.
12     A. Okay. There up at the top is a color code --
13     Q. Okay.
14     A. -- or a legend, if you will, indicating if
15 applicable, yellow necessary -- green if applicable,
16 yellow if necessary, and orange leave blank.
17     Q. Orange -- orange it says leave blank?
18     A. Yes.
19     Q. And let me hand you -- let me hand you a pen.
20     A. Okay.
21     Q. If you could clarify what those words are. You
22 could write -- you can write on that Exhibit No. 5 and
23 mark those words. It is okay.
24     A. Okay. Actually they are here. Up at the top
25 where -- you can see the green if applicable.

Page 167

1      Q. All right.
2      A. In yellow necessary.
3      Q. Okay. Necessary.
4      A. And the color orange next to leave blank.
5      Q. Okay. So everything in yellow needs to be
6  completed 100 percent of the time every time?
7      A. In yellow, yes, necessary information.
8      Q. Okay. Green if applicable. That is the top
9  one?
10     A. Correct.
11        MR. RUIZ: Okay. Can you zoom in on that?
12     Q. And you have seen this -- you have seen this --
13     A. Booking card.
14     Q. -- booking card before. Right?
15     A. Yes, sir.
16     Q. Okay. And the booking card is comprised of two
17 sections. Would that be fair?
18     A. Actually this is the front of the booking card.
19     Q. Okay.
20     A. And on Exhibit 9, you will see a blank booking
21 card front right here on the top, and this scan, albeit
22 sideways, is the reverse of the booking card or the
23 backside of the booking card.
24     Q. Okay. Now, is that -- that booking card is
25 different from the one you are holding, though. Right?

Page 168

1  Because the bottom part addresses property, and I think
2  the one you have -- you have shown us on Exhibit No. 5
3  addresses a medical questionnaire.
4      A. Correct.
5      Q. Okay.
6      A. The medical questionnaire on Exhibit 5, on the
7  bottom portion --
8      Q. Uh-huh.
9      A. -- would actually be an attachment to the
10 one-piece booking card, two-sided.
11     Q. Okay. So Exhibit No. 9 is the actual one --
12 one-document booking card?
13     A. Right. If you would fold it over, that is --
14 that is the approximate size of the original booking
15 card.
16     Q. Okay.
17     A. And when you turn it over, that would be the
18 back of the booking card.
19     Q. Okay. And the front of the booking card, does
20 it have -- if we take a look at Exhibit No. 9, are there
21 any areas in the front of Exhibit No. 9 that are
22 necessary, that have to be completed by the jailer?
23     A. Yes. As indicated in Exhibit 5, necessary
24 would be name, address, date of birth, height, and the
25 applicable charges here.

Page 169

1      Q. Okay.
2      A. Date of arrest.
3      Q. Okay.
4      A. Those are all appearing to be in the yellow.
5  Time of arrest, location of arrest, and the rest of the
6  descriptors up here, which would be actual available
7  information or not necessarily -- not everybody that is
8  arrested has ID.
9      Q. Okay.
10     A. But this identifies the arrested person on this
11 booking card to the best of the jailer's ability.
12     Q. And this was a requirement back on May 17th,
13 2007?
14     A. That is correct.
15     Q. Okay. And on the -- the only area that I
16 see leave -- that says leave blank would be the release
17 boxes?
18     A. Date of release, time of release, and time
19 served.
20     Q. Because you wouldn't know at that point,
21 because the person is just being admitted. Right?
22     A. That's correct.
23     Q. Okay. Now, the back part of it, I don't -- are
24 there any -- I don't have a color copy of that one, but
25 what -- are there -- what are the color codes for the

43 (Pages 166 to 169)

Electronically signed by Terri Hill (201-390-152-8303)              2c2ed275-adae-476d-8430-69873ef8f5b8

Page 170

1   back part of Exhibit 9?
2       A.  Whatever would be applicable.
3       Q.  Okay.
4       A.  If they did or did not have currency, change,
5   checks, wallet, so on.
6       Q.  So most of it is in green.  Correct?
7       A.  Yes.
8       Q.  And does the jailer have to sign every time,
9   though?  Is that a necessary?
10      A.  As you look at Exhibit 9, which would be the
11  back of the booking card, signature of prisoner.
12  Basically what this is is the signature of the prisoner,
13  if they are cooperative, acknowledging that the jailer
14  has taken possession of their personal property
15  consisting of any of the items listed here and/or other
16  property that they may have that is not listed up
17  here --
18      Q.  Okay.
19      A.  -- which are common things that people have in
20  their possession.
21      Q.  And this would be -- if we are looking at
22  section four, this would be the booking card.  Correct?
23      A.  That is correct.
24      Q.  Is there another document called an arrest and
25  detention report?

Page 171

1       A.  There is.
2       Q.  Okay.
3       A.  But they are none of the exhibits I have here
4   in front of me.
5       Q.  Okay.
6       A.  DPS blank --
7       Q.  Those are the only -- well, those are the color
8   ones that I -- that I have.  Is this a -- the arrest and
9   detention report, is that a Weslaco PD document?
10      A.  Yes, it is.
11      Q.  Okay.
12      A.  It is a full-page form much like the booking
13  card on the top portion.  And if you want me to, I can
14  refer back to the Exhibit 5 --
15      Q.  Okay.
16      A.  -- of the booking card.
17      Q.  Okay.
18      A.  The top of a detention report or an arrest
19  report --
20      Q.  Okay.
21      A.  -- will be very similar to the information that
22  is contained in here to include charges of the
23  individual that has been arrested, all of their
24  information up here, again, the case number, the time,
25  the date, the location of the arrest and so on.  The

Page 172

1   bottom portion of an arrest report or detention report
2   will also have a narrative where the officer will begin
3   the narrative of the arrest.
4       Q.  Okay.  And that form is completed or filled out
5   by the arresting officer?
6       A.  Actually the top portion that has a lot of the
7   same information as this booking card --
8       Q.  Okay.
9       A.  -- booking cards are maintained and stay in the
10  booking area.
11      Q.  Okay.
12      A.  The arrest report will eventually be turned
13  over to the officer to complete the narrative form of
14  the arrest or detention report on the bottom.
15      Q.  Okay.
16      A.  The jailer has filled out everything up here on
17  the top, hands it off to the police officer who actually
18  effected the arrest to complete the narrative portion.
19      Q.  Okay.  Now -- and so we didn't have an example
20  of that --
21      A.  No, sir.
22      Q.  -- here?  Okay.  So the booking card is
23  comprised of a one sheet of paper, which is Exhibit
24  No. 9, front and back.  Correct?
25      A.  Correct.

Page 173

1       Q.  Now, the medical questionnaire, WPD-23, you
2   said it was an attachment.  Correct?
3       A.  That is correct.
4       Q.  And that medical questionnaire, that is a
5   separate one-sided card or document?
6       A.  Yes.  If I may with Exhibit 9?
7       Q.  Sure.
8       A.  Again demonstrating what the actual booking
9   card would look like, it would be more or less in this
10  shape and form --
11      Q.  Okay.
12      A.  -- with the back of the booking card with this
13  information, and this being one card stapled to the back
14  of this would be the WPD-23 medical questionnaire.
15      Q.  Okay.
16      A.  Which stap -- staples, excuse me, to the
17  one-piece card.
18      Q.  Okay.  And that is -- okay.  And when a jailer
19  is doing -- is performing his booking, is following
20  these booking procedures, he has access to both the
21  booking card and the medical questionnaire WPD-23?
22      A.  That is correct.
23      Q.  And that was true back in May of 2007?
24      A.  That is correct.
25      Q.  Now, I can't tell, Lieutenant Walensky, but if

44  (Pages 170 to 173)

Electronically signed by Terri Hill (201-390-152-8303)                                   2c2ed275-adae-476d-8430-69873ef8f5b8

Page 174

1 we look at Exhibit No. 5, what are the color -- are
2 there any color-coded directives for the medical
3 questionnaire?
4    A.  It doesn't appear to be, and to my knowledge I
5 don't believe that portion was also color-coded.  Again
6 the medical questionnaire is voluntary information
7 provided by the person.  If they did not wish to provide
8 any, none would be obtained.
9    Q.  Is there -- but it says here, "Complete the
10 medical questionnaire as well."  It seems like that is a
11 directive to the jailer or the person performing the
12 booking procedure.  Am I correct on that?
13    A.  Yes.
14    Q.  And so he is -- he or she is required to
15 complete the medical questionnaire.  Correct?
16    A.  Correct.
17    Q.  100 percent of the time every time, even if it
18 is a return -- a repeat customer of the jail?
19    A.  Yes.
20    Q.  Okay.  This example that you have in Exhibit
21 No. 5, does it show any -- does it show a requirement
22 that it is necessary to fill out all the fields in the
23 medical questionnaire?
24    A.  Just as stated in the policy.  It says -- if I
25 can read it in here, if you will give me a moment to

Page 175

1 locate it.  Yes.  Under number four, booking procedures,
2 "Complete the booking card and arrest/detention report
3 fields accordingly.  Complete the medical questionnaire
4 (WPD-23) as well."
5    Q.  Okay.  So there is no way around it, huh?
6    A.  Other than if -- again, this is all voluntary
7 information.  If you do not have the information, there
8 wouldn't be anything to put on here, which is a little
9 different from the booking card.
10    Q.  Okay.
11    A.  Yes.  You could have somebody come in and say,
12 I am not going to give you my name.  If they are there
13 for an arrestable offense, now they have just committed
14 the additional charge of failure to identify.  However,
15 that is not applicable for failing to complete a medical
16 questionnaire, so --
17    Q.  Okay.
18    A.  -- this will always be done.  If they don't
19 wish to volunteer this, there is not really anything we
20 can tell them or do to compel them to provide the
21 information.
22    Q.  Okay.  And -- but does the policy, though,
23 under section four of the booking procedures, does it
24 require that the jailer make an effort to ask the
25 individual the questions or to complete the fields that

