1  correctly?
2     A.  Yes.
3     Q.  And the assigned officer for this call was
4  Xenia Yarrito and the assisting officer -- officers were
5  Jose Rodriguez and Eloy Cano.  Did I read that
6  correctly?
7     A.  Yes.
8     Q.  The dispatcher was Lydia Olalde.  And the call
9  was received by Lydia Olalde, and the other party or
10 parties is Maricela Trevino.  Did I read that correctly?
11    A.  Yes.
12    Q.  Okay.  The second part is the narrative of the
13 call, and the author is Officer Xenia Yarrito.  Did I
14 read that correctly?
15    A.  Yes.
16    Q.  And the title is section 26.  Do you see that,
17 sir?
18    A.  Yes.
19    Q.  The first paragraph reads, "On Monday,
20 November 6, 2006, at about 10:11 a.m., I was dispatched
21 to 815 America in reference to a suicidal female.  Upon
22 arrival I made contact with Maricela Trevino," her
23 birthday of 8-18-71, "who stated she was arguing with
24 her mother so she cut her left wrist three times.
25 Female was detained under emergency mental health

1  warrant and transported to Knapp Medical Center.  Upon
2  medical clearance, female was transported to Tropical
3  Texas for screening/evaluation.  Female was not
4  accepted.  She was transported back to 815 America and
5  released to her mother."  Did I read that correctly?
6     A.  Yes.
7     Q.  Would you agree that the -- Officer Yarrito's
8  description of Maricela Trevino's cuts to the wrist on
9  the second page, that those cuts to her wrist are
10 consistent with suicidal behavior, lieutenant?
11    A.  I would have to see the cuts and some
12 information about how they were done or were they
13 self-inflicted.  Yeah.
14    Q.  Even if Officer Yarrito is making a decision to
15 take this individual on a section twenty -- this is a
16 what?  Section 26?
17    A.  Uh-huh.
18    Q.  You would have to see the cuts?
19    A.  In her place, just asking me that question
20 outright, not being in her position to have the
21 observation she had, can you re -- ask the question
22 again, please.
23    Q.  Well, sure.  Do you have any criticism of -- of
24 Officer Yarrito's decision to take Maricela Trevino to
25 the -- to Tropical Texas for screening and evaluation

1  after she observed Maricela Trevino on November 6th,
2  2006 with cuts to her wrist?
3        MS. KENNAMER:  Objection, form.  That is not
4  the same question you asked before.  You are welcome to
5  ask that question, but don't represent that it is the
6  same question you asked.
7     A.  I will answer that question.
8     Q.  Okay.  Go ahead.
9     A.  Yes.  What she did based on her observations,
10 yes.
11    Q.  Okay.  And so do you have any reason to doubt
12 Officer Yarrito's observations of November 6th, 2006?
13    A.  No.
14    Q.  Do you have any reason to question her judgment
15 concerning the emergency or the urgency of Maricela
16 Trevino's injuries to her left wrist?
17    A.  No.
18    Q.  And this is consistent with what you testified
19 earlier that Weslaco PD officers should do, correct,
20 when coming into contact with someone who may injure him
21 or herself?
22    A.  Yes.
23    Q.  Okay.  So did Officer Yarrito do the right
24 thing by taking Maricela Trevino, based on these facts,
25 to Knapp Medical Center and then to Tropical Texas,

1  Lieutenant Walensky?
2     A.  Yes.
3     Q.  And this is a sectioning -- a section 26; is
4  that correct?  Am I correct?
5     A.  Well, actually what she states in here was
6  detained under mental health warrant.  Actually if she
7  would have invoked it herself, it would be application
8  without warrant for emergency.
9     Q.  Okay.  Oh, that -- is that number correct?  Is
10 that the correct section number, 26?
11    A.  Well, that -- really that number is just to
12 identify this as a mental health issue.
13    Q.  Okay.
14    A.  But section 26 does indicate it is an officer
15 is the one that is initiating the apprehension and it is
16 an emergency apprehension without warrant.
17    Q.  Okay.  And -- okay.  And based on this
18 emergency apprehension of November 2006 as well as the
19 section of November 2005 and the January 2006 overdose
20 of Maricela Trevino, did the City of Weslaco Police
21 Department have knowledge of Maricela Trevino's
22 vulnerability to suicidal tendencies?
23        MS. KENNAMER:  Objection, form.
24    A.  Just a yes or no?
25    Q.  Yes, sir.

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)
2c2ed275-adae-476d-8430-69873ef8f5b8

Page 242

1    A.  No.
2    Q.  Okay.  And based on the November 2005
3  sectioning of Maricela Trevino, her January of 2006
4  overdose, and this emergency -- did you call it an
5  emergency health --
6    A.  Which one?
7    Q.  -- section?
8    A.  By the judge or by an officer?
9    Q.  By Officer Yarrito.
10   A.  An officer, it is an emergency apprehension
11  without warrant.
12   Q.  And based on this emergency apprehension
13  without warrant of November 2006 for cuts to a wrist,
14  did the City of Weslaco Police Department have knowledge
15  that Maricela Trevino was a suicide risk in November of
16  2006?
17        MS. KENNAMER:  Objection, form.
18   A.  I would say no.  She was refused by the
19  screening process at the mental health facility.
20   Q.  The dispatcher on this call was Lydia Olalde.
21  Correct?
22   A.  Based on this call sheet, that appears to be
23  correct.  Can we take a quick --
24   Q.  Sure.  Yes, sir.  We can take a break.
25        (Off the record)

Page 243

1    Q.  Lieutenant Walensky, I have handed you
2  Exhibit 15 during our break.  I will give you an
3  opportunity to review that.
4    A.  Okay.
5    Q.  What is Exhibit No. 15, sir?
6    A.  This looks like a CAD-generated report.
7    Q.  Okay.  And it is a Weslaco Police Department
8  document.  Correct?
9    A.  It appears to be, yes.
10   Q.  And it has a call number of 2006024429; is that
11  correct?
12   A.  Yes.
13   Q.  And -- and this is a document that was created
14  by the dispatch division of the Weslaco Police
15  Department?
16   A.  Yes.
17   Q.  Okay.  And there are -- there is a note section
18  to this exhibit.  Do you see that in the middle?
19   A.  Yes.
20   Q.  And it shows several -- several numbers.  The
21  first one is 1787.  Do you see that, sir, under notes?
22   A.  Yes.
23   Q.  And it provides you with a time of November 6,
24  2006 at 8:43 a.m. with 43 seconds.
25   A.  Yes.

Page 244

1    Q.  Do you see that?
2    A.  Yes, sir.
3    Q.  And then there is another entry for 1787,
4  11-06-2006 at 8:42 p.m. -- a.m. with 45 seconds, and it
5  reads, "Ref to daughter DC with mother."  1787, those
6  are the numbers identifying an individual at the bottom
7  of that exhibit.  Correct?
8    A.  Yes.
9    Q.  1787, that number was assigned to Ernesto
10  Beraza?
11   A.  Yes.
12   Q.  And he is also an employee of the Weslaco
13  Police Department dispatch?
14   A.  At that time, yes.
15   Q.  Okay.  And then we also see under Ernesto
16  Beraza that Lydia Olalde.  She is ident -- her ID number
17  is 1771.  Do you see that, sir?
18   A.  Yes.
19   Q.  And Lydia Olalde was a dispatcher as well with
20  the Weslaco Police Department on November 6th, 2006; is
21  that correct?
22   A.  Yes.
23   Q.  And there is an entry, you see her number,
24  1771, and then it says 11-06-2006, 8:59 a.m. with 20
25  seconds.  Did I read that correctly?

Page 245

1    A.  8:59 with 26 seconds.
2    Q.  20 -- 26.  I am sorry.  Mine says 20.  I am
3  sorry.  Then there is an entry that says, "Very short
4  hair, black wind shorts, female left, WB" which I am
5  assuming that means westbound?
6    A.  Correct.
7    Q.  "From location, does have cut to the wrist."
8  Did I read that entry correctly that was made by Lydia
9  Olalde?
10   A.  Yes.
11   Q.  Okay.  Then it says 1771, this is her ID number
12  again, right, Ms. Olalde's?
13   A.  Yes.
14   Q.  November 6, 2006 at 9:05 a.m. with 38 seconds.
15  "Female possibly ER to PD."  What does ER mean there?
16   A.  En route.
17   Q.  "En route to PD to make contact with Judge
18  Farias about section 28."  Did I read that entry
19  correctly?
20   A.  Yes.
21   Q.  Okay.  Would you say -- strike that question.
22  Would you agree with me, Lieutenant Walensky, that based
23  on Exhibit No. 15 in January of 2006 Weslaco Police
24  Department dispatcher Lydia Olalde had knowledge that
25  Maricela Trevino was a suicide risk?

62 (Pages 242 to 245)

Page 246

1      A. No.
2      Q. Would you agree with me, Lieutenant Walensky,
3   that based on the November 20 -- that on November 26th
4   when Maricela Trevino was taken to the MHMR for cuts to
5   her wrists by Officer Yarrito that dispatcher Lydia
6   Olalde had knowledge of Maricela Trevino's vulnerability
7   to suicidal tendencies?
8      A. No.
9      Q. Would you say that based on the January 2006
10  overdose of Maricela Trevino and the November 2006
11  emergency apprehension by Officer Yarrito that Officer
12  Yarrito had knowledge that Maricela Trevino was a
13  suicide risk?
14     A. On the incident involving when she sectioned
15  her?
16     Q. Yes, sir.
17     A. When she took her into custody?
18     Q. And the overdose, because she responded to both
19  of those calls.
20     A. The overdose, I would say no. The other
21  incident, she had reason to believe that this person
22  needed to be screened by a mental health professional to
23  ascertain whether or not she had a mental health crisis,
24  yes.
25     Q. So the November 2006 when Maricela Trevino had

Page 247

1   cuts to her wrist, you are saying, yes, at that instance
2   Weslaco Police Department Officer Yarrito had knowledge
3   that Maricela Trevino was a suicide risk?
4      A. No.
5         MS. KENNAMER: Objection, form.
6      A. She had reasonable belief to apprehend her
7   without warrant under emergency apprehension to take her
8   to a mental health facility for a mental health
9   evaluation.
10     Q. Okay. Well, let me ask it this way. In
11  November 2006 based on Maricela Trevino's cuts to the
12  wrist, did police officer Yarrito have a reasonable
13  belief that Maricela Trevino may injure herself --
14     A. Yes.
15     Q. -- fatally?
16     A. Fatally, that would be speculation on my part
17  as far as I don't know how deep the cuts were, was it
18  superficial, if it was -- I understand she did go to the
19  hospital, but that is common for any -- any injury
20  whatsoever --
21     Q. Okay.
22     A. -- to provide medical attention.
23     Q. Well, and would you say that based on this
24  November 2006 incident where Maricela Trevino was taken
25  to the MHMR for cuts to her wrists that Weslaco Police

Page 248

1   Department dispatcher Lydia Olalde had knowledge that
2   Maricela Trevino could potentially be a suicide risk?
3      A. Based on the officer's apprehension and
4   transport, it would be assumed for about two hours until
5   they refused her at the --
6      Q. So I am asking about --
7      A. -- MHMR.
8      Q. I am asking about the dispatcher who was on the
9   call.
10     A. I don't -- it is just strange for me to say it
11  would -- it is reasonable for her to believe. First, I
12  don't know what she believes. All I know is she has
13  gotten information that an officer has effected an
14  apprehension, an emergency apprehension of an individual
15  to take to a screening process. I don't know how she
16  processes that information, whether she believes it to
17  be she is dealing with somebody with a mental health
18  issue or --
19     Q. Okay. Well, can we --
20     A. -- she is taking them in for screening to see
21  if this person is in mental health crisis.
22     Q. Well, can we agree then that at least Officer
23  Yarrito based on her observations felt that the cuts to
24  Maricela Trevino's wrists could suggest the risk of
25  further self-injury?

Page 249

1      A. Yes.
2      Q. Okay. And Dispatcher Olalde, Lydia Olalde, was
3   privy to this call because she is -- is the dispatcher
4   who handled the call for the Weslaco Police
5   Department --
6      A. Yes.
7      Q. -- dispatch?
8      A. (Moving head up and down)
9      Q. Okay. And she, too, would know of Maricela
10  Trevino's behavior by cutting her wrists that suggested
11  a further risk of self-injury to her if not taken to a
12  medical or a mental health facility?
13        MS. KENNAMER: Objection, form.
14     A. Now, which one are we talking about?
15     Q. Olalde.
16     A. Yes. But which --
17     Q. Oh, the November -- the November 2006 incident
18  where --
19     A. November 6th?
20     Q. November 6th, 2006.
21     A. The one where the -- she has the CAD notes?
22     Q. Yes, sir.
23     A. Well, according to -- all she says is does have
24  cut to the wrist. It doesn't indicate whether it was
25  self-induced or caused by other, so I don't know how she

63 (Pages 246 to 249)

Hill & Romero
Certified Court Reporters

Page 250

1  could draw that conclusion.
2  Q.  But that cuts to the wrist does suggest
3  behavior --
4  A.  I would disagree.  I have a cut to my wrist and
5  I have never made a suicide attempt, so I don't --
6  Q.  But, sir, that's a scar that you have.  That is
7  not a cut.  It is a scar.  Right?
8  A.  Right.
9  MS. KENNAMER:  Objection --
10  A.  At one time --
11  MS. KENNAMER:  -- argumentative.
12  A.  -- it was a cut.
13  Q.  Well, no.  You just said --
14  A.  At one time, it was a cut.  It doesn't mean I
15  committed -- attempted to commit suicide.
16  Q.  I understand your reasoning.
17  A.  But for a dispatcher to say somebody has an
18  injury to -- you know, say somebody comes -- calls in
19  and says, I am out with a subject on the ground, he has
20  a gunshot wound to the head.  I wouldn't natural -- I
21  wouldn't assume that he shot himself in the head.
22  Q.  Well --
23  A.  All I know is he has a gunshot wound to the
24  head and that is it.
25  Q.  Well, she would know that Maricela Trevino at

Page 251

1  least had injuries to her wrists that Officer Yarrito
2  believed suggested the risk of further self-injury.
3  Would you agree with that statement?
4  A.  She could deduce that.
5  Q.  And she could deduce that based on the calls
6  and the communication with Officer Yarrito, who writes
7  in her report that she took Maricela Trevino -- that she
8  was detained under an emergency mental health warrant
9  and that Maricela Trevino was transported to Knapp
10  Medical Center --
11  A.  Uh-huh.
12  Q.  -- and that she was cleared and later taken to
13  Tropical Texas?
14  A.  And she could deduce three hours later that she
15  was refused.
16  Q.  That wasn't my -- my question.  My question to
17  you was -- so I need to object to the nonresponsiveness
18  of your answer.  Dispatcher Olalde could deduce and
19  infer from Xenia Yarrito's actions in taking Maricela
20  Trevino under an emergency apprehension order that the
21  cuts to her wrists was behavior suggesting a further
22  risk of self-injury?
23  MS. KENNAMER:  Objection, form.
24  A.  I don't know how I can speculate what she --
25  Q.  All right.

