Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

JUAN ESTRADA, JR., ROSA ESTRADA,   )
CRISELDA VILLARREAL, ADMINISTRATRIX)
OF THE ESTATE OF MARICELA TREVINO  )
AND AS NEXT FRIEND OF S.M.L.,      )
N.T.L. AND R.L., JR., AND FRANCISCO)
TREVINO,                           )
                                   )
        PLAINTIFFS,                )     CIVIL ACTION NO:
                                   )        09-158
VS.                                )
                                   )
CITY OF WESLACO, ALFREDO MORENO,   )
JR., ALBERT PONCE, WESLACO POLICE  )
CHIEF JOHN DANIEL MARTINEZ, ONE    )
UN-NAMED WESLACO EMS MEDIC, ALEX   )
CAVAZOS AND CHRISTOPHER CUELLAR,   )
                                   )
        DEFENDANTS.                )



*************************************************************
ORAL AND VIDEOTAPED DEPOSITION OF

JOHN DANIEL MARTINEZ

June 8, 2010

*************************************************************

        ORAL AND VIDEOTAPED DEPOSITION of JOHN DANIEL

MARTINEZ, produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 8th day of June,

2010, from 9:04 a.m. to 2:52 p.m., before Anica Diaz,

CSR in and for the State of Texas, reported by

stenograph, at the City Manager's Office, 255 South

Kansas, Weslaco, Texas, pursuant to the Texas Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 2

# APPEARANCES

1
2
3 COUNSEL FOR THE PLAINTIFFS:
4   MR. MAURO RUIZ
    RUIZ LAW FIRM, L.L.P.
5   200 East Cano
    Edinburg, Texas 78539
6
7 COUNSEL FOR THE DEFENDANTS:
8   MR. MITCHELL C. CHANEY
    COLVIN, CHANEY, SAENZ & RODRIGUEZ, L.L.P.
9   1201 East Van Buren Street
    Brownsville, Texas 78522
10
11 ALSO PRESENT:
12   Mr. Leo Trevino, Videographer, OTS Legal Video
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

# INDEX

|  |  | PAGE |
|---|---|---|
| Appearances | ...................................... | 02 |
| Exhibits | ......................................... | 04 |
| JOHN DANIEL MARTINEZ |  |  |
| Examination by Mr. Ruiz | ........................... | 05 |
| Changes and Signature | ............................. | 273 |
| Reporter's Certificate | ............................ | 275 |

Page 4

# EXHIBITS

| Plaintiffs' Exhibit No. 1 |  |
|---|---|
| TCLEOSE Personal Information | 36 |
| Plaintiffs' Exhibit No. 2 |  |
| Jail & Detention Procedures | 63 |
| Plaintiffs' Exhibit No. 3 |  |
| State of Texas Oath of Office | 86 |
| Plaintiffs' Exhibit No. 4 |  |
| Jailer Application for Employment | 110 |
| Plaintiffs' Exhibit No. 5 |  |
| City of Weslaco App for Employment | 112 |
| Plaintiffs' Exhibit No. 6 |  |
| 5/13/2007 Incident Report | 127 |
| Plaintiffs' Exhibit No. 7 |  |
| 5/15/2007 Incident Report | 161 |
| Plaintiffs' Exhibit No. 8 |  |
| 7/24/2009 Incident Report | 172 |
| Plaintiffs' Exhibit No. 9 |  |
| 5/16/07 Jailer Daily Activity Sheet | 194 |
| Plaintiffs' Exhibit No. 10 |  |
| 2/5/06 Jailer Daily Activity Sheet | 229 |
| Plaintiffs' Exhibit No. 11 |  |
| 9/7/05 Jailer Daily Activity Sheet | 230 |
| Plaintiffs' Exhibit No. 12 |  |
| Police Department Internal Memo | 232 |
| Plaintiffs' Exhibit No. 13 |  |
| Offense Report for Maricela Trevino | 239 |
| Plaintiffs' Exhibit No. 14 |  |
| 7/24/2009 Dispatch Report | 243 |
| Plaintiffs' Exhibit No. 15 |  |
| 7/24/2009 Incident Report | 247 |

Page 5

# PROCEEDINGS

1
2        THE VIDEOGRAPHER:  Today's date is June 8th,
3 2010.  The time is 9:07 a.m., we are on the record.
4        JOHN DANIEL MARTINEZ,
5 having been duly sworn, testified as follows:
6        THE WITNESS:  Yes, ma'am.
7        EXAMINATION
8 BY MR. RUIZ:
9    Q.  Good morning, sir.
10    A.  Good morning, sir.
11    Q.  Could you please state your full name for the
12 record?
13    A.  Juan Daniel Martinez.
14    Q.  Now, Mr. Martinez, my name is Mauro Ruiz, and
15 prior to this morning, you and I have never met, is that
16 correct?
17    A.  That's correct, sir.
18    Q.  And you understand that I represent the Estate of
19 Maricela Trevino, her children, and her parents in a
20 lawsuit that was brought against you?
21    A.  Yes, sir.
22    Q.  Do you understand that?
23    A.  Yes, sir.
24    Q.  Okay.  And do you also understand that there are
25 some other individual Defendants in this particular

2  (Pages 2 to 5)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 6

```
1    lawsuit as well that have been sued?
2        A.  Yes, sir.
3        Q.  Okay.  And lastly, there's also the City of
4    Weslaco that's a Defendant in this lawsuit, do you
5    understand that?
6        A.  Yes, sir.
7        Q.  Okay.  And you know that the -- that the lawsuit,
8    the allegations that have been brought against you,
9    arise from the time that you were chief of police for
10   the City of Weslaco, you understand that?
11       A.  Yes, sir, I sure do.
12       Q.  Okay.  Since -- would it be okay if I address you
13   as Chief Martinez then?
14       A.  That'll be fine.
15       Q.  Okay.  And so, basically, you understand that I'm
16   on the other side from you?
17       A.  (Witness nods head.)
18       Q.  Is that a yes?
19       A.  Yes, sir.
20       Q.  Okay.
21       A.  I understand.
22       Q.  Now, before you came into this conference room
23   this morning, Chief Martinez, did you have a chance to
24   speak to your attorney about what's going to happen
25   today?
```

Page 7

```
1        A.  Yes, sir, I did.
2        Q.  Okay.  And did he explain to you that your
3    testimony here today is under oath, and that it has the
4    same force and effect as if it were -- as if you were
5    testifying in a court of law?
6        A.  Yes, sir, he did.
7            MR. CHANEY:  Just for the record, I didn't
8    mind that question, but if you would not say, did he
9    explain to you --
10           MR. RUIZ:  Oh.
11           MR. CHANEY:  -- because our discussions,
12   obviously --
13           MR. RUIZ:  Okay.
14           MR. CHANEY:  -- are attorney/client.
15           MR. RUIZ:  Right.
16           MR. CHANEY:  But that -- but I did explain
17   that to him and I didn't object.
18       Q.  (By Mr. Ruiz) Okay.  And throughout this
19   deposition, Chief Martinez, I will -- I will not ask you
20   any questions concerning the substance of any discussion
21   between you or any other of your lawyers, including
22   Mr. Vela or Mr. Chaney, okay?
23       A.  I understand.
24       Q.  Okay, thank you.  Chief Martinez, do you
25   understand that your testimony today is being
```

Page 8

```
1    transcribed by this court reporter to my left, and that
2    it's being videotaped as well?
3            And in the event that you are not available, it
4    will be presented -- it could be presented to the judge
5    and jury in this case?
6        A.  Yes, sir.
7        Q.  Okay.  And do you also understand that should
8    your answer to my questions at trial differ from the
9    same questions I ask you here today, I can use the
10   questions that were transcribed here today to question
11   your credibility at trial?
12       A.  Yes, sir.
13       Q.  Okay.  And also, it's important for me to get
14   a -- a clear answer that I can rely on today, okay?
15       A.  Yes, sir, we're going to try.
16       Q.  Thank you.  And I think I asked you early, back
17   in May of 2007 -- strike that question.
18           Chief Martinez, in May 2007, you were the chief
19   of police for the City of Weslaco when Maricela Trevino
20   hung herself while locked up at the Weslaco PD jail, is
21   that correct?
22       A.  That's correct.
23       Q.  Okay.  And it's my understanding that you are no
24   longer chief of the City of Weslaco, is that correct?
25       A.  That's also correct, yes, sir.
```

Page 9

```
1        Q.  Okay.  Chief Martinez, what is your date of
2    birth?
3        A.  August 29th of 1950.
4        Q.  How old are you?
5        A.  59.
6        Q.  Are you married?
7        A.  Yes, sir, I am.
8        Q.  Okay.  What's your wife's name?
9        A.  Sylvia.
10       Q.  And is it Sylvia Martinez?
11       A.  Yes, sir.
12       Q.  Okay.  Where do you currently reside?
13       A.  I reside in the County of Real, Leakey, Texas.
14       Q.  What county is that?
15       A.  Real.
16       Q.  Oh, Real County, okay.  And where does your wife
17   Sylvia Martinez reside?
18       A.  She resides here in Weslaco.
19       Q.  Okay.  Is she the only wife you've had or have
20   you been married before?
21       A.  I've been married before.
22       Q.  Okay.  How many times?
23       A.  Just twice.
24       Q.  Twice before?
25       A.  No.
```

3 (Pages 6 to 9)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 10

1   Q. Or twice total?
2   A. Twice total.
3   Q. Okay. What was the name of your first wife?
4   A. Juanita.
5   Q. Does she still go by Martinez?
6   A. Yes, sir.
7   Q. What was her maiden name?
8   A. Suarez.
9   Q. Okay. And Ms. Sylvia Martinez, what was her
10  maiden name?
11  A. Hernandez.
12  Q. Are they both from the Weslaco area?
13  A. Yes, sir, they are.
14  Q. Okay. When did you divorce Ms. Juanita Martinez
15  Suarez?
16  A. Oh, I want to say in '80 -- '89.
17  Q. Okay. Where is she currently employed?
18  A. I think she still works for the Weslaco
19  Independent School District.
20  Q. What does she do for the Weslaco ISD?
21  A. She is a teacher aid.
22  Q. And Ms. Sylvia Martinez, is she currently
23  employed?
24  A. She's currently employed here at the City of
25  Weslaco.

Page 11

1   Q. Okay. And what is her job title with the City of
2   Weslaco?
3   A. I believe she is the urban -- they've changed job
4   titles. The urban development coordinator.
5   Q. Okay, okay. Are there any children from your
6   first marriage to Juanita Martinez Suarez?
7   A. Yes, sir.
8   Q. How many?
9   A. Four.
10  Q. Okay. What are their names?
11  A. John David.
12  Q. Okay.
13  A. Jessica Daniel, Jennifer Diana and Jack Daniel.
14  Q. Are they all living in the Weslaco area right
15  now?
16  A. Yes, sir, they are.
17  Q. Okay. Are they enrolled in school?
18  A. No, sir, they're all up and grown.
19  Q. Okay.
20  A. They're married.
21  Q. Your -- your eldest is John Daniel?
22  A. John David.
23  Q. John David. What is -- what is -- is he
24  employed?
25  A. He's employed with the Weslaco Independent School

Page 12

1   District.
2   Q. Okay. And Jessica?
3   A. She is a nurse.
4   Q. Is she a nurse here with Knapp?
5   A. No, she's in home healthcare.
6   Q. Okay. What company does she work for?
7   A. Oh, that, I wouldn't be able to tell you.
8   Q. Okay. And then you have Jennifer?
9   A. Yeah. Jennifer is a cosmetologist, and she works
10  in Pharr somewhere, I don't know the name.
11  Q. Okay. And Jack Daniel?
12  A. Jack Daniel is employed by H.E.B. Food Stores and
13  he's also a musician.
14  Q. Okay. Are there any children from your second
15  marriage with Sylvia Martinez?
16  A. No, sir.
17  Q. Okay.
18  A. Well, she's got a daughter and of course --
19  Q. What is her daughter's name?
20  A. It's Marissa, Marissa Hernandez. And she's 18
21  years old.
22  Q. And does she reside in Hidalgo County?
23  A. She resides in Hidalgo County, works for the
24  Weslaco Independent School District.
25  Q. Okay. Chief, what is your wife Sylvia Martinez's

Page 13

1   current physical address?
2   A. It's P.O. Box 349 Weslaco.
3   Q. Okay. Chief, tell me -- tell me a little bit
4   about your educational background.
5   A. I've got a degree in education, health and Phys
6   Ed. And of course, the basic, I graduated from Weslaco
7   High School.
8   Q. What year, sir?
9   A. That was in '69. I was a former student at the
10  University of Nuevo Leon in Mexico Tech, El Tech, played
11  American football up there on scholarship.
12  Q. Okay.
13  A. And then finished up with University of Texas Pan
14  American in '75.
15  Q. After graduating -- and what was your degree at
16  the -- what degree did you receive from the University
17  of Texas Pan American?
18  A. An educational degree.
19  Q. After graduating from the University of Texas Pan
20  American, did you engage in any other formal education?
21  A. No, sir.
22  Q. At some point you enrolled in the police
23  academy -- in a police academy, right?
24  A. DPS Academy.
25  Q. Okay. And where is that academy located?

4 (Pages 10 to 13)

Page 14

1    A. In Austin. Austin, Texas.
2    Q. While you're at the academy -- how long is that
3  course work at the academy?
4    A. 20 weeks.
5    Q. 20 weeks. Were you working another job at the
6  same time?
7    A. No, sir. That -- that was my job.
8    Q. That was the job?
9    A. Department of Public Safety, you get picked up as
10  a route -- as an applicant, and then you're being paid
11  while you go to DPS.
12    Q. Okay.
13    A. You're an employee until you graduate.
14    Q. And during the time that you're at the academy,
15  are you a patrolmen or are you in the work -- or you're
16  in the process of becoming a patrolman?
17    A. No, you're going to the academy. You're in the
18  process of becoming either one out of five services,
19  Highway Patrol, driver's license, license and weight.
20    Q. Okay.
21    A. You know, there's five services.
22    Q. So during those 20 weeks you're more like a
23  student?
24    A. (Witness nods head.)
25    Q. Is that correct?

Page 15

1    A. That's correct.
2    Q. Okay.
3    A. Yes, sir.
4    Q. What year did you graduate from the DPS Academy?
5    A. '77.
6    Q. So between 1975 when you graduated from U.T. Pan
7  American and 1977 when you attended the DPS Academy,
8  what did you do during that time?
9    A. I was the executive director for Boys &
10  Girls Club of America in Weslaco.
11    Q. And what were your duties as executive director,
12  sir?
13    A. Child growth and development, character
14  development, total operation of the club, finances,
15  budgeting, fund raising.
16    Q. Okay. So after completing the academy, the DPS
17  academy, do you get commissioned as a peace officer upon
18  completing that course, or is there another step?
19    A. You get commissioned as a peace officer.
20    Q. Okay. So would it be fair to say you were a
21  commissioned peace officer in 1977?
22    A. It'd be '78. It was the latter part of '77,
23  graduated in '78, got commissioned in '78.
24    Q. Okay. And after being commissioned as a peace
25  officer, who did you work for, sir?