Page 176

1 are part of the medical questionnaire?
2    A.  As stated in here, it says, "Complete the
3 medical questionnaire as well."
4    Q.  Okay.  And what kinds of questions does this
5 medical questionnaire contain?  Can you see those?
6    A.  Yes, sir.  It was documented in Exhibit No. 5.
7 The questions are as follows, "Are you under a doctor's
8 care," and then it will have an indication over here as
9 to whether they answered yes or no.  The questions will
10 continue.  "Are you currently sick or injured?  Are you
11 currently taking any medication?  Are you diabetic?"
12 Are you epilepsy -- it should say -- I am sorry.  It
13 says, "Do you have epilepsy?"
14    Q.  Okay.
15    A.  "Do you have any communicable diseases?  If
16 yes, what?"  And then it continues to ask, "When was
17 your last doctor's visit?  What was the reason for the
18 visit?"
19    Q.  Okay.  These -- it is my understanding these
20 are -- were photo -- were photos which were copied from
21 the booking area.  These are forms that are posted in
22 the booking area, Lieutenant Walensky?
23    A.  They appear to be the same forms as documented
24 in Exhibit 10.
25    Q.  Exhibit 10.  Let me -- let me find that real

Page 177

1 quick.  Okay.  And do you know whether this medical
2 questionnaire, Exhibit No. 5, which is one of the
3 cabinets at the booking area, do you know what color the
4 fields are, what marker was -- what color -- what marker
5 color was used to mark the medical questionnaire section
6 of Exhibit 5?  And the only reason I ask, I can't tell
7 based on this copy.
8    A.  And that would be my answer as well --
9    Q.  Okay.
10    A.  -- without actually being in the booking area.
11    Q.  Well, regardless of the color, they have a --
12 the jailer has a -- has a mandate from section four to
13 complete it at the time of booking.  Correct?
14    A.  If the information is available, he is.
15    Q.  Okay.  And if it is not available at the time
16 of booking, he needs to complete it before the
17 individual gets released, though?
18    A.  If -- if the information is provided.
19    Q.  Right.  I mean, but he still has to ask and --
20    A.  Yes.
21    Q.  -- and make an effort to complete it?
22    A.  Yes.
23    Q.  Are there any other forms that are -- are there
24 any other forms used by jailers during the booking
25 process that we are not seeing in Exhibits 2 through 10?

45 (Pages 174 to 177)

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

## Page 178

1    A. That the jailer would complete. The arrest
2  report, booking.
3    Q. Do we have examples of those?
4    A. WPD-23. I am sorry. I am thinking out loud.
5    Q. That is fine.
6    A. If it is a -- if it is a county charge or
7  above, it will go to the Hidalgo County booking sheet,
8  and then all of that paperwork gets forwarded over to
9  criminal investigations division where they will type up
10  the complaint, the warrant. That should be it as far as
11  booking. The evidence -- I am sorry. The property will
12  go into a bag, be identified, placed in storage, the
13  shoes. The Texas Department of Public Safety criminal
14  history reporting form, which is basically an outdated
15  form, but we continue to do it.
16    Q. Okay.
17    A. What this was was a -- the Texas DPS reporting
18  form, which would ultimately end up in the FBI's
19  database.
20    Q. Okay.
21    A. This form is outdated now. Everything gets
22  done at the sheriff's office and gets done
23  electronically. However, we still use this to do the
24  fingerprint cards and put all of this information up
25  there with all the applicable charges as required by the

## Page 179

1  state just in case an arraignment packet gets lost or
2  misplaced, anything like that, we still have a
3  fingerprint card and all of the state's required
4  designated fields filled out and held just in case.
5    Q. Okay.
6    A. It was a procedure that was a have-to at one
7  time. Now, it is no longer required. However, we still
8  do it.
9    Q. Okay.
10    A. And I think that is all as far as the booking
11  procedures go and paperwork.
12    Q. Are there any forms that need to be filled out
13  on a computer by the jailer? Any fields on a --
14    A. Yes.
15    Q. Okay.
16    A. They will actually fill out what we refer to as
17  booking someone into the system.
18    Q. Okay. What is that form called? Maybe I can
19  find one. What does it -- what does it look like? What
20  is it called on top?
21    A. Actually nothing gets produced in paper. It is
22  just all held in the electronic database and to the CPU
23  of the booking system or CAD jail management system that
24  we have.
25    Q. The medical questionnaire section -- aspect of

## Page 180

1  Exhibit No. 5, I think --
2    A. Uh-huh.
3    Q. -- does it contain --
4    A. The WPD-23 form?
5    Q. 23. Does WPD-23, does it screen for mental
6  health issues that a detainee may be facing?
7    A. No.
8    Q. Is there a Weslaco Police Department form that
9  attempts to screen or that is required to be filled out
10  by the jailer that screens for mental health issues
11  faced by the detainee at the time of booking?
12    A. No.
13    Q. So when it comes to any -- when it comes to
14  medical -- a medic -- an interview or a -- strike that
15  question. Besides the WPD-23, which is a medical
16  questionnaire --
17    A. Uh-huh.
18    Q. -- is there a form used by jailers at the
19  Weslaco Police Department that screens for other medical
20  issues?
21    A. Well, actually the WPD-23 does ask, "Are you
22  under a doctor's care?"
23    Q. Okay.
24    A. A lot of people are currently receiving -- or
25  consumers for mental health are under a doctor's care.

## Page 181

1  They are prescribed medication to control or assist with
2  the issues that they are having with whatever they have
3  been diagnosed with, whether it is paranoia,
4  schizophrenic, bipolar. So those questions would come
5  up, "Are you currently taking any medication?"
6    Q. Okay.
7    A. I am taking whatever.
8    Q. So that would -- those last two questions on
9  WPD-23 are the -- what would be the lead-in for --
10    A. Actually one and three.
11    Q. All right.
12    A. One, "Are you currently seeing a doctor?" I am
13  seeing Dr. So-and-So.
14    Q. Okay.
15    A. Okay. And if that didn't bring up anything,
16  "Are you currently taking any medication?" I am taking
17  Zoloft.
18    Q. Okay.
19    A. It could be an indication of, oh, really.
20    Q. Okay. And is there any -- okay. So every --
21  so just to be clear, there is no mental health
22  questionnaire form that jailers are required to complete
23  during the booking process. Am I correct?
24    A. Yes. And specifically for mental health, yes.
25    Q. Okay. Any -- is there any other form that the

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 182

1  jailer is required to complete for purposes of suicide
2  identification screening?
3      A.  No.
4      Q.  Okay.  Let me find something here.
5      MR. RUIZ:  Alison, I am going to show him
6  these.  They are all the same.
7      MS. KENNAMER:  Okay.
8      MR. RUIZ:  For the week of May 13th.
9      MS. KENNAMER:  Okay.
10     Q.  Let me hand you Exhibit No. 11, Lieutenant
11  Walensky.  What is the date on Exhibit No. 11?
12     A.  5-13 of '07.
13     Q.  Okay.  What is that exhibit that you are
14  holding?  What is that called?
15     A.  This is visual assessment and medical question.
16     Q.  Is that a Weslaco Police Department form that
17  is kept at the jail?
18     A.  No.  This -- it looks like something from the
19  jail management system.
20     Q.  Is that the system you referred to as CAD,
21  C-A-D?
22     A.  Under CAD, yes.  It is the jail management
23  system.
24     Q.  Okay.  Had you seen that form before this
25  afternoon?

Page 183

1      A.  I recognize the -- the printing up here from
2  the jail management system.
3      Q.  Okay.
4      A.  Yes.  It is -- yes.  It is the medical
5  questionnaire that is with the jail management.
6      Q.  So that is -- is that a -- since Weslaco uses
7  the CAD program or software --
8      A.  Yes.
9      Q.  -- is that a Weslaco Police Department form
10  that jailers when electronically booking a detainee is
11  required to fully complete?
12     A.  Not as per the policy, but it is a field that
13  they have access to.
14     Q.  Okay.  Is there any policy or directive or memo
15  for that matter that directs jailers to complete Exhibit
16  No. 11 every time they electronically book someone,
17  Lieutenant Walensky?
18     A.  Not in our -- not in this jail procedure.
19     Q.  Okay.
20     A.  But --
21     Q.  Are you aware of any verbal directives to
22  jailers to complete the CAD system fields which include
23  this document?  It is called, what, a booking medical
24  sheet?
25     A.  Yes.  Yeah.  When we were going through the

Page 184

1  jail management system, this was accessed at one time,
2  and I advised the jailers we need to be filling this out
3  as well, but it was not addressed in the policy.
4      Q.  Okay.
5      A.  But this was --
6      Q.  But it was addressed to jailers in what
7  setting, lieutenant?
8      A.  It would have been a verbal, by myself, that we
9  need to be filling this out.  Which if it is in the
10  system, we should have it filled out.
11     Q.  Okay.  And you agree with me that this booking
12  medical sheet assists the jailer with determining
13  whether a detainee requires medical and even
14  psychological care.  Would you agree with that?
15     A.  As I see it in here, yes.
16     Q.  And let's look at the -- it is a two-part --
17  two-part form.  Correct?
18     A.  Yes.  Visual and medical.
19     Q.  Okay.  You said that you recognize the bold
20  print at the top --
21     A.  Yeah.
22     Q.  -- from the CAD system fonts, I guess?
23     A.  Uh-huh.
24     Q.  Okay.  And the first -- the first question, the
25  first part of that Exhibit No. 11, the booking medical

Page 185

1  sheet, is a visual assessment.  Correct?
2      A.  Yes.
3      Q.  And to the -- to the left, it says yes and no.
4  Do you see that?
5      A.  Yes.
6      Q.  Okay.  So the yes and no is before the
7  question.  And under visual assessment, the first
8  question is, "Is inmate unconscious?"  Did I read that
9  correctly?
10     A.  Yes.
11     Q.  And so after the -- jailer, based on your
12  verbal directive, is required to observe the detainee
13  and write -- type in yes or no to the left of the
14  question?
15     A.  It appears so, yes.
16     Q.  Okay.  The second question is, "Does inmate
17  have any visible signs of trauma, illness, obvious pain
18  or bleeding, requiring immediate medical attention?"
19  Did I read that correctly?
20     A.  Yes.
21     Q.  The third question under the visual assessment,
22  "Is there obvious fever, swollen lymph nodes, jaundice
23  or other evidence of infection that may be contagious?"
24  Did I read that correctly?
25     A.  Yes.