Page 252

1  A.  She could.  She could.
2  Q.  Okay.
3  A.  Now, if you are telling me yes or no, I don't
4  know.
5  Q.  Okay.  Well, she knows for a fact that based on
6  her communications with Officer Yarrito that --
7  A.  She knows an officer left the location after
8  arguing with her mother.  She knows that the officer
9  checked out with her, that she has cuts to her wrists
10  and the officer is doing a section 26 and taking her to
11  the hospital and then to a mental health screening.
12  Q.  And so she knows all of that on November 6th,
13  2006?
14  A.  Yes.
15  Q.  And we are talking about Dispatcher Olalde.
16  Correct?
17  A.  Correct.
18  Q.  Okay.  Have you ever read the affidavit of
19  officer --
20  MS. KENNAMER:  I am going to have to insist
21  that we break for the day here, because you are
22  obviously going into a new area of questioning and the
23  off -- and Lieutenant Walensky did indicate that he had
24  to get to his car.  So if we are going to a whole new
25  area, which obviously we are, I think it is time to

Page 253

1  break for the day.
2  MR. RUIZ:  That is fine.
3  (Deposition recessed on July 13, 2010 and
4  (resumed on July 14, 2010)
5  BY MR. RUIZ:
6  Q.  Good morning, Lieutenant Walensky.
7  A.  Good morning.
8  Q.  I am going to continue asking you some
9  questions concerning the matter involving Maricela
10  Trevino and the City of Weslaco.  Last -- yesterday we
11  looked at several exhibits, including Exhibit No. 14.
12  Could you look at Exhibit No. 14 again, please?
13  A.  Okay.
14  Q.  Okay.  And I want you to -- that Exhibit 14 is
15  dated what day?
16  A.  It is dated November 6th, 2006.
17  Q.  2006.  And now I am going to hand you Exhibit
18  No. 16, which you have not had an opportunity to review
19  until right now.  I will give you an opportunity to
20  review that.
21  MS. KENNAMER:  Let me take a quick look at
22  it.
23  MR. RUIZ:  Oh, here is --
24  MS. KENNAMER:  Okay.  I just needed to know
25  which one it was.

64  (Pages 250 to 253)

Electronically signed by Terri Hill (201-390-152-8303)   2c2ed275-adae-476d-8430-69873ef8f5b8

Page 254

1    A.  Is this just a --
2    Q.  Well, I was going to ask you.  Exhibit No. 16,
3  what is that, sir?
4    A.  My question was, are these the same pages?
5    Q.  I believe one was --
6    A.  089 and 090 --
7    Q.  Yes, sir.
8    A.  -- appear to be the same copies.
9    Q.  Yes, sir.  And I just --
10   A.  And again what --
11   Q.  Based on -- based on your review of Exhibit 14,
12 that is -- that is a Weslaco Police Department record as
13 well, right, Exhibit No. 14?
14   A.  It's -- the top page appears to be a call
15 sheet.
16   Q.  It's a call sheet.  And it has a Weslaco PD
17 case number?
18   A.  Correct.
19   Q.  And Exhibit 16 also has the call sheet format?
20   A.  Correct.
21   Q.  And it has a Weslaco PD case number as well.
22 Correct?
23   A.  It does.
24   Q.  The first page is -- on the first pages of
25 Exhibit 14, do you see the name of the assigned officer

Page 255

1  to that call?
2    A.  On Exhibit 16?
3    Q.  14.
4    A.  On 14.  The assigned officer appears to be
5  Xenia Yarrito.
6    Q.  Okay.  Does it show the assigned dispatcher on
7  Exhibit 14?
8    A.  Lydia Olalde.
9    Q.  Okay.  And that is the -- correct.  That --
10 that incident is from November 6th, 2006.  Correct?
11   A.  Correct.
12   Q.  All right.  If you look -- if you look at
13 Exhibit No. 16, does that call sheet show the name of
14 the assigned officer?
15   A.  Yes.
16   Q.  And who was that, sir?
17   A.  Albert Ponce.
18   Q.  Okay.  And if you look on the first sheet or
19 the second sheet of Exhibit No. 16 -- what is the date
20 of Exhibit No. 16, of that call sheet, by the way?
21   A.  May 17th, 2007.
22   Q.  Okay.  If you look at the following page, does
23 that call sheet of May 17th, 2007 identify the assigned
24 dispatcher?
25   A.  Yes.

Page 256

1    Q.  And who is that, sir?
2    A.  Lydia Olalde.
3    Q.  So both of those call sheets show that Lydia
4  Olalde was a dis -- a Weslaco Police Department
5  dispatcher who assisted the Weslaco Police Department
6  officers with both calls on November 6th of 2006 and
7  May 17th of 2007; is that correct?
8    A.  Yes.
9    Q.  Okay.  And if you look at the narratives,
10 those -- those call sheets have narratives.  Correct?
11   A.  Attached to them, yes.
12   Q.  Okay.  What is -- the narrative written by
13 Officer Yarrito on Exhibit No. 14, does it describe any
14 injuries to Maricela Trevino?
15   A.  It has a sentence here where it states that
16 Maricela Trevino was arguing with her mother so she cut
17 her left wrist three times.
18   Q.  Okay.
19   A.  It was a statement made to the officer by
20 Maricela.
21   Q.  Okay.  Does Exhibit No. 16 in the narrative by
22 Officer Albert Ponce, does it describe any injuries to
23 Maricela Trevino?
24   A.  Yes.
25   Q.  Okay.  And what -- what Bates stamp number at

Page 257

1  the bottom?  What page are you looking at, Lieutenant
2  Walensky?
3    A.  00089.
4    Q.  Okay.  And where do you -- where do you see
5  Officer Ponce describe the injuries of Maricela Trevino?
6    A.  In the paragraph two-thirds of the way down.
7    Q.  Okay.
8    A.  The sentence beginning with it.
9    Q.  It.  Okay.  Can you read that sentence, please?
10   A.  "It was at this time that I noticed that was
11 bleeding from the right forearm."
12   Q.  Okay.  Are there any other sentences in there,
13 in that narrative, to describe injuries to Ms. Trevino?
14   A.  Where he requested EMS.
15   Q.  Okay.  Can you read that, sir?
16   A.  "I informed dispatch that I was going to
17 transport the female prisoner.  I requested them to call
18 EMS meet me at the station due to the fact that the
19 female had cut her right arm while jumping the fence."
20   Q.  Okay.  Any other -- any other place on that
21 narrative by Officer Ponce that describes the injuries
22 to Ms. Trevino?
23   A.  "Once at the station, EMS attended to what he
24 called small superficial cuts.  I noticed they were
25 cleaning blood from her left wrist.  I stood by as EMS

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)

2c2ed275-adae-476d-8430-69873ef8f5b8

Page 258

```
 1   placed a bandage on both cuts and then -- on both cut
 2   and then left the booking area."
 3       Q.  Okay.  And so based -- the similarities of both
 4   Exhibit No. 14 concerning the November 6th, 2006 call
 5   and the May 17, 2007, just six months later, involving
 6   Maricela Trevino, they both have in common two things.
 7   They -- the injuries of Maricela Trevino to her wrist.
 8   Correct?
 9       A.  Well --
10           MS. KENNAMER:  Objection, form.
11       A.  On May 17th, he indicated forearm.
12       Q.  Okay.  But later on at the bottom, didn't you
13   say that -- that he wrote that "I noticed they were
14   cleaning blood from her left wrist"?
15       A.  Yes.
16       Q.  So that is -- that is also similar to the
17   injuries she had on November 6th, 2006.  Correct?
18       A.  Well --
19       Q.  Well, the description, lieutenant.  That is all
20   I am talking about.
21       A.  Vaguely, yes.
22       Q.  Okay.  And also the other similarity, both
23   officers, Yarrito and Ponce, described the injuries as
24   cuts on Maricela Trevino's wrist and forearm, correct,
25   for both days?
```

Page 259

```
 1       A.  Actually the description here was -- by the
 2   officer was cut to the forearm from jumping the fence,
 3   and on Officer Yarrito's it was just a statement that
 4   Maricela had made that she had cut her left wrist three
 5   times.
 6       Q.  Lieutenant, I am only asking about the
 7   description for the injury.  Okay.  What are the
 8   descriptions provided by Officer Yarrito and Officer
 9   Ponce concerning Maricela Trevino's injuries on
10   November 6th and May 17th, 2007?
11           MS. KENNAMER:  Objection, sidebar.
12   Objection, asked and answered.
13       Q.  You can go ahead and answer.
14       A.  Okay.  The Officer Yarrito on November 6th,
15   2006 does not make an observation.  She just writes what
16   Maricela stated to her.  And Officer Ponce indicated she
17   had a cut to her forearm after jumping the fence at the
18   church.
19       Q.  Do both narratives include the word cut or
20   cuts?
21       A.  Both narratives do include the word cut.
22       Q.  Okay.  And both narratives include the word cut
23   to describe injuries on Maricela Trevino's either
24   forearm or wrist.  Correct?
25       A.  In narrative form, both indicate, yes.
```

Page 260

```
 1       Q.  Thank you.  Let me move on.
 2       A.  Thank you.
 3       Q.  Just to clarify something.  What is Exhibit
 4   No. 17, Lieutenant Walensky?
 5       A.  Exhibit 17 as handed to me is an apprehension
 6   by peace officer without warrant.
 7       Q.  And who is the applicant?
 8       A.  The applicant is Xenia Yarrito.
 9       Q.  And who is she seeking to detain without a
10   warrant?
11       A.  This is an application for emergency detention
12   of Maricela Trevino.
13       Q.  And what is the date of that application?
14       A.  The date as listed is November 6th.
15       Q.  What year?
16       A.  2006.
17       Q.  Okay.  And why does -- why did Officer Yarrito
18   seek emergency detention?
19       A.  Cut to her left wrist.
20       Q.  Can you read that paragraph?
21       A.  "I have reason to believe and do believe that
22   the person evidences a risk of serious harm to" -- it
23   should read himself or herself, but reads "himself or
24   others which is described as follows, cut her left
25   wrist."
```

Page 261

```
 1       Q.  Okay.  And can you read paragraph three and
 2   four of that application?
 3       A.  Paragraph three reads, "I have reason to
 4   believe and do believe that the risk of harm is imminent
 5   unless the person is immediately restrained."  Four, "My
 6   above stated beliefs are based on the following specific
 7   recent behavior, overt acts, attempts, threats, cut her
 8   left wrist."
 9       Q.  Okay.  And then there is some blanks in
10   which -- what does it read under that -- under those
11   blanks?
12       A.  "Which were observed by me and/or reliably
13   reported to me by Celia Trevino."
14       Q.  Okay.  So she checked off the blank at a space
15   where it says "which were observed by me."  Correct?
16       A.  Well, someone did, yes.
17       Q.  Could you hold that up for the camera, please?
18       A.  (Complying)
19       Q.  Thank you.
20           MR. RUIZ:  I am going to ask him about this
21   one, Alison.
22           MS. KENNAMER:  Okay.  Sorry.
23       Q.  Lieutenant Walensky, what exhibit number are
24   you reviewing?
25       A.  Exhibit 18.
```

66 (Pages 258 to 261)

Page 262

1    Q.  And the Bates number at the bottom of that
2  document is?
3    A.  02549.
4    Q.  Okay.  Thank you.  Let me know when you have
5  had an opportunity to review it.
6    A.  Okay.
7    Q.  This -- what is Exhibit No. 18, sir?
8    A.  It appears to be a police department internal
9  memo.
10    Q.  And that is the City of Weslaco Police
11  Department internal memo?
12    A.  Correct.
13    Q.  And it is dated June 9th, 2008?
14    A.  Yes, sir.
15    Q.  And it is addressed to Anthony Covacevich, the
16  city manager?
17    A.  Yes.
18    Q.  And it is from J.D. Martinez, the chief of
19  police?
20    A.  That is correct.
21    Q.  And those are the chief of police's initials
22  next to the word police?  Do you see that?
23    A.  Yes.
24    Q.  Okay.  And the subject is Advocacy Incorporated
25  document review.  Did I read that correctly?

Page 263

1    A.  Yes.
2    Q.  It reads, sir, and the first paragraph reads,
3  "Captain Walensky and I have reviewed the
4  recommendations provided by Advocacy Incorporated and
5  found the following to be factual and/or reasonable
6  implementations."  Did I read that correctly?
7    A.  Yes.
8    Q.  Number one, "The medical questionnaire was and
9  is to be completed for each booking process."  Did I
10  read that correctly?
11    A.  Yes.
12    Q.  Number two, "Pat searches are conducted on
13  arrested personnel however male pat downs of female
14  prisoners are used only in extreme circumstances such as
15  a probable cause and high probability of someone having
16  a weapon or narcotics on their person."  Did I read that
17  correctly?
18    A.  Yes.
19    Q.  "The Weslaco Police Department is in the
20  process of hiring another female jailer and has
21  requested additional personnel for the jail so that we
22  may have a male and female jailer on duty at any given
23  time."  Did I read that correctly?
24    A.  Yes.
25    Q.  Number three, "CPR training/recertification is

Page 264

1  currently being scheduled for our police officers, which
2  will now include jailers."  Did I read that correctly?
3    A.  Yes.
4    Q.  Four, "Jailer Moreno was serving in the
5  capacity as a jailer and was not a police officer."
6  Five -- did I read that correctly?
7    A.  Yes.
8    Q.  Five, "Lydia Olalde is a civilian dispatcher
9  and not an officer."  Did I read that correctly?
10    A.  Yes.
11    Q.  Okay.  Let me ask you about the third item in
12  that -- in that memo where it says CPR training.  Do you
13  see that, sir?
14    A.  Yes.
15    Q.  When you hired Jailer Moreno -- when the City
16  of Weslaco hired Jailer Moreno, was there a requirement
17  that jailers have CPR training?
18    A.  No.
19    Q.  Okay.  Was Jailer Moreno on or before May 17th,
20  2007 trained in CPR?
21    A.  I don't know.
22    Q.  What would you need to do in order to determine
23  whether he was or not?
24    A.  To determine if he was or not, you would have
25  to check his military record.  You could see if he was

Page 265

1  attending and had completed that course of first
2  responder or first aid training, CPR, in the police
3  academy that he was attending.  However, those dates are
4  not clear to me.
5    Q.  Okay.  And did you ever discuss what happened
6  on May 17th, 2007 with Jailer Moreno?
7    A.  Not that I have any recollection.
8    Q.  Did you read his affidavit?
9    A.  No.
10    Q.  Okay.  So you don't know whether Jailer Moreno
11  was trained in CPR on May -- on or before May 17th,
12  2007?
13    A.  As -- as by our department, I don't believe so,
14  but through the police academy, through his military --
15    Q.  Well, I mean --
16    A.  -- I wouldn't know.
17    Q.  And my question was, do you know whether he had
18  CPR training?  By the way, what is -- before -- strike
19  that question.  What is CPR training?
20    A.  Cardiopulmonary resuscitation.
21    Q.  And that is a -- is that a first aid -- is that
22  a -- what is CPR training used for?
23    A.  Resuscitating someone who is not breathing and
24  does not have a heartbeat.
25    Q.  Okay.  And my only question is, do you or do

67  (Pages 262 to 265)

Electronically signed by Terri Hill (201-390-152-8303)          2c2ed275-adae-476d-8430-69873ef8f5b8