Page 16

1    A. Department of Public Safety, Harris County,
2  Houston.
3    Q. Did you get to select Harris County or were you
4  assigned that area?
5    A. You're assigned.
6    Q. That's what I figured.
7    A. Yes. My choices were the Valley and I got
8  assigned to Humble, Texas, a place I'd never heard. So
9  I worked out of Humble.
10    Q. And as a -- and during your assignment with the
11  DPS in Harris County in 19 -- was that in 1978?
12    A. '78, yes, sir.
13    Q. Okay. And during that assignment in 1978, what
14  were your job duties as an --
15    A. Highway --
16    Q. -- as an employee of DPS?
17    A. Highway supervision, case preparations, and
18  criminal traffic, law enforcement.
19    Q. Was -- is that basically -- are those functions
20  of a patrol officer?
21    A. Yes, sir.
22    Q. Okay. During your -- during your -- and how many
23  years were you in that --
24    A. In Houston?
25    Q. -- in that capacity?

Page 17

1    A. In the capacity as a trooper, a total of I
2  believe it'll be five years, six years.
3    Q. Okay. But that was -- that was -- did you do
4  five years?
5    A. No, sir, there was -- I believe there was two
6  years, and then I home and did some Boys & Girls Club of
7  America.
8    Q. Okay.
9    A. And then went back to DPS.
10    Q. Okay. So would it be fair to say that from 1978,
11  when you were first employed by DPS as a trooper or
12  patrol officer --
13    A. Uh-huh.
14    Q. -- you continued in that capacity for two
15  years --
16    A. For two years.
17    Q. -- until 1980?
18    A. About 1979, latter part of '79.
19    Q. Okay.
20    A. Came to do some teaching and coaching.
21    Q. Okay. And were you assigned to the Houston -- to
22  Harris County during that entire time --
23    A. Yes, sir.
24    Q. -- that you were with DPS?
25    A. Yes, sir.

5 (Pages 14 to 17)

Electronically signed by Anica Diaz (001-137-509-0044)   031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 18

1    Q.  Okay.  And while -- and during the time that you
2  were at the academy, and during those two years that you
3  were with DPS in Harris County, did you receive any kind
4  of training on jail administration techniques?
5    A.  Oh, we briefly touched on it.  They just
6  discussed the responsibilities and the requirements.
7    Q.  Okay.  And at what point did you -- was that
8  issue discussed, during your academy work?
9    A.  Academy work.
10    Q.  Okay.  And how long was that -- that aspect of
11  your academy training?  Was it several weeks, days or
12  hours?
13    A.  No, no, it's hours.
14    Q.  Hours, okay.  So -- and during the time that you
15  were a patrol officer or trooper --
16    A.  Uh-huh.
17    Q.  -- did at any point, did any of your job duties
18  include jail administration, or handling detainees or
19  prisoners in the jail setting?
20    A.  No, not in the jail setting.
21    Q.  Okay.  So would it be fair to say that before
22  1980 the -- you received several hours worth of course
23  work on jail administration issues during your -- the
24  time you were in the academy -- the DPS Academy?
25    A.  Yes, sir.

Page 19

1    Q.  I think you told me that you returned to the
2  Valley after 1979?
3    A.  Yes, sir, I did.
4    Q.  What were your reasons for leaving the Department
5  of Public Safety in Harris County?
6    A.  They -- my first wife, all her family being here,
7  being a country girl, never being out of the Valley, she
8  got homesick and wanted to come home.  And it was an
9  option, either quit or we go to the Valley.
10    Q.  Okay.  Did you -- before leaving your position
11  with DPS in Harris County, did you secure a job, or did
12  you come down here and then look for work?
13    A.  Well, my intentions were -- no, I had a job.  I
14  secured a job in teaching.
15    Q.  Oh, okay.
16    A.  My intentions were, DPS would allow you two years
17  of leave without losing your commission and --
18    Q.  Two years of what?
19    A.  Leave.
20    Q.  Leave, okay.
21    A.  Leave of absence.  And my -- my plan was to come
22  down here and possibly join up in the Valley as DPS, if
23  I could.
24    Q.  Okay.
25    A.  But I had a degree to fall back to, so I went

Page 20

1  back into teaching.
2    Q.  Okay.  And so the positions that you had with DPS
3  in Harris County, that -- the -- I guess the job was
4  primarily a patrol officer?
5    A.  That's correct.
6    Q.  Any other type of position that you -- that you
7  held during that timeframe?
8    A.  While a trooper?
9    Q.  Yes, sir.
10    A.  No, just a trooper.
11    Q.  Who was your supervisor at the time in 1979 when
12  you decided to --
13    A.  Sergeant Gardner.
14        MR. CHANEY:  Let him finish -- make sure you
15  let him finish his question --
16        THE WITNESS:  Oh, okay.
17        MR. CHANEY:  -- because it's hard for her.
18        THE WITNESS:  Okay.
19    Q.  (By Mr. Ruiz) Is that Gardner?
20    A.  Sergeant Gardner.
21    Q.  And his first name?
22    A.  We never called him by first name.  I
23  don't -- sergeant.  It was Sergeant Gardner.
24    Q.  And you said you were able to secure a job in the
25  Valley?

Page 21

1    A.  Yes, sir.
2    Q.  And that was teaching?
3    A.  Weslaco High School.
4    Q.  Okay.  And what did you teach at Weslaco High
5  School?
6    A.  I taught health, which was one of my majors,
7  health and Phys Ed.  So I taught health and physical
8  education.
9    Q.  Okay.  And how long did -- how long were you at
10  Weslaco ISD teaching health and physical education
11  courses?
12    A.  Right before my two years was up.
13    Q.  Okay.  And then you made an effort to join DPS
14  again?
15    A.  I went back to DPS.
16    Q.  Okay.  And was there an opening or was that
17  something that you just --
18    A.  Well --
19    Q.  What did you do to go back?
20    A.  No, there was an opening with -- with an intent
21  to bring me down to the Valley and the opening was in
22  Kingsville.  I had started off in Corpus, and then did
23  Bishop and then Kingsville, so.
24    Q.  Okay.  So you -- you were offered this position
25  or you sought it out?

6  (Pages 18 to 21)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 22

1    A. Well, I was asked to come back.
2    Q. Okay.
3    A. If I wanted a job.
4    Q. And so you were first -- so you accepted and you
5    were stationed where your first -- your first --
6    A. Corpus.
7    Q. Corpus. And from Corpus?
8    A. I went to Bishop.
9    Q. You went to Bishop?
10   A. Bishop to Kingsville.
11   Q. To Kingsville?
12   A. And then Weslaco.
13   Q. And then Weslaco. And so -- and you worked for
14   DPS in these four different areas for a period of five
15   years, would that be correct?
16   A. Yes, sir.
17   Q. And that was from 1981 to 19 -- through 1995?
18   A. In different times, but yeah, all together. I
19   believe this would give you the --
20   Q. Okay. Well, and during that -- during those four
21   years, Chief Martinez, at any point during those four
22   years were you responsible for any type of jail in
23   Corpus, in Bishop, in Kingsville or in -- was it
24   Weslaco?
25   A. Uh-huh.

Page 23

1    Q. Was that the last one?
2    A. Uh-huh.
3    Q. Okay.
4    A. No, we weren't in charge of any jail proceedings.
5    We just arrested and took them to the -- to the
6    different detention centers, and then turned them over
7    to the jail personnel.
8    Q. Okay. During the time that you were with Weslaco
9    ISD from 19 -- let's say '79 to '81.
10   A. Uh-huh.
11   Q. Did you take any courses that would be reflected
12   in this document that Mr. Chaney provided to me this
13   morning?
14   A. No, sir. Those are all law enforcement courses.
15   Q. Okay.
16   A. That's all it is.
17   Q. Okay. So during the time that you were teaching
18   at Weslaco High School, you did not continue or take any
19   law enforcement education courses?
20   A. I was a reservist for the Hidalgo County
21   Sheriff's Department, never -- never left my commission.
22   Q. Okay.
23   A. So that I could keep my commission. And we did
24   inservice classes.
25   Q. Okay. So there were some inservice classes?

Page 24

1    A. Two weeks in-service, it had to be 40 hours.
2    Q. Okay. And the Hidalgo County Sheriff's Office
3    would have records of the courses you took, or would
4    they be contained in that document?
5    A. They're contained in that document.
6    Q. Oh, okay. And that would have been from 1979
7    through 1991, right?
8    A. Let me see. Hidalgo County Sheriff's Department
9    was in '97, when I was reservist. When I left DPS, I
10   would go and do some reserve work for the county. It
11   was in '97 -- from '81 to '97, and then the first time
12   was in 2003-2003.
13   Q. Okay. And just so that I could clarify, Chief,
14   you -- what year did you become a reservist for -- for
15   the Hidalgo County Sheriff's Department?
16   A. From the time that I left DPS the first time.
17   Q. Okay. So that would have been from 1979?
18   A. 19 -- no, 1981.
19   Q. Okay.
20   A. 1981.
21   Q. '81?
22   A. Yes, sir.
23   Q. So that's when you -- you mean when you left
24   Weslaco ISD?
25   A. Yeah -- well, while in Weslaco ISD I was also a

Page 25

1    reservist.
2    Q. Okay.
3    A. So.
4    Q. And --
5    A. The requirement is only 16 hours a month.
6    Q. Okay. And that's reflected in the --
7    A. Yes, sir.
8    Q. -- this document --
9    A. Yes, sir.
10   Q. -- that we have right here?
11   A. Yes, sir, it is.
12   Q. So according to this document --
13   A. It states reserve officer, reserve officer.
14   Q. For the Hidalgo County Sheriff's Office?
15   A. Yes, sir. Yes, sir.
16   Q. September 1st, 1981?
17   A. Yes, sir.
18   Q. And you continued in that capacity as a reserve
19   officer until September 30th, 1997?
20   A. Yes, sir.
21   Q. Would that be correct?
22   A. Uh-huh. That's 16 years and 4 months as a
23   reservist.
24   Q. Okay.
25   A. Down at the bottom, the next line right there.

7  (Pages 22 to 25)

Hill & Romero
Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e0

Page 26

1       No, right here.  It gives you --
2       Q.  Oh, got it.
3       A.  It tells you the --
4       Q.  Your -- the time that you served in that
5   capacity?
6       A.  With DPS and chief of police.
7       Q.  Okay.  And so -- and so during this time as a
8   reserve officer with -- with the Hidalgo County
9   Sheriff's Department, at any time did you serve as a
10  jailer?
11      A.  Yes, sir.
12      Q.  Okay.  During what timeframe did you serve as a
13  jailer?
14      A.  It was from 2/27/03 to 6/6 of '03, three months.
15      Q.  2/27/03?
16      A.  Yes, sir.
17      Q.  Through?
18      A.  6/6 of '03.
19      Q.  But by that time you were already chief of police
20  for the City of Weslaco, correct?
21      A.  No, sir.
22      Q.  No, you were not?
23      A.  No, sir.
24      Q.  Oh, okay.  Okay.  Well, then let me -- let me go
25  back to my -- my chronology.  You said --

Page 27

1       A.  When I left the Sheriff's Department, if you
2   notice down here where it says jailer -- right there
3   where it says jailer.
4       Q.  Right.
5       A.  Right there, then go across.
6       Q.  Okay.
7       A.  Jailer license, 2/27/03 to 6/6/03.  This is three
8   months.
9       Q.  All right.
10      A.  And then if you jump up to -- to the City of
11  Weslaco.
12      Q.  Oh, okay.
13      A.  Chief of police.
14      Q.  Right.
15      A.  It starts at 6/6/03 to 12/09.
16      Q.  Okay.  Because there was a break in -- in the
17  time that you -- there was a break in there?
18      A.  Yes, sir.
19      Q.  Correct?
20      A.  Yes, sir.
21      Q.  And I'm going to get to that real quick.
22      A.  Okay, sure.
23      Q.  But I appreciate you pointing that out.
24      A.  Okay.
25      Q.  After -- after you -- when you became a Highway

Page 28

1   Patrol officer or trooper for DPS --
2       A.  Uh-huh.
3       Q.  -- in 1981, correct?
4       A.  Uh-huh, yes, sir.
5       Q.  And you continued doing that until 1985?
6       A.  Yes, sir.
7       Q.  And I think that's when I asked you earlier,
8   whether during that timeframe, '81 through '85, were you
9   employed in -- as a jailer or did you administer a jail
10  during that time?  And I believe you said no?
11      A.  No.
12      Q.  Am I correct?
13      A.  That's correct.
14      Q.  Okay.  After 1985 you leave DPS again, is that
15  correct?
16      A.  Uh-huh, yes, sir.
17      Q.  And you --
18      A.  I work for the City of Weslaco.
19      Q.  Was it for the City of Weslaco?
20      A.  Yes, sir.
21      Q.  Okay.  It wasn't for the Boys & Girls Club?
22      A.  Boys & Girls Club, yes, sir.
23      Q.  Right.  And so you returned to the Boys & Girls
24  Club of Weslaco from 1980 -- in 1985, right?
25      A.  Yes, sir.

Page 29

1       Q.  What was your position at that point?
2       A.  Executive director.
3       Q.  Okay.  Did you have the same duties you had the
4   first time when you were executive director?
5       A.  Yes, sir, but more enhanced.
6       Q.  But more enhanced?
7       A.  Yes, sir.
8       Q.  What do you mean by that?
9       A.  Well, when I first started with the Boys & Girls
10  Club of America, we started it back in '74 from scratch,
11  nothing, and we built it up to what it was.
12          I left to go to DPS and they went through three,
13  four directors, executive directors.  I was doing
14  Highway Patrol service here now, and they brought some
15  kids over, they invited me to a board meeting, and they
16  wanted me to come back.
17          And I said, I've got a good job, I've got a good
18  salary, and I don't -- I'm not looking for a job.  And
19  they said, well, we just need to get the Boys & Girls
20  Club started back up again in Weslaco.
21          The people that we've had there, there's some
22  complaints that are happening that we have to
23  dismiss the executive directors, and it's not running
24  the way -- the way they wanted it to run.
25          So thinking ahead -- the first time it was, no,

8 (Pages 26 to 29)

Page 30

1  and thank you for the food.  And the second time they
2  brought me in, they brought some kids in.  And
3  they're -- you know, they -- I guess it was staged
4  because they go crying, we want our boys and girls club
5  back.  So I kind of looked at the president, and I said,
6  you know, I'll be back.  But you've got two years to
7  find you an executive director.
8      Q.  Okay.
9      A.  And two years turned out to be 18, so.  And
10  I -- I went from -- I went from -- from one -- one
11  central meeting place to seven in the school district,
12  and then the main house.
13      Q.  Okay.  And --
14      A.  And started Mercedes Boys & Girls Club and
15  assisted with Donna Boys & Girls Club.
16      Q.  Who approached you about returning to the Weslaco
17  Police?
18      A.  The board president.
19      Q.  And who was that at that time?
20      A.  Lorenzo Aguilar.  He is no longer living, he's
21  deceased.
22      Q.  Okay.  Now and you were there from 1985 through
23  what year?
24      A.  Through '89, I believe, all together with the
25  Boys & Girls Club.