47 (Pages 182 to 185)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8



Page 186

1    Q.   Number four, it asks the jailer to respond to
2  the following question, "Any signs of poor skin
3  condition, vermin, rashes or needle marks?"  Did I read
4  that correctly?
5    A.   Yes.
6    Q.   Five, the fifth question under the visual
7  assessment is, "Does inmate appear to be under the
8  influence of drugs or alcohol?"  Did I read that
9  correctly?
10   A.   Yes.
11   Q.   Okay.  And for purposes of this medic --
12 booking medical sheet, why is that question important,
13 Lieutenant Walensky?
14   A.   Number five or --
15   Q.   Yes, sir.
16   A.   -- six?
17   Q.   Number five.
18   A.   Asking for an observation made by the booking
19 officer of the condition of the person being processed.
20   Q.   Would it also help the -- the jailer determine
21 the state of mind of the individual?
22   A.   No.  Because it falls under visual assessment.
23 I don't know that he would know what the state of mind
24 of the individual would be other than his observations
25 from a visual.

Page 187

1    Q.   Okay.  And the next -- the next question is,
2  number six, any signs of alcohol or drug withdrawal.
3  Did I read that correctly?
4    A.   Yes.
5    Q.   Okay.  Number seven, "Does inmate's behavior
6  suggest the risk of suicide or assault?"  Did I read
7  that correctly?
8    A.   Yes.
9    Q.   And why is that question important, Lieutenant
10 Walensky?
11   A.   You would be able to indicate and document on
12 here that the inmate's behavior suggests the risk of
13 suicide or assault.
14   Q.   Okay.  And you would want to know that because
15 there is a policy that requires a jailer to contact the
16 supervisor for purposes of sectioning the individual?
17   A.   Possibly, yes.
18   Q.   Okay.  And that requires a visual assessment,
19 correct, of the behavior?
20   A.   Initially under this visual assessment, yes.
21   Q.   The next question is number eight, "Is inmate
22 carrying medication?"  Did I read that correctly?
23   A.   Yes.
24   Q.   And number seven -- I mean, number nine, "Does
25 the inmate have any physical deformities?"  Did I read

Page 188

1  that correctly?
2    A.   Yes.
3    Q.   Number ten, "Does the inmate appear to have
4  psychiatric problems?"  Did I read that correctly?
5    A.   Yes.
6    Q.   The second part of the -- of Exhibit No. 11 is
7  the medical question, and that starts off with question
8  11 and it ends on question 22.  Do you see that, sir?
9    A.   Yes.
10   Q.   And for 11 it asks, "Do you have any -- do you
11 have or have you ever had any of the following," and it
12 lists several illnesses from allergies to venereal
13 diseases.  Do you see that, sir?
14   A.   Yes.
15   Q.   Okay.  Then for females, it asks females only
16 if they are pregnant, do they take birth control pills,
17 or have they recently delivered.  Did I read that
18 correctly?
19   A.   Yes.
20   Q.   Okay.  13, "Have you recently been hospitalized
21 or treated by a doctor?"  Did I read that correctly?
22   A.   Yes.
23   Q.   14, "Do you currently take any medication
24 prescribed by a doctor?"  Did I read that correctly?
25   A.   Yes.

Page 189

1    Q.   15, "Are you allergic to any medication?"  Did
2  I read that correctly?
3    A.   Yes.
4    Q.   16, "Do you have any handicaps or conditions
5  that limit activities?"  Did I read that correctly?
6    A.   Yes.
7    Q.   17, "Have you ever attempted suicide or are you
8  thinking about it now?"  Did I read that correctly?
9    A.   Yes.
10   Q.   Okay.  18, "Do you regularly use alcohol or
11 street drugs?"  Did I read that correctly?
12   A.   Yes.
13   Q.   19, "Do you have any problems when you stop
14 drinking or using drugs?"  Did I read that correctly?
15   A.   Yes.
16   Q.   20, "Do you have a special diet prescribed by a
17 doctor?"  Did I read that correctly?
18   A.   Yes.
19   Q.   21, "Do you have any problems or pain with your
20 teeth?"  Did I read that correctly?
21   A.   Yes.
22   Q.   22, "Do you have any other medical problems we
23 should know about?"  Did I read that correctly?
24   A.   Yes.
25   Q.   Okay.  And the -- and do you agree with me that

48  (Pages 186 to 189)

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 190

1  questions number seven pertaining to the inmate's
2  behavior suggesting the risk of suicide or assault and
3  question number 17, "Have you ever attempted suicide or
4  are you thinking about it now," are questions that are
5  included in order for the jailer to assess whether the
6  detainee is a suicide risk or not?
7      A.  Yes.
8      Q.  And if -- so these questions are helpful
9  for his booking procedure because jailers have to
10 classify the detainees with respect to cell assignments.
11 Correct?
12     A.  Yes.
13     Q.  And jailers also have to ensure that -- and you
14 talked about it earlier.  They have to ensure that the
15 detainees while in their custody do not experience
16 serious injuries or death.  Would you agree with that?
17     A.  To the best of their ability, yes.
18     Q.  And that is why these questions, question
19 number seven pertaining to the behavior, the risk of
20 suicide and number 17, "Have you ever attempted suicide
21 or are you thinking about it now," should always be
22 completed by the jailer?
23         MS. KENNAMER:  Objection, form.
24     A.  Your question again.  Should this questionnaire
25 always be --

Page 191

1      Q.  Should it -- should this -- should these
2  questions be made to the detainee based on the CAD
3  system program?
4          MS. KENNAMER:  Objection, form.  That is not
5  the question you asked before.  But if that is the
6  question you want to ask now, that is fine.  It just
7  isn't --
8          MR. RUIZ:  Sure.  I will ask it again.
9          MS. KENNAMER:  -- the same question.
10     Q.  Question 17 and question seven are CAD
11 questions.  Right?
12     A.  Correct.
13     Q.  CAD is a program, the booking program, that is
14 contained by your computer system at the jail.  Correct?
15     A.  Okay.  CAD is the system -- operating system,
16 it is my understanding.
17     Q.  Okay.
18     A.  And one of the abilities, I guess, of CAD or
19 one of the programs for CAD is jail management.
20     Q.  Okay.  So that is -- for purposes of jail
21 management --
22     A.  Uh-huh.
23     Q.  -- these questions are part of the booking
24 medical sheet questionnaire?
25     A.  Yes.

Page 192

1      Q.  That comes up on the computer electronically?
2      A.  As an option, yes.
3      Q.  Okay.  And you had previously directed the
4  jailers to complete everything that is in this CAD jail
5  management system?
6      A.  Everything that was on the WPD-23.
7      Q.  Okay.
8      A.  At some point one of the jailers -- and when
9  the booking system first came out, all officers were
10 shown this is how you book somebody in.  In my training,
11 and even in the booking in and processing of arrested
12 people, I had never seen this visual assessment or
13 medical question form, but it was told to me by a jailer
14 there is a medical questionnaire option on here.  And I
15 said, if it is on there and available, we need to be
16 utilizing it.
17     Q.  Okay.  So it was your directive to the jailers
18 that they should always complete the booking medical
19 sheet that we are seeing as Exhibit No. 11?
20     A.  When this took place, I can't tell you, and I
21 believe it was with Edward Zuniga, the jailer.
22     Q.  Okay.  And was -- and this requirement, you
23 expressed this -- this mandate that they complete this
24 booking medical sheet prior to May 17th of 2007.
25 Correct?