Page 266

1    you not know whether on or before May 17th Jailer
2    Alfredo Moreno who was on duty that evening, whether he
3    had CPR training?
4        A.  I do not know.
5        Q.  Thank you.  And if he didn't have the training,
6    he would have been unable to comply with one of the
7    policies of the Weslaco Police Department at the time,
8    correct, which was under C, page 464?
9        A.  In what area are you --
10       Q.  And I am sorry.  Please -- please refer to
11   section C, emergency medical needs of prisoners.
12       A.  Okay.
13       Q.  And that section is under Roman Numeral V,
14   emergency situations.  Okay?
15       A.  Uh-huh.
16       Q.  Under C, emergency medical needs of prisoners,
17   number one reads, "When an inmate is discovered or
18   reported to have an injury or need of medical attention,
19   the jailer will, A, request EMS if necessary, B,
20   immediately render first aid if necessary."  Did I read
21   that correctly?
22       A.  Yes.
23       Q.  And CPR would have been a type of first aid
24   that the Weslaco Police Department policies require that
25   the jailer undergo in the event of an emergency medical

Page 267

1    need of a prisoner.  Correct?
2        A.  Where do you read that?
3        Q.  Well, it is under section C, emergency needs of
4    prisoners.  Right?
5        A.  Yes.  I see that.
6        Q.  Is CPR a type of first aid?
7        A.  Yes.  It can be.
8        Q.  Okay.  And so did the Weslaco policies in
9    effect for the jail require jailers to render first aid
10   such as CPR upon discovering that there was an emergency
11   medical need of a prisoner?
12       A.  As stated in subsection B, "Immediately render
13   first aid if necessary."
14       Q.  So the answer is yes?
15       MS. KENNAMER:  Objection, form.
16       A.  To immediately render first aid if necessary.
17       Q.  Okay.  And did -- and you -- did officer --
18   strike that.  Did Jailer Moreno immediately render first
19   aid when he first found Maricela Trevino hanging in her
20   cell on May 17th, 2007?
21       A.  I don't know.
22       Q.  And if he didn't immediately render first aid,
23   would he -- was that a violation?  Did he violate this
24   section C of the Weslaco jail and detention procedures?
25       A.  If he did not render first aid, it is --

Page 268

1        Q.  Immediately.
2        A.  Yes.  As stated in here, immediately render
3    first aid is our policy.
4        Q.  Okay.  And also if you look at that policy, it
5    requires that the jailer document the incident on the
6    jail daily log.  That is under letter D.  Do you see
7    that, sir?
8        A.  Yes.
9        Q.  Okay.  And if Jailer Moreno did not log an
10   incident which required emergency attention to the
11   medical needs of a prisoner, in this case on May 17th,
12   2007, Ms. Maricela Trevino, if he didn't log that on the
13   jail daily log, he would have violated section D of this
14   Weslaco policy as well; is that correct?
15       A.  If he did not log the incident in the daily
16   logs?
17       Q.  Yes, sir.  Was that a violation of this policy?
18       A.  Yes.
19       Q.  Let me go back to Exhibit No. 9 -- 18.  I am
20   sorry.  It is towards the bottom under number -- I mean,
21   I am sorry, the fourth section, "Jailer Moreno was
22   serving in the capacity as a jailer and was not a police
23   officer."  Do you see that, sir?
24       A.  Yes.
25       Q.  Why is that section included in this memo?  Why

Page 269

1    was that relevant back then on June 9th, 2008?
2        A.  I don't know.  It is not my memo.
3        Q.  Were you involved in drafting this memo in any
4    way?
5        A.  No.
6        Q.  Okay.  You didn't assist the chief with any of
7    the language in here?
8        A.  No.
9        Q.  So this Exhibit No. 18 was solely written by
10   Chief of Police J.D. Martinez.  Is that your
11   understanding?
12       A.  Yes.
13       Q.  Okay.  Do you know why he would --
14       A.  He discussed these issues with me, but I did
15   not draft the memo and --
16       Q.  Okay.  You don't -- so you don't know why he
17   would have included a statement such as, "Lydia Olalde
18   is a civilian dispatcher and not an officer"?
19       A.  No.
20       Q.  Okay.  The next -- the last paragraph of this
21   memo, it reads, "The Weslaco Police Department deals
22   with suicidal subjects, section 26/28," open
23   parentheses, "(apprehensions with and without warrant
24   for mental health)," close parentheses, "on a regular
25   basis in order to get professional help to those in need

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

1  of mental health services." Did I read that correctly?
2      A. Yes.
3      Q. Did you discuss this subject with Chief
4  Martinez back in June of 2008?
5      A. No. This is just common knowledge.
6      Q. Okay. And this was common knowledge to Chief
7  Martinez and the Weslaco Police Department even before
8  May 17th, 2007. Correct?
9      A. In dealing with suicidal subjects?
10     Q. Yes, sir.
11     A. Yes.
12     Q. Okay. The next sentence says, "After having
13  contact with police, emergency medical services and the
14  jailer, Ms. T" -- I am assuming he means Ms. Trevino?
15     A. I -- your assumption, I would believe so.
16     Q. Okay. "...did not give any indication that she
17  was suicidal." Did I read that correctly?
18     A. Yes.
19     Q. "Furthermore," this memo reads, "at no time did
20  family members indicate to us that Ms. T was ever in
21  need of any mental health service." Did I read that
22  correctly?
23     A. Yes.
24     Q. Did you have anything -- did you assist Chief
25  Martinez with drafting of that middle sentence, "After

1  having contact with police, emergency medical services
2  and the jailer, Ms. T did not give any indication that
3  she was suicidal"?
4      A. No.
5      Q. Okay. And the last sentence, did you assist
6  Chief Martinez draft the last sentence, "Furthermore, at
7  no time did family members indicate to us that Ms. T was
8  ever in need of any mental health service"? Did you
9  assist in writing that down?
10     A. No.
11     Q. Did you discuss with Chief Martinez whether
12  Ms. Trevino had ever -- whether her family members had
13  ever indicated to the Weslaco Police Department that she
14  may be in need of mental health services?
15     A. No.
16     Q. But you know that that statement is not correct
17  based on Exhibit No. 12, if you could look at that?
18         MS. KENNAMER: Objection, form.
19     Q. What is Exhibit No. 12, Lieutenant Walensky?
20     A. Order of issuance of a mental health warrant.
21     Q. Okay. And anywhere on that -- and that is a
22  three-page document. Right?
23     A. Correct.
24     Q. And if you could look at the second or third
25  page of that document, does it reference any family

1  member of Maricela Trevino?
2      A. Yes. The applicant's name.
3      Q. And -- and what is his name?
4      A. Fred Trevino.
5      Q. And in doing so, what is Mr. Trevino doing by
6  completing that -- that notarized application?
7      A. He is requesting that a magistrate issue an
8  order of a mental health warrant for Maricela Trevino.
9      Q. And he is also requesting the assistance of the
10  Weslaco Police Department to transfer Ms. Trevino, who
11  was in custody, to a mental health facility. Would you
12  agree with that?
13         MS. KENNAMER: Objection, form.
14     A. He is requesting the magistrate to issue an
15  order of apprehension under mental health warrant.
16     Q. And the apprehension is going to be done by
17  who?
18     A. A peace officer, any peace officer in the State
19  of Texas.
20     Q. Okay. And does that -- does that direct any
21  peace officer in the State of Texas, or does it direct
22  an officer of the Weslaco Police Department, which is
23  the jurisdiction of Judge Farias?
24     A. Well, I can read it verbatim.
25     Q. Well --

1      A. "It is therefore ordered that a warrant shall
2  issue for the immediate apprehension, detention, and
3  transport of the above named person to an appropriate
4  treatment facility for a preliminary examination by a
5  physician."
6      Q. Okay. And that order would be directed -- it
7  is written -- it is signed by the judge. Correct?
8      A. Yes.
9      Q. And the judge would later transfer that order
10  to what department?
11     A. Normally to the Weslaco Police Department.
12     Q. Because that is her jurisdiction, right, the
13  City of Weslaco?
14     A. That is the municipality she is a magistrate
15  in, yes.
16     Q. So if someone is going to do the transfer or
17  take Maricela Trevino to a mental health facility based
18  on her brother's application, what municipal police
19  department would have done that on November 5th, 2005?
20     A. Normally the Weslaco Police Department.
21     Q. Okay. And so if we go back to Exhibit No. 18,
22  that last sentence, I am going to read it to you again.
23  "Furthermore, at no time did family members indicate to
24  us that Ms. T was ever in need of any mental health
25  service." That is incorrect based on Exhibit No. 12.

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 274

1        MS. KENNAMER:  Objection, form.
2    Q.  Would you agree with that?
3    A.  I am not aware if he had knowledge of this.
4  Again, this was Chief Martinez's memo.
5    Q.  Okay.  Well -- okay.  Do you have any exhibit
6  that would show a family member of Maricela Trevino
7  applying for mental health services through the court?
8    A.  Are you referring to Exhibit 12?
9    Q.  Is that -- is that the only one that would show
10  that from the ones you have in front of you?
11    A.  The question again?
12    Q.  Is there any document in front of you,
13  Lieutenant Walensky, that would indicate that a family
14  member of Maricela Trevino sought the assistance of
15  mental health services for Ms. Trevino?
16    A.  Exhibit 12.
17    Q.  Okay.  And what is that?
18    A.  That is the application by Fred Trevino.
19    Q.  Okay.  And that application and the order
20  granting the application were at one point taken to the
21  Weslaco Police Department in order to follow the
22  directive of the judge, Judge Farias?
23        MS. KENNAMER:  Objection, foundation.
24  Objection, asked and answered.
25    A.  I don't know that.

Page 275

1    Q.  Okay.
2    A.  All I have is the application here.
3    Q.  Okay.  Does that app -- that application and
4  order, it would routinely be taken to the Weslaco Police
5  Department to follow.  Correct?
6    A.  Routinely.
7    Q.  Is that a yes?
8    A.  Yes.
9    Q.  Okay.  And would that document, the application
10  and the order, would that be a document that would
11  indicate to the Weslaco Police Department that
12  Ms. Trevino was in need of mental health services on
13  November -- in November of 2005?
14    A.  It would indicate that there was a warrant -- a
15  mental health warrant for her apprehension to take her
16  to a facility to see if she needed mental health
17  services.
18    Q.  So, yes, it would indicate that Ms. Trevino was
19  in need of mental health services in November of 2005?
20        MS. KENNAMER:  Objection, form.
21    A.  It could.
22    Q.  Okay.  Thank you.  Can you read exhibit --
23  where is your policy exhibit, Lieutenant Walensky?  That
24  was the first exhibit that we had, the City of Weslaco
25  policy.  Oh, there.  Can you read section -- I think we

Page 276

1  talked about earlier section D on page 464 under C,
2  emergency medical needs of prisoners.  One, "When an
3  inmate is discovered or reported to have an injury or
4  need of medical attention, the jailer will," semicolon.
5  Can you read D for me?
6    A.  "Document the incident on the daily -- on the
7  jail daily log."
8    Q.  Okay.
9        MR. RUIZ:  I am going to show him this one.
10  Okay?
11        MS. KENNAMER:  Okay.
12    Q.  I am going to hand you Exhibit No. 19.  What is
13  that, Lieutenant Walensky?
14    A.  It appears to be a copy of the jailer daily
15  log.
16    Q.  Okay.  For what dates?
17    A.  For -- the first page starting May 16th, '07.
18    Q.  Okay.  That is on the first page.  Correct?
19    A.  Correct.
20    Q.  And on the second page, what dates are shown on
21  that second page?
22    A.  The top of the page continues, May 16th of '07,
23  and then it jumps to May 18th, I believe, of '07.
24    Q.  And this jailer daily activity, this is a
25  Weslaco Police Department form; is that correct?

Page 277

1    A.  It appears to be, yes.
2    Q.  Is this the form that section D that you just
3  read requires a jailer to complete when the jailer
4  discovers an injury or finds that a detainee requires
5  medical attention?
6    A.  Yes, it is.
7    Q.  On May 17th, 2007 when Maricela Trevino was
8  hanging in her cell, would that have been an example or
9  would that have been an incident that should have
10  been -- that would have been an injury or a situation where
11  medical attention was needed?
12    A.  Yes.
13    Q.  Okay.  So upon observing Ms. Trevino, at some
14  point Jailer Moreno would have had to follow this
15  policy, letter D, and log that -- his observations of
16  the injury on this jailer daily log.  Correct?
17    A.  Of her injury --
18    Q.  Well, he needed to document the incident
19  involving Maricela Trevino on the evening of May 17th,
20  2007?
21    A.  Yes.
22    Q.  And what was that incident?  What is your
23  understanding of that incident?
24    A.  Of Maricela Trevino?
25    Q.  Yes, sir.

70  (Pages 274 to 277)

Hill & Romero
Certified Court Reporters

Page 278

1    A.  That she had asphyxiated herself.
2    Q.  Okay.  And would he -- would he have to -- what
3  would he have -- what did he need to write on this
4  jail -- jailer daily activity sheet?
5    A.  That incident.
6    Q.  Okay.  Does he just write incident or would
7  he -- would he say -- would he describe the injury and
8  the reason for the medical attention?
9    A.  Well, something in detail like that would have
10  actually been done on a -- on an incident report --
11    Q.  Okay.
12    A.  -- as per the policy.
13    Q.  Right.  But this policy also required that
14  something be logged concerning an incident involving an
15  injury or medical attention of a prisoner.  Correct?
16    A.  Yes.
17    Q.  Okay.  If you had to write that description of
18  what happened on May 17th, 2007, what would you have
19  written on this jailer daily activity log?
20    A.  The incident that occurred.
21    Q.  Okay.  What words would you have used?
22    A.  Incident occurred in the female holding cell --
23  if that is where it took place -- involving Maricela
24  Trevino and EMS contacted.
25    Q.  Would you describe the incident?

Page 279

1    A.  No.
2    Q.  No.  There was no need -- there would be no --
3  there would not be a need to describe the incident?
4    A.  Not in the jail log.
5    Q.  Just the word incident would have been enough?
6    A.  No.  Those are your words.  What I would
7  indicate was I would be filing a WPD incident report, or
8  if this was as large of an issue that it turned out to
9  be this would be supplemented in a report with any other
10  involved officers.
11    Q.  Right.  But the policy doesn't talk about
12  another incident in this section.  Correct?  It just
13  talks about the jail daily log.  Right?
14    A.  Yes.  But in this it indicates if there is an
15  incident that requires in depth that it will be filed on
16  a --
17    Q.  Well, which form -- is that a particular form?
18    A.  Yes.
19    Q.  What form is that?
20    A.  It is a WPD-57 incident report.
21    Q.  Okay.  And so Jailer Moreno, did he have a
22  choice which form he could fill out or did he have to
23  fill both of them out?
24    A.  Well, he could have filled that out, unless he
25  was instructed to do otherwise by anyone investigating

Page 280

1  the incident in the jail.
2    Q.  Okay.  But as his -- as jail commander and
3  based on these jail policies, without him -- without
4  anybody telling him, those policies required that he
5  document something about Maricela Trevino's hanging on
6  May 17th, 2007 in this jail daily log.  Right?
7    A.  Yes.  There should be some documentation as to
8  what he did.
9    Q.  Okay.  And you are also telling me that there
10  was a requirement that he also fill out a Weslaco Police
11  Department form number what?
12    A.  WPD-57.
13    Q.  Okay.  And where is that, sir?  Where in the
14  policies do you see that requirement?
15    A.  If you will go to 00461, records and reports.
16    Q.  Okay.  Roman Numeral IV, records and reports,
17  A, official records.  Which number are you looking at
18  and, if you could, please read it for us?
19    A.  Number two, "Incidents occurring in the jail
20  facility will be documented on a WPD-56 miscellaneous
21  incident report for serious matters and incidents.
22  These will include but not be limited to fights, medical
23  attention, disturbances and contraband found inside the
24  jail if it cannot be related to an already existing case
25  number."