Page 31

1      Q.  Okay.  Because I thought I had looked at your
2  resume and you had been there until 1997, was that -- am
3  I mistaken?
4      A.  Well, I -- the years, I mean, I've done -- if I
5  look at the papers.  It may be -- I updated my resume
6  every time I left work and came back.  It's hard to keep
7  track of all of the years and where you've been, so.
8      Q.  Well, and I don't think --
9      A.  That's why I have the resume.
10      Q.  I don't think I brought it but --
11      MR. CHANEY:  You want me to see if I have it
12  to give it to him?
13      MR. RUIZ:  Yeah, that'd be great, if you
14  don't mind.
15      THE WITNESS:  Yeah, this is all -- oh, he's
16  got it.
17      MR. CHANEY:  I'll show you the one I have.
18  I don't know how current that is, it's probably -- I
19  think it's from your personnel file.
20      THE WITNESS:  Uh-huh.
21      MR. CHANEY:  So it's probably dated a little
22  bit.
23      THE WITNESS:  Yeah, this one needs to be
24  upgraded just a little bit, but this is pretty
25  much -- yeah.

Page 32

1      A.  See, in '85 to '97 with the Boys & Girls Club.
2      Q.  (By Mr. Ruiz)  So that was 12 years?
3      A.  Yes, sir.
4      Q.  Okay.
5      A.  And then I came back to Boys & Girls Club.  Let
6  me see --
7      Q.  Is that shown anywhere?
8      A.  Yes, sir.  '74 to '77 is when I first started.
9      Q.  Right.
10      A.  We started the Boys Club and --
11      Q.  And we discussed that one already?
12      A.  So okay.  And then I came back the second time
13  and did '85 to '97.
14      Q.  Okay.  Did you ever come back to the Boys Club
15  after becoming chief of police?
16      A.  No, I passed that on to my wife.
17      Q.  Oh, okay.
18      A.  She became the executive director.
19      Q.  Okay.  So we can -- we can say that -- just to be
20  sure on these dates, you were executive director of the
21  Weslaco Boys & Girls Club from 1985 through 1997,
22  correct?
23      A.  That's correct, sir.  That's correct.
24      Q.  And if I'm correct, that's in 1997 you left the
25  Boys Club to assume the job of police chief, would that

Page 33

1  be correct?
2      A.  Yes, sir, that's correct.
3      Q.  At any point during your tenure as executive
4  director of the Boys & Girls Club, did you -- and I'm
5  just trying to -- you had -- did they require that --
6  the Boys & Girls Club of America require you that you
7  take any courses in law enforcement or jail
8  administration?
9      A.  No, sir.
10      Q.  Anything of that sort?
11      A.  No, sir.
12      Q.  Okay.  And during this time that you were with
13  the Boys & Girls Club, you served in the capacity of an
14  Hidalgo County Sheriff's reserve officer?
15      A.  Yes, sir.
16      Q.  Okay.  And as part of your position with the
17  county as a reserve officer --
18      A.  Uh-huh.
19      Q.  -- what were your duties as a reserve officer?
20      A.  I served as their -- their lieutenant and also
21  got up to captain.  I trained the defensive driving to
22  incoming sheriff deputies from the academy, and some
23  other courses that --
24      Q.  Could -- could you explain how you would handle
25  serving as executive director and also serving as an

9 (Pages 30 to 33)

031a3c36-ed2a-42b4-b528-26a2cacc5e0

Electronically signed by Anica Diaz (001-137-509-0044)

Page 34

1      Hidalgo County reserve officer to me?
2        A.  Very simple.  It's 16 hours -- 16 hours a month
3    by state law.
4        Q.  Okay.
5        A.  So that's all I gave them, 16 hours a month.
6        Q.  Okay.  So -- and they were scheduled whenever
7    you -- they said you have --
8        A.  Whenever they called and they need assistance --
9        Q.  Okay.
10       A.  -- then I would -- I would make arrangements to
11   be there.
12       Q.  And as a reserve officer, did you also -- did you
13   qualify for any type of benefits, insurance benefits
14   with the county or medical insurance?
15       A.  No.  The only thing they covered was -- was our
16   insurance on work.  If we worked, I'd get hurt during
17   the line of duty, then they would cover that.
18       Q.  Okay.  In order to serve as a reserve officer
19   those 16 hours every month, Chief Martinez, did the
20   county require that you continue law enforcement or
21   attend law enforcement courses and training?
22       A.  The state requires you.
23       Q.  Okay.
24       A.  And the county also.
25       Q.  And would you have to comply -- so you did -- you

Page 35

1    did take courses --
2        A.  Yes, sir, I did.
3        Q.  -- during that timeframe?
4        A.  Yes, sir, I did.
5        Q.  So even though you were serving as executive
6    director of the Boys & Girls Club, you also were a
7    reserve officer, but in order to do that job as a
8    reserve officer, you had to take continuing law
9    enforcement education courses?
10       A.  That's correct.
11       Q.  Okay.  Would this document show us what
12   correspondences you took --
13       A.  Yes, sir.
14       Q.  -- during that timeframe?
15       A.  Yes, sir.  Basically, they would be in there.  It
16   has to do with -- anything having to do with
17   continuation.
18       Q.  And there's -- so we would look from 19 -- 1981,
19   right?
20       A.  Yes, sir.
21       Q.  That would be our start date?
22       A.  Yes, sir.
23       Q.  And --
24           MR. CHANEY:  Mauro, would you mind if we --
25   if we marked this?

Page 36

1           MR. RUIZ:  Oh, no, not at all.
2           MR. CHANEY:  Just so that we're talking
3    about it --
4           MR. RUIZ:  Yeah.
5           MR. CHANEY:  -- instead of this document and
6    just so the record is clear that it's the TCLEOSE
7    printout that I gave you this morning from Chief --
8           MR. RUIZ:  That's fine.
9           MR. CHANEY:  You want to mark which one?
10          MR. RUIZ:  You can mark his.
11          MR. RUIZ:  Okay.
12          MR. RUIZ:  There's a little area right here.
13          MR. CHANEY:  I'm just -- I'm going to take a
14   second, Chief.
15          THE WITNESS:  Okay, sure.
16          MR. CHANEY:  Just so when we refer to the
17   document it's -- we're talking about Exhibit 1, okay?
18          THE WITNESS:  Okay.
19          MR. RUIZ:  So let the record reflect that
20   Exhibit 1 is the Texas Commission on Law Enforcement
21   Officer Standards and Education personal information
22   Juan D. Martinez.
23          (Plaintiff's Exhibit No. 1 marked.)
24          MR. CHANEY:  Thank you.
25          MR. RUIZ:  Yes, sir, thank you.

Page 37

1        A.  I don't see them on here.  I don't see them
2    showing.
3        Q.  (By Mr. Ruiz)  Because it -- you would think
4    they'd be on the last page, right?
5        A.  Ethics, general inservice training '97 and '98
6    patrol tactics.  Also, '98 -- that's in '98.  '95 to
7    '97 -- here it is.  Hidalgo County Sheriff Academy at --
8    from '96 -- it'll be the last courses down here.
9        Q.  Is that on -- that's from Page 6?
10       A.  That's on Page 6.
11       Q.  Of Exhibit 1, right?
12       A.  Yes, sir.
13       Q.  Okay.  And you're looking at a timeframe that
14   shows September 1st of 1995 through August 31st of 1997,
15   correct?
16       A.  That's correct.
17       Q.  Okay.  And during those two years you took
18   your -- your 40 hours?
19       A.  Yes, sir.
20       Q.  Of -- okay.  Are they called continuing law
21   enforcement?
22       A.  Continuing -- yeah, continuing education, and
23   then state mandated courses.
24       Q.  Okay.
25       A.  For law enforcement.

10  (Pages 34 to 37)

031a3c36-ed2a-42b4-b528-26a2cacc5e0

Electronically signed by Anica Diaz (001-137-509-0044)

Page 38

1    Q. And those courses were Course No. 31, do you see
2  that, sir --
3    A. Uh-huh.
4    Q. -- that top course 31 --
5    A. Yeah.
6    Q. -- and it says law?
7    A. Yeah.
8    Q. And that course date was May 9th of '96?
9    A. May 9th of '96, yes, sir.
10    Q. And that was for five hours?
11    A. For five hours, yes, sir.
12    Q. Do you recall what was taught during that course,
13  sir?
14    A. You have everything from traffic law enforcement
15  to arrests, search warrants, anything having to do
16  with -- with daily operation of a peace officer.
17    Q. Okay. And did that course involve any training
18  on jail administration or jail standards?
19    A. Yes, sir.
20    Q. It did?
21    A. Yes, sir.
22    Q. How long -- what percentage of that course was
23  dedicated to that?
24    A. Oh, man, I would say about a couple of hours, two
25  hours.

Page 39

1    Q. Were you tested at the result -- at the -- at the
2  end of that course?
3    A. Yes, sir.
4    Q. Okay, okay. And what do you recall regarding
5  jail standards? Was it a very -- was it specialized
6  training or was it more general?
7    A. It's general.
8    Q. Okay. And that one -- that course was put on by
9  the Hidalgo County Sheriff's Academy?
10    A. Yes, sir.
11    Q. Correct?
12    A. Uh-huh.
13    Q. Okay. The other course you -- you took during
14  the timeframe of September 1st, '95 through August 31st,
15  1997 was one -- was course No. 3939, cultural diversity?
16    A. Yes, sir.
17    Q. Did I read that correctly?
18    A. Yes, sir.
19    Q. And that one -- that course date was on May 9th,
20  1996 as well, right?
21    A. That's correct.
22    Q. And that course, you -- you secured or you
23  obtained 13 hours worth of course credit?
24    A. Yes, sir.
25    Q. Okay. Did that course train -- train you or

Page 40

1  provide any training regarding jail standards and jail
2  administration?
3    A. All of the courses that were took under the
4  Sheriff's Academy had at one point or another, 30
5  minutes to an hour of handling of prisoners, booking
6  prisoners, and the -- in the jail facility.
7    Q. Okay.
8    A. So very, very general, what you do, what you
9  don't do is what -- what was -- what was discussed and
10  touched on.
11    Q. Okay. And so during these -- I'm just looking at
12  these --
13    A. Sure.
14    Q. -- at the bottom of Page 6.
15    A. Sure.
16    Q. If we look at those, did any of those courses
17  address the handling of detainees or prisoners with
18  mental illness or mental disorders?
19    A. Yes, sir.
20    Q. Okay. Did -- did they address how to handle
21  suicidal detainees?
22    A. Yes, sir.
23    Q. It did? Okay. So if we look back at those
24  course materials, if I get copies of those, they would
25  be -- these four right here, Course 3100?

Page 41

1    A. Uh-huh.
2    Q. 3939 on cultural diversity. 3232 --
3    A. Uh-huh.
4    Q. -- special investigative topic?
5    A. Uh-huh.
6    Q. And 3200 investigations?
7    A. That's correct.
8    Q. Your testimony is that they all touch upon, in
9  general terms, on handling prisoners?
10    A. Handling prisoners, yes.
11    Q. Okay. Do they -- are they specific enough to
12  address issues concerning handling prisoners with mental
13  illness, mental instability, and with -- and prisoners
14  who are suicidal?
15        MR. CHANEY: Objection, form. You can
16  answer I just --
17    A. Very general, as to what -- how the -- how to
18  handle the prisoners.
19    Q. (By Mr. Ruiz) Okay. And what did -- what do you
20  recall from those courses? Because these are courses
21  you took at the Hidalgo County Sheriff's Academy,
22  correct?
23    A. Yes, sir.
24    Q. Okay. What do you recall being trained back in
25  1996?

11 (Pages 38 to 41)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 42

1    A.  Okay.  About more having to do with
2  anger -- anger management; and also people with -- with
3  problems, anger problems; and also those that are
4  suicidal.
5    And you know, that those need to be evaluated,
6  assessments done, evaluated by the proper folks, and
7  then either released or -- or continued safety
8  evaluation.
9    Q.  Did those courses concerning the -- the detainees
10  who were suicidal, did they -- did they address, or did
11  they teach you how to identify suicidal detainees?
12    MR. CHANEY:  Objection, form.  You can
13  answer, I just --
14    THE WITNESS:  Okay.
15    MR. CHANEY:  Unless I -- unless I tell you
16  not to answer, you can answer.
17    THE WITNESS:  Okay.
18    MR. CHANEY:  But I need to do this for the
19  record.
20    THE WITNESS:  Sure, no problem.
21    A.  Yeah.
22    Q.  (By Mr. Ruiz) They did?
23    A.  Yes, sir, they did.
24    Q.  And what's your understanding as to how to
25  identify prisoners who may be suicidal?

Page 43

1    A.  There's usually marks that they have where
2  they've tried to hurt themselves, prior history,
3  parents, relatives that -- that would bring that to your
4  attention.
5    Q.  And by marks, you mean marks on their bodies such
6  as cuts.
7    A.  Yes, sir.  I mean, something out of the ordinary,
8  not just little cuts.  I mean, in vital -- vital places.
9    Q.  Like the wrists?
10    A.  The wrist, the neck, the -- you know.
11    Q.  Linear cuts, as opposed to other types of cuts?
12    A.  Linear cuts, right.
13    Q.  Because you can assume that was done with an
14  object?
15    MR. CHANEY:  Objection, form.
16    A.  Abrasions -- abrasions, scratches, that was not
17  considered suicidal.
18    Q.  (By Mr. Ruiz) Okay.  But linear cuts or linear
19  marks would be?
20    A.  Deep cuts, linear cuts where --
21    Q.  Okay.
22    A.  -- a great amount of blood loss was -- was
23  visible.
24    Q.  Okay.
25    A.  Yeah.