Page 193

1      A.  No.  I don't know when we had this.
2      Q.  Okay.
3      A.  He brought this to my attention that, did you
4  know there is also a medical questionnaire.  Now, CAD
5  and the booking systems and all those operating systems
6  that we have at the police department get updates.  When
7  this came out, when we were processing, even as I was
8  booking people in years and years and years back, I
9  never utilized this area of a medical assessment or
10 visual assessment medical questionnaire on the jail
11 booking system.  I don't know if this has always been
12 there, when this did come in, but as soon as Zuniga --
13 and I think it was Edward -- let me know there is also a
14 medical questionnaire actually in the CAD or in the --
15 in the jail system, I said, we need to utilize that as
16 well.
17     Q.  Okay.  And Zuniga, was he still with the
18 department in May of 2007?
19     A.  I think so.
20     Q.  Okay.  Well, do you think --
21     A.  I believe so.
22     Q.  Well, as you sit here today, do you think that
23 this form should always be completed?
24     A.  As I see it now, yes.
25     Q.  Okay.  And it is a must because -- it is a

49 (Pages 190 to 193)

Electronically signed by Terri Hill (201-390-152-8303)                                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 194

1    must.  Right?
2        A.  I would say so, yes.
3        Q.  And it is a must because it is essential to
4    save lives and to give the detainees the medical care
5    that you underlined under the booking procedures that
6    says, "No inmate will be denied medical attention"?
7        MS. KENNAMER:  Objection, form.  Compound.
8    Are you saying that completing the form saves lives?
9        Q.  Asking the questions saves lives.
10       A.  I think it is more inclusive as far as the
11   questioning goes to the WPD-23, but I don't know in
12   itself.
13       Q.  Is it a supplement to the WPD form that you
14   believe here today that should always be completed?
15       A.  I think it should be as I see it here today,
16   yes.
17       Q.  Okay.  Thank you.  And it is a lot more
18   comprehensive than the questions in the WPD-23 medical
19   questionnaire.  Correct?
20       A.  Yes.
21       Q.  And it is more comprehensive because it asks
22   questions concerning the mental stability of the
23   detainee who is about to be incarcerated at the Weslaco
24   jail?
25       A.  It has many -- yes.  It has many other

Page 195

1    questions that -- that are not on the WPD-23.
2        Q.  And assume with me, Lieutenant Walensky, that
3    when -- when this form is used that -- that a detainee
4    answers yes to question number seven -- strike that.
5        Assume with me that a jailer is using this
6    form and he sees -- he answers yes to question number
7    seven, "Does inmate's behavior suggest the risk of
8    suicide or assault," and then later on he goes to the
9    medical question -- section and asks the detainee, "Have
10   you ever attempted suicide or are you thinking about it
11   now?"  If the detainee answers affirmatively to question
12   17, would you agree with me then that based on that
13   affirmative answer to question 17 and based on the
14   jailer's assessment of the inmate's behavior that the
15   monitoring or surveillance of that detainee should be
16   heightened in order to monitor him continuously?
17       A.  Yes.
18       Q.  Okay.  Because the screening -- and this is a
19   mental health screen.  It has a medical and a mental
20   health screen aspect to it.  That -- the answers that
21   the detainee provides should dictate the level of
22   monitoring or surveillance that the jailers should be
23   providing that detainee.  Do you agree with that?
24       A.  To an extent.
25       Q.  Because a jailer will have to conduct

Page 196

1    surveillance, especially if he knows that there is an
2    individual with a mental health history.  Would you
3    agree with that?
4        MS. KENNAMER:  Objection, form.
5        A.  No.
6        Q.  So he just walks off, puts someone with a
7    mental health history, just locks them up, and he
8    doesn't check on him -- check on him until his next
9    shift -- until his next required interval?
10       A.  Those aren't my words.
11       Q.  Okay.
12       A.  I am not saying that at all.
13       Q.  Well, if you incarcerate someone with a mental
14   health history, what should the jailer do?
15       MS. KENNAMER:  Objection, form.
16       A.  If -- just because they have a history is not
17   indicative that there is going to be an issue.  You have
18   to observe the person, are they exhibiting these signs.
19   Would it be a good idea to keep an eye on this person?
20   Yeah.
21       Q.  Would you -- how often would that monitoring
22   be?
23       A.  It depends.  A lot of mental health people on
24   medication lead very productive lives and don't have any
25   issues.  Would it be a good idea, could you check him

Page 197

1    more than you would check everybody else?  Sure.
2        Q.  Okay.  Would you agree with me that the jailer
3    should constantly monitor that individual with a mental
4    health history?
5        A.  Definition of constantly.
6        Q.  100 percent of the time.
7        A.  Okay.  And if something happens in another
8    cell, I am going to be sitting in here with somebody
9    else going over a different deposition for neglecting
10   one prisoner for another.  I think you have to weigh it
11   like anything else and again apply common sense.  Should
12   you go by and check this person more?  Yes.  Should you
13   put a 24/7 watch on the person with the one jailer that
14   is there in the jail facility to monitor all the
15   jailers?  I can't rob from Peter to pay Paul, but yes.
16   Would I give them more attention the other way?  Yeah.
17       Q.  And what are the intervals at which jailers are
18   required to monitor the detainees?
19       A.  At that time, 30 minutes.
20       Q.  Back in May of 2007?
21       A.  I believe, yes.
22       Q.  Has that changed?
23       A.  Yes.
24       Q.  What is the new interval for -- that they are
25   required to follow?

50  (Pages 194 to 197)

Electronically signed by Terri Hill (201-390-152-8303)                                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 198

```
 1        A.  15.
 2        Q.  15.  And if -- are there any exceptions, if
 3   they come across or come in contact with a detainee who
 4   expresses, makes a statement that, I am going to kill
 5   myself?
 6        A.  Yes.  You go back to your policy, call in your
 7   supervisor on duty to conduct an interview with the
 8   person, does this person meet the criteria of someone in
 9   need to be taken into custody for mental health and
10   taken for a professional screening.
11        Q.  And in the meantime while the jailer is doing
12   this, does the person get incarcerated or is -- or is
13   the detainee there waiting next to the jailer in the
14   booking area?
15        A.  It could be in the booking area.  It could be
16   in the single cell.
17        Q.  Okay.  Do you think that -- a statement from a
18   detainee that says I am going to kill myself, do you
19   think that would be a basis for a constant watch?
20        A.  For a constant watch?
21        Q.  Yes.  Constantly monitoring him.
22        A.  Yes.
23        Q.  Okay.
24        A.  Until an evaluation can be done.
25        Q.  Okay.  And who -- and have evaluations -- have
```

Page 199

```
 1   detainees -- strike that question.  An evaluation done
 2   with respect to the mental health of the detainee.
 3   Right?  That is what you mean?
 4        A.  No.  As -- as a police officer --
 5        Q.  Oh.
 6        A.  -- when I come in and I am -- have some reason
 7   to believe that somebody has some ideation of following
 8   through with a plan or even just making the comment, you
 9   know what, I am going to kill myself, I am going to have
10   an interview with the person.  I am going to talk with
11   them.
12        Q.  Okay.  There is a basis for following up with
13   that detainee, though.  Right?
14        A.  Yes.
15        Q.  And what type of questions -- is there anything
16   that tells us what -- the types of questions that the
17   jailer should follow up with?
18        A.  It is not for the jailer.  It would be for the
19   supervisor on duty.
20        Q.  Okay.  And so the jailer would lock the person
21   up and contact his shift supervisor and allow the shift
22   supervisor to further investigate and to determine that
23   individual's mental health condition at the time?
24        A.  Yes.
25        Q.  Okay.  The monitoring or surveillance
```

Page 200

```
 1   procedures on May 17th, 2007, you said the intervals
 2   were at 30 minutes.  Correct?
 3        A.  I believe so.  If I could review.
 4        Q.  Oh, is that in the policies?
 5        A.  Yes.
 6        Q.  Okay.  Sure.
 7        A.  Now, this one says 15 minutes.  I know at some
 8   point they were at 30 minutes and a change had been
 9   made.
10        Q.  What page are you looking at, lieutenant?
11        A.  I am looking at page 0468.
12        Q.  0468.  Okay.
13        A.  At I.
14        Q.  I.
15        A.  I take that back.  Wait a minute.  That is for
16   the juvenile.
17        THE VIDEOGRAPHER:  Five minutes.
18        A.  I believe it is underlined.  If you will look
19   on page 465 under inmate supervision.
20        Q.  465.
21        A.  Section A, subsection two.
22        Q.  Okay.  Inmate supervision, welfare checks,
23   counts and cell procedures.  Okay.  Two, "A welfare
24   check of all inmates will be made every 30 minutes."  So
25   that was a requirement back in May of 2007?
```

Page 201

```
 1        A.  Correct.
 2        Q.  Okay.  Now, since when did it change to
 3   15-minute intervals?
 4        A.  I believe that change was made in either '08 or
 5   '09.  I want to say '08.
 6        Q.  What prompted that change, Lieutenant Walensky?
 7        A.  Chief Martinez believed that the checks should
 8   be at a 15-minute interval.
 9        Q.  Do you know what his basis for that request
10   was?
11        A.  He wanted them checked every 15 instead of
12   every 30.
13        Q.  And along with the checks, did it require --
14   well, let's talk about the 30-minute interval checks.
15   That -- that policy, which was in effect in May of 2007,
16   was there -- was there a requirement that the jailer
17   also log the check, log that he has observed the
18   detainees that are housed at the Weslaco jail?
19        A.  Yes.  Checks were to be made on the daily log,
20   the jail daily log.
21        Q.  Was that mandatory?
22        A.  Yes.  We implemented a jail log system to
23   document the -- what the jailer did in that eight-hour
24   shift, his checks, welfare checks, any of the day-to-day
25   duties that they were conducting.
```

                                    51 (Pages 198 to 201)

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 202

1    Q.  Okay.  And when was that instituted?
2    A.  I am not sure of the date.
3    Q.  Was it before May of 2007?
4    A.  I believe so.  Yes.  It would have actually
5  been in 2005.  If you will go to 460.
6    Q.  460.
7    A.  Under responsibilities of personnel.
8    Q.  Okay.
9    A.  Under C, 11.
10   Q.  C, 11.  Okay.  "Completes the daily -- daily
11 jail log accordingly with any pertinent information
12 entered."  Okay.  Any -- any other form that tells you
13 what pertinent information means there?
14   A.  No.  Just examples were the day -- the welfare
15 checks, if they had laundry, if they had -- whatever
16 day-to-day activities were being conducted would be on
17 the jail log.
18   Q.  And these -- let me ask you one question.
19 Going back to the 468, we had touched upon that earlier.
20 Under booking procedures, B, adult and juvenile cells,
21 four, "The single cells will be used for inmates who are
22 injured."  You have medically cleared or preexisting,
23 close parentheses, have communicable diseases or
24 conditions, suicidal, combative or violent.  Did I read
25 that section correctly?