Page 281

1    Q.  Okay.  So as chief commander -- as jail
2  commander in May of 2007 for the Weslaco PD jail, Jailer
3  Moreno was required to comply with this policy under
4  records and reports Bates stamped number 461 and the
5  policy that we looked at earlier concerning emergency
6  medical needs of prisoners in Bates stamp number 464,
7  section five, emergency situations.  Am I understanding
8  you correctly?
9    A.  He would be responsible for documenting it in
10  some type of a narrative form report for the department,
11  yes.
12    Q.  Okay.  And if -- if Jailer Moreno did
13  not either -- did not complete either form, either the
14  WPD-56 or the -- and did not also log the incident in
15  the jailer daily activity log, would Jailer Moreno have
16  violated both of these policies you have just -- we have
17  just discussed?
18    A.  No.
19    Q.  No.  Why is that, sir?
20    A.  Because as it indicates and I read here, if it
21  cannot be related to an already existing case number.
22    Q.  Well, she is in jail, isn't she?
23    A.  Yes.
24    Q.  And at booking don't they assign her a case
25  number?

71  (Pages 278 to 281)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 282

1    A.  Yes.
2    Q.  So doesn't that make it a requirement that he
3  fill out that section -- that WPD-56 report then?
4    A.  It could have also been documented into a case
5  number assigned to the incident itself, where he would
6  have to provide a written statement or some
7  documentation as to what he did for that incident.
8    Q.  Okay.  Is that somewhere in writing or --
9    A.  I will read it again.
10    Q.  Okay.
11    A.  "This will include but not be limited to
12  fights, medical attention, disturbances and contraband
13  found inside the jail if it cannot be related to an
14  already existing case number."
15    Q.  Okay.  And so -- well, then --
16    A.  If there is an incident in the jail, and
17  obviously a serious one such as this, and a case number
18  is generated and he is instructed to file his report of
19  what actions he took or what was done to that case
20  number, that would suffice to meeting the requirement
21  under four, records and reports, A, subsection two.
22    Q.  Okay.  And -- okay.  But at a minimum, if that
23  doesn't happen, he was still required under the Weslaco
24  policies to document the incident on the jail daily log,
25  correct, under C, emergency medical needs of prisoners?

Page 283

1    A.  For an incident like this, I think it would --
2  it is understanding that that did not get completed for
3  this incident.
4    Q.  Lieutenant Walensky, let me ask you the
5  question again.  I am just asking, at a minimum, these
6  policies require that the jailer, Jailer Moreno on
7  May 17th, 2007, write something describing the incident
8  of Maricela Trevino and her injuries and her need -- or
9  need of medical attention on that day in the jail daily
10  log.  That is the document referenced by section D; is
11  that correct?
12    A.  Yes.
13    Q.  And if he didn't log the incident of May 17th,
14  2007 involving Maricela Trevino in Jailer Moreno's daily
15  log, he would have violated this policy; is that
16  correct?
17    A.  Yes.
18    Q.  Okay.  Well, let's look at the jailer daily log
19  for those days that you have in front of you.  What
20  exhibit number is that, sir?
21    A.  Which number?
22    Q.  What exhibit number --
23    A.  19.
24    Q.  -- are you holding?  19.  Okay.  Thank you,
25  sir.  Can you go -- is there a date on Exhibit 19 --

Page 284

1  there are dates for May 16th, 2007.  Correct?
2    A.  Yes.
3    Q.  Okay.  What is the last date shown for the
4  entries made on May 16th, 2007?
5    A.  4:00 p.m.
6    Q.  Okay.  And what is the type of incident that is
7  commonly filled in the blanks on this jailer daily
8  activity?
9    A.  The most common would be the checking of 95s --
10    Q.  Okay.
11    A.  -- which is the checking of prisoners.
12    Q.  Okay.  And that checking of prisoners, that
13  requirement, is there a requirement in the Weslaco
14  policies in Exhibit 1 that you have that requires the
15  checking of prisoners?
16    A.  There is.  Would you like me to --
17    Q.  Yes, sir.  If you -- could you please find it
18  and read it?
19    A.  Yes.  It will be on 00465.
20    Q.  Okay.  Under what section?  What is it called?
21    A.  It would be section six, inmate supervision.
22    Q.  Okay.  And can you read the relevant section,
23  sir?
24    A.  It will be under section A, subsection two, "A
25  welfare check of all inmates will be made every 30

Page 285

1  minutes."
2    Q.  So -- so this is a requirement that -- for a
3  jailer to conduct an observation of the detainees or
4  inmates at the Weslaco PD jail every 30 minutes.
5  Correct?
6    A.  Correct.
7    Q.  Are there any written policies that would
8  excuse a jailer for not performing a welfare check on
9  all inmates every 30 minutes?
10    A.  I am just reviewing emergency situations.
11    Q.  Sure.
12    A.  No.  Nothing as it relates to that.
13    Q.  Okay.  And so if we look at Exhibit No. 18, the
14  last -- the last welfare check performed by a jailer on
15  May 16th, 2007 was at 4:00 p.m.?
16      MS. KENNAMER:  Objection, form.
17    Q.  I am sorry.
18    A.  Exhibit 18?
19    Q.  I am sorry.  I apologize.  That was the wrong
20  one.  I meant Exhibit 19, the jailer daily log.
21    A.  Okay.
22    Q.  Like I told you earlier, I am rushing a little
23  bit, so I apologize.
24    A.  That's okay.
25    Q.  If you could please look at the jailer daily

72 (Pages 282 to 285)

Page 286

1  log, Exhibit No. 19, the last entry on -- for May 16th,
2  2007 is at what time, sir?
3      A.  4:00 p.m.
4      Q.  4:00 p.m.  And do you see any other entries for
5  the remainder of the day for May 16th, 2007?
6      A.  No.
7      Q.  And if there were prisoners jailed at the
8  Weslaco jail on May 16th, 2007 after 4:00 p.m., the
9  jailer would have had this requirement pursuant to
10  Weslaco policy inmate supervision to conduct welfare
11  checks on the inmates every 30 minutes.  Correct?
12     A.  Correct.
13     Q.  And can you tell from Exhibit No. 19 whether
14  the jailer that was on duty the evening of May 16th,
15  2007, whether he, in fact, complied with this policy by
16  conducting welfare checks on the Weslaco PD inmates
17  after 4:00 p.m. on May 16th, 2007?
18     A.  I don't know if he did.
19     Q.  Okay.  Because -- you don't know because there
20  are no entries for the evening of May 16th, 2007.
21  Correct?
22     A.  There are no entries.
23     Q.  And if there were inmates or there were
24  detainees at the Weslaco jail, being housed at the
25  Weslaco jail, during the evening of May 16, 2007, then

Page 287

1  the jailer who was responsible for those detainees
2  during that shift would have violated this welfare check
3  policy under inmate supervision?
4      MS. KENNAMER:  Objection, form.
5      A.  No.  He did not fill it out on the daily log,
6  but I don't know that he did not make the checks.
7      Q.  Right.  And all I am talking about is based on
8  the jailer daily activity log.  Just Exhibit No. 19.
9      A.  He did not document his checks.
10     Q.  Okay.  And is there a requirement that he
11  document his checks in the Weslaco PD policies?
12     A.  It would have been under responsibilities of
13  personnel on 00460, all the way down at the bottom,
14  number 11.
15     Q.  Okay.  Can you read that?
16     A.  "Completes the daily log accordingly with any
17  pertinent information entered."
18     Q.  Okay.  So did the jailer on -- and I am just
19  saying based on your review of this Exhibit 19, the
20  jailer daily activity log for May 16th of '07 --
21     A.  Uh-huh.
22     Q.  -- did the jailer on duty that evening violate
23  his responsibilities on page 460, number 11 that you
24  just read?
25     A.  Yes.

Page 288

1      Q.  Okay.  And -- and if we look at the following
2  entry on Exhibit No. 19, what is the next date that is
3  shown on that jailer daily activity log?
4      A.  May 18th.
5      Q.  There is no entry for May 17th, 2007; is that
6  correct?
7      A.  That is correct.
8      Q.  Would you agree with me then that the jailer
9  who is responsible for inmates on May 17th, 2007,
10  because we see no entries written on this exhibit, also
11  violated section 11 of their responsibilities, which
12  requires that they complete the daily jail log
13  accordingly with any pertinent information entered?
14     A.  Yes.
15     Q.  Do you know who the jailer responsible for the
16  detainees during the evening of May 16th, do you know
17  who he was?
18     A.  The evening of May 16th?
19     Q.  Yes.
20     A.  At what time?
21     Q.  After 4:00 p.m.
22         MS. KENNAMER:  And the time cards are
23  attached.
24     A.  Okay.  Do you have an actual day on the 16th?
25     Q.  I think it is a Wednesday.

Page 289

1      A.  Wednesday.  Okay.  Wednesday, May 16th.
2      Q.  After 4:00 p.m.
3      A.  It would have been Alfredo Moreno.
4      Q.  Okay.  And Jailer Moreno is the same jailer who
5  was on duty the evening of May 17th, 2007.  Correct?
6      A.  That's my understanding.
7      Q.  And so just based on your review of these
8  policies, your -- the jailer's schedule that is in front
9  of you, and the jailer daily activity sheets for
10  May 16th and May 18th, would it be correct to say that
11  Jailer Alfredo Moreno violated section 11 under his
12  responsibilities because he did not complete the daily
13  jail log during his shifts?
14     A.  It does appear that way.
15     Q.  Did you ever talk to him about why he did not
16  log any pertinent information on the evening of May 16th
17  and May 17th, Lieutenant Walensky?
18     A.  No.
19     Q.  Okay.  Did you ever look at these documents
20  prior to today with Mr. Moreno?
21     A.  No.  All of this was handled by the
22  investigators looking into the incident, so --
23     Q.  Would that have been Captain Vallejo?
24     A.  He would have been the captain in charge of the
25  criminal investigations division who normally handles

73 (Pages 286 to 289)

Electronically signed by Terri Hill (201-390-152-8303)                                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 290

1  investigations.
2      Q.  Okay.  And at some -- was there a criminal
3  investigation case opened on this matter involving
4  Ms. Maricela Trevino?
5      A.  No.  It is just the criminal investigations
6  division.
7      Q.  Oh, I see.
8      A.  That has the investigators who normally do case
9  investigations handle any in-house investigations such
10  as this --
11      Q.  Okay.
12      A.  -- due to the incident.
13      Q.  And he would be the top Weslaco PD officer in
14  that criminal investigations division, though?
15      A.  Yes.
16      Q.  And was that true on May 17th, 2007?
17      A.  Yes.  He was the CID captain.
18      Q.  Okay.  So if there was any CID investigation,
19  Captain Vallejo would have assigned a group of police
20  officers to investigate the incident involving Maricela
21  Trevino on May 17th, 2007?
22      A.  I would assume so.
23      Q.  Okay.
24      A.  Either he or the chief.  Would this be a good
25  time for a break?

Page 291

1      Q.  Yes.  We can take a break.
2          (Off the record)
3      Q.  Lieutenant Walensky, we are looking at the
4  jailer daily log activity sheets for May 16th and
5  May 18th, 2007.
6      A.  Correct.
7      Q.  And would -- if Jailer Moreno, who was on duty
8  during the evening of May 17th, 2007, if he did not
9  conduct a welfare check on the inmates every 30 minutes
10  during that evening, he would have been in violation of
11  Roman Numeral VI, inmate supervision, policy number two,
12  "A welfare check of all inmates will be made every 30
13  minutes"; is that correct?
14      A.  Correct.
15      Q.  Okay.  And if he -- and assuming that he did
16  conduct a welfare check but he did not log that
17  information on the jailer daily activity log on the
18  evening of May -- on the evenings of May 16th or
19  May 17th, 2007, Jailer Moreno would have been in
20  violation of his responsibilities as per Roman Numeral
21  III, responsibilities of personnel, C, jailers, 11,
22  "Completes the daily log -- daily jail log accordingly
23  with any pertinent information entered"; is that
24  correct?
25      A.  If he didn't check them, yes.

Page 292

1      Q.  Do you know of any reason why Jailer Moreno
2  would not have written or filled or completed the jailer
3  daily activity log after 4:00 p.m. on May 16th, 2007?
4      A.  I do not.
5      Q.  Do you know -- do you know any reason why
6  Jailer Moreno did not complete the jailer daily log
7  activity sheet during the evening of May 17th, 2007?
8      A.  I do not.
9      Q.  Do you know why any of the other jailers on
10  duty that day, May 17th, 2007, do you know why they did
11  not complete the jailer daily activity log for May 17th
12  of '07?
13      A.  I do not.
14      Q.  And all three of those jailers on that day
15  would have violated policy number 11 under
16  responsibilities of jailers, correct, completing the
17  daily jail log accordingly with any pertinent
18  information?
19      A.  Yes.
20      Q.  Can I direct your attention to Roman
21  Numeral VI, inmate supervision, section B, female
22  inmates?  Do you have that in front of you, lieutenant?
23      A.  Yes.
24      Q.  Okay.  Can you read number two under B, female
25  inmates?

Page 293

1      A.  "Jail personnel will not intentionally make
2  inmate welfare checks, which intrude on an inmate's
3  right to privacy.  Jailers should announce their
4  presence before entering cell blocks occupied by the --
5  by the opposite sex inmates to avoid unduly embarrassing
6  inmates at these times.  The announcement requirement
7  does not apply to jailers supervising same sex inmates."
8      Q.  Okay.  What does the -- thank you.  Thank you
9  for reading that.  What is the motivation for writing
10  the first sentence of number two under B?
11      A.  While supervising same -- or opposite sex
12  inmates, it would be appropriate to announce prior to
13  going in, say, a male jailer to the female cell area to
14  make an announcement in case they are using the
15  restroom.
16      Q.  Okay.  And that is the right to privacy that
17  this policy references, the right to privacy when using
18  the restroom?
19      A.  Yes.
20      Q.  Any other policies -- any other reasons or
21  situations that would fit under right to privacy under
22  that scenario?
23      A.  Not that I am aware of.
24      Q.  Okay.  Thank you, sir.  Can I direct your
25  attention to Roman Numeral VII, booking procedures, A,

74  (Pages 290 to 293)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 294

1 booking procedures, number seven? It is on 467 of
2 Exhibit No. 1.
3     A.  Okay.
4     Q.  Can you read number seven, please?
5     A.  "All required booking information will then be
6 entered into the jail management system via the booking
7 computer to include inmate photos."
8     Q.  And what is required -- the language required
9 booking information.  What is -- what information is
10 that, sir?
11     A.  That is the jail management system.  Any
12 arrested person's information for the purpose of
13 entering this person into the jail management.
14     Q.  And that jail management system, does it
15 transfer that information or convey that information to
16 any other agencies?
17     A.  No.
18     Q.  It is just for Weslaco Police Department?
19     A.  Correct.
20     Q.  And so is that the C-A-D or CAD jail management
21 system that Weslaco had in May of 2007?
22     A.  Yes.
23     Q.  Is it still called the CAD, C-A-D?
24     A.  Well, CAD is the access into dispatch and a lot
25 of your -- this is a CAD --

Page 295

1     Q.  Okay.
2     A.  -- as I understand it.  CAD information,
3 officer trip reports, call log, things of that nature.
4 The jail management system is the photographs, the
5 persons that are arrested, their information, their
6 booking information.  It is --
7     Q.  Is this --
8     A.  -- retained in that jail management system.
9     Q.  I am sorry, sir.  Is this also a CAD, Exhibit
10 No. 11, the booking medical sheet?
11     A.  By the font at the top, it appears to be so,
12 yes.
13     Q.  Okay.  So that -- that info -- that, what is it
14 called, jail -- what is at the top of that document?
15     A.  Weslaco city jail.
16     Q.  Booking medical sheet.  Since it is a CAD,
17 based on this policy here, number seven, jailers would
18 have been required to complete all booking information
19 into the jail management system.  That would have
20 included that CAD called the booking medical sheet.  Is
21 that true?
22     A.  If that was an option on the -- yes.
23     Q.  Okay.  And that would have been true on or
24 before May 17th, 2007?
25     MS. KENNAMER:  Objection, form.