Page 44

1    Q.  And so -- and these --
2    A.  Consciousness, unconsciousness.
3    Q.  And you learned this -- it's your testimony you
4  were exposed to these topics during these courses during
5  the timeframe of September 1st, 1995 through
6  August 31st, 1997?
7    A.  Yes, sir.
8    Q.  And I'm just curious about this Course
9  3232 special investigative topics --
10    A.  Narcotics.
11    Q.  Narcotics?  So that course --
12    A.  Narcotics, gang prevention.
13    Q.  Okay.
14    A.  Gang involvement.
15    Q.  Okay.  And that one was also on May 7th of
16  1996 --
17    A.  Yes, sir.
18    Q.  -- correct?
19    A.  Yes, sir.
20    Q.  So that one did not include jail administration
21  issues or prisoner handling issues, correct?
22    A.  Yeah.
23    Q.  It did?
24    A.  They all did, yeah.
25    Q.  Okay.  Well, okay, and investigations, what were

Page 45

1  the -- what were the main topics that were discussed
2  upon?
3    A.  Okay.  Investigations was from building a case,
4  and then of course going from the time that the -- that
5  the arrest was made to the time that it was gone through
6  the jurisdiction -- the judicial system.
7    Q.  Okay.  And that -- that one also addressed a jail
8  administration?
9    A.  Investigations, yes, sir.
10    Q.  Okay.
11    A.  You'd have to investigate all the -- all -- if
12  they're suicidal, you can't just say, well, he's
13  suicidal.  Well, you have to -- you have to investigate.
14    Q.  But were those two courses special investigative
15  topics, which is 3232, and 3200 investigations, were
16  they -- did they address substantively issues concerning
17  the handling of suicidal detainees?
18    A.  Very general.
19    Q.  Okay.
20    A.  Not --
21    Q.  And according to Exhibit No. 1, you were no
22  longer a reserve officer on September 30th, 1997,
23  correct?
24    A.  That's correct, sir.
25    Q.  At that point, or the fall -- during the fall of

12  (Pages 42 to 45)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 46

1  1997, you became executive -- strike that.
2      During the fall of 1997, I think it was
3  October 1st, you became police chief for the City of
4  Weslaco?
5      A.  That is correct.
6      Q.  Okay.  What were your job duties as the police
7  chief for the City of Weslaco?
8      A.  To oversee the -- the department, the police
9  department, budget, and also the -- making sure
10 that -- that the requirements for TCLEOSE on each peace
11 officer were met.
12     Q.  Okay.  Before I move on, Chief, the last page of
13 Exhibit No. 1 lists some courses from September 1st,
14 1987 through August 31st, 1989, do you see that, sir?
15     A.  '88, '89?  Recognition, child abuse and neglect.
16     Q.  Right.
17     A.  Is that what you're talking about?
18     Q.  Right.  And in the -- and the two courses that
19 you took during that timeframe were Course No. 3601
20 recognition of child abuse?
21     A.  Yes, sir, patrol tactical.
22     Q.  Patrol tactical, which is Course No. 3300?
23     A.  Yes, sir, uh-huh.
24     Q.  Did these courses address issues of handling
25 detainees with mental illness and who are suicidal?

Page 47

1      A.  The recognition of child abuse or neglect.
2      Q.  It did?  Tell me -- tell me what it taught you.
3      A.  Well, it showed us autistic and also when they
4  get real angry and -- I can't find the word right now.
5  Bipolar.
6      Q.  Well, and did -- did these courses address issues
7  of identification, screening and monitoring of detainees
8  inside a -- a jail?
9      A.  No, no.
10     Q.  Okay.
11     A.  I mean, they're strictly out on the field.
12     Q.  Okay, okay.  Now, the last course that we see on
13 Exhibit No. 1 is dated -- was from 1985, and for the
14 timeframe of 19 -- of September 1st, 1985 through
15 August 31st, 1987, correct?
16     A.  Uh-huh, that's correct.
17     Q.  And that's called -- that's Course No. 9999,
18 that's other inservice training?
19     A.  Yes, sir.
20     Q.  And that was done by the Texas Department of
21 Public Safety.  What does LEA stand for?
22     A.  Law Enforcement Academy.
23     Q.  Okay.  And it shows that you -- you obtained 957
24 hours of course work?
25     A.  Yes, sir.

Page 48

1      Q.  And is that -- was that provided like on a weekly
2  basis at DPS, or how did that work?
3      A.  No, that was through the inservice, two weeks
4  inservice.
5      Q.  Two weeks inservice?
6      A.  Yeah, uh-huh.
7      Q.  Okay.  And did that course, what were the -- what
8  were the topics covered by that Course 9999 back in --
9      A.  Field work, outside highway patrolman work,
10 traffic enforcement, criminal enforcement, and that's
11 basically what it did.
12     Q.  Okay.  Did that course include any topics
13 concerning the identification, screening and monitoring
14 of suicidal detainees in -- in the jail confines?
15     A.  Yes, sir, it's some of the training mandates for
16 the State --
17     Q.  Yeah.
18     A.  -- of Texas, you covered working with -- with
19 suicidals and -- and special needs subjects
20 identification.
21     Q.  I understand those are the requirements, but I'm
22 saying did you -- were you actually -- did the course
23 work address those issues?
24     A.  Yes, sir.
25     Q.  In that course work 9999?

Page 49

1      A.  Yes, sir.
2      Q.  Okay.  And it did address how to identify, screen
3  and monitor detainees who were going to be booked and
4  incarcerated?
5      A.  Yes, sir.
6      Q.  Okay.  And how many hours were dedicated to that?
7      A.  Oh, I would say, anywhere from two to four hours.
8      Q.  Okay.  And when you get credit for two or four
9  hours worth of course work, is it actual two to four
10 hours worth of -- of time that you spend on it?  Or is
11 it 50 minutes, let's say, for an hour and you still get
12 the credit for one hour?
13     A.  No, we get two to four hours.
14     Q.  Two to four?  Whatever time you spend inside the
15 classroom?
16     A.  That is correct.
17     Q.  That's the number of credit hours you get?
18     A.  Yes, sir.
19     Q.  Okay.  Even though you said you became an Hidalgo
20 County reserve officer in 1981, am I correct in stating
21 that this Exhibit No. 1, which -- which reflects your
22 course history and your training, does not reflect any
23 type of courses or training from -- prior to
24 September 1st, 1985, is that correct?
25     A.  That's correct, uh-huh.

Hill & Romero
Certified Court Reporters

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 50

1    Q. Okay. Were those -- could those courses be
2    recorded somewhere else, or do you know why that is?
3    A. No, I sure don't. Maybe they're -- they weren't
4    required at that time, that's the only thing I can think
5    of. Because everything that's on here is a required
6    course.
7    Q. But when you -- when you graduated from the
8    academy --
9    A. Uh-huh.
10   Q. -- and you were first a -- and you were a trooper
11   back in 1978, there were requirements -- there were
12   requirements that you continued training education
13   courses, right?
14   A. Yeah, every two years.
15   Q. Every two years?
16   A. Yes, sir.
17   Q. Okay.
18   A. As mandated by the State.
19   Q. So --
20   A. Inservice.
21   Q. Okay, inservice. So would it be fair to say that
22   from the time you graduated the academy in 1978 -- or
23   was that '77?
24   A. Well, school of '77, graduated in '78.
25   Q. Okay. After graduating from school in '77 --

Page 51

1    A. Uh-huh.
2    Q. -- through 1985, there were -- are no courses
3    that are recorded in this Exhibit No. 1?
4    A. I don't believe so, not after the two years of
5    inservice.
6    Q. Okay. And am I -- so am I correct in saying
7    that?
8    A. Yes, sir.
9    Q. So by virtue of being employed at the Hidalgo
10   County Sheriff's Office as a reserve officer you kept
11   your peace officer's license, correct?
12   A. That is correct.
13   Q. And like you -- like we just discussed, you
14   continued with training?
15   A. Yes, sir.
16   Q. Okay. While -- while you were at the police
17   academy, the DPS Police Academy, Chief Martinez, was
18   there any specific course on jail administration that
19   you were required to take?
20   A. Not specific, it's all in general.
21   Q. And while at the DPS Academy, did you receive any
22   jail training on handling detainees with mental health
23   problems, including suicide, in a specific course?
24   A. That's correct. Yes, we did.
25   Q. You did?

Page 52

1    A. Yeah.
2    Q. Okay. How long was that course you said?
3    A. Well, all throughout the academy there's certain
4    things that are talked about, arrestees, detainees, and
5    there's always talk about the handling of special needs
6    prisoners.
7    Q. And those special needs issues, for these
8    prisoners did they include identification, screening,
9    booking and monitoring?
10   A. Yes, sir.
11   Q. So when you applied for position of chief of
12   police -- Weslaco chief of police in 1997, would it be
13   correct to say that you had 15 years of experience as an
14   executive director of the Boys & Girls Club and that you
15   had five years of experience as a full-time law
16   enforcement officer with DPS?
17   A. That's right, plus reserve time is not recorded
18   on there. Well, it is. It is, reserve time 16 years
19   and four months.
20   Q. And during that reserve time and as a reserve
21   officer, did you have any supervisory duties over
22   anybody?
23   A. Yes, sir.
24   Q. Okay. How many -- who did you supervise?
25   A. Other reserve officers.

Page 53

1    Q. Did you have any -- were you required to
2    supervisor jailers?
3    A. Yes, sir.
4    Q. And at which jail?
5    A. Hidalgo County Sheriff's Department.
6    Q. Were you required, as part of your job, to
7    perform evaluations on jailers concerning their work
8    practices and whether they're meeting the -- meeting
9    their job description?
10   A. Not on -- not a -- a regular evaluation that was
11   done by full-time employees.
12   Q. Okay.
13   A. We were -- as a reservist, you're considered a
14   reserve officers. You have supervisory -- if you're
15   from the rank of sergeant all the way up to major, you
16   have supervisory responsibilities, other
17   than -- than putting it down on paper.
18        The regular lieutenant, the regular sergeant,
19   would -- we would work there only when someone was going
20   to be off.
21   Q. Okay.
22   A. Or someone -- that's what a reserve does.
23   Q. Okay. So you cover for --
24   A. You cover for regular police officers.
25   Q. Okay.

14 (Pages 50 to 53)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 54

1    A. Regular deputies.
2    Q. And during the -- and as a reserve officer, when
3  you covered for the full-time officers, you were
4  never -- were you ever assigned day-to-day activities,
5  let's say, over the jail?
6    A. No, sir.
7    Q. Or the jailers, for that matter? Is that a no?
8    A. Yes, sir.
9    Q. Okay. What prompt -- or who prompted you, or why
10  did you want to serve as police chief for the City of
11  Weslaco in 1997?
12    A. I liked law enforcement, and I like
13  administration, and I wanted to get back into law
14  enforcement.
15    Q. Chief Martinez, who was the mayor back then?
16    A. The mayor back then was -- I want to say Jo
17  Sanchez -- no, I'm sorry, Dr. Cuellar, Armando Cuellar.
18    Q. Okay. And who was the city manager?
19    A. The city manager back then was -- I want to say
20  Frank Castellanos, that was the second time. The first
21  time -- the first city manager -- yeah, I think it was
22  Frank.
23    Q. And is in 1997 that we're talking about?
24    A. Yes, sir. Frank Castellanos the one that hired
25  me.

Page 55

1    Q. Is he still the city manager?
2    A. No, sir, he's personnel now.
3    Q. Is he still employed by the City of Weslaco?
4    A. He's employed by the City of Weslaco.
5    Q. And do you still keep in touch with
6  Mr. Castellanos?
7    A. No, sir.
8    Q. What did Mr. Castellanos and the City of Weslaco
9  require that you do before becoming chief of police?
10    A. Well, we fill out an application, interview, be
11  selected, and then recommended by the recommendations be
12  made -- be in the top three selection, and then
13  recommended by the mayor and commissioners.
14    Q. And chief, were there other persons completing
15  for this position at the time?
16    A. Yes, there were.
17    Q. Who were those persons, do you remember?
18    A. Yes, Perez, Joe Perez, who just recently
19  resigned. Joe Perez, it was Victor Escalone, it was
20  DPS -- retired DPS.
21    Q. He was retired DPS?
22    A. Yes, sir. And myself.
23    Q. Okay. Who was -- who was the chief immediately
24  before you were appointed?
25    A. They went through several, three months, two

Page 56

1  months, one year.
2    Q. And the last one?
3    A. Big turnover. The last one was, I think, Garza
4  who is now an attorney.
5    Q. What's his first name?
6    A. I can't remember his first name, Chief Garza.
7  I'm sure he's --
8    Q. Okay. And so you first assumed the position of
9  Weslaco police chief in October of 1997, correct?
10    A. That's correct.
11    Q. What departments did you oversee as chief of
12  police --
13    A. All of them.
14    Q. -- for Weslaco?
15    A. All of the departments.
16    Q. And would those departments, would they include
17  the communications department?
18    A. Yes, sir.
19    Q. Would they include the jail?
20    A. Yes, sir.
21    Q. The --
22    A. CID.
23    Q. What is CID?
24    A. Criminal investigation division. Patrol
25  division, community policing.

Page 57

1    Q. Community?
2    A. Community policing.
3    Q. Okay.
4    A. DEA task force unit.
5    Q. Okay.
6    A. Narcotics unit. And that's it.
7    Q. So we have the jail, you have -- we have the
8  communications department?
9    A. Yes, sir.
10    Q. And that's where you have the dispatchers?
11    A. Yes, sir.
12    Q. Okay. The criminal investigation
13  department -- division?
14    A. Yes, sir.
15    Q. Patrol division?
16    A. Yes, sir.
17    Q. Community policing?
18    A. Yes, sir, division.
19    Q. Division? DEA task force?
20    A. HIAT task force.
21    Q. And narcotics?
22    A. And also, we had an officer assigned to the FBI
23  task force.
24    Q. And from the time you first became police chief
25  in October of 1997 through today, the Weslaco Police

15  (Pages 54 to 57)

Electronically signed by Anica Diaz (001-137-509-0044)          031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 58

1    Department operates a municipal jail, correct?
2        A. That's correct.
3        Q. And as the Weslaco police chief, you were the
4    final policy maker regarding jail operations --
5        A. That's correct.
6        Q. -- during your tenure as chief of police?
7        A. That's correct.  With the assistance of our -- of
8    our captains, and lieutenants, and sergeants, but I was
9    the final approval.
10       Q. Okay.  And in May of 1997, who were the -- who
11   assisted you with --
12       A. Captain --
13       Q. -- the jail operations?
14       A. In '97.
15       Q. No, no.  In -- I'm sorry, strike that question.
16           In May of 2007, who assisted you with the
17   day-to-day operations of the jail?
18       A. Captain Walinsky.
19       Q. And Captain Walinsky, what percentage did you --
20   did you have him out on patrol?
21       A. No, sir.
22       Q. He was inside?
23       A. Yes, sir.
24       Q. And his job duties as a captain, what did they
25   include?