Page 203

1    A.  Yes.
2    Q.  Did the -- did the jailers at the Weslaco PD
3  jail have a guide or some document, some kind of
4  guidance that would tell them, this individual is
5  suicidal, he should go -- he should go into the single
6  cell?
7    A.  Okay.
8    Q.  I guess my question is, how would the jailer
9  know a detainee is suicidal for purposes of complying
10 with this section four, single cell housing?
11   A.  We have had the occurrence where we have had
12 people in custody or we have even had people where we
13 detained someone without warrant or under a judge's
14 order for a mental health warrant, taken them, had them
15 screened, and they were denied at the screening
16 facility, the mental health screening facility, MHMR,
17 Texas Tropical, any of the mental health facilities you
18 want to name.  There is a screening process, and I would
19 say, if I had to guess, 40 percent of the people are
20 turned away and returned either to their home or
21 incarceration.
22   THE VIDEOGRAPHER:  One minute.
23   Q.  Okay.  I just have to object to the
24 nonresponsiveness.  How -- under what -- how would a
25 jailer know --

Page 204

1    A.  If he was --
2    Q.  -- to place someone who is suicidal --
3    A.  If someone was sectioned that was in custody,
4  screened, refused, and returned, we are going to place
5  them in that cell.
6    Q.  Sectioned -- someone who has been sectioned.
7  That is sectioned by a judge.  Correct?
8    A.  It could be by a judge.  It could be by a
9  police officer without warrant.
10   Q.  Or a police officer?
11   A.  Apprehension of subject exhibiting mental
12 health issues without warrant or with a mental health
13 warrant as issued by a magistrate.
14   Q.  Okay.  So those are the two instances.  Any
15 other instance that you can -- that would warrant a
16 jailer to place -- to identify someone as suicidal?
17   A.  I would say that is a possibility.  If they
18 have displayed symptoms or signs that led an officer to
19 believe, you know what, or somebody else -- and it has
20 happened where the family has gone to a judge, gotten
21 section paperwork from a judge to serve on somebody we
22 have in custody.  We will take them, take them through
23 the screening process, and close to half the time they
24 will be returned, and we return them to custody pending
25 arraignment or payment of fine.

Page 205

1    Q.  Okay.  We are going to stop right there to
2  change tape.
3    A.  Okay.
4    (Off the record)
5    Q.  We just took a break, Lieutenant Walensky.  We
6  were talking about section four under the -- under
7  section B of the booking procedures on page 468.
8    A.  Okay.
9    Q.  Do you see that, sir?
10   A.  Yes, sir.
11   Q.  And you mentioned those instances when a jailer
12 should use a single cell to house a suicidal detainee.
13   A.  Yes.
14   Q.  When there has been a sectioning or by -- or as
15 per court order or as per a police involuntary --
16   A.  Well, I want to clarify that.
17   Q.  Okay.
18   A.  Upon return.
19   Q.  Okay.
20   A.  If they did not meet criteria at the screening
21 facility and they were returned.
22   Q.  If they didn't meet the criteria to be admitted
23 into the facility and they are returned to the jail,
24 they should be placed in a single cell.  Is that -- am I
25 understanding you correctly?

52  (Pages 202 to 205)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 206

1    A.  Yes.
2    Q.  Okay.  And because -- this procedure applies
3  when a police officer, patrol officer out in the field
4  involuntarily arrests someone, right, for a mental
5  health issue --
6    A.  Okay.
7    Q.  -- or --
8    A.  I was giving you an example of why would
9  somebody be put in there --
10   Q.  Okay.
11   A.  -- under the circumstances that they may be at
12 risk for that.  If somebody is in custody and we receive
13 order --
14   Q.  Okay.
15   A.  -- to take somebody to a screening facility,
16 just because we have an order or an officer takes
17 somebody into custody under emergency order for mental
18 health and we take them to a screening facility, the
19 screener at the mental health facility may not accept
20 them.
21   Q.  Okay.
22   A.  They may say they do not meet criteria for
23 emergency detention.  Therefore, the person is to be
24 taken back where they were.  If the person was arrested
25 for a criminal offense, they would be returned to the

Page 207

1  City of Weslaco pending arraignment.
2    Q.  Is there any document that reflects what you
3  just told me for purposes of a jailer knowing what he
4  needs to do?
5    A.  No.  Because all of those operations are
6  handled by a police officer.
7    Q.  Okay.  And what if that individual who was
8  detained pursuant to an emergency order by a court or by
9  a police officer and -- and what if that person is a
10 repeat customer of the -- of the Weslaco jail during
11 the -- if that individual gets arrested two days
12 later --
13   A.  Uh-huh.
14   Q.  -- should the jailer take note of the past
15 sectioning by a court or a police officer and place them
16 into a single cell to comply with this number four of
17 the booking?
18   A.  No.
19   Q.  No.  Why not?
20   A.  Because there is nothing leading you to believe
21 that we have something current that this person is in
22 crisis.
23   Q.  Okay.  And so there would have to be
24 examples -- the jailer would have -- the jailer would
25 have to know and then communicate that knowledge of past

Page 208

1  crises to the shift supervisor and allow that supervisor
2  to make the determination as to where to house the
3  detainee, if it is a person who routinely gets in
4  trouble and gets arrested?
5    A.  Well, there is -- we have no database for that.
6  We can pull out a history as to what the person's
7  previous criminal charges were for, things of that
8  nature.
9    Q.  Who is we?  Are you talking about the jailers,
10 the dispatchers?
11   A.  The department.
12   Q.  The department.  Okay.
13   A.  And I think my example of, you know, why are we
14 putting somebody in here, I was just giving you a for
15 instance of where this person would be.  Would we put
16 them in with other people?  Probably not.  Again if
17 somebody has an issue with closed spaces, that single
18 cell is not an option, because it is very confining.
19   Q.  Correct.
20   A.  So a lot of it is going to be based on what is
21 the jailer dealing with at the time.  You have somebody
22 that gets arrested and they have issues with being in
23 small confined space.  We will put them in the larger
24 one.  But as I was trying to explain, it is just as a
25 for instance.  Why would we put somebody in the single

Page 209

1  cell specifically for suicide?  If this person has been
2  screened, not accepted, they do have to come back to the
3  facility.  It would be preferable that they be placed
4  into the single cell, a notation would be made on the
5  board, watch this person on the note board.  There is --
6  off to the side there is a -- a grease pencil board
7  where you write the offender's name, what they are
8  charged with, and then there is also notes.  Something
9  like that would be noteworthy and would be put up on
10 that board, brought back after section, placed in single
11 cell.
12   Q.  And that would be -- that would be for jailers
13 and police officers to read?
14   A.  Anybody in the room would be able to read that.
15   Q.  To brief the -- the next shift --
16   A.  Yeah.
17   Q.  -- as to what happened?  Okay.  Besides this
18 section four where the word suicide is mentioned, is
19 there any other section of these jail and detention
20 procedures that reference suicide in any way?
21   A.  No.
22   Q.  Okay.  Detective -- I mean -- I am sorry, sir.
23 Lieutenant Walensky, you have mentioned that a -- that a
24 family in the past had requested assistance from the
25 court and from the Weslaco Police Department for

53  (Pages 206 to 209)

Electronically signed by Terri Hill (201-390-152-8303)          2c2ed275-adae-476d-8430-69873ef8f5b8

Page 210

1 purposes of sectioning an individual and transporting an
2 individual to a mental health facility.
3    A.  That has happened in the past.
4    Q.  How many times has that happened?
5    A.  I wouldn't even venture a guess.
6    Q.  Are there any records that would show the dates
7 when that happened?
8    A.  If it would be on an incident report.
9    Q.  Okay.
10    A.  Usually when we serve a mental health warrant,
11 we do an incident report.  However, if they are already
12 in custody, it could have been done on a supplement to
13 that arrest report.  It could have been done on another
14 incident report.  It --
15    Q.  And --
16    A.  -- could be either.
17    Q.  And so if there is a -- if a judge orders the
18 sectioning of an individual, the judge is giving a
19 police -- a police officer the authority to take an
20 individual against his or her will and transport that
21 individual to a medical facility.  Am I correct?
22    A.  It commands any law enforcement officer in the
23 State of Texas to take the listed person to the nearest
24 mental health facility.
25    Q.  Okay.  So who at the police department would

Page 211

1 receive that order from the court?
2    A.  They would usually refer it to the supervisor
3 on duty.
4    Q.  Okay.  And the supervisor on duty, what does he
5 or she do after receiving that order from the court?
6 That is a section 26 or a section 28?
7    A.  28.
8    Q.  28.  Because there is a judge involved.
9 Correct?
10    A.  Uh-huh.
11    Q.  What does the supervisor do with that order?
12    A.  They supervisor will assign a patrol officer to
13 take the paperwork and that person and take them to
14 Texas Tropical or request that a field screening person
15 from Texas Tropical meet us somewhere, depending on what
16 has happened, where they are at.
17    Q.  Do people -- do personnel from the mental
18 health hospitals, do they travel to the jail?
19    A.  No.  If they do a field visit, it is usually at
20 the hospital.
21    Q.  At the hospital.  Okay.
22    A.  And usually under a 26 and --
23    Q.  If it is at a hospital, the nearest one would
24 be Knapp?
25    A.  Yes.  But now you are getting off into a big