Page 296

1     A.  That, I don't know.
2     Q.  Well, what is the date on that CAD form?
3     A.  May 13th, 2007.
4     Q.  Okay.  Okay.  So then it was part of the jail
5 management system booking process on May 13th, 2007?
6     A.  It appears to be, yes.
7     Q.  And would that also be true for May 15th and
8 May 17th of 2007 based on your experience as the jail
9 commander for the Weslaco PD jail?
10     A.  Yes.
11     Q.  Thank you.  And if that wasn't completed, it
12 would have been a violation of this policy number seven,
13 correct, that we just read?
14     A.  Yes.
15     Q.  So on May 13th -- Lieutenant Walensky, so on
16 May 13th, 2007, the jailer who was on duty for that
17 arrest of Maricela Trevino violated policy number seven
18 under the booking procedures that you just read by not
19 completing the jail booking medical sheet, Exhibit
20 No. 13?
21     A.  If he would have been aware of this, yes.
22     Q.  Okay.  And does it -- does that document
23 provide you, Exhibit No. 13, with information specific
24 to Maricela Trevino?  I think it is by your right hand.
25     A.  Exhibit 11?

Page 297

1     Q.  Yes, sir.
2     A.  I am sorry.  The question again.
3     Q.  Does that -- does that Exhibit 13, the jail --
4     A.  Exhibit 11.
5     Q.  I am sorry.  Exhibit 11, that booking medical
6 sheet -- I apologize.  Does it provide identification --
7 any identification of Maricela Trevino?
8     A.  It does.
9     Q.  What information does it provide?
10     A.  Name, address, date of birth, age, race, sex,
11 height, weight, eye color, hair color, home telephone
12 number, Social Security number.
13     Q.  So everything -- those identifiers are provided
14 on Exhibit 11, but the visual assessment and the medical
15 questions that form the substance of that CAD form are
16 not.  Correct?
17     A.  Yes.  These are automatically transposed into
18 all of those areas.
19     Q.  Okay.  So it would have been the jailer on that
20 occasion violated not only -- policy number seven
21 requiring booking information being entered into the
22 jail management system.  Correct?
23     MS. KENNAMER:  Objection, form.
24     Q.  I will rephrase.  On May -- based on Exhibit
25 No. 11, can you tell, Lieutenant Walensky, whether the

75 (Pages 294 to 297)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 298

1   jailer who was in charge of processing Ms. Trevino
2   violated policy number seven under booking procedures
3   requiring, quote, "All required booking information will
4   be entered into the jail management system via the
5   booking computer to include inmate photos"?
6       A.  If he was aware of this, yes.
7       Q.  Okay.  Well, he was aware of the identifiers
8   for her.  Right?
9       A.  Well, when you enter these identifiers on there
10  when you are doing the initial booking, it automatically
11  transposes all of this information into all fields.
12      Q.  Okay.  And you had been made aware by a jailer
13  of the Weslaco PD that that form existed on the CAD
14  system.  Correct?
15      A.  At some point in time, yes.
16      Q.  And if the jailer was aware of that
17  questionnaire and saw that on the computer --
18      A.  Uh-huh.
19      Q.  -- it would -- he would have been required to
20  fill all of it out, is that correct, on May 13th, 2007?
21      A.  Yes.
22      Q.  Do you see that completed in any way, the
23  medical or the -- the medical visual -- the visual
24  assessment or the medical questions?
25      A.  It doesn't appear to be.

Page 299

1       Q.  Okay.  Thank you.  What is Exhibit No. 20, sir,
2   which I have handed to you?
3       A.  Exhibit No. 20 appears to be a Weslaco city
4   jail visual assessment medical questionnaire.
5       Q.  And what is it called at the top?
6       A.  Weslaco city jail.
7       Q.  Okay.  Now --
8       A.  Booking medical sheet.
9       Q.  The jail -- a booking medical sheet.  Okay.  Is
10  it assigned a number, a case number?
11      A.  It is.
12      Q.  And does it identify a person?
13      A.  It does.
14      Q.  And who does it identify?
15      A.  Maricela Trevino.
16      Q.  Does it provide any type of other information,
17  identifying information, for Ms. Trevino?
18      A.  Yes.
19      Q.  Okay.  Does it -- and that jail medical booking
20  sheet also contains a visual assessment and a medical
21  question.  Correct?
22      A.  Yes.
23      Q.  And that jail medical booking sheet is also
24  part of the City of Weslaco CAD forms that are required
25  by jailers to complete at booking?

Page 300

1       A.  Jail management, yes.
2       Q.  Okay.  And was that completed by the jailer on
3   that occasion, on May -- what is the date?
4       A.  It has a date of May 15th, 2007.
5       Q.  Okay.  Did the jailer on May 15th, 2007 comply
6   with the Weslaco policy requiring, quote, "All required
7   booking information will be entered into the jail
8   management system"?
9       A.  No.
10      Q.  So the jailer who processed Ms. Trevino on that
11  day, on May 15th, 2007, violated policy number seven
12  under the A, booking procedures.  Correct?
13      A.  Under booking procedures, they are required to
14  fill out the medical questionnaire that was usually
15  attached with the booking card, but it appears this was
16  not filled out.
17      Q.  And that form is part of the jail management
18  system.  Correct?
19      A.  Correct.
20      Q.  And policy number seven under booking
21  procedures requires, quote, "All required booking
22  information will be entered into the jail management
23  system via the booking computer"?
24      A.  Yes.
25      Q.  So if the jailer didn't do that on May 15th,

Page 301

1   2007 he would have violated this policy that I just read
2   to you?
3       A.  It could be viewed that way, yes.
4       Q.  Okay.  What does it look like to you based on
5   Exhibit No. 20?  Did he or -- did the jailer comply with
6   section seven of the booking procedures?
7       A.  It appears that this field was not entered.
8       Q.  Okay.  So it is a violation?
9       A.  If they were aware of this field, yes, it could
10  be.
11      Q.  Okay.  What is Exhibit No. 21, sir?
12      A.  It appears to be a Weslaco city jail booking
13  medical sheet.
14      Q.  For what date, sir.
15      A.  May 17th, 2007.
16      Q.  And who is the person who was arrested?
17      A.  Maricela Trevino.
18      Q.  Does that -- that jail medical booking sheet is
19  part of the City of Weslaco jail management system.
20  Correct?
21      A.  It appears to be, yes.
22      Q.  Okay.  And it requires the completion of
23  questions for visual observation.  Correct?
24      A.  It has fields for this, yes.
25      Q.  And it also has fields for medical questions at

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 302

1   the bottom. Correct?
2       A. Yes.
3       Q. A total of 22 questions?
4       A. Correct.
5       Q. Are any of those 22 questions completed by the
6   jailer on May 17th, 2007 based on your exhibit that you
7   are holding, Exhibit No. 21?
8       A. They don't appear to be.
9       Q. Okay. And then if -- then that would be a
10  violation of policy number seven, correct, under booking
11  procedures?
12      A. It could be, yes.
13      Q. I apologize. I am just trying to get a little
14  bit organized. Let me direct your attention to Exhibit
15  No. 1 again under the booking procedures, sir. Under
16  number four, we discussed it briefly yesterday.
17      A. Yes.
18      Q. It said -- it reads, "Complete the booking card
19  and arrest/detention report fields accordingly.
20  Complete the medical questionnaire (WPD-23) as well."
21  Did I read that correctly?
22      A. Yes.
23      Q. Okay. Are there any exceptions to those two
24  sentences that you are aware of that are in written
25  policy form?

Page 303

1       A. Not that I am aware of.
2       Q. Were there any exceptions in any written policy
3   form to those two sentences back in 2005, 2006, or 2007?
4       A. Not that I am aware of.
5       Q. Okay. Are you aware of any verbal directives
6   or verbal policies that would allow jailers reasons for
7   not completing the booking card and arrest detention
8   reports and the medical questionnaire form WPD-23 for
9   those years 2005, 2006, or 2007?
10      A. No.
11      Q. Okay. So it was a requirement 100 percent of
12  the time every time from 2006 through 2007. Correct?
13      A. Unless they were not compliant in providing the
14  information.
15      Q. And that would have been true in May -- in May
16  of 2007?
17      A. Yes.
18      Q. May 17th, 2007?
19      A. Yes.
20      Q. Okay. Now, it is my understanding -- I am
21  going to hand you --
22          MR. RUIZ: I will ask him questions about
23  these. You have them.
24          MS. KENNAMER: Okay.
25          MR. RUIZ: The jail cards.

Page 304

1       Q. Weslaco form WPD-23, the medical questionnaire
2   form, was it -- did it become a requirement for the
3   first time in May of 2005, on May 1st, that jailers
4   complete the -- that medical questionnaire every time?
5       A. No. The medical questionnaire has been in
6   existence for some time before that.
7       Q. Okay. For how much time before that?
8       A. I don't know.
9       Q. Okay. And was there a requirement, a written
10  requirement in any Weslaco PD policy prior to May 1st of
11  2005 -- which would be the effective date of this
12  policy -- that also required jailers to complete at all
13  times the medical questionnaire form WPD-23?
14      A. As my memory serves, the policy that replaced
15  this --
16          MS. KENNAMER: You mean the one that came
17  before?
18      A. Yeah. Was actually from 1989.
19      Q. Okay.
20      A. And although I was not an officer with the
21  Weslaco Police Department in 1989, I can reasonably
22  assure you that there was no jailers working at that
23  time, therefore, I don't know what those policies would
24  have been at the time. If that card was in effect or
25  when it went into effect --

Page 305

1       Q. Okay.
2       A. -- prior to the update of 2005 for the jail
3   policy, I am not sure.
4       Q. Okay. But do you recall -- you said that on
5   some occasions when you were a patrol officer you also
6   booked some individuals --
7       A. Yes.
8       Q. -- some detainees?
9       A. Yes.
10      Q. And did you recall prior to 2005 seeing the
11  medical questionnaire form WPD-23 as part of the
12  documents that you completed during the booking process?
13      A. I believe so.
14      Q. Okay. So we can say that prior to May 1st of
15  2005 there was a form, a Weslaco PD medical
16  questionnaire form number 23 --
17      A. I --
18      Q. -- or WPD-23?
19      A. I believe so.
20      Q. Okay. And for what years do you believe that
21  form, based on your experience here --
22      A. You are taking me back.
23      Q. A little.
24      A. The past five years, to the '05 --
25      Q. Since at least 2000?

77 (Pages 302 to 305)

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)          2c2ed275-adae-476d-8430-69873ef8f5b8

Page 306

1      MS. KENNAMER: Objection, form.
2      A.  I couldn't even venture a guess.
3      Q.  Okay.  But there was a form prior to 2005
4   called WPD-23 -- dash 23, that was a medical
5   questionnaire?
6      A.  I believe so.
7      Q.  And it was -- was it a requirement that it be
8   completed during the booking process, sir, prior to
9   May 1st of 2005?
10     A.  It was just something I recall doing.
11     Q.  Okay.
12     A.  I don't know if it was in writing or a
13  requirement, but it was -- it was a form I -- I believe
14  I recall filling out from time to time when booking
15  somebody in.
16     Q.  Okay.
17     A.  I believe it existed prior to that.
18     Q.  Okay.  Let me find the date.  On eight -- on
19  August 21st of 2005, the Weslaco PD policy, jail and
20  detention procedures that we have on Exhibit No. 1 was
21  already in effect.  Correct?
22     A.  According to the date here, yes.
23     Q.  Okay.  And does that sound about right, since
24  you are the -- you were the jail commander and the
25  individual who assisted with the drafting and completion

Page 307

1   of these policies?
2      A.  It does.
3      Q.  Okay.  And so effective May 1st of 2005,
4   jailers were required to complete WPD form dash 23 at
5   every -- during every booking procedure?
6      A.  Yes.
7      Q.  Okay.  Let me hand you Exhibit No. 22.  What is
8   Exhibit No. 22, sir?
9      A.  Exhibit 22 as handed to me is four page, the
10  first page being Weslaco Police Department jail card.
11     Q.  Okay.  And does it show a case number?
12     A.  It does.
13     Q.  What is the case number?
14     A.  05-18943.
15     Q.  Okay.  And who is the person that this exhibit
16  shows has been arrested?
17     A.  Maricela Trevino.
18     Q.  And for -- on what date was the arrest?
19     A.  The date shown for the arrest is August 21st,
20  2005.
21     Q.  Okay.  And does it show the date of release
22  from the jail?
23     A.  It does.
24     Q.  What date is that, sir?
25     A.  The date indicated is August 23rd, 2005.