Page 59

1        A. To oversee the -- the jail, administer -- the
2    personnel.
3        Q. And that would be personnel over the jail or over
4    the entire police department?
5        A. The jail.
6        Q. The jail, okay.
7        A. The jail and then other duties, grant -- assist
8    with grants.
9        Q. Would that be grant writing?
10       A. Grant writing.
11       Q. Okay.
12       A. And also --
13       Q. For the jail?
14       A. -- supplies for the -- yeah, for the jail --
15       Q. Okay.
16       A. -- and for the entire department.
17       Q. Okay.
18       A. The fleet, the motor vehicle fleet.
19       Q. That would be all the police fleet?
20       A. All police vehicles, yeah.
21       Q. Okay.  So what -- what percentage of his day
22   would you say was dedicated towards operating, running
23   the jail.
24       A. I would say about -- anywhere from 40 to 60
25   percent.

Page 60

1        Q. Okay.  The rest of his time, the remaining, I
2    guess, 60 to 40 percent depending, what -- what would he
3    do that was non-jail related?
4        A. The rest of the other assignments --
5        Q. Okay.
6        A. -- that I mentioned.
7        Q. Which would be the police fleet?
8        A. The fleet, communications.
9        Q. Oh, was he over communications?
10       A. He over -- in the absence of myself and also
11   Martha Saenz, who is the administrative assistant.
12       Q. Is she like a secretary for the communications
13   department?
14       A. Well, she's more of an administrative assistant
15   for the -- for the office of the chief, and also a
16   supervisor for communications and clerks.
17       Q. Okay.
18       A. I mean, the identification clerks, ID clerks.
19       Q. So Captain Walinsky was responsible for jail
20   operations, and that would include the hiring of
21   jailers?
22       A. He sat on the -- on the interview, yes.
23       Q. Okay.  He would also -- would he also fire, have
24   the authority to fire jails and recommend that firing?
25       A. The recommendation was made.

Page 61

1        Q. Okay.  And you would be the --
2        A. I had the authority.
3        Q. You had the authority to accept the
4    recommendation or reject it?
5        A. That's correct.
6        Q. And he --
7        A. But the final say so would be from the city
8    manager.  I would make that same recommendation that was
9    made to me by the captain to the city managers, the city
10   manager is the ultimate --
11       Q. Okay.  Even over the position of jailer?
12       A. Yes, sir.  In all -- in all areas, in call city
13   run operations.
14       Q. Is that because --
15       A. Because he's the city manager.
16       Q. -- it's civil service?
17       A. No, civil service is -- the civil service is the
18   police officers.
19       Q. Okay.
20       A. Any civilian employees.
21       Q. Okay.  Well, were jailers police -- were they
22   civilian employees?
23       A. Civilian employees.
24       Q. The dispatchers?
25       A. Civilian employees.

16 (Pages 58 to 61)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 62

1    Q. But Weslaco police officers were civil service --
2    A. Civil service.
3    Q. -- employees?
4    A. Employees, yes.
5    Q. Okay.  So if there was an issue with the
6    termination of a police officer, it would be addressed
7    through civil service commission?
8    A. Yes, sir.
9    Q. However, if there was an issue with a --
10    A. Civil -- a civilian employee.
11    Q. -- a civilian employee --
12    A. It goes up to the city manager.
13    Q. -- like jailer or dispatcher it would go --
14    A. All the way up to the city manager.
15    Q. Captain Walinsky would make that recommendation
16    to you?
17    A. Or whoever is assigned or oversees that
18    particular division.
19    Q. Okay.
20    A. We had 105 personnel.
21    Q. Okay.  And then you would forward that
22    recommendation --
23    A. The recommendation would be made to me.
24    Q. -- to the city manager?
25    A. And whether or not I followed that same

Page 63

1    recommendation, then that recommendation followed up to
2    the city manager.
3    Q. Okay.  I've got you.  I understand, thank you.
4    A. Yeah.
5        (Plaintiff's Exhibit No. 2 marked.)
6    Q. (By Mr. Ruiz) Chief Martinez, I'm going to hand
7    you what's been marked as Exhibit No. 2.
8    A. Yes, sir.
9        MR. RUIZ:  I've got an exhibit for you,
10    Mr. Chaney.
11        MR. CHANEY:  Okay, thank you.
12    Q. (By Mr. Ruiz) Chief, what is Exhibit No. 2, sir?
13    A. Exhibit No. 2 is jail and detention procedures.
14    Q. Okay.  And if you -- if you look at the -- and
15    that starts with Bate stamp No. 29 at the bottom, do you
16    see that, sir?
17    A. Yes, sir.
18    Q. And it goes to 39, approximately, 10 pages?
19    A. I've got to 28.
20    Q. Okay.
21    A. Wait a minute.
22    Q. You also have 27 and 28?
23    A. 27, 28, okay.  39, yes, sir.
24    Q. And I did it like this because that's how it
25    was -- it was produced during the discovery process --

Page 64

1    A. Uh-huh.
2    Q. -- by your lawyers, and if you look at the last
3    two pages --
4    A. Yeah, it's also just the --
5    Q. -- it says -- it talks about the June 3rd letter,
6    which is Bate stamped No. 27.
7    A. Uh-huh.
8    Q. It's a memo from you, revised jail and detention
9    procedures, attached is a revision to general order 705
10    jail detention procedures.
11    A. That's correct.
12    Q. Please read and replace the two pages from your
13    Weslaco Department General Orders Manual.
14    A. Uh-huh.
15    Q. Okay.  And then No. 28 also talks about amended
16    general orders for the bicycle patrol unit and the jail
17    and detention procedures, do you see that?
18    A. Yes, sir.
19    Q. And these orders are in effect, and it says here,
20    it's a directive to your police officers, right?
21    A. Yes, sir.
22    Q. It is your responsibility to read and insert them
23    in your Weslaco Police Department General Order Policies
24    and Procedures Manual.
25    A. Uh-huh.

Page 65

1    Q. Did I read that correctly?
2    A. That's correct.
3    Q. All police personnel are to comply with these
4    directives?
5    A. That is correct.
6    Q. Did I read -- okay.  I just don't know what the
7    changes were in these policies.  I don't know if these
8    were the policies that were in effect during May of
9    2007, and if -- if so, that's fine, I just -- I'm just
10    trying to determine, what were the pages that were
11    included in June 3rd of '09 --
12    A. It tells you here, the General Order 63.08
13    bicycle patrol unit.
14    Q. Okay.
15    A. And Order 705.
16    Q. Okay.
17    A. So 705 would be this -- this entire -- entire
18    policy manual.
19    Q. So it would be from --
20    A. To make it more -- more enhance, they had very,
21    very vague policies --
22    Q. Well --
23    A. -- and what we did was -- was just enhanced --
24    Q. Okay.  Well, do you know --
25    A. -- and put a little bit more meat into the

17 (Pages 62 to 65)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 66

```
1    procedures.
2        Q.  Okay.  So these -- so what were -- what were the
3    sections of the jail and detention procedures that were
4    added?
5        A.  Responsible --
6            MR. CHANEY:  Let him finish the question.
7            THE WITNESS:  Okay, okay.  I'm sorry.
8        Q.  (By Mr. Ruiz) What sections were added with your
9    memos in '08 and in '09?
10       A.  There was no additional sections added.  What was
11   done was they were -- they were enhanced and --
12       Q.  Could you give me an example?
13       A.  For example, they would go into responsibility of
14   personnel, and it was very vague.  We added -- we added
15   B and C so we could --
16       Q.  Right.
17       A.  In addition to rules and regulations, general
18   orders Weslaco Police Department personnel assigned to
19   jail will be responsible for duties specified in any --
20           MR. CHANEY:  Chief, if you're going to read,
21   you've got to slow down.
22           THE WITNESS:  Oh, okay.
23           MR. CHANEY:  Because she's -- she's got to
24   take everything down.
25           THE WITNESS:  Oh, okay.  All right, all
```

Page 67

```
1    right.
2            MR. RUIZ:  Yeah.
3            MR. CHANEY:  So just try to remember.
4        A.  And we would add -- like we have to jail
5    commander at that time, there was no jail commander, and
6    then we -- when I got in.
7        Q.  (By Mr. Ruiz) Okay.
8        A.  And since then we didn't know we have a jail
9    commander, so we need to address, you know, a little bit
10   about the jail commander.
11       Q.  So --
12       A.  And then break it down to the jailers also.
13       Q.  Okay.  So in June of 2009, you revised the jail
14   and detention procedures by adding Section B for the
15   jail commander?
16       A.  By adding the commander.
17       Q.  And by adding Section C for jailers?
18       A.  Yes, sir.
19       Q.  If I would have looked at this -- at this jail
20   and detention procedures --
21       A.  Uh-huh.
22       Q.  -- prior to -- prior to 2008, it wouldn't have a
23   section on jail commander or jailers, correct?
24       A.  I believe, no, it would not.
25       Q.  It would not?  So I am correct in saying that
```

Page 68

```
1    there would have been -- under Roman numeral three,
2    there would not have been a section regarding the
3    responsibilities of the jail commander or of the jailers
4    in the Weslaco Police Department Jail and Detention
5    Procedures, would that be correct?
6        A.  That would be correct.
7        Q.  And that would have also been true in May of
8    2007, correct?
9        A.  That would be correct.
10       Q.  So in May of 2007, there would not have been any
11   section in the jail -- in the Weslaco Police Department
12   Jail and Detention Procedures that would set out the
13   responsibilities of a jail commander or of jailers, is
14   that correct?
15       A.  There was a -- there was for jailers, but again,
16   like I said, it was -- it was about four or five
17   bullets, and what we need to do -- after making a
18   complete assessment, and looking at other communities as
19   to their procedures, then we came up with our --
20       Q.  Okay.
21       A.  Added some additional things.
22       Q.  Well, then let me -- let's take the -- let's take
23   the timeframe of May 2007, okay?
24       A.  Okay.
25       Q.  I want to know what -- what were the jail and
```

Page 69

```
1    detention procedures look like in May of 2007?  Did it
2    include a section under Roman numeral three of
3    responsibilities of personnel that addressed what the
4    jail commander would do?
5        A.  No.
6        Q.  Okay.  In May of 2007, did the Weslaco Police
7    and -- Police Department Jail and Detention Procedures,
8    would it have a section under Roman numeral three,
9    responsibilities of personnel, that included the duties
10   and responsibilities of jailers?
11       A.  Yes, sir.
12       Q.  Okay.  And what -- you said there were several
13   bullets, correct?
14       A.  Yes, sir.
15       Q.  Do you remember -- would you know what bullets
16   were included back in 2007 in the -- the version that
17   was in effect at the time?
18       A.  I would have to look at -- at a -- I'm sure that
19   the -- they have them at the police department, they
20   should keep them, the prior -- the prior policies and
21   then new policies.
22       Q.  Okay.
23       A.  Let me see if I can see.
24       Q.  Okay.
25       A.  Like, for instance, No. 5, meet arresting officer
```

18  (Pages 66 to 69)

Electronically signed by Anica Diaz (001-137-509-0044)          031a3c36-ed2a-42b4-b528-26a2cacc5e09

## Page 70

1    at the prison and drop off from reception -- reception
2    of the prisoners.
3        Q. That was included back in May of 2007, that was
4    in here?
5        A. That was added on.
6        Q. Oh, this was added?
7        A. Usually, they -- the officer would bring the
8    prisoner in, and now, with this, they would -- once they
9    get into the Sally port -- what they call Sally port --
10   the jailer would go up and assist --
11       Q. Okay.
12       A. -- with the prisoner. In other words, they would
13   take full control of the prisoner from that point on --
14       Q. Okay.
15       A. -- to the inside.
16       Q. And what other -- and this may be kind of hard,
17   Chief --
18       A. Yeah, no.
19       Q. -- because you have two memos with two revisions,
20   and I was going to ask you, do you know which ones were
21   added in '08 and which ones were added in '09?
22       A. I mean, you're talking some time back. I'd have
23   to sit down and go over them, and then I would be able
24   to compare both.
25       Q. Okay.

## Page 71

1        A. I mean, it's impossible for me.
2        Q. All right.
3        A. I can't answer that.
4        Q. And would -- would Captain Walinsky --
5        A. Yes, sir.
6        Q. -- know?
7        A. Yes, sir.
8        Q. Do you recall if there were any changes made in
9    '08 or '09 to the Weslaco PD Jail and Detention
10   Procedures that effected Roman numeral one, purpose and
11   policy?
12       A. No, sir.
13       Q. No, there weren't any?
14       A. No, sir, there weren't any.
15       Q. There weren't any?
16       A. The policy --
17       Q. Okay. So we look at the policy under -- under
18   Roman numeral one purpose and policy --
19       A. Uh-huh.
20       Q. -- B policy, it reads, the policy set forth in
21   the jail and detention procedures are established to
22   assist department employees in determining appropriate
23   practices in dealing with the day-to-day operations of
24   the facility.
25       A. Uh-huh.

## Page 72

1        Q. Did I read that correctly?
2        A. Yes, sir.
3        Q. The procedures are as complete as necessary,
4    however, since it is impossible to cover every
5    conceivable incident that a member of this department
6    may encounter during day-to-day activities, much is left
7    to the intelligence, common sense and the discretionary
8    judgment of the individual, did I read that correctly?
9        A. That's correct.
10       Q. Okay. Then under Section C, it reads, standard
11   operating procedure. This is section was also in effect
12   in May of 2007, correct?
13       A. Yes, sir.
14       Q. The jail and detention procedures will be
15   maintained and updated at the discretion of the chief of
16   police or the jail supervisor?
17       A. Uh-huh.
18       Q. Is that correct? Did I read that correctly?
19       A. That's correct, yes, sir.
20       Q. The jail supervisor will also be responsible for
21   updating the manual and distributing the procedure to
22   all jail employees. Did I read that correctly?
23       A. Yes, sir.
24       Q. Jail employees will maintain proficiency with all
25   jail and detention procedures. Did I read that

## Page 73

1    correctly?
2        A. That's correct, sir.
3        Q. This -- this section talks about a jail
4    supervisor?
5        A. Yes, sir.
6        Q. Would that -- was that Captain Walinsky's title
7    as well?
8        A. Yes, sir.
9        Q. During your tenure?
10       A. Yes, sir.
11       Q. Okay. And would that have been true in May of
12   2007?
13       A. Yes, sir.
14       Q. He would have been captain, but he also would
15   have been the jail supervisor?
16       A. Yes, sir.
17       Q. All right. And under this policy -- okay. The
18   last section under -- on Page 1 of Exhibit No. 2, it
19   reads, command and responsibility, do you see that, sir?
20       A. Yes, sir.
21       Q. Under a command it says, the city -- the Weslaco
22   City Jail is overseen by the jail commander and is
23   accountable to the chief of police. Did I read that
24   correctly?
25       A. That is correct.