Page 212

1 legal battle that has recently resulted in the State
2 Attorney General's opinion.  Mental health facilities
3 used to say, we are not taking anybody until you get a
4 medical clearance.  That was a large argument with law
5 enforcement and the mental health facilities on there is
6 no prerequisite or legal requirement that we be taking
7 anybody to a hospital for medical care for somebody who
8 wasn't in obvious need of medical assistance.
9         If somebody overdoses, yes, they are going
10 to go to the hospital to treat the overdose, get a
11 medical clearance, and then take them in for screening
12 or have the field screener come to the hospital and
13 conduct that screening at the hospital.  Without that,
14 we just take them over to Texas Tropical or whatever
15 mental health facility is available to get them
16 screened.  But a recent Attorney General's opinion has
17 said, there is no mandate or requirement or
18 responsibility for law enforcement to take them to a
19 hospital for someone not in need of any medical care to
20 get a medical clearance prior to taking them into an
21 intake facility.
22    Q.  Because they are two different --
23    A.  Well --
24    Q.  -- two different --
25    A.  -- it is a liability argument with the private

Page 213

1 and state mental health facilities.
2    Q.  Now --
3    A.  But it is -- it is a different thing from this,
4 but we are required to take them to the closest mental
5 health facility.
6    Q.  Okay.  That would be Tropical Texas?
7    A.  Uh-huh.
8    Q.  Okay.  Is that the -- is that where the City of
9 Weslaco police officers generally take --
10    A.  Unless it is indicated elsewhere by the judge.
11 The magistrate is supposed to order where it is supposed
12 to go.
13    Q.  Okay.
14    A.  A lot of times they will write down two or
15 three, which they are not supposed to.
16    Q.  Okay.
17    A.  To get technical, you could say this
18 invalidates this order because it needs to be one
19 facility.
20    Q.  Okay.
21    A.  You may have someone who is already registered
22 with private insurance at a hospital that has a facility
23 like Doctors Hospital or McAllen Behavioral, but usually
24 it is Texas Tropical.
25    Q.  Okay.  Lieutenant Walensky, and what is done

54  (Pages 210 to 213)

Electronically signed by Terri Hill (201-390-152-8303)                                                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 214

1  with the document, the order of the court?  Is that
2  kept --
3      A.  After return -- actually he will complete the
4  return just like he would on any other warrant.
5  However, this is a noncriminal mental health warrant.
6  That document is supposed to be forwarded back to the
7  court of original jurisdiction, usually the JP or
8  municipal judge, but oftentimes, again, dealing with
9  some of these behavioral facilities, they want to keep
10  that original document.  So after a brief discussion
11  over the issue, we tell them, take that up with -- but
12  an MI report, an incident report, will be documented
13  with our department files.
14      Q.  So there is a requirement, there is an internal
15  procedure, that requires the patrol officer who
16  transported the individual to the -- to the mental
17  health facility to complete an incident report?
18      A.  Yeah.  It is a noncriminal custodial report
19  which is documented on an incident report.
20      Q.  On an incident report.  Okay.  There is a
21  difference?
22      A.  Uh-huh.
23      Q.  Okay.  Now, in May of 2007, did the City of
24  Weslaco -- did the officers and staff of the Weslaco
25  Police Department, including jailers and dispatchers and

Page 215

1  detectives, did they have knowledge that Maricela
2  Trevino was a suicide risk?
3      MS. KENNAMER:  Objection, form.
4      A.  I can't speculate as to what detectives or
5  police officers or jailers --
6      Q.  And Ms. Trevino had an extensive arrest history
7  at the Weslaco Police Department jail.  Correct?
8      A.  That is what I understand.
9      Q.  Okay.  Did you know that her family sought
10  assistance from a court to section her while she was
11  already in custody of the Weslaco Police Department in
12  November of 2005?
13      A.  No.
14      Q.  Okay.  Let me hand you a couple of documents
15  here.  Let me hand you Exhibit No. 12.  I will give you
16  an opportunity to look at Exhibit No. 12.
17      MR. RUIZ:  Oh, I have one for you.
18      MS. KENNAMER:  Oh, okay.  Thank you.
19      A.  And your question?
20      Q.  Sure.  Exhibit number -- what number is that?
21      A.  12.
22      Q.  12.  It is comprised of how many pages --
23      A.  Three.
24      Q.  -- lieutenant?  Three.  And the Bates stamp
25  numbers at the bottom are 05703 through 05705.  Do you

Page 216

1  see that?
2      A.  Correct.
3      Q.  Okay.  And the first page of Exhibit 12 is an
4  order for issuance of mental health warrant, sections
5  573.011 and 573.012 of the HSC.  Do you see that at the
6  top of the order?
7      A.  Yes.
8      Q.  Okay.  And the cause number is 145984.  And
9  this order, the style of the order, is State of Texas,
10  for the best interest and protection of Maricela
11  Trevino.  Did I read that correctly?
12      A.  Yes.
13      Q.  And it is in -- and this order is -- was issued
14  by the municipal court, City of Weslaco, Hidalgo County,
15  Texas; is that correct?
16      A.  Correct.
17      Q.  And the paragraph -- the order reads, "Upon
18  presentation of an application for emergency detention
19  by," and then the name of the applicant, you see Fred
20  Trevino, comma, "The Court finds that there is
21  reasonable cause, in other words, a (basis of reasonable
22  cause), see the application attached to believe that the
23  (name of the person to be committed)," and then it says,
24  "Maricela Trevino evidences mental illness that creates
25  an imminent, substantial risk of serious harm to

Page 217

1  (himself)(herself, or others," comma, "the risk of harm
2  is imminent unless the person is immediately restrained
3  and that necessary restraint for treatment cannot be
4  accomplished without emergency detention, and that
5  emergency detention is the least restrictive means to
6  effect necessary restraint."  Did I read all of that
7  correctly?
8      A.  Yes.
9      Q.  Okay.  Then it reads, "It is therefore ordered
10  that a warrant shall issue for the immediate
11  apprehension, detention and transport of the above named
12  person to an appropriate treatment facility for a
13  preliminary examination by a physician."  Did I read
14  that correctly?
15      A.  Yes.
16      Q.  And then the date entered, it shows, November
17  10th, 2005, and it is signed by Melinda G. Farias,
18  magistrate, City of Weslaco, Hidalgo County, Texas.  Did
19  I read that correctly?
20      A.  Yes.
21      Q.  That is actually the order prior -- before the
22  order, in this case Mr. Fred Trevino, Ms. Trevino's
23  brother, filed an application for the emergency
24  detention; is that correct?
25      A.  That is what I see on the first page here of

55 (Pages 214 to 217)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 218

1    Exhibit 12.
2       Q.   And the application is shown on the second and
3    third page of the exhibit.  Do you see that, sir?
4       A.   Yes.
5       Q.   Okay.  At the top of page two of Exhibit 12, it
6    says, application for emergency detention,
7    section 573.01 HSC.  I am assuming that is Health and
8    Safety Code.  Cause number 145984.  State of Texas, and
9    then it says Maricela Trevino, and then municipal court,
10   City of Weslaco, Hidalgo County, Texas.  Did I read that
11   correctly?
12      A.   Yes.
13      Q.   It says, "(Note:  This application must be
14   presented personally to a magistrate.  The magistrate
15   may interview the applicant."  Did I read that
16   correctly?
17      A.   Yes.
18      Q.   The first paragraph says, "I, the undersigned
19   applicant, have reason to believe and do believe that
20   Maricela Trevino evidences a substantial risk of serious
21   harm to herself or others.  This harm is specifically
22   described as follows, Maricela has started talking of
23   committing suicide, overdosing with the drugs she
24   takes," and it says heroin and cocaine, period.  Did I
25   read that first paragraph correctly?

Page 219

1       A.   Yes.
2       Q.   Next -- next paragraph, "I further believe that
3    the risk of harm is imminent unless the person named
4    above is immediately restrained.  My belief is derived
5    from specific recent behavior, overt acts, attempts, or
6    threats which are described in detail as follows."
7    Maricela -- and handwrite -- this is handwritten.
8    "Maricela has suicidal thoughts.  She has mentioned
9    overdosing herself.  She walks onto the oncoming --
10   oncoming traffic and on a number of times -- and on a
11   number of times she has almost been," it says, "runned
12   over by vehicles.  She stands in the middle of traffic."
13   Did I read that handwritten section correctly?
14      A.   Yes.
15      Q.   Next paragraph, "My relationship to the person
16   named above is," and it says, "My name is Fred
17   Trevino.  I am her brother."  Did I read that correctly?
18      A.   Yes.
19      Q.   Other relevant information, it says, "Maricela
20   has hallucinations, hears voices, and hears her children
21   calling her.  She has attempted to get into strangers'
22   vehicles looking for her children.  She had the traffic
23   stopped on Pike Avenue by standing in the middle of the
24   street.  This incident happened last week."  Did I read
25   that handwritten section correctly?

Page 220

1       A.   Yes.
2       Q.   Then it reads, "Therefore, I request the
3    magistrate to issue an order and warrant for emergency
4    detention pursuant to Chapter 573 of the Health and
5    Safety Code of the person named above."  Did I read that
6    section correctly?
7       A.   Yes.
8       Q.   And then we have Mr. Trevino's name and address
9    on one side.  Do you see that, sir?
10      A.   Yes.
11      Q.   His telephone number on the other, and it is
12   dated November 10th, 2005 with his signature at the
13   bottom.  Did I read that correctly?
14      A.   Yes.
15      Q.   The last page of Exhibit 12, at the top it
16   identifies the patient's name, which would be Maricela
17   Trevino.  Do you see that, sir?
18      A.   Yes.
19      Q.   And it shows her address, which is 815 East
20   America Street, Weslaco, Texas, 78596.  Her race, W;
21   sex, female; age, 34; height, 5'3"; weight, 95 pounds;
22   birth date, August 18th, 1971; hair color, brown; eyes,
23   dark brown.  I purposely skipped the Social Security
24   number, but did I read that section correctly, sir?
25      A.   Yes.