Page 308

1      Q.  So based on this exhibit, how many days did
2   Ms. Trevino spend in jail at the Weslaco Police
3   Department jail?
4      A.  Calendar days, it would appear to be three
5   calendar days.
6      Q.  And based on Exhibit No. 22, does it also
7   include a -- a WPD-23 medical questionnaire form?
8      A.  It does.
9      Q.  Okay.  And that medical questionnaire, is it --
10  was it -- was every field of that medical questionnaire
11  form filled out or completed by the jailer on duty that
12  day?
13     A.  No.
14     Q.  And yesterday you testified that the last two
15  questions on medical questionnaire WPD form dash 23
16  seven and eight are the questions that kind of lead into
17  the --
18     A.  Can you back up?
19     Q.  Sure.
20     A.  WPD-23?
21     Q.  I am sorry.  It was 27.  I am sorry.
22     A.  Oh, okay.
23     Q.  Would the -- did the medical questionnaire form
24  have different numbers?
25     A.  I think the -- doesn't this one refer to

Page 309

1   WPD-23?
2      Q.  I believe so.  And it identifies it as medical
3   questionnaire.
4      A.  What page are you on, sir?
5      Q.  467, number four.
6      A.  467, number four.  That may be an error.
7      Q.  An error.  The error was in the policy or in
8   the numbering of the actual medical questionnaire card?
9      A.  I would have to venture a guess that it would
10  be an error in the policy.
11     Q.  Okay.  So instead of reading WPD-23, it should
12  read WPD-27?
13     A.  Yes.  It could be a typo.
14     Q.  Okay.
15     A.  That would be my error.
16     Q.  Okay.  And if you look at the -- is the medical
17  questionnaire in Exhibit No. 22, are all of the medical
18  questions completed as required by the Weslaco booking
19  procedure policy?
20     A.  It appears that seven and eight are not
21  completed.
22     Q.  Okay.  Would that be a violation of Weslaco
23  booking procedure policy number four?
24     A.  It could, but it may indicate no response.
25     Q.  Well, and just -- but it doesn't say no

78 (Pages 306 to 309)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 310

1  response.  Right?
2      A.  Correct.
3      Q.  It is just --
4          MS. KENNAMER:  Objection, form.
5      Q.  -- blank?  Are they just blank?
6      A.  They are blank.
7      Q.  Okay.  So they are not answered?
8          MS. KENNAMER:  Objection, form.
9      A.  They may have been answered, just not
10 indicated.
11     Q.  Right.  There is nothing recorded?
12     A.  Correct.
13     Q.  Okay.  And so you -- and if there is nothing
14 recorded, it is not completed as required by the policy.
15 Right?
16         MS. KENNAMER:  Objection, form.
17     A.  That could be assumed.
18     Q.  So that could be a violation.  Right?
19     A.  It could be.
20     Q.  And just based on the fact that this booking
21 procedure form number four requires the recording of
22 answers to medical questions, would you say based on
23 your experience, training, and education and as jail
24 commander of the jail that this medical questionnaire
25 does not comply with policy number four, Lieutenant

Page 311

1  Walensky?  Would you agree with that?
2      A.  I would have some question as to a portion of
3  it was filled out, however, the last two were not.  That
4  may indicate again no response or unknown, but I
5  wouldn't know.
6      Q.  It could also indicate that the questions just
7  weren't asked also.  Right?
8      A.  It could.
9      Q.  Thank you.  Oh, before I forget, this Exhibit
10 No. 22 is made up of four pages, right, numbers 5739
11 through 5742, the Bates stamps at the bottom?
12     A.  Correct.
13     Q.  The last -- last page 5742, it says officer's
14 observation and then a booking officer's signature at
15 the bottom?
16     A.  Yes.
17     Q.  Is -- officer's observation at the top, does
18 that mean a booking officer or is that police officer's
19 observations?
20     A.  As indicated -- oh, at the top?
21     Q.  Uh-huh.
22     A.  That would be the booking officer.
23     Q.  Okay.  And what type of -- this is another form
24 that is -- that makes up WPD-27's medical questionnaire?
25     A.  I believe it is the backside.

Page 312

1      Q.  Okay.  And what kind of information should be
2  included on this form?
3      A.  Any observations of interest.
4      Q.  Okay.  Like what?  What would you include in
5  there?
6      A.  Any observations of intoxication, things of
7  that matter.
8      Q.  Suicidal behavior, would that be something that
9  could be written down there?
10     A.  It could be.
11     Q.  Self-mutilation and injury?
12     A.  It could be.
13     Q.  Okay.
14     A.  However, this would be kind of redundant
15 because the booking process does ask a lot of questions
16 about physical appearance.  So obviously this card, the
17 WPD-27, or as referred to in the policy 23, predated
18 the -- the jail management system, as I recall, so --
19     Q.  Okay.
20     A.  -- it could just be a matter of it is redundant
21 and it is going to be reflected in the actual booking --
22     Q.  Okay.  Well --
23     A.  -- into the booking system.
24     Q.  Okay.  I am sorry.  What was the first year
25 that the jail management system was being -- was used

Page 313

1  here at the City of Weslaco Police Department?
2      A.  I am not sure.
3      Q.  Okay.
4      A.  Prior to my -- prior to me taking over the
5  jail.
6      Q.  So prior to 2005?
7      A.  I believe so, yes.
8      Q.  Okay.  So -- strike that question, sir.  Let me
9  hand you Exhibit No. 23, if you could please read out
10 the Bates stamp numbers of the pages that are handed to
11 you, sir.
12     A.  Exhibit No. 23 consists of four pages,
13 beginning 05743, ending 05746.
14     Q.  Okay.  What is the date -- what is Exhibit
15 No. 23?
16     A.  Exhibit No. 23 is a Weslaco Police Department
17 jail card.
18     Q.  And this jail card shows -- who is the person
19 that was arrested?
20     A.  The jail card indicates Maricela Trevino.
21     Q.  Okay.  And does it show how many calendar days
22 she spent at the Weslaco Police Department jail?
23     A.  Showing a date of arrest of August 31st, 2005
24 and a release date of September 2nd, 2005.  It would
25 indicate all or part of three calendar days.

79 (Pages 310 to 313)

Page 314

1    Q.  Okay.  Does Exhibit No. 23 include WPD form 27
2  medical questionnaire?
3    A.  Yes.  Referring to 05745.
4    Q.  And does it also include a page for officer's
5  observation?
6    A.  It does.
7    Q.  Okay.  And the medical questionnaire, was it --
8  was it completed based on your review of Exhibit No. 23?
9    A.  Short of emergency contact, address, city, and
10  state, yes --
11    Q.  Okay.
12    A.  -- and phone number for Maricela.
13    Q.  Okay.  Were there any officer's observations on
14  the last page of Exhibit 23?
15    A.  None indicated.
16    Q.  Okay.  Who is -- do you notice on the first
17  page of that exhibit, it identifies booking officer J5
18  AG?
19    A.  It does.
20    Q.  And who -- those are the initials for what
21  employee of the Weslaco PD jail?
22    A.  J5.  Well, as I review this -- but this was --
23  what year was this?  '05.  It would have been prior to
24  the schedule.  I would have to review an '05 schedule.
25    Q.  Okay.  That's fine.  Let me hand you Exhibit

Page 315

1  No. 24, Lieutenant Walensky.
2    A.  Okay.  Exhibit No. 24 consists of four pages
3  beginning 05747, ending 05750.
4    Q.  And this is -- what is Exhibit No. 24?
5    A.  Exhibit No. 24 is a Weslaco Police Department
6  jail card.
7    Q.  And does it identify the person arrested?
8    A.  It does.
9    Q.  And what is the date -- what is the date of
10  arrest?
11    A.  Date of arrest indicated is September 8, 2005.
12    Q.  And who was the person arrested?
13    A.  Person arrested, Maricela Trevino.
14    Q.  Okay.  Does it show a release date?
15    A.  It does.
16    Q.  And what is her -- what was her release date?
17    A.  September 10th, 2005.
18    Q.  How many days in -- how many days did she --
19  how many calendar days did Ms. Trevino spend at the
20  Weslaco jail on this occasion?
21    A.  As indicated, all or part of three calendar
22  days.
23    Q.  Does this Exhibit 24 also include a medical
24  questionnaire?
25    A.  It does.

Page 316

1    Q.  Is it completed?
2    A.  No, it is not.
3    Q.  Okay.  Does it have a page for officer's
4  observations?
5    A.  It does.
6    Q.  And is that completed?
7    A.  No, it is not.
8      MS. KENNAMER:  I am sorry.  Can I see the --
9    A.  (Complying)
10    Q.  Who was the -- well, who was identified as the
11  jailer on this occasion?
12    A.  J5.
13    Q.  Okay.  And you don't recall who that is.
14  Right?
15    A.  I would have to refer, but on -- the medical
16  questionnaire is partially filled out.
17    Q.  Okay.  But all of the fields of the medical
18  questionnaire are not filled out; is that correct?
19    A.  Correct.  It is attached, however, to the
20  booking card indicating it would have been for Maricela
21  Trevino.
22    Q.  But the -- that card, the Weslaco Police
23  Department jail card, that is form WPD-7.  Right?  If
24  you could --
25    A.  That is.

Page 317

1    Q.  Okay.  And the jail medical questionnaire would
2  be WPD form --
3    A.  27.
4    Q.  -- 27.  Okay.  Was there a requirement,
5  Lieutenant Walensky, that the booking officers or
6  jailers also write down their observations of -- of the
7  detainees at every booking procedure based on the
8  policies of the City of Weslaco?
9    A.  Just as stated in here, complete the medical
10  questionnaire.
11    Q.  Okay.  And that -- those observations are part
12  of Weslaco PD form 27.  Would that be correct?  It is
13  the backside.
14    A.  Correct.  But it is nothing involving the
15  medical questionnaire.  It is just observations, more of
16  a noteworthy-type thing for the --
17    Q.  Okay.
18    A.  -- booking officer to indicate, but it is not a
19  required field under the policy.
20    Q.  Okay.  Let me hand you Exhibit No. 25.  What is
21  Exhibit No. 25, sir?
22    A.  Handed to me as Exhibit No. 25 consisting of
23  four pages beginning 05751 and ending 05754.
24    Q.  And who does this jail card identify as the
25  person arrested?

Hill & Romero
Certified Court Reporters

Electronically signed by Terri Hill (201-390-152-8303)                                        2c2ed275-adae-476d-8430-69873ef8f5b8

Page 318

1    A.   Maricela Trevino.
2    Q.   Okay.  Does it show the date of arrest?
3    A.   It does.
4    Q.   And does it -- and what is the date?
5    A.   September 21st, 2005.
6    Q.   And what is the date of release?
7    A.   September 22nd, 2005.
8    Q.   Does Exhibit 25 also include a WPD form 27
9  medical questionnaire?
10   A.   It does.
11   Q.   And is that medical questionnaire complete?
12   A.   The medical questionnaire portion is, except
13  for seven and eight is blank.
14   Q.   Okay.  So it is not complete.  Correct?
15   A.   Correct.
16   Q.   And --
17   A.   Again, it may have been no answer, but the
18  field is blank.
19   Q.   Okay.  There is nothing recorded on questions
20  seven and eight; is that correct?
21   A.   That is correct.
22   Q.   Would that have been a violation of booking
23  procedure policy number four requiring completion of the
24  medical questionnaire WPD-23 -- 27?
25   A.   Depending on the response from the arrested

Page 319

1  person.  It may have been left blank as no response.
2    Q.   Are there any -- is the officer's observation
3  sheet filled out?
4    A.   No.
5    Q.   Thank you, sir.  Let me hand you exhibit -- let
6  me hand you the following exhibit.  Oh, how many
7  calendar days did Ms. Trevino spend in jail for that
8  arrest, during that arrest?
9    A.   On Exhibit No. 28?
10   Q.   25.  The one you -- the one you have, what
11  number does it show?
12       THE COURT REPORTER:  That's a 5.
13   A.   Okay.  It shows all or part of two calendar
14  days.
15   Q.   Okay.  Let me hand you exhibit number --
16       (Discussion off the record)
17   Q.   Let me hand you Exhibit No. 26.  What is
18  Exhibit No. 26?
19   A.   No. 26 is -- consists of four pages, 05755,
20  ending in 05758.
21   Q.   Okay.  And what is Exhibit No. 26, sir?
22   A.   It is a Weslaco Police Department jail card.
23   Q.   Does it identify the person arrested?
24   A.   It does.
25   Q.   Who is that?

Page 320

1    A.   Maricela Trevino.
2    Q.   What is the date of arrest for Ms. Trevino?
3    A.   The date of arrest is November 4, 2005.
4    Q.   And does it show the date of release?
5    A.   It does.
6    Q.   What is the date?
7    A.   November 6th, 2005.
8    Q.   How many calendar days was Ms. Trevino
9  incarcerated at the Weslaco Police Department jail --
10   A.   All --
11   Q.   -- based on Exhibit 26?
12   A.   All or part of three days.
13   Q.   Okay.  And based on this Exhibit No. 26, does
14  it include a medical questionnaire WPD form 27?
15   A.   It does.
16   Q.   Was any field in that medical questionnaire
17  completed by the booking officer?
18   A.   No.
19   Q.   And that would have been a violation of Weslaco
20  booking procedure policy number four.  Correct?
21   A.   Correct.
22   Q.   Let me hand you Exhibit No. 27.  What is
23  Exhibit No. 27, sir?
24   A.   Exhibit No. 27 consists of four pages beginning
25  05759 and ending in 05762.

Page 321

1    Q.   And does -- and what is Exhibit No. 27?
2    A.   A Weslaco Police Department jail card.
3    Q.   Does it identify the person arrested?
4    A.   Yes.
5    Q.   Does it show the date of arrest?
6    A.   It does.
7    Q.   And who was the person arrested on that date?
8    A.   Maricela Trevino.
9    Q.   And what was the date of arrest?
10   A.   Date of arrest was November 7th, 2005.
11   Q.   Okay.  And date of release?
12   A.   November 10, 2005.
13   Q.   Okay.  And does this -- and towards the bottom
14  of this jail card on the right-hand side, it shows under
15  box 33 time served.  Do you see that, sir?
16   A.   Yes.
17   Q.   And what does it say under that?
18   A.   "Trans to MHMR."
19   Q.   Okay.  Would that be Tropical Texas?
20   A.   No.  That would be transport to Mental Health
21  Mental Retardation center.  It was the predecessor to
22  Texas Tropical.
23   Q.   Okay.  Does this Exhibit No. 27 include a
24  medical questionnaire?
25   A.   It does.

81  (Pages 318 to 321)

Page 322

1    Q.  And was that completed?
2    A.  It was.
3    Q.  Okay.  Are there any officer observations on
4  the last page of Exhibit 27?
5    A.  There are.
6    Q.  What does it say?
7    A.  "Female is highly PIOTA but seems in good
8  health."
9    Q.  Okay.  That was signed by Jailer 3.  Right?
10   A.  Correct.
11   Q.  Let me hand you Exhibit No. 28, sir.  What is
12 Exhibit No. 28?
13   A.  Exhibit No. 28 is a Weslaco Police Department
14 jail card.
15   Q.  Does it show -- who was the person arrested?
16   A.  Maricela Trevino.
17   Q.  What was her date of arrest?
18   A.  Date of arrest, November 27th, '05.
19   Q.  And what was her date of release?
20   A.  November 29, '05.
21   Q.  How many calendar days did Ms. Trevino spend at
22 the Weslaco jail during this arrest?
23   A.  All or part of three calendar days.
24   Q.  Does Exhibit 28 include a medical
25 questionnaire?

Page 323

1    A.  It does.
2    Q.  Is it complete?
3    A.  No phone number provided and case number
4  partial.
5    Q.  Okay.  It is partially complete.  Okay.
6  Lieutenant Walensky, who was the booking officer on this
7  occasion?
8    A.  As indicated on the medical questionnaire
9  WPD-27, HG.
10   Q.  Do you know --
11   A.  J5.
12   Q.  Whose initials are those?  Oh, okay.  It's HG.
13 I see.  All right.  Let me move on.  Let me hand you
14 Exhibit No. 29, sir.  What is Exhibit No. 29?
15   A.  A Weslaco Police Department jail card.
16   Q.  And does it show the name of the person
17 arrested?
18   A.  It does.
19   Q.  And does it show the date of her arrest?
20   A.  It does.
21   Q.  What day -- I mean, what is the date of her
22 arrest?
23   A.  It appears to be December 6th, '05.
24   Q.  And what is the date of release for
25 Ms. Trevino?