19 (Pages 70 to 73)

Page 74

1    Q. Okay. But you said earlier you still were the
2  final -- had the final say with respect to jail
3  operations, correct?
4    A. Yes, sir.
5    Q. Okay. Besides the responsibilities of personnel
6  under Roman numeral three, and how you discuss the
7  additions to the section of jail commander and the
8  addition of several bullets to the jailer -- Section C
9  of jailers, do you recall any other changes that were
10 made in 2008, Chief Martinez?
11   A. Let me look at this. Only authorized personnel
12 are allowed in the jail facility, under jail security.
13 It used to be that they could walk in there and -- and
14 visit with the prisoners, and that --
15   Q. What section is that, sir?
16   A. That's on jail security.
17   Q. What number?
18   A. Section 5.
19   Q. No. 5, okay. Section 5, okay. Oh, No. 3?
20   A. Yes, sir.
21   Q. That was added in --
22   A. And No. 4.
23   Q. Okay.
24   A. And No. 5.
25   Q. So 3, 4 and 5 were added -- Nos. 3, 4 and 5 under

Page 75

1  Roman numeral 5 of jail security --
2    A. Yes, sir, I believe so.
3    Q. -- were not included in the -- in the Weslaco
4  Jail and Detention Procedures in May of 2007, correct?
5    A. Well, the jail equipment with a video
6  surveillance system to insure the safety and security
7  was. This would be monitored by jailers and
8  communication personnel. That was -- that was in there.
9    Q. Now, let me ask you a question about that, Chief.
10 The video surveillance system in May of 2007, were
11 jailers, did they have access to the monitors, or was it
12 only the dispatchers?
13   A. The dispatchers has access to the monitor. The
14 jailer, whenever he's not booking, had a monitor in his
15 office.
16   Q. Okay.
17   A. Which was a little -- a little -- it used to be a
18 holding cell --
19   Q. Okay.
20   A. -- and that was converted into an office for the
21 jailers.
22   Q. Okay.
23   A. Whenever they were not booking somebody, or they
24 weren't -- they sat and they monitored the cells.
25   Q. And that -- that monitor, it monitored all of the

Page 76

1  cells?
2    A. Yes, sir.
3    Q. Okay.
4    A. Yes, sir.
5    Q. It has -- it had split screens?
6    A. Yes. It's got a little square screens where --
7    Q. Okay.
8    A. -- if they wanted one individual, they would push
9  certain -- and it would give them just one screen.
10   Q. Okay. And that was the set up in May of 2007?
11   A. That's correct, sir.
12   Q. And was -- was that video surveillance equipment,
13 was it functional, was it working, on May 17th of 2007?
14   A. Yes, sir.
15   Q. Okay. And if the -- if the jailer is not in the
16 room, you said it's a -- it's a room, right?
17   A. Uh-huh.
18   Q. Where this --
19   A. In his office.
20   Q. In his office, where the -- where the monitor
21 with the split screen --
22   A. Uh-huh.
23   Q. Where the -- where the monitor and the
24 split -- where the split screen is located, then there
25 would be nobody monitoring the inmates, correct?

Page 77

1    A. That's not what I said.
2    Q. Okay.
3    A. I said the dispatchers. It's in the dispatchers
4  office and in the jailers office.
5    Q. Okay. So there's -- dispatchers have --
6    A. Yes, sir.
7    Q. -- would be monitoring?
8    A. Yes, sir.
9    Q. From the --
10   A. They constantly monitor.
11   Q. From the communications department?
12   A. Yes, sir.
13   Q. And let me slow you down there because I'm going
14 to ask you a couple of questions --
15   A. Okay, okay.
16   Q. -- and you're getting a little bit ahead of me.
17     So in May -- on May 17th of 2007, there were
18 monitors in the female cell?
19   A. Yes, sir.
20   Q. And the female cell can house more than one
21 female detainee, correct?
22   A. Yes, sir.
23   Q. And you're saying -- you're testifying that the
24 surveillance equipment inside that cell on May 17th was
25 functioning?

20  (Pages 74 to 77)

Page 78

1    A. Yes, sir.
2    Q. And that the jailer on duty on May 17th, or any
3 jailer on duty on May 17th, would have been able to
4 monitor the detainee activity inside the cell and the
5 detainees by going to his office and viewing the
6 monitor?
7    A. Yeah, if he was in his office.  That's what I
8 stated.
9    Q. If he was in his office?
10   A. Right.
11   Q. Am I correct?
12   A. That is correct.  If he was booking, then he
13 would not have any --
14   Q. Ability to monitor?
15   A. Ability to monitor.
16   Q. Okay.
17   A. Yeah.  When there was nothing -- everybody was
18 put up, then he would go into his office and do the
19 paperwork, whatever, and he's monitoring the cells.
20   Q. Okay.  You also said that the dispatchers, and
21 that would be persons in the communications department,
22 correct?
23   A. That's correct, sir.
24   Q. That's a separate department from the?
25   A. Yes.

Page 79

1    Q. -- from the jail, correct?
2    A. Yes, sir.
3    Q. They would have access or they would also monitor
4 detainees inside the -- the Weslaco City Jail, correct?
5    A. That is correct.
6    Q. And on May 17th, 2007, the video surveillance
7 equipment for the female cell where Maricela Trevino was
8 held was functioning?
9    A. I believe so, yes, sir.
10   Q. Okay.  And so dispatchers were also -- would have
11 been able to monitor Maricela Trevino on May 17th, 2007?
12   A. That is correct.
13   Q. Okay.  And is that your understanding of what
14 happened?
15   A. Yes, sir.
16   Q. Okay.  And the dispatchers in the communications
17 department, they also fall under your leadership and
18 supervision as police chief, right?
19   A. Yes, sir.
20   Q. I'm interested, Chief Martinez, in knowing
21 whether in -- in June of 2009 or in May of 2008, whether
22 there were any additions, or changes, or amendments to
23 the section entitled booking procedures, Roman numeral
24 seven?
25   A. No, sir, not that I can think of.

Page 80

1    Q. Have you had a --
2    A. This was the final amendment -- amendments that
3 were made, and they went in effect as of 5/1 of '05.
4    Q. Well, and the reason I was asking you -- right.
5 That's --
6    A. Okay.
7    Q. But the memos on the last two pages --
8    A. Uh-huh.
9    Q. -- they show that there were amendments to the
10 7/05 general order?
11   A. Yeah.
12   Q. Do you see that?
13   A. Uh-huh.
14   Q. And so if you notice the first page of Exhibit
15 No. 2 --
16   A. Uh-huh.
17   Q. -- it doesn't say effective May 6th of 2008.
18   A. Uh-huh.
19   Q. And it doesn't say effective June 3rd of 2009, it
20 keeps the May 1st, '05 date.
21   A. Right, sir.
22   Q. That's why I was -- that's why I was wondering
23 whether any changes were made after May of 2007 to these
24 policies, booking specifically?
25   A. We added female -- added female booking

Page 81

1 personnel, so --
2    Q. Okay.  What's --
3    A. Let me see if they've got something on personnel.
4 I know that we added -- because that was a -- that
5 was -- I think there's something on there where it says
6 that females will search females.
7    Q. Oh, on -- if you look at Roman numeral -- I mean,
8 Page No. 37.
9    A. Let me see, 37.
10   Q. Booking procedures Roman numeral seven, and then
11 it says search the inmate?
12   A. Yes.
13   Q. Pat down on same sex inmates only?
14   A. Yes, that's --
15   Q. Is that the section you're talking about?
16   A. Yes, sir.
17   Q. And it's underlined?
18   A. Yes, sir.
19   Q. Do you recall the year that this -- that section
20 was added to the Weslaco PD jail and detention
21 procedures?
22   A. That was that year that -- that the incident
23 occurred.
24   Q. So that --
25   A. That was the recommendation that was made

21 (Pages 78 to 81)

Electronically signed by Anica Diaz (001-137-509-0044)                                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 82

1    by -- by the jail commissioner.
2        Q. You mean by the Advocacy, Inc. --
3        A. Advocacy, Inc.
4        Q. -- Organization?
5        A. Yeah.
6        Q. Okay. So Advocacy, Inc. --
7        A. Recommended that we have female jail personnel.
8    We didn't have -- we had nothing but male personnel.
9        Q. So prior to -- so in May of 2007, your jail
10   personnel was exclusively male?
11       A. Right.
12       Q. Okay. So this change that was suggested to you
13   by Advocacy, Inc. happened after the suicide incident of
14   Maricela Trevino, correct?
15       A. The way -- the way that we used to do this was,
16   we had three female officers on the field, police
17   officers females.
18       Q. And you're talking about prior to the --
19       A. Yes, sir.
20       Q. -- inclusion of this --
21       A. Yes, sir.
22       Q. Of this --
23       A. Yes, sir.
24       Q. -- policy?
25       A. That's how we used to -- that's how business was

Page 83

1    being conducted.
2        Q. Okay.
3        A. You would bring the female officer in to do a
4    full, you know, pat down, or disclothe another female
5    officer, if it was led to believe that -- that either
6    she was in possession of drugs, or there was something
7    there that needed to be -- that need to be searched.
8        The men would very lightly just tap over on the
9    pockets, nothing was in the pockets and that was it,
10   because we wouldn't pat down the females. And
11   that's -- that's how we did it.
12       Now, the recommendation to bring in --
13   advocacy group said, well, instead of taking a police
14   officer off the road and their responsibilities as peace
15   officers, why don't you hire some female jailers,
16   civilian jailers. And the recommendation was taken and
17   we did hire female.
18       Q. Okay.
19       A. We now have -- well, they now have female -- when
20   I left they had female jailers and male jailers.
21       Q. And --
22       A. And then we have to have one female, one male
23   jailer. In the past it was just one -- one jailer
24   working.
25       Q. Okay. So -- and this change, with respect to the

Page 84

1    hiring of female jailers, happened in what year, Chief
2    Martinez?
3        A. In -- right after the -- the incident with
4    Maricela Trevino.
5        Q. So that happened in 2007?
6        A. The incident that Maricela was --
7        Q. May 17th.
8        A. May 17th?
9        Q. 2007.
10       A. Yes, sir.
11       Q. And so would these changes --
12       A. They --
13       Q. Would it be fair that the Advocacy, Inc.
14   investigation, whenever it was --
15       A. Uh-huh.
16       Q. -- after its findings, it suggested, and you
17   accepted their suggestion, to now hire female jail
18   personnel, is that correct?
19       A. Their -- their -- their conclusion of the
20   investigation was that nothing was done wrong, that we
21   were in compliance with everything, that we did what was
22   supposed to be done. But they would offer some
23   recommendations so that if anything like that were to
24   happen again there would not be a question.
25       MR. RUIZ: Okay. I need to object as

Page 85

1    nonresponsive.
2        THE WITNESS: Okay, that's fine.
3        Q. (By Mr. Ruiz) Let me ask you the question again,
4    Chief Martinez. It was at the suggestion of Advocacy,
5    Inc., after they conducted an investigation, that the
6    City of Weslaco agreed to hire female jail personnel, is
7    that correct?
8        A. That's correct.
9        Q. And do you know what date and year that happened?
10       A. That was on the same year, immediately
11   thereafter.
12       Q. Okay. So --
13       A. Three months, four months after.
14       Q. Three or four months after?
15       A. Uh-huh.
16       Q. But it was -- but the City of Weslaco didn't make
17   this personnel change in hiring female jailers by
18   itself, right? That was something that was prompted by
19   the Advocacy, Inc. investigation, is that correct?
20       A. That was something that was recommended and
21   accepted by -- by me.
22       Q. By you?
23       A. Yes, sir.
24       Q. But only after Advocacy, Inc. made the
25   suggestion, correct?

22  (Pages 82 to 85)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 86

1     A. Yeah, upon making the suggestion.
2     Q. Okay.
3        MR. CHANEY: Since we've been going about an
4  hour and a half, you think we could --
5        MR. RUIZ: Yes, sir.
6        MR. CHANEY: -- take a break?
7        MR. RUIZ: We can take a break, sure.
8        THE VIDEOGRAPHER: We're off the record at
9  10:33 a.m.
10       (Break was taken at 10:31 a.m. - 10:42 a.m.)
11       THE VIDEOGRAPHER: We're back on record at
12 10:44 a.m.
13    Q. (By Mr. Ruiz) Chief Martinez, we've taken a brief
14 break.
15    A. Yes, sir.
16    Q. Mr. Chaney has asked to locate the policies, the
17 jail and detention procedures that were in effect in
18 May of '07. I'm going to go ahead and move on to
19 another area, okay?
20    A. Okay, sir.
21       (Plaintiff's Exhibit No. 3 marked.)
22    Q. (By Mr. Ruiz) I'm going to hand you
23 Exhibit No. 3.
24    A. Okay.
25    Q. And give you an opportunity to review that.

Page 87

1     A. Okay.
2     Q. And what is Exhibit No. 3, sir?
3     A. That's the oath of office.
4     Q. And this oath of office is for yourself, right?
5     A. Yes, sir.
6     Q. And it was when you took the oath of office in
7  June of 2003?
8     A. Yes, sir.
9     Q. Would that be correct?
10    A. Yes, sir.
11    Q. So -- so you were chief of police from 1997 to
12 what year, Chief Martinez?
13    A. Okay. It was '97 to -- well, I came back on 2003
14 again for the second time.
15    Q. You came back in February of '03?
16    A. Yeah.
17    Q. And you took this --
18    A. June of '03.
19    Q. You took this oath in June of '03?
20    A. June of '03.
21    Q. Is this the same exact oath you took in
22 October of 1997?
23    A. No, sir, it's not.
24    Q. Why is it different?
25    A. Because I left -- I was -- I was wrongfully

Page 88

1  terminated.
2     Q. Okay.
3     A. And returned -- I was then rehired and was given
4  the oath again.
5     Q. Okay. So you brought a lawsuit against the City
6  of Weslaco?
7     A. Did I brought -- bring a lawsuit?
8     Q. Yes.
9     A. When?
10    Q. After -- after you were terminated?
11    A. After my wrongful termination?
12    Q. Yes, sir.
13    A. Yes, I did.
14    Q. And did you file this in state or federal court?
15    A. That was -- I think it's federal court.
16    Q. Federal court. And what were -- why were you
17 terminated?
18    A. I think that's -- well, wrongfully terminated. 1
19 think what happened is that there was allegations made
20 that I would -- I would not allow a city official to
21 take charge of a division in my department, someone who
22 had no authority as a law enforcement officer, and I got
23 fired for that.
24    Q. What division was it in?
25    A. Narcotics.