Page 221

1       Q.   The other side, you see the name of the
2    applicant, Fred Trevino.  Do you see that, with his
3    address?
4       A.   Yes.
5       Q.   323 Forest Hills Drive in Weslaco, Texas,
6    78596.  The relationship, blank.  In the relationship
7    blank, he filled brother, and he lists his cell phone
8    number.  Did I read that information correctly?
9       A.   Yes.
10      Q.   Then under that you have, "The following
11   questions are asked so that the patient can be taken
12   into custody with a minimum of danger to patient or to
13   others.  This information will be kept confidential by
14   officers."  And it lists that because the officers are
15   the ones who are going to execute the order from the
16   judge.  Do you see that section --
17      A.   Yes.
18      Q.   -- lieutenant?
19      A.   (Moving head up and down)
20      Q.   Okay.  The first question under this section
21   says, "Has the patient ever received psychiatric care,"
22   and it says "No."  Number two, "What has patient done
23   recently?"  And in hand -- handwritten, and they wrote,
24   "Talks of suicide, tried to overdose, walks onto
25   oncoming traffic, drugs - heroin and cocaine."  Did I

56  (Pages 218 to 221)

Electronically signed by Terri Hill (201-390-152-8303)                                                2c2ed275-adae-476d-8430-69873ef8f5b8

Page 222

1    read that section correctly?
2        A.  Yes.
3        Q.  "Has the patient ever been arrested or jailed?"
4    And the check -- there is a checkmark for yes.  "If yes,
5    on what charges?"  And it says, "Currently in jail,
6    11-9-05 - public intoxication," and a car almost --
7    well, public intoxication.  Did I read that section
8    correctly?
9        A.  Yes.
10       Q.  And then question number four, "Is patient a
11   danger to himself or others," and they checked off
12   "Yes."  And then there is some handwritten notes that
13   say -- I am sorry.  I apologize.  Under four -- under
14   the fourth question, it says, "If yes, how?"  And the
15   applicant, Mr. Trevino, responded, "Suicidal, drug
16   problem, walks onto oncoming traffic," and then he
17   wrote, "And a car almost ran over her."  Did I read that
18   correctly?
19       A.  Yes.
20       Q.  "Do you think the patient will be violent when
21   the officers serve the warrant," and they checked off
22   "No."  "Do you think the patient will try to run when
23   the officers serve the warrant," and they checked off
24   "Yes."  "Are there any weapons in the close proximity of
25   the patient," and they checked off "Yes."  Did I read

Page 223

1    those questions correctly?
2        A.  Yes.
3        Q.  And it says, "If yes, what kind?  Officers'
4    weapons, she is in jail."  Did I read that correctly?
5        A.  Yes.
6        Q.  Number eight, "Does the patient have any of the
7    following, (a) physical handicaps?"  The answer is "No".
8    "(b) communicable disease?  I am not aware of any" is
9    the response.  And "(c) medical problems?  Thyroid,
10   hears voices, hallucinates."  Did I read those -- that
11   question correctly?
12       A.  Yes.
13       Q.  Nine, "Are there any other persons in the
14   residence with patient," and the answer is, "She is
15   homeless."  Did I read that section correctly?
16       A.  Yes.
17       Q.  Number ten, "Does the patient have any pets?"
18   "No" is the answer.  Then it says -- then at the bottom,
19   there is a question ten, which is unanswered -- or it
20   says, "Please list any information or suggestions that
21   you think will be helpful to the officers when they take
22   the patient into protective custody."  That is left
23   blank.  And then the last line reads, "I understand that
24   if the patient resists being taken into custody, the
25   officers will use whatever force is necessary to execute

Page 224

1    the warrant and to subdue and/or restrain him/her."  It
2    is signed by the applicant Mr. Trevino, and it is
3    notarized by Lori A. Maldonado.  Did I read that section
4    correctly, sir?
5        A.  Yes.
6        Q.  Based on Exhibit No. 12, Lieutenant Walensky,
7    and based on your education, training, and experience,
8    would you say that Maricela Trevino was a person that
9    suffered from mental illness in November of 2005?
10           MS. KENNAMER:  Objection, form.
11       A.  I don't know.
12       Q.  You don't know based on that application for a
13   health warrant?
14       A.  It doesn't tell me she is suffering from mental
15   illness.
16       Q.  The fact that -- the fact that the application
17   says she was suicidal doesn't characterize as mental
18   illness?
19           MS. KENNAMER:  Objection, form.  Objection,
20   assumes facts not in evidence.  The fact that her
21   brother said something doesn't establish any facts.
22       Q.  Lieutenant Walensky, Judge Farias found that
23   there was reasonable cause based on the application,
24   which she attaches to this --
25       A.  Uh-huh.

Page 225

1        Q.  -- for issuing a mental health warrant.
2        A.  Okay.
3        Q.  Okay.  Do you disagree with the judge's
4    decision to order a mental health warrant for Maricela
5    Trevino on November 10th, 2005?
6        A.  Whether she issued a warrant doesn't
7    necessarily mean that she in this case had mental
8    illness.  That is for a doctor to decide or a mental
9    health screener to get to a doctor to say.  I have --
10       Q.  Okay.  Would you --
11       A.  I will tell you this.  I have served many of
12   these and driven them right back to their house.
13       Q.  Okay.  And --
14       A.  I follow through with the warrant as law
15   requires.  However, I would leave the judgment of
16   whether a person suffers from mental illness to a
17   doctor.
18       Q.  Well, and -- but the Health and Safety Code
19   allows a judge --
20       A.  Uh-huh.
21       Q.  -- specifically in this case Judge Farias, to
22   make a determination whether the behavior -- that is why
23   it says over here for the best interest and protection
24   of Maricela Trevino.  Do you see that?
25       A.  Uh-huh.

57  (Pages 222 to 225)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 226

1    Q.  Whether her behavior evidences mental illness,
2    I will refer you to the first paragraph of the first
3    page of Exhibit 12.
4    A.  Yes.
5    Q.  She feels -- she felt that the apply -- that
6    what was written on the application was evidence of
7    mental illness.
8    A.  No.
9         MS. KENNAMER:  Objection, form.
10   A.  It evidences a -- the ability for the judge to
11   sign a custodial mental health warrant to take the
12   person into some place who could make that decision.
13   Q.  Okay.  Well, I --
14   A.  That is what it says to me.
15   Q.  I am reading the order and it says -- I will
16   read it again.  "The Court finds that there is
17   reasonable cause..."
18   A.  "To believe."
19   Q.  And then it says, "See application attached to
20   believe that Maricela Trevino evidences mental illness
21   that creates an imminent, substantial risk of serious
22   harm to him -- to herself or others."
23        MS. KENNAMER:  Objection, form.  There is no
24   question even on the table at the moment and objection,
25   argumentative.  He has told you what he thinks.  You

Page 227

1    just don't like his answer.
2    Q.  Well, I just wanted to know whether you have
3    any -- has she filled these orders before?  Have you
4    ever served any of these orders?
5    A.  Yes.
6    Q.  Have you ever disagreed with her and told her
7    directly that that person did not evidence mental
8    illness?
9    A.  I keep my opinions to myself.  The judge signs
10   the order.
11   Q.  Okay.
12   A.  Now, I am bound by law to have a peace officer
13   effect the mental health warrant, take the person to a
14   qualified person to make that decision.
15   Q.  Okay.  And in order to do that, the Weslaco
16   Police Department has to get involved?
17   A.  A peace officer has to serve the warrant.
18   Q.  Okay.  Well, who serves the warrants for --
19   that come out of the municipal court of the City of
20   Weslaco?
21   A.  The Weslaco Police Department.
22   Q.  Okay.  And wouldn't you say that based on
23   Exhibit No. 12 some members of the Weslaco Police
24   Department had knowledge that Maricela Trevino was
25   sectioned by Judge Farias in November of 2005?

Page 228

1    A.  The officer handling the section.
2    Q.  Do you know who handled this sectioning?
3    A.  I don't.
4    Q.  Okay.  Would you agree with me that the -- that
5    the Weslaco Police Department personnel had knowledge of
6    Maricela Trevino's suicidal behavior in November
7    of 2005 --
8         MS. KENNAMER:  Objection, form.
9    Q.  -- based on Exhibit 12?
10   A.  If this was served to a Weslaco police officer,
11   that police officer would have knowledge.
12   Q.  And would the jailer that -- in this case,
13   because she was in custody already, the jailer who was
14   handling -- or who was manning the booking department
15   would have knowledge as well.  Correct?
16   A.  If she was still in custody, yes.
17   Q.  Well, that is what it says here.  No?  That she
18   is in custody.  I thought I read it somewhere.
19   A.  Yes.  When this application was filled out, to
20   Mr. Trevino's knowledge she was in custody for public
21   intoxication.
22   Q.  Well, and, you know, if you notice something of
23   this -- on the application, it is also notarized.
24   A.  Uh-huh.
25   Q.  The fact that it is notarized and that someone