Page 324

1    A.  December 8, '05.
2    Q.  So how many calendar days did she spend
3  incarcerated at the Weslaco jail?
4    A.  As indicated, all or part of three calendar
5  days.
6    Q.  Okay.  Does this Exhibit No. 29 also include a
7  medical questionnaire?
8    A.  It does.
9    Q.  And was it completed by the booking officer?
10   A.  Yes.
11   Q.  And does it also include an officer's
12 observation card?
13   A.  Yes.
14   Q.  And what is the -- what is the Bates stamp
15 number for that officer's observation card?
16   A.  05770.
17   Q.  Okay.  And does it -- what were the officer's
18 observation on that day?
19   A.  "Female is extremely hysterical and hitting
20 the" -- it looks like cell door.
21   Q.  Okay.  Thank you.  Let me hand you Exhibit
22 No. 30.  What is Exhibit No. 30, sir?
23   A.  Weslaco Police Department jail card.
24   Q.  And does it -- who was arrested according to
25 this jail card?

Page 325

1    A.  Excuse me.  Maricela Trevino.
2    Q.  Does it show the -- her date of arrest?
3    A.  It does.
4    Q.  What is the date of arrest?
5    A.  As indicated, December 12th, '05.
6    Q.  And what was the charge?
7    A.  Criminal trespass.
8    Q.  Okay.  And what was the date of her release?
9    A.  Date of release from our facility,
10 December 13th, '05.
11   Q.  Okay.  And how many calendar days did she spend
12 at the Weslaco PD jail?
13   A.  As indicated, all or part of two calendar days.
14   Q.  Okay.  And does this exhibit number -- what was
15 this exhibit number -- 30, does it include a medical
16 questionnaire PD form -- WPD form 27?
17   A.  It does.
18   Q.  Was it completed?
19   A.  Yes.
20   Q.  Okay.  I took them.  Let me hand you what has
21 been marked as Exhibit No. 31.  What is Exhibit No. 31?
22   A.  A Weslaco Police Department jail card.
23   Q.  And who was the person arrested?
24   A.  Maricela Trevino.
25   Q.  And what was the date of her arrest?

82  (Pages 322 to 325)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 326

1    A. February 4, 2006.
2    Q. And what was the date of her release?
3    A. February 6, 2006.
4    Q. How many calendar days did she spend at the
5  Weslaco Police Department jail?
6    A. All or part of three calendar days.
7    Q. Okay. Does this Exhibit No. 31 include a
8  medical -- a completely filled out medical questionnaire
9  form?
10    A. Except for seven and eight. The fields are
11  blank.
12    Q. So it is partially complete?
13    A. It could be no -- no question given, but the
14  fields are blank.
15    Q. Okay. There is nothing recorded on question
16  seven or eight. Correct?
17    A. Correct.
18    Q. Are there -- on the last page, are there any
19  observations by the booking officer?
20    A. Yes.
21    Q. And what is the -- that is Bates stamp number
22  05778. Correct?
23    A. Correct.
24    Q. What were the officer's observation?
25    A. "Female came in crying and highly intoxicated

Page 327

1  on drugs."
2    Q. Thank you. Let me hand you Exhibit No. 32.
3  What is Exhibit No. 32?
4    A. A Weslaco Police Department jail card.
5    Q. Okay. And who was the person arrested based on
6  Exhibit 32?
7    A. Maricela Trevino.
8    Q. What is her date of arrest?
9    A. It appears to be December 12th, 2006.
10    Q. And what is her date of release?
11    A. It looks like an eight, but I believe it should
12  be 12-14 of '06.
13    Q. Okay. And who was the booking officer on that
14  occasion?
15    A. J4.
16    Q. Do you know who J4 was back in -- who was that
17  jailer back in December of 2006? If you know, I mean,
18  right off the bat.
19    A. Off the top of my head -- it may have been
20  Jailer Yanez, but that is a guess at this point without
21  having --
22    Q. And if your assumption is correct that it
23  was -- her date of release was 12-14-06, how many days
24  did Ms. Trevino spend at the Weslaco PD jail during this
25  arrest?

Page 328

1    A. All or part of three calendar days.
2    Q. Are there -- does this Exhibit No. 32, does it
3  have a completely filled out medical questionnaire form
4  WPD-27?
5    A. No.
6    Q. How many of the fields are completed --
7    A. None.
8    Q. -- based on Exhibit 32? I am sorry. How many?
9    A. No fields.
10    Q. Thank you. So that would have been a violation
11  of booking procedure number four. Correct?
12    A. Yes.
13    Q. Let me hand you Exhibit No. 33. What is
14  Exhibit No. 33?
15    A. City of Weslaco Police Department jail card.
16    Q. And who was the person arrested based on
17  Exhibit No. 33?
18    A. Maricela Trevino.
19    Q. And what was her date of arrest?
20    A. It appears to be December 18th, 2006.
21    Q. And what was her -- the date of release?
22    A. December 20, 2006.
23    Q. Okay. And how many calendar days was she
24  housed at the Weslaco jail?
25    A. All or part of three calendar days.

Page 329

1    Q. Okay. And Lieutenant Walensky, based on
2  Exhibit No. 33, was there a medical questionnaire
3  completed?
4    A. It appears to be lined out.
5    Q. Okay.
6    A. Some of it is completed and -- some of the
7  responses, but none of the identifying fields.
8    Q. Okay. Would that have been a violation of
9  policy number four under booking procedures?
10    A. It could be.
11    Q. Okay. Thank you. Let me hand you Exhibit
12  No. 34. What is Exhibit No. 34? What is Exhibit
13  No. 34, Lieutenant Walensky?
14    A. A Weslaco Police Department jail card.
15    Q. Okay. And who was the person arrested?
16    A. Maricela Trevino.
17    Q. And what is the date of her arrest?
18    A. It appears to be December 30th, 2006.
19    Q. And what is the date of her release?
20    A. December 30th, 2006.
21    Q. Does Exhibit No. 34 also include a medical
22  questionnaire?
23    A. It does.
24    Q. And how many fields of that medical
25  questionnaire were completed by the booking officer

83 (Pages 326 to 329)

Electronically signed by Terri Hill (201-390-152-8303)                          2c2ed275-adae-476d-8430-69873ef8f5b8

Page 330

1  during that booking procedure?
2     A.  None.
3     Q.  Would that have been a violation of policy
4  number four of the booking -- Weslaco PD booking
5  procedures?
6     A.  Yes.
7     Q.  Let me hand you Exhibit No. 35.  What is
8  Exhibit No. 35?
9     A.  Weslaco Police Department jail card.
10    Q.  And who was the person arrested?
11    A.  Maricela Trevino.
12    Q.  And what was her date of arrest?
13    A.  January 20th, 2007.
14    Q.  Okay.  And what was her date of release?
15    A.  It appears to be January 21st, 2007.
16    Q.  Does Exhibit 35 also include a medical
17 questionnaire form, sir?
18    A.  Yes.
19    Q.  And how many fields of that medical
20 questionnaire form are completed or filled out?
21    A.  None.
22    Q.  Would that have been a violation of policy
23 number four of the Weslaco booking procedures?
24    A.  Yes.
25    Q.  Let me hand you Exhibit No. 36.  What is

Page 331

1  Exhibit No. 36?
2     A.  Weslaco Police Department jail card.
3     Q.  And who was the person arrested?
4     A.  Maricela Trevino.
5     Q.  What is the date of arrest?
6     A.  It is March 20th, 2007.
7     Q.  And what is the date of release?
8     A.  March 22nd, 2007.
9     Q.  And how many calendar days did Ms. Trevino
10 spend at the Weslaco PD jail?
11    A.  All or part of three calendar days.
12    Q.  Okay.  Does Exhibit No. 36 include a medical
13 questionnaire form?
14    A.  It does.
15    Q.  Is it -- are all the fields completed in that
16 medical questionnaire form?
17    A.  No.
18    Q.  Okay.  Would that be a violation of booking
19 procedure number four?
20    A.  It could be, yes.
21    Q.  Okay.  Let me hand you Exhibit No. 37.  What is
22 Exhibit No. 37, sir?
23    A.  A Weslaco Police Department jail card.
24    Q.  And who was the person arrested?
25    A.  Maricela Trevino.

Page 332

1     Q.  And what is the date of arrest?
2     A.  March 22nd, 2007.
3     Q.  And what is her date of release?
4     A.  March 25th, 2007.
5     Q.  How many -- how many calendar days did
6  Ms. Trevino spend at the Weslaco PD jail during this
7  arrest?
8     A.  All or part of two calendar days.
9     Q.  Does Exhibit No. 37 also include WPD-27 form
10 medical questionnaire?
11    A.  It does.
12    Q.  How many of those fields were completed by the
13 booking officer on that occasion?
14    A.  None.
15    Q.  Would that have been a violation of policy
16 number four under booking procedures?
17    A.  Yes.
18    Q.  Let me hand you Exhibit No. 38.  What is
19 Exhibit No. 38?
20    A.  A Weslaco Police Department jail card.
21    Q.  And who was the person arrested?
22    A.  Maricela Trevino.
23    Q.  And what was her date of arrest?
24    A.  I believe it is 4-11-2007.
25    Q.  Okay.  And what was her date of release?

Page 333

1     A.  It appears to be April 16, '07.
2     Q.  How many calendar days did Ms. Trevino spend at
3  the Weslaco PD jail?
4     A.  All or part of six calendar days.
5     Q.  And does this Exhibit No. 38 also include a
6  medical questionnaire form?
7     A.  Yes.
8     Q.  And is it -- the medical questionnaire form
9  entirely completed by the booking officer on this
10 occasion?
11    A.  Blank fields for address of emergency contact,
12 city, state.
13    Q.  So it is incomplete?
14    A.  It may not be if that information couldn't be
15 provided by the arrested subject.  Fields are all
16 completed.  The medical questionnaire fields are
17 completed.  The party may not have known her sister's
18 address, city, or state.
19    Q.  But three fields are not filled out.  Correct?
20    A.  Three fields are blank.
21    Q.  Thank you.  And would that have been a
22 violation of policy number four of the Weslaco PD
23 booking procedures?
24    A.  Might.
25    Q.  Let me hand you Exhibit No. 29.  What is

84  (Pages 330 to 333)

Electronically signed by Terri Hill (201-390-152-8303)          2c2ed275-adae-476d-8430-69873ef8f5b8

Page 334

1   Exhibit No. 29?
2       A.  Weslaco Police Department jail card.
3           THE COURT REPORTER:  39.
4       Q.  39.  I am sorry.  What is Exhibit No. 39,
5   Lieutenant Walensky?
6       A.  Weslaco Police Department jail card.
7       Q.  Lieutenant, who was the person arrested?
8       A.  Maricela Trevino.
9       Q.  And what is her date of arrest?
10      A.  April 21, 2007.
11      Q.  And what is her date of release?
12      A.  April 22, 2007.
13      Q.  And does Exhibit No. 39 include a medical
14  questionnaire?
15      A.  It does.
16      Q.  How many of the fields in the medical
17  questionnaire attached to Exhibit 39 were completed?
18      A.  None.
19      Q.  Would that have been a violation of Weslaco PD
20  booking procedure number four?
21      A.  Yes.
22      Q.  Who was the booking officer on that occasion?
23      A.  I am unable to make that out.
24      Q.  Okay.  J6?  Does it look like a J6?
25      A.  It looks like a signature and then a six.  It

Page 335

1   may --
2       Q.  Okay.  That's fine.  Let me hand you Exhibit
3   No. 40.  What is Exhibit No. 40?
4       A.  A Weslaco Police Department jail card.
5       Q.  And for -- and who is the person arrested?
6       A.  Maricela Trevino.
7       Q.  And do we know the date of arrest?
8       A.  May 13th, 2007.
9       Q.  We can't tell the date of release from that
10  card.  Correct?
11      A.  No.  The copy is not legible.
12      Q.  Okay.  Does that Exhibit No. 40, does it
13  include a medical questionnaire form WPD-27?
14      A.  It does.
15      Q.  Is -- that medical questionnaire, is it
16  complete?
17      A.  No.
18      Q.  And are any of the medical questions -- are
19  there recorded answers for the medical questions on WPD
20  form 27?
21      A.  No.
22      Q.  And there are also other blanks for emergency
23  contact information?
24      A.  Correct.
25      Q.  So the jailer, jailer J4, on February 13th,

Page 336

1   2007 based on this incomplete medical questionnaire
2   would have violated policy number four of the booking
3   procedures for the City of Weslaco?
4       A.  Yes.
5       Q.  Let me hand you Exhibit No. 41.  What is
6   Exhibit No. 41?
7       A.  A Weslaco Police Department jail card.
8       Q.  And who was the person arrested?
9       A.  Maricela Trevino.
10      Q.  What was the date of her arrest?
11      A.  May 15th, 2007.
12      Q.  And what was the date of her release?
13      A.  May 17th, 2007.
14      Q.  And in this exhibit, Exhibit No. 41, does it
15  also include -- well, how many calendar days was she
16  housed at the Weslaco jail?
17      A.  All or part of three calendar days.
18      Q.  And does Exhibit 41 include a medical
19  questionnaire?
20      A.  It does.
21      Q.  And are any of the fields in that medical
22  questionnaire complete?
23      A.  No.
24      Q.  Would that have been a violation of policy --
25  Weslaco PD policy number four?

Page 337

1       A.  Yes.
2       Q.  I have just handed you Exhibit No. 42.  What is
3   Exhibit No. 42?
4       A.  A Weslaco Police Department jail card.
5       Q.  And who was the person arrested?
6       A.  Maricela Trevino.
7       Q.  And what is the date of her arrest?
8       A.  May 17th, 2007.
9       Q.  And what is the charge?
10      A.  Criminal trespass.
11      Q.  And under 21, what is the court that is
12  identified?
13      A.  County.
14      Q.  What does that mean when county is filled out,
15  lieutenant?
16      A.  It is a county jail charge.
17      Q.  Okay.  And who was the arresting officer?
18      A.  A. Ponce.
19      Q.  Okay.  And this Exhibit No. 42, does it -- does
20  it tell us the time of arrest?
21      A.  It does.
22      Q.  And what is the time?
23      A.  It appears to be 1916 hours.
24      Q.  And -- is it 1916 or 1946?  You can't tell?
25      A.  I couldn't be certain.  It could be 1946 hours.