Page 89

1     Q. Okay. And who was the officer that -- that
2  claims that you did not give him authority to handle
3  that?
4     A. The mayor.
5     Q. And who was the mayor at that time?
6     A. Buddy De La Rosa.
7     Q. Who is current mayor right now?
8     A. Yes, sir.
9     Q. Okay.
10    A. Well, he was a commissioner at that time.
11    Q. Oh, he was a commissioner?
12    A. Yeah.
13    Q. Okay. And so what were your allegations in your
14 lawsuit against the City of Weslaco?
15    A. Wrongful termination.
16    Q. Right. But based on what, sir?
17    A. Retaliation.
18    Q. Okay. You were retaliated because you did not
19 let a certain employee --
20    A. Exactly.
21    Q. -- take over the narcotics division?
22    A. Yes, sir.
23    Q. And who was the employee that you did not allow
24 to handle the narcotics division?
25    A. Who was the employee?

23 (Pages 86 to 89)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 90

1    Q. Right.
2    A. No, the commissioner wanted to oversee. He
3  wanted to know who, when and where raids were going to
4  be made.
5    Q. Raids?
6    A. The narcotic busts.
7    Q. Drug raids?
8    A. Yes.
9    Q. And narcotic raids?
10   A. Yes.
11   Q. He wanted to know ahead of time?
12   A. Yes.
13   Q. And you refused to --
14   A. Yes, that's correct.
15   Q. -- provide that information?
16   A. Yes, correct.
17   Q. And so after your lawsuit you were reinstated?
18   A. Well, no, I was reinstated -- well, when I
19  attempted to do the lawsuit I was reinstated, so when I
20  got reinstated --
21   Q. As police chief, right?
22   A. As police chief, yeah.
23   Q. Right.
24   A. Then I was in there for the long-term, the 11
25  years.

Page 91

1    Q. So then you went from --
2    A. And then from --
3        MR. CHANEY: Let him ask you --
4        THE WITNESS: Okay, I'm sorry.
5    Q. (By Mr. Ruiz) Right. And so you hired a lawyer
6  to file a lawsuit, and to -- to get your job back,
7  correct?
8    A. That's correct.
9    Q. And --
10   A. To clear my name.
11   Q. And to clear your name?
12   A. Yeah, because there was a whole bunch of stuff
13  that was being said that was untrue.
14   Q. Okay.
15   A. I was --
16   Q. And that case did not go to trial, correct?
17   A. No, sir. No, sir.
18   Q. Am I correct?
19   A. That's correct.
20   Q. And what ultimately happened was that you were
21  reinstated as police chief some time in 2003?
22   A. And the city manager was fired.
23   Q. Okay.
24   A. Because he was the one that -- that fired me.
25   Q. Okay.

Page 92

1    A. The city manager.
2    Q. And who was that city manager?
3    A. Frank Castellanos.
4    Q. But Frank Castellanos is still employed by the
5  city today, right?
6    A. Yeah, because he also got rehired by Buddy De La
7  Rosa.
8    Q. Okay. So after your lawsuit, it didn't go to
9  trial, and there was a settlement, I'm assuming, is that
10  correct?
11   A. That's correct.
12   Q. And as a result of the settlement, part of the
13  relief that you were given was that you were going to
14  have your job back as police chief, correct?
15   A. That's correct.
16   Q. And that happened in 2003 at some point?
17   A. That's correct.
18   Q. And in June of 2003 you took the oath of office,
19  correct?
20   A. That's correct.
21   Q. And that's the oath of office that's presented to
22  you in Exhibit No. 3, correct?
23   A. That's correct.
24   Q. And let me -- and that oath of office states --
25  and it's notarized, correct, at the bottom?

Page 93

1    A. That's correct.
2    Q. That you agree to pre -- to preserve, protect and
3  defend the Constitution and laws of the United States
4  and of this State, did I read that correct?
5    A. So help me God.
6    Q. And I can read it -- let me read it in its
7  entirety.
8    A. Okay.
9    Q. It states that -- well, you can go ahead and read
10  it.
11   A. I, Juan Daniel Martinez, do solemnly swear or
12  affirm that I will faithfully execute the duties of the
13  office of the chief of police for the City of Weslaco,
14  of the State of Texas, and will, to the best of my
15  ability, preserve, protect and defend the Constitution
16  and laws of the United States and of this State, so help
17  me God.
18   Q. And that's your signature above the word affiant,
19  is that correct?
20   A. That's correct.
21   Q. Okay. So back in June of 2003 you agreed
22  to -- when you took that oath, you agreed that as
23  Weslaco police chief to respect and protect the
24  Constitutional rights of all persons, including the
25  young, the elderly, the physically sick, and the

24  (Pages 90 to 93)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 94

1 mentally ill as well, is that correct?
2    A. That is correct.
3    Q. And when you took your oath of office in June of
4 2003, you agreed that as Weslaco police chief, to
5 protect persons jailed at the Weslaco lockup from
6 themselves as part of your constitutional duty to
7 provide medical care during their incarceration, is that
8 correct?
9       MR. CHANEY: Could you repeat that, please?
10    A. I don't understand the question.
11    Q. (By Mr. Ruiz) Sure, sure. When you took your
12 oath of office in June of 2003, you agreed that as
13 Weslaco police chief that you were going to protect the
14 rights of persons jailed at the Weslaco lockup as part
15 of your constitutional duty to provide medical care
16 during their incarceration, is that correct?
17       MR. CHANEY: Objection, form.
18    A. That falls under the -- the duties of the chief
19 of police.
20    Q. (By Mr. Ruiz) So is that a yes?
21    A. Yes, sir.
22    Q. Okay. And because when someone is in jail, or
23 someone is behind bars, Chief Martinez, they can't go to
24 a doctor or pharmacist to take care of themselves, is
25 that correct?

Page 95

1    A. That is correct.
2    Q. And when someone is behind bars in a cell, their
3 family members and loved ones cannot care for them
4 either, is that correct?
5    A. That's correct.
6    Q. And when someone is in jail, they must rely on
7 law enforcement and jail personnel to provide medical
8 care for their serious medical needs, is that correct?
9    A. That's correct.
10    Q. And if we look at Exhibit No. 1 -- or No. 2, I'm
11 sorry. The procedures, on Page 30 --
12    A. Uh-huh.
13    Q. Above Section C, there's a section called, see
14 jailers, do you see that?
15    A. Uh-huh, yes, sir.
16    Q. And that reads, jailers are the primary providers
17 of care and custody of inmates of the Weslaco City Jail.
18    A. Uh-huh.
19    Q. Did I read that correctly?
20    A. Yes, sir, you did.
21    Q. They are responsible for the day-to-day
22 operations of the jail, including the transporting of
23 prisoners to the county jail. Did I read that
24 correctly?
25    A. Yes, sir, you did.

Page 96

1    Q. And if we look at that section in Exhibit No. 2,
2 under jailers, when we talk about primary provider care,
3 are we talking about medical care as well, sir?
4    A. First responder, immediate -- you know, just CPR,
5 first responder care. I mean, they're not doctors,
6 they're not certified nurses, they're just certified
7 first aid.
8    Q. Okay. And would you agree with me that a person
9 who -- a person may have a serious medical need for
10 psychological or psychiatric treatment?
11    A. You're asking me or you're telling me?
12    Q. I'm asking you. Would you agree with me that a
13 person may have a serious medical need for psychological
14 or psychiatric treatment?
15    A. If -- if I would agree to --
16    Q. Yes.
17    A. If a person is -- is assessed and is noted to
18 have psychological impairments, yeah, then the answer
19 would be yes.
20    Q. And someone with suicidal tendencies would also
21 have a serious medical need for mental healthcare and
22 treatment, would you agree with that?
23       MR. CHANEY: Objection, form.
24    A. Yes, sir.
25    Q. (By Mr. Ruiz) So when you took your oath of

Page 97

1 office as chief of police, with supervisory powers over
2 the jail, would you agree with me, Chief Martinez, that
3 one of the most important functions you had as chief was
4 to insure proper medical care was given to persons
5 locked up at the Weslaco lockup?
6    A. (Inaudible answer.)
7    Q. I'm sorry?
8    A. Yes, sir.
9    Q. And that was -- that's true today for the current
10 chief, and it would have been true back in May of 2007
11 when you served as chief, is that --
12    A. That's correct.
13    Q. Would you agree with me that during your tenure as chief,
14 and as part of your job for providing care to persons
15 locked up at the Weslaco jail, part of your job was to
16 ensure that your police officers, jailers and
17 dispatchers were trained in minimum jail standards?
18       MR. CHANEY: Objection, form.
19    A. They are not -- we are a holding facility, 24
20 hours, okay, or upon registration, they either go to the
21 county or they're released at that point in time. We
22 are not a jail facility, we don't fall under the same
23 standards as a detention center.
24       MR. RUIZ: Object as nonresponsive.
25    Q. (By Mr. Ruiz) Do you -- you're -- when you were

25 (Pages 94 to 97)

Page 98

1  chief of the Weslaco Police Department and over its
2  jail, people were incarcerated for more than one day,
3  correct?
4      A. On the order of the judge.
5      Q. Right.
6      A. If they magistrate within 24 hours, and sometimes
7  no more than two, no more than 72 hours.
8      Q. Okay. So up to -- up to three days?
9      A. Yes, sir.
10     Q. Okay. So people are incarcerated -- people --
11 you knew that people were going to be incarcerated at
12 the Weslaco jail lockup up to three days, correct?
13     A. That's correct.
14     Q. Okay. And that's why I was asking you, if we
15 look at these procedures, and we talk about what jailers
16 and their primary -- as the primary providers of care,
17 would you agree with me that part of your job as a chief
18 of police overseeing these jailers, knowing that there's
19 going to be people incarcerated up to three days, that
20 it was your job to insure that your police officers,
21 that your jailers and your dispatchers had an
22 understanding of minimum jail standards?
23          MR. CHANEY: Objection, form. You answered
24 that question, you don't need to answer it again. He
25 already answered it.

Page 99

1          MR. RUIZ: I don't think he answered it but
2  okay.
3          MR. CHANEY: Can we take a break?
4          MR. RUIZ: Sure.
5          THE VIDEOGRAPHER: We're off the record at
6  10:57 a.m.
7          (Discussion off the record.)
8          THE VIDEOGRAPHER: We're back on at
9  10:59 a.m.
10     Q. (By Mr. Ruiz) Chief Martinez, you want competent
11 jailers to be providing the care and custody of inmates
12 at the Weslaco City Jail, correct?
13     A. Correct.
14     Q. And in order to have a competent jailer, based on
15 your experience, training and education, that jailer
16 needs to have a basic understanding concerning the
17 medical care that needs to be provided to persons who
18 are going to be incarcerated at the jail, correct?
19     A. They need to follow procedures -- policy and
20 procedures, and that is outlined in the policy and
21 procedure.
22     Q. Okay.
23     A. As long as they follow the policy and procedure,
24 then that's -- anything outside of that
25 is -- is -- comes from them, that they want to continue

Page 100

1  their education to provide -- preferably they're going
2  to go either to the detention center somewhere.
3      Q. Okay. And Chief, I don't have the policies and
4  procedures. I don't have -- I don't have what was in
5  effect in May of 2007, that's why I can't ask you
6  questions about it.
7      A. Okay.
8      Q. But would you agree with me that your police
9  officers, your jailers and your dispatchers need to have
10 adequate training in order to identify when a detainee
11 requires medical attention? Would you agree with that?
12          MR. CHANEY: Did he not -- did you not ask
13 this before and he answered?
14          MR. RUIZ: No, it's a different question.
15          MR. CHANEY: Okay.
16     A. The -- the personnel, the jailers, people that
17 are dealing with the arrestees, should have that
18 personal knowledge and understanding of the -- of the
19 recognition.
20          Dispatchers are not jail personnel, and they
21 don't need to have that understanding. All they do is
22 report if someone is either banging on the walls, or
23 someone is either laying down, or someone is doing
24 something out of the ordinary that a normal person would
25 do.

Page 101

1      Q. (By Mr. Ruiz) But police officers and jailers do
2  need --
3      A. Police officers and jailers, yes, sir. They deal
4  with prisoners.
5      Q. And the type of training that they should have
6  because they're dealing with jailers is a training that
7  assists them in identifying detainees who suffer from
8  mental illness, would you agree with that?
9          MR. CHANEY: Objection, form. You
10 said -- just so the record is clear, Mauro, you said
11 dealing with jailers.
12          MR. RUIZ: Oh.
13          MR. CHANEY: And I think you meant dealing
14 with inmates.
15          MR. RUIZ: I'm sorry. And I'll rephrase
16 that question.
17     Q. (By Mr. Ruiz) And Chief Martinez, and in order
18 -- you need to have an adequately trained police force
19 and jailers that are trained to identify detainees, or
20 persons who are going to be incarcerated and who suffer
21 from mental illness, and what they need to do is have
22 the training to identify those persons who suffer from
23 mental illness, would you agree with that?
24          MR. CHANEY: Objection, form.
25     A. They are trained to assess their behavior, and

26 (Pages 98 to 101)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 102

1  then refer them to either a medical doctor, who will
2  then make that determination as to whether they are
3  mentally instable or not stable.
4      Q. (By Mr. Ruiz) Would you agree that identifying
5  would be the first issue that they need to learn how to
6  do as jailers and police officers?
7      A. The first thing would be to assess --
8      Q. Okay.
9      A. -- the situation.
10      Q. Assess the situation?
11      A. Uh-huh.
12      Q. And if we're talking about a jailer, would you
13  agree with me that the jailer needs to have training in
14  proper screening of persons who suffer from mental
15  illness?
16          MR. CHANEY: Objection, form.
17      A. No. No, sir.
18      Q. (By Mr. Ruiz) No. Do you -- do you believe that
19  a jailer should have proper training in monitoring --
20  adequate monitoring of individuals who suffer from
21  mental illness who are going to be incarcerated at the
22  Weslaco Police Department lockup?
23          MR. CHANEY: Objection, form.
24      A. We would -- okay. We would not incarcerate a
25  person who is assessed and then evaluated as a mental