Page 229

1    took the time to fill this out, to go to a judge and
2    request all of this, that -- that doesn't give the
3    application credibility in your eyes, Lieutenant
4    Walensky?
5         MS. KENNAMER:  Objection, form.  It is not a
6    proper question.
7    A.  All this tells me is to take this person to
8    somebody who is medically qualified to make that
9    decision.
10   Q.  Okay.
11   A.  I may have an arrest warrant, criminal, for
12   somebody.  It doesn't mean I know they did it.
13   Q.  Let me hand you another exhibit.  Thank you.
14   Have you had a chance to review Exhibit No. 13,
15   Lieutenant Walensky?
16   A.  I am reading it.
17   Q.  Okay.  Sorry.
18   A.  Yes.  I have read it.
19   Q.  What is Exhibit No. 13?
20   A.  This appears to be a CAD-generated -- although
21   an older CAD -- document of a call that Officer Xenia
22   Yarrito responded to involving Maricela Trevino.
23   Q.  And Officer Xenia Yarrito is one of the four
24   mental health officers of the Weslaco -- strike that
25   question.  Officer Xenia Yarrito is a mental health

58  (Pages 226 to 229)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 230

1   peace officer employed by the City of Weslaco Police
2   Department. Correct?
3       A.  Currently.
4       Q.  Currently. Was she back then --
5       A.  I don't --
6       Q.  -- in January of 2006?
7       A.  I don't know.
8       Q.  Okay. And Ms. -- this is a report by
9   Ms. Yarrito, correct, by Officer Yarrito dated
10  January 30th, 2000 -- 2006. Correct?
11      A.  Well, it is not -- it is not her report. It
12  is -- looks like a facsimile of a call sheet.
13      Q.  A facsimile. Where do you -- where do you see
14  that?
15      A.  When an officer generates a report for the
16  Weslaco Police Department, it doesn't look like this.
17      Q.  Okay. What is -- what is this document then?
18  What is this called? It says Weslaco -- and the only
19  reason I am asking you, it says Weslaco Police
20  Department on top. Do you see that?
21      A.  Yes. But this could have been generated in
22  dispatch by the CAD. This could have been something
23  typed in by people in data entry, but this is not on
24  the -- the report type that an officer would generate.
25  So I am at a loss as to is this CAD-generated report

Page 231

1   from dispatch, is this a copy of her report as entered
2   in by --
3       Q.  I see.
4       A.  -- a data entry clerk.
5       Q.  Okay. But it says -- it has a Weslaco Police
6   Department number. Right?
7       A.  It appears to be a case number, yes.
8       Q.  And the case number is 2006002308. Did I read
9   that correctly?
10      A.  Yes.
11      Q.  And it shows a complainant -- a complainant,
12  right, Chris Villarreal?
13      A.  Yes. This looks like a call sheet, a
14  CAD-documented call sheet.
15      Q.  Okay. Call sheet. And it shows -- it shows
16  the offense of overdose. Do you see that in the middle
17  of the first page?
18      A.  Yes.
19      Q.  And towards the bottom, it shows -- it lists
20  the assigned officer as Xenia Yarrito. Did I read that
21  correctly?
22      A.  Yes.
23      Q.  And it shows the assisting officer is Maria
24  Gandy, David Garcia, Carlos Servantes, and the
25  dispatcher is listed as Israel Trevino, and the call was

Page 232

1   received by Israel Trevino and the other party or
2   parties is listed as Maricela Trevino. Did I read that
3   correctly?
4       A.  Yes.
5       Q.  Okay. And this exhibit has a narrative.
6   Correct?
7       A.  Page two, yes.
8       Q.  And the author of this narrative is a -- is
9   patrol -- is police officer Yarrito. Do you see that at
10  the top?
11      A.  Yes.
12      Q.  And the title of this narrative is overdose.
13  Do you see that, sir?
14      A.  Yes.
15      Q.  And it reads, "On Monday, January 30th, 2006 at
16  about 1:06 p.m., I was dispatched to 815 East America in
17  reference to an overdose." Did I read that correctly?
18      A.  Yes.
19      Q.  "Upon arrival I made contact with Chris
20  Villarreal 01-13-63, who stated her sister had taken an
21  unknown amount of anxiety pills (Lorazepam). When asked
22  Maricela Trevino advised she took about eight pills."
23  Did I read that correctly?
24      A.  Yes.
25      Q.  "Maricela Trevino appeared to be highly

Page 233

1   intoxicated our (sic) under the influence of medication.
2   She also had slurred speech and unsteady balance.
3   Weslaco EMS transported her to Knapp Medical Center."
4   Did I read that correctly?
5       A.  Yes.
6       Q.  Okay. So this is -- and you called it a call
7   sheet. Right?
8       A.  Uh-huh.
9       Q.  This call sheet. Would you agree with me that
10  overdosing on prescription drugs is consistent with
11  suicidal behavior?
12      A.  Exclusively? No.
13      Q.  Can it be consistent with suicidal behavior?
14      A.  It can be.
15      Q.  Okay. And Officer Yarrito, who is the author
16  of this report, she was a licensed peace officer in
17  January of 2006. Right?
18      A.  That sounds right.
19      Q.  And she is a competent police officer?
20      A.  Yes.
21      Q.  Okay. And was she competent -- a competent
22  police officer back in January of 2006?
23      A.  I believe so.
24      Q.  And Officer Maria Delores Gandy, she was a
25  licensed peace officer in January of 2006 as well.

59 (Pages 230 to 233)

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 234

```
1    Correct?
2        A.  I believe so.
3        Q.  Is -- was she a competent police officer back
4    in January of 2006?
5        A.  I believe so.
6        Q.  Okay.  Do you disagree with Officer Yarrito's
7    decision to have Maricela Trevino transported to Knapp
8    Medical Center --
9        A.  No.
10       Q.  -- as shown in this exhibit?
11       A.  No.
12       Q.  And based on this incident, would you say that
13   Maricela Trevino suffered from mental illness in January
14   of 2006?
15       A.  No.
16       Q.  Would you agree with me that the Weslaco Police
17   Department, in this instance Officer Yarrito and Officer
18   Gandy, were both aware that Maricela Trevino was
19   vulnerable to suicidal tendencies in January of 2006?
20           MS. KENNAMER:  Objection, form.
21       A.  I would lend credence to that if there was a
22   suicide note or -- I don't see anything that gives any
23   indication that she took this Lorazepam as to take her
24   own life, other than she was taking them for whatever
25   reason.
```

Page 235

```
1        Q.  Okay.  Now, based on the November 2005
2    sectioning of Maricela Trevino and this January 2006
3    overdose, did the City of Weslaco Police Department and
4    its officers have knowledge of Maricela Trevino's
5    vulnerability to suicidal tendencies?
6            MS. KENNAMER:  Objection, form.
7        A.  I think one officer had, by Exhibit No. 12,
8    sectioned her, but I don't see a return or anything with
9    this or a report documenting that it was served.  And
10   this tells me they responded to her house after she took
11   eight pills and contacted EMS to have her transported to
12   Knapp Medical Center for medical treatment.  I can't --
13   are you asking me to speculate whether she did it due to
14   mental illness?
15       Q.  No.
16       A.  I can't say --
17       Q.  No, sir.  I was asking whether -- whether the
18   City of Weslaco, based on the incident in November
19   of 2005 when she was sectioned and the overdose in
20   January of 2006, whether at that time did the City of
21   Weslaco police personnel have knowledge of Maricela
22   Trevino's vulnerability to suicidal tendencies?
23           MS. KENNAMER:  Objection, form.
24       Q.  Yes or no?
25       A.  I don't see how.
```

Page 236

```
1        Q.  Okay.  Let me ask you another question.
2            MS. KENNAMER:  Let him finish his answer.
3        Q.  Oh, I didn't know.  I thought he was going
4    to --
5        A.  I would say, yes, I had these officers
6    responding to this incident for her taking an amount of
7    pills.  What was behind it, what was her intent, I don't
8    know, and those officers are aware of this situation.
9    And then I have an application for emergency
10   apprehension under Health and Safety Code for mental
11   health screening, but I don't have an attachment of
12   completion.  And I am assuming that if this was served,
13   then that one officer would have evidence that her
14   brother sectioned her.  Any more or less than that, did
15   the department as a whole know?  No.
16       Q.  Okay.  Let me ask you the following question.
17   And based on the November 2005 sectioning of Maricela
18   Trevino and the January 2006 overdose on prescription
19   pills, did the Weslaco Police Department have knowledge
20   that Maricela Trevino was a suicide risk?
21       A.  No.
22       Q.  Okay.  Let me hand you Exhibit No. 14.  Please
23   let me know when you are done reviewing it, lieutenant.
24       A.  Okay.
25       Q.  Okay.  What is Exhibit No. 14?
```

Page 237

```
1        A.  Exhibit No. 14 consists of three pages stapled
2    together.  The first page appears to be a call sheet,
3    and again the second page is -- it looks like a
4    facsimile of either officer's notes or a report
5    regarding Maricela Trevino.
6        Q.  Okay.  And on page one of Exhibit 14, that is
7    a -- shows Weslaco Police Department at the top.  Right?
8        A.  Yes.
9        Q.  With a case number 2006024440; is that correct?
10       A.  Yes.
11       Q.  And it is dated November 6th, 2006?
12       A.  Correct.
13       Q.  And the location is outlet/Los Torritos,
14   Weslaco.  Is that what is shown?
15       A.  Yes.
16       Q.  Okay.  And the complainant is Xenia Yarrito.
17   That is Officer Yarrito of the Weslaco Police
18   Department?
19       A.  Correct.
20       Q.  And under offender it says, "See other
21   parties."  Under offense -- do you see that section in
22   the middle of the page?
23       A.  Yes.
24       Q.  Offense 1, and then it says, "Offense (RS#)
25   section 26/28."  Do you see that, sir?  Did I read that
```

60  (Pages 234 to 237)

Hill & Romero
Certified Court Reporters