85  (Pages 334 to 337)

Page 338

1    Q.  Okay.  And does this Exhibit No. 42 also
2  include a medical questionnaire form WPD-27?
3    A.  It does.
4    Q.  How many of the fields in that medical
5  questionnaire are filled out or completed?
6    A.  None.
7    Q.  And that booking officer on May 17th, 2007 was
8  Jailer Moreno; is that correct?
9    A.  I am not sure.
10    Q.  Okay.  Whoever the jailer was, that jailer
11  violated booking procedure number four of the Weslaco PD
12  jail procedures that evening?
13    A.  As it pertains to the medical questionnaire?
14    Q.  Yes, sir.
15    A.  Yes.
16    Q.  Let's take a brief five-minute break.
17    A.  Okay.
18    Q.  We went through a bunch of documents.
19       MS. KENNAMER:  Will you calculate the time
20  for us, please?
21       MR. RUIZ:  I think 12:00.
22       (Off the record)
23       MS. KENNAMER:  When we took the break, we
24  calculated the time for the deposition at seven hours
25  and 28 minutes, so 28 minutes over the allotted seven

Page 339

1  hours for depositions under the Federal Rules.  I have
2  stated on the record, but I will permit the plaintiffs'
3  counsel an additional 15 minutes to wrap up with that
4  objection.
5       MR. RUIZ:  And so we would stop at?
6       MS. KENNAMER:  Ten till.
7       MR. RUIZ:  Ten till.  Thank you.
8    Q.  Lieutenant Walensky, I have taken the
9  deposition of two EMS -- strike that question.
10  Lieutenant Walensky, I have taken the depositions of
11  several Weslaco EMTs or paramedics who responded to the
12  call of Ms. Trevino on May 17th, 2007.  Some of the
13  question -- one of the questions I asked them was
14  whether they had completed a -- a patient contact run
15  sheet, and they told me that when there was -- when
16  there were -- when they made patient contacts at the
17  jail where the in -- where the detainee was not
18  transported by ambulance that it was not -- it was a
19  practice of the Weslaco EMS fire department not to
20  create a patient run sheet.  Is that your understanding?
21    A.  I wouldn't know either way.
22    Q.  Okay.  Were you responsible for hiring jailers
23  in 2000?
24    A.  In 2000?
25    Q.  Yes, sir.

Page 340

1    A.  No.
2    Q.  Who was responsible for hiring jailers at the
3  Weslaco PD in 2000?
4    A.  I would assume that would have been an
5  administrative function.
6    Q.  Okay.  And do you know what the job
7  requirements were for jailers, the job qualifications
8  back in 2000?
9    A.  No.
10    Q.  And were you -- who was responsible for hiring
11  jailers in 2001?
12    A.  The same answer.
13    Q.  Okay.
14    A.  I --
15    Q.  That was not your job?
16    A.  In 2001?
17    Q.  Yes, sir.
18    A.  No.
19    Q.  Okay.  Would you know anything concerning the
20  qualifications that were -- that the city sought for
21  jailers in either 2000 or 2001?
22    A.  No.
23    Q.  Okay.  And if it was an administrative -- you
24  said an administrative individual?
25    A.  It may have been.  These are job vacancy

Page 341

1  announcements.
2    Q.  Does it have --
3    A.  2001.
4    Q.  For what years?
5       MR. RUIZ:  Can I mark that one?
6       MS. KENNAMER:  You may.
7       MR. RUIZ:  Okay.  Thank you.
8       MS. KENNAMER:  Those copies are for you.
9  Those are some of the documents that Lieutenant Walensky
10  looked at in preparing for his deposition.
11       MR. RUIZ:  Okay.  What number is that?
12       THE COURT REPORTER:  43.
13    Q.  Let me hand you Exhibit No. 43.  What is that,
14  sir?
15    A.  This is a public notice, job vacancy
16  announcement.
17    Q.  Is that a City of Weslaco document?
18    A.  It appears to be, yes.
19    Q.  And what is the date posted?
20    A.  Date posted, December 7, 2000.
21    Q.  Okay.  And for what position?
22    A.  Jailer.
23    Q.  Okay.  And can you read the section on
24  responsibility?
25    A.  "Responsible for physical intake, detention and

86  (Pages 338 to 341)

Electronically signed by Terri Hill (201-390-152-8303)                    2c2ed275-adae-476d-8430-69873ef8f5b8

Page 342

```
 1    release of prisoners.  Responsible for correct reports,
 2    records."
 3         (Interruption)
 4       A.  I apologize.
 5       Q.  No problem.
 6       A.  "...and other paperwork involved with jail
 7    operations.  Arranges for and supervises visitation of
 8    prisoners.  Arranges for feeding of prisoners.
 9    Responsible for security and cleanliness of jail
10    facilities.  Makes frequent and regular inspections and
11    evaluations of structural and functional conditions of
12    all jail facilities.  Performs any other duties
13    necessary in order to provide a safe, sanitary and
14    humane environment as possible for inmates.  Performs
15    other job related duties as necessary."
16       Q.  Okay.  And what are the qualifications?  Could
17    you read that?
18       A.  "A high school diploma or GED certificate is
19    required.  Must have some knowledge of mechanics of
20    arrest and have the ability to execute basic
21    self-defense and restraint techniques.  Must be
22    dependable, self-motivated and responsible individual
23    who possesses good interpersonal skills and is able to
24    deal with the city employees and the general public.
25    "Preferred -- it says by not required, I am assuming a
```

Page 343

```
 1    typo -- "One year experience in a law enforcement agency
 2    or jail facility or a jailer certificate by the Texas
 3    Commission on Law Enforcement Officers Standards and
 4    Education.  Must be computer literate.  A valid Texas
 5    driver's license is required."
 6       Q.  Okay.  And can you please read Exhibit No. 44?
 7    What is Exhibit No. 44?
 8       A.  Exhibit No. 44 is a public notice, job vacancy
 9    announcement.
10       Q.  Is that a City of Weslaco document?
11       A.  It appears to be.
12       Q.  For what position?
13       A.  Jailer.
14       Q.  And what is the date posted?
15       A.  September 12th, 2001.
16       Q.  And what are the qualifications for this job
17    posting?
18       A.  "A high school diploma or GED certificate is
19    required.  Must have some knowledge or mechanics of
20    arrest and have the ability to execute basic
21    self-defense and restraint techniques.  Must be
22    dependable, self-motivated and responsible individual
23    who possesses good interpersonal skills and is able to
24    deal with the city employees and the general public.
25    Must have one/two years experience as a jailer.  Must be
```

Page 344

```
 1    computer literate.  A valid Texas driver's license is
 2    required."
 3       Q.  And so between -- for that job posting in 2001,
 4    the City of Weslaco dropped the requirement for TCLEOSE
 5    certification of jailers; is that correct?
 6         MS. KENNAMER:  Objection, form.
 7       A.  I don't know.
 8       Q.  Okay.
 9       A.  According to --
10       Q.  Well, if you look at -- the qualifications are
11    different in 2000 from the job qualifications required
12    for the jailer position in 2001.  Correct?
13       A.  Yes.
14       Q.  What is different from the qualifications, sir?
15       A.  Preferred by -- again, the typo.  I believe it
16    is preferred but not required one year experience in a
17    law enforcement agency or jail facility or a jailer
18    certificate by the Texas Commission on Law Enforcement
19    Officers Standards and Education.
20       Q.  Okay.  And so that requirement was dropped,
21    correct --
22         MS. KENNAMER:  Objection, form.
23       Q.  -- as a jail -- as a jailer qualification
24    from -- in 2001?
25         MS. KENNAMER:  Objection.  Misstates --
```

Page 345

```
 1       A.  I don't know if it was dropped.
 2         MS. KENNAMER:  -- the witness's testimony.
 3    You hear he is saying or.  Right?
 4         MR. RUIZ:  I am hearing.
 5         MS. KENNAMER:  Okay.
 6         MR. RUIZ:  I am just asking.
 7       Q.  Well, does the jail qualifications form or job
 8    posting for 2001 mention a certificate by the Texas
 9    Commission on Law Enforcement Officers Standards and
10    Education?
11       A.  Under qualifications?
12       Q.  Yes, sir.
13       A.  I do not see it here.
14       Q.  Okay.  Now, in 2007, were any of the jailers
15    employed by the City of Weslaco, were any of those
16    jailers TCLEOSE certified?  In other words, did they
17    have a jailer's certificate from the Texas Commission on
18    Law Enforcement Officers Standards and Education.
19       A.  I don't know.
20       Q.  And were you involved in any of the hiring
21    decisions for those jailers employed by the city in May
22    of 2007?
23       A.  I may have been.
24       Q.  Okay.  And was that a requirement in 2007, that
25    jailers be -- have jailer certificates from TCLEOSE?
```

87  (Pages 342 to 345)

Page 346

1    A.  I don't know.
2    Q.  Okay.  Thank you.  Let me move on, sir.  Let me
3  hand you Exhibit No. 45, Lieutenant Walensky.  What is
4  Exhibit No. 45?
5    A.  A Weslaco Police Department jail card.
6    Q.  And who was the person arrested?
7    A.  Maricela Trevino.
8    Q.  And what is the date of arrest?
9    A.  February 18th, 2001.
10   Q.  And what is the date of release?
11   A.  February 18th, 2001.
12   Q.  And who is the officer -- arresting officer?
13   A.  A. Ponce.
14   Q.  Okay.  Does this Exhibit No. 45 include a
15  medical questionnaire, WD -- WPD form 27?
16   A.  No.
17   Q.  Okay.  Let me hand you Exhibit No. 46.  What is
18  Exhibit No. 46?
19   A.  A Weslaco Police Department jail card.
20   Q.  Who was the person arrested?
21   A.  Maricela Trevino.
22   Q.  And what is the date of arrest?
23   A.  April 13, 2001.
24   Q.  And what is the date of release?
25   A.  April 14, 2001.

Page 347

1    Q.  How many calendar days was she jailed at the
2  Weslaco PD jail?
3    A.  Two calendar days, all or part of.
4    Q.  Okay.  And does Exhibit No. 46 include a
5  completely filled out medical questionnaire form WPD-27?
6    A.  No.
7    Q.  Does it include form WPD-27 at all?
8    A.  Exhibit 46 does not.
9    Q.  Can you look at the previous exhibit, No. 45,
10  sir?  Can you tell how many calendar days Ms. Trevino
11  spent at the Weslaco jail based on that exhibit?
12   A.  It appears to be all or part of one calendar
13  day.
14   Q.  Okay.  Thank you.  Let me hand you Exhibit
15  No. 47.  What is Exhibit No. 47?
16   A.  A Weslaco Police Department jail card.
17   Q.  And for -- and who is the person arrested?
18   A.  Maricela Trevino.
19   Q.  What is the date of arrest?
20   A.  February 6, 2003.
21   Q.  And what is the date of release?
22   A.  February 7, 2003.
23   Q.  And how many calendar days did she spend at the
24  jail?
25   A.  All or part of two calendar days.

Page 348

1    Q.  Does that jail card, Exhibit No. 47, does it
2  include a medical questionnaire?
3    A.  It does not.
4    Q.  Would that be a violation of Weslaco booking
5  policy number four?
6        MS. KENNAMER:  Objection, form.
7    A.  No.
8    Q.  Why not?
9    A.  Because according to this Weslaco Police
10  Department jail card, this was an arrest made on
11  February 6, 2003, and this policy did not go into effect
12  until 2005.
13   Q.  Okay.  So prior to 2005, there was no
14  requirement for jailers or booking officers to ask
15  detainees any type of medical questions; is that
16  correct?
17   A.  I am --
18       MS. KENNAMER:  Objection, form.  Asked and
19  answered.
20   A.  I am not sure.
21   Q.  Okay.  Was there a form prior to May 1st, 2005
22  that included medical questions that were supposed to be
23  asked by jailers during the booking process?
24       MS. KENNAMER:  Objection, form.  Asked and
25  answered.

Page 349

1    A.  There may have been.
2    Q.  Okay.  But there was no written policy that
3  required the jailers to complete or make any questions
4  pertaining to a detainee's medical status during
5  booking?
6        MS. KENNAMER:  Objection, form.  Asked and
7  answered.
8    A.  I am not sure.
9    Q.  Okay.  There --
10       MS. KENNAMER:  And I am going to call it
11  now, because we are going over things that have already
12  been asked and answered.  We are way beyond the time,
13  and we are before the time of the jail policies that
14  were in effect at this time.  So I think we have gone
15  way past what I was required to do by the rules in
16  presenting the witness for seven hours.
17       MR. RUIZ:  Okay.

88 (Pages 346 to 349)

Hill & Romero
Certified Court Reporters

Page 350

CHANGES AND SIGNATURE

1
2  PAGE  LINE  CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 351

1        I, TED WALENSKY, have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4
5        _____
6        TED WALENSKY
7  THE STATE OF TEXAS )
8  COUNTY OF HIDALGO )
9        Before me, _____,
on this day personally appeared TED WALENSKY, known to
10 me (or proved to me under oath or through
_____)(description of identity
11 card or other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged
12 to me that they executed the same for the purposes and
consideration therein expressed.
13
       Given under my hand and seal of office
14 this _____ day of _____, 2010.
15
16
17 _____
       Notary Public in and for the State of Texas
18
19
20
21
22
23
24
25

Page 352

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS
2               McAllen DIVISION
3  JUAN ESTRADA, JR., ROSA     )(
   ESTRADA, CRISELDA VILLARREAL,)(
4  ADMINISTRATRIX OF THE ESTATE )(
   OF MARICELA TREVINO AND AS   )(
5  NEXT FRIEND OF S.M.L., N.T.L.,)(
   AND R.L., JR., AND FRANCISCO )(
6  TREVINO                      )(
                                )(
7  VS.          )( CIVIL ACTION NO. 09-158
                )(
8  CITY OF WESLACO, ALFREDO     )(
   MORENO, JR., ALBERT PONCE    )(
9  WESLACO POLICE CHIEF JOHN    )(
   DANIEL MARTINEZ, ONE UN-NAMED)(
10 WESLACO EMS MEDIC, ALEX      )(
   CAVAZOS AND CHRISTOPHER      )(
11 CUELLAR                      )(
12         REPORTER'S CERTIFICATION
     VIDEOTAPED DEPOSITION OF TED WALENSKY
13          July 13 and July 14, 2010
       I, TERRI L. HILL, Certified Shorthand
14 Reporter in and for the State of Texas, hereby certify
   to the following:
15      That the witness, TED WALENSKY, was duly
16 sworn by the officer and that the transcript of the oral
   deposition is a true record of the testimony given by
17 the witness;
18      That the deposition transcript was submitted
19 on _____, 2010, to the witness or to
   the attorney for the witness for examination, signature
20 and return to Hill & Romero by _____,
   2010;
21
        That the amount of time used by each party at
22 the deposition is as follows:
        MAURO F. RUIZ - 7 Hours: 44 Minutes
23      ALISON D. KENNAMER - 0 Hours: 0 Minutes
        That pursuant to information given to the
24 deposition officer at the time said testimony was taken,
25 the following includes counsel for all parties of

Page 353

1   MAURO F. RUIZ
    RUIZ LAW FIRM, P.L.L.C.
2   200 East Cano
    Edinburg, Texas  78539
3
    ALISON D. KENNAMER
4   COLVIN, CHANEY, SAENZ & RODRIGUEZ, L.L.P.
    1201 East Van Buren
5   Brownsville, Texas 78522
6       I further certify that I am neither counsel
   for, related to, nor employed by any of the parties or
7  attorneys in the action in which this proceeding was
   taken, and further that I am not financially or
8  otherwise interested in the outcome of the action.
9
10      Sworn to by me this _____ day of
11 _____, 2010.
12
13
14 _____
   TERRI L. HILL, Texas CSR 4495
15 Expiration Date: 12-31-10
   Hill & Romero
16 Certified Court Reporters
   Firm Registration No. 313
17 10225 N. 10th, Suite B
   McAllen, Texas  78504
18 (956) 287-8898
19
20
21
22
23
24
25

89 (Pages 350 to 353)

Hill & Romero
Certified Court Reporters