Page 103

1  patient.
2      Q. (By Mr. Ruiz) Okay. And the person or the -- or
3  the -- what police department employee would be
4  responsible for assessing?
5      A. The first officer that -- that placed the -- the
6  person under arrest.
7      Q. Okay. That -- and there is no responsibility, in
8  your opinion, on behalf of the jailer, is that correct?
9          MR. CHANEY: Objection, form.
10      Q. (By Mr. Ruiz) To assess?
11      A. Okay. Their behavior, after they're being booked
12  and in the cell, that's where the jailer comes in.
13      Q. Okay. But that's why I'm trying to find out.
14      You're saying the first person who approaches the
15  detainee, you -- which is usually the police officer,
16  right?
17      A. Exactly.
18      Q. That police officer is the first person
19  responsible with assessing whether a detainee suffering
20  from mental illness requires medical care?
21      A. That is correct.
22      Q. Okay. It's that police officer's call to refer
23  the detainee to a doctor or a hospital, would that be
24  correct?
25      A. His primary responsibility is to contact the

Page 104

1  supervisor and to gather the supervisor, and the officer
2  on the field will agree that they're -- the assessment
3  is correct and that, yeah, 26 -- Section 26 would be in
4  order, and then they get taken before they -- MHMR.
5      Q. And a Section 26 is a reference to a Weslaco
6  Procedure 26 or a state --
7      A. State.
8      Q. Law or code?
9      A. It's a -- it's a state -- it's a -- what do you
10  call it, the statute.
11      Q. Okay.
12      A. It's a statute.
13      Q. What code is that contained in?
14      A. In -- it's a Section 26 under mental health,
15  mental retardation.
16      Q. Okay. Would that be the involuntary commitment
17  section?
18      A. That's correct.
19      Q. Okay. Are you sure it's Section 26?
20      A. Yes.
21      Q. Okay.
22      A. The officer is -- will do a 26, a doctor can do a
23  Section 26. The judge is the only one that can do a 28,
24  Section 28.
25      Q. A 28, okay. Now -- and just to be clear, because

Page 105

1  I asked you a question about screening and monitoring.
2      A. Uh-huh.
3      Q. Okay. Is it -- what is -- what is your opinion,
4  Chief Martinez, regarding the training that a jailer
5  should have regarding proper screening of persons who
6  are being booked who happen to suffer from mental
7  illness? Should they have that training?
8      A. In my opinion?
9      Q. Yes, sir.
10      A. I think they need all the training that they can
11  get, provided that it's -- that the finances are there.
12      Q. Okay. And --
13      A. To include mental --
14      Q. Screening?
15      A. Mental health, mental retardation.
16      Q. And screening, would you say since you've had
17  some exposure to -- to the -- the jail, when you were a
18  reserve officer, I believe?
19      A. Yes, sir.
20      Q. You had --
21      A. Yes, sir.
22      Q. You worked at a jail for three months?
23      A. Yes, sir.
24      Q. Would you agree with me that screening -- proper
25  screening of a detainee is vital, especially in cases

27 (Pages 102 to 105)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

1  where that detainee suffers from mental illness?
2      MR. CHANEY: Objection, form.
3      A. If the officer that's in -- that's placing the
4  person in the facility that is not being -- that has
5  been cleared medically, there's nothing wrong with them,
6  there's no blood that you see, says that this person
7  is -- is a -- should be an MHMR arrestee.
8      Then the screen is asked -- in the screening, the
9  application and the filling out of the report is where
10  they go in to asking, has he ever attempted suicide?
11  Does he see visions?  Does he hear people?  Does
12  he -- and that's the screening that is done by a jailer.
13  But that's upon recommendation by the officer making the
14  arrest.
15      Q. (By Mr. Ruiz) Okay.
16      A. So it falls -- the responsibility falls on the
17  officer making the arrest.  And then the screen is done
18  after the officer says, this person is -- is a possible
19  suicide or is -- has mental problems.
20      And once you ask the questions and stuff, then
21  the next thing would be to take him to an MHMR or call
22  in MHMR.
23      Q. But Chief Martinez, wouldn't that -- so you're
24  saying that first the responsibility is of the arresting
25  officer to determine whether there's going to be a need

1  for further medical questioning by the jail -- jailer?
2      A. There's a form.  The form -- the jailer fills the
3  form.
4      Q. Okay.
5      A. But the officer would tell him to pay particular
6  attention to the -- to the -- the questions that deal
7  with suicide, questions with deal -- and how far back,
8  when, and all this stuff.
9      Q. Okay.  So --
10      A. But that's at a detention center.
11      Q. Right.  Well --
12      A. That is -- that is minimum requirements from the
13  state detention facility.
14      Q. Okay.
15      A. And it differs from municipalities.
16      Q. Well, tell me, what's your understanding
17  regarding the minimum standards at a municipal lockup or
18  jail like the one Weslaco has?
19      A. Whatever is based on your policy and procedures.
20      Q. Okay.  And so -- and no -- municipal jails are
21  not regulated by the State of Texas?
22      A. That is correct.
23      Q. Is that correct?
24      A. That is correct.
25      Q. And so in order to insure the safety of those

1  persons being detained or incarcerated in a municipal
2  jail, it's up to the municipal -- it's up to the
3  municipality to make sure there are adequate policies,
4  procedures, and training for -- or training of the jail
5  personnel, would you agree with that?
6      MR. CHANEY:  Objection, form.  Can you
7  define adequate training?
8      Q. (By Mr. Ruiz) Well, there are
9  organizations -- you've gone to -- you've gone to many
10  seminars before, right?
11      A. Yes.  That -- basically, when you go to certify
12  as a jailer, then you go through those types of courses.
13      Now, municipality -- some municipals don't
14  require jail personnel to be certified.
15      Q. Okay.
16      A. That takes money, and then of course with the
17  money -- I mean, with that and your certification, the
18  pay that you -- that you earn is equivalent to the
19  certification.  That's why the municipalities don't
20  require jail certification.
21      Q. And so in May of 2007 the City of Weslaco did not
22  require their jailers to be certified, correct?
23      A. That is correct.
24      Q. And in May of 2007, the City of Weslaco did not
25  employ certified jailers, correct?

1      A. That is not correct.
2      Q. Okay.
3      A. You know, the individual people that -- and I
4  know that we had some certified jailers --
5      Q. Uh-huh.
6      A. -- that came in that went to school and got
7  certified, okay.  When we first started, they -- the
8  requirement is still there -- I mean, there's no
9  requirement to certify, but yet we do hire, and the
10  preference was to hire certified jailers.
11      Q. Okay.  And that was going to be my question.
12  There is no requirement that in order to work as a
13  jailer at the City of Weslaco while you were chief, that
14  the jailer was a certified jailer, correct?
15      A. There was no requirement, but it was something
16  that I wanted to --
17      Q. Okay.
18      A. I made sure that I would hire people that were
19  certified over people that weren't.
20      Q. Okay.  But in May of 2007, you also had jailers
21  who were certified and licensed, right?
22      A. Uh-huh, yeah.
23      Q. Which means licensed by the State of Texas,
24  right?
25      A. Yeah, yeah.  That's correct.

28  (Pages 106 to 109)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 110

Q. And you also had jailers who were not licensed?
A. That is correct.
Q. Okay. And I have -- the jailer on duty on May 17th, 2007, I have his -- his application. Could we look at his application --
A. Sure.
Q. -- and determine whether he was licensed --
A. Yes, sir.
Q. -- or not licensed?
A. Yes, sir.
Q. Okay.
MR. RUIZ: If you give me a second, we could go off the record, Mr. Chaney.
MR. CHANEY: Sure.
MR. RUIZ: It won't take long, Mr. Chaney.
MR. CHANEY: Not a problem.
THE VIDEOGRAPHER: We're off the record at 11:11 a.m.
(Break was taken at 11:09 a.m. - 11:11 a.m.)
THE VIDEOGRAPHER: We're back on at 11:13 a.m.
(Plaintiff's Exhibit No. 4 marked.)
Q. (By Mr. Ruiz) Okay. Chief Martinez, I'm going to hand you what's marked as Exhibit No. 4.
A. Okay, sir.

Page 111

Q. What is Exhibit No. 4?
A. It's an application for employment. It's a jailer from Alfredo Moreno, Jr.
Q. And Alfredo Moreno, Jr. was the jailer who was on duty during the -- Alfredo Moreno, Jr. was the jailer who was on duty the evening of May 17th, 2007, is that correct?
A. That's correct, sir.
Q. Okay. And if you -- and we were asking about licensing.
A. Uh-huh.
Q. There is a section in this application for employment that Mr. Moreno filled out for the City of Weslaco --
A. Yes, sir.
Q. -- back in 2001?
A. Uh-huh.
Q. September 13th of 2001 --
A. Yes, sir.
Q. -- that asks about licenses and certification?
A. Yes, sir.
Q. It's on the second page, right?
A. That's correct.
Q. That would be -- and it says, list all current licenses -- licenses or certifications you hold.

Page 112

Mr. Moreno only wrote down driver's license and he put Texas, do you see that, sir?
A. Yes, sir, sure do.
Q. He did not represent to the City of Weslaco that he had a jailer's license, is that correct?
A. That's correct.
Q. And he was hired, nonetheless, right?
A. That's correct.
Q. Now --
MR. CHANEY: What exhibit number did you make that?
MR. RUIZ: Four.
THE WITNESS: Four.
MR. CHANEY: Okay, thank you.
(Plaintiff's Exhibit No. 5 marked.)
Q. (By Mr. Ruiz) I'm going to hand you Exhibit No. 5. What is Exhibit No. 5, Chief Martinez?
A. An application for a police officer from Alfredo Moreno, Jr.
Q. Okay. This is the same gentleman who was the jailer during the evening of May 17th, 2007, correct?
A. That's correct.
Q. But this application that he fills out, he filled it out approximately one month before the suicide by Maricela Trevino?

Page 113

A. Uh-huh.
Q. On April 17th, do you see that?
A. Uh-huh.
Q. And he is applying for entry level police officer position, is that correct?
A. That's correct.
Q. And if we turn -- is it the same form that we looked at in Exhibit No. 4?
A. Yes, sir.
Q. If we looked at -- if you look at the second page, when it asks for licenses and certifications, he only listed driver's license, once again, and the issuing agency Texas DPS?
A. Uh-huh.
Q. Did I read that correctly?
A. That's correct.
Q. So in April of 2007 Mr. Moreno was not a licensed or certified jailer working for the City of Weslaco, is that correct?
A. That's correct, sir.
Q. Okay. And in -- on May 17th, 2007, when he was the jailer on duty during the evening of May 17th, 2007, he was also not licensed or certified as a jailer on that date, is that correct?
A. That's correct.

Hill & Romero
Certified Court Reporters
031a3c36-ed2a-42b4-b528-26a2cacc5e09
Electronically signed by Anica Diaz (001-137-509-0044)

Page 114

1    Q. And so just so that I can understand you, Chief
2    Martinez, the -- the responsibility for assessment of
3    someone who has -- who is arrested, and who has a mental
4    disability or a mental illness rests on the arresting
5    police officer?
6    A. Yes, sir.
7    Q. Okay. Now, at what point does the jailer have a
8    responsibility for providing that care that we discussed
9    under the Weslaco Jail and Detention Procedures a little
10   while ago? Could you explain that to me?
11   A. Okay. Whenever they're in -- in their -- in
12   their custody, when he's being placed in the cell.
13   Q. Is that during booking?
14   A. No, during -- that's after the booking.
15   Q. After the booking?
16   A. Yeah.
17   Q. Okay.
18   A. He is now placed under arrest. He's already
19   completed all his booking, and then he goes into the
20   cell block.
21   Q. Okay.
22   A. Okay. From that point on, then the -- the jailer
23   or detention officer is responsible for the welfare and
24   wellbeing of that prisoner.
25   Q. Okay. And I asked you earlier, so that we talked

Page 115

1    about the arresting officer?
2    A. Uh-huh.
3    Q. And when -- and what his responsibilities are and
4    when?
5    A. Uh-huh.
6    Q. And you've -- we've also discussed the jailer or
7    detention officer, and we discussed when his
8    responsibility to provide medical care, no?
9    A. Medical care?
10   Q. Well, okay --
11   A. You never mentioned medical care.
12   Q. Okay. When -- and this was my -- and I'm glad
13   you asked me. Thank you for asking me, I'll clarify my
14   question.
15          After the arresting police officer, you said, is
16   responsible for assessment of someone who's arrested for
17   purposes of whether they're mentally disabled or they
18   have mental illness? Did I get that correct?
19   A. Yes, sir.
20   Q. Is that what you said earlier?
21   A. The assessment is made by the arresting officer.
22   Q. Okay, okay. When does that -- when does that
23   police officer or arresting officer's responsibility
24   end?
25   A. The minute that he takes him to either MHMR Texas

Page 116

1    of whatever, after the assessment.
2    Q. Okay.
3    A. When the evaluation is done of that particular
4    prisoner, that's it. When he transports him to MHMR.
5    Q. Okay. And so the police officer has this
6    authority to make an assessment out on the field?
7    A. Yes, sir.
8    Q. Without having to come to the police department?
9    A. Yes, sir.
10   Q. Without having to come to the jail?
11   A. Yes, sir.
12   Q. And so -- and the police officer has the
13   authority to transport that -- that detainee, or the
14   person arrested, right, to a medical facility?
15   A. Yeah. He goes from an arrestee to a patient.
16   Q. Okay. Explain to me when a police officer
17   arrests someone but does not take them to a hospital,
18   instead he takes them to the Weslaco lockup.
19          What was your understanding about their
20   responsibilities when that happens, with respect to the
21   care to that detainee?
22   A. I don't believe I understand the question.
23   Q. Sure.
24   A. Repeat it.
25   Q. You gave me an example concerning the police

Page 117

1    officer -- arresting officer's assessment and transport?
2    A. Yeah.
3    Q. Correct?
4    A. Uh-huh.
5    Q. Does that happen every time, whenever a police
6    officer comes across or arrests someone with a -- who's
7    behaving -- who's behaving in an odd manner?
8    A. Yes, sir.
9    Q. Okay. Or it should happen every time?
10   A. Well, it should happen every time, yes, sir.
11   Q. Okay. And what happens -- tell me, what are the
12   responsibilities of that police officer when he arrests
13   someone with a -- with known mental illness, okay, and
14   he takes that individual to the lockup.
15   A. When you say known mental illness --
16   Q. Right.
17   A. -- you are saying that the officer knew that this
18   person that he arrested was a mental patient?
19   Q. Well, let's say the officer saw --
20   A. What is the question?
21   Q. So do you need -- so in other words, do you need
22   the --
23   A. Prior history?
24   Q. You need the -- well, what do you need? Do you
25   need the arrested person to carry their medical files

30 (Pages 114 to 117)

Hill & Romero
Certified Court Reporters