## Page 118

1  with them in order for the police officer to know that
2  they have a mental history or --
3        MR. CHANEY:  Hang on, he was just asking you
4  to clarify.
5        THE WITNESS:  Clarify that question.
6        MR. CHANEY:  You said known mental illness.
7        MR. RUIZ:  Right.
8        MR. CHANEY:  And he said, what do you mean
9  known?  That the officer knows?
10  Q. (By Mr. Ruiz) Well, let's say the officer
11  observed --
12        A.  Okay.  He assessed --
13        Q.  -- odd behavior.
14        A.  Yeah, okay.
15        Q.  Okay.  And he assessed --
16        A.  Right.
17        Q.  -- this odd behavior.
18        A.  Yes, sir.
19        Q.  But he doesn't take him to the MHMR, okay,
20  instead he takes this person with odd behavior to the
21  lockup, to the Weslaco lockup.
22        A.  Yes, sir.
23        Q.  Does he have any continuing responsibility for
24  the care of this individual?
25        A.  No, it shifts to the jail -- the jailer.

## Page 119

1        Q.  Okay.  Well, what are the responsibilities of the
2  jailer at that point, Chief Martinez?
3        A.  Well, at that point, if she fills out the
4  booking -- the booking sheet, where they fill out
5  the -- the questions that they're asked, have they ever
6  been brought for any other different mental problems or
7  whatever, they say no.
8        There's a -- there should be a question there,
9  there is a question that says if they have any -- any --
10  are they under doctor's care?  Are they under --
11        Q.  Okay.
12        A.  And if they answer truthfully that they're not,
13  then -- now, if he notices behavior that is not common
14  to people who are intoxicated, or people who are
15  drugged, but rather is talking to the wall, is seeing
16  visions or whatever, then yeah, then they calls the
17  supervisor, who is Captain Walinsky, and then calls the
18  arresting officer back in, and together, they
19  assess -- reassess that prisoner, and then take him to
20  MHMR.
21        Q.  And Chief, and in order to allow the jailer
22  to -- in order for the jailer to make that call to
23  Captain Walinsky for further assessment, the jailer,
24  would you agree with me, needs to have an understanding
25  regarding what behavior can be attributed to mental

## Page 120

1  illness and what behavior is not attributed to mental
2  illness, would you agree with that?
3        A.  Well, abnormal behavior.
4        Q.  Okay.  And since -- and -- okay, abnormal
5  behavior, right?
6        A.  Yes, sir.  Yes, sir.
7        Q.  And so is there -- did the City of Weslaco
8  provide its uncertified and unlicensed jailers with a
9  list of what would count or what would be abnormal
10  behavior so that they could do their job properly?
11        MR. CHANEY:  Objection, form.  Don't answer
12  that question.
13        MR. RUIZ:  What's wrong with that question?
14        MR. CHANEY:  Because it's argumentative.
15        MR. RUIZ:  It's not.
16        MR. CHANEY:  When you say, so they could do
17  their job properly --
18        MR. RUIZ:  Okay.  Let me -- I'll rephrase.
19  I'll be more than glad to rephrase.
20        Q. (By Mr. Ruiz) Did the City of Weslaco, during
21  your tenure as chief, and I'm -- from 1997 and at any
22  point, Chief Martinez, did the City of Weslaco provide a
23  list, or any type of document to their jailers that they
24  could refer to that would describe what is abnormal
25  behavior?

## Page 121

1        A.  I think there's -- there's addressed here about
2  using good judgment and also common sense.
3        MR. CHANEY:  Page 37, No. 4, maybe that's
4  what you're thinking of.
5        A.  Yes, sir.
6        Q. (By Mr. Ruiz) Okay.  I don't -- what is your
7  answer, sir?
8        A.  What was the question again?
9        Q.  The question was -- and I'll ask you the
10  question.
11        A.  Okay.
12        Q.  And I'll be even more specific.
13        A.  Okay.
14        Q.  Were you aware of any document that was a City of
15  Weslaco document that existed in May of 2007 that would
16  describe for your jailers or detention officers what
17  would constitute abnormal behavior of persons arrested?
18        A.  No, there's no list.  Common sense.
19        MR. CHANEY:  He just asked you if there was
20  a list, you said no, and that's the end of it.
21        THE WITNESS:  Okay, no.
22        MR. CHANEY:  That's a sufficient answer.
23        THE WITNESS:  No.
24        Q. (By Mr. Ruiz) Okay.  And were there any type of
25  other memos or directives to these jailers that you were

31 (Pages 118 to 121)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 122

1  aware of in May of 2007 that would describe for your
2  jailers and detention officers when a detainee was
3  behaving abnormally?
4      A. No.
5      Q. Okay. Now, you referenced a section under -- in
6  Exhibit No. 2, I believe.
7      A. Uh-huh, yes, sir.
8      Q. Under the booking procedures.
9      A. Yes, sir.
10     Q. Was that -- and you were -- you were pointing at
11 Section No. 4, I think, is that what you read?
12     A. Yes, sir.
13     Q. No. 4?
14     A. Yes, sir.
15     Q. Was -- do you know if that section existed in
16 May of 2007 in the policies and procedures of the -- or
17 the jail and detention procedures of the Weslaco Police
18 Department back in May of 2007?
19     A. If it existed?
20     Q. Right. Was it --
21     A. In 2007?
22     Q. Yes, sir. If --
23     A. I would need to -- I would need to look at
24 the --
25     Q. Well, and we don't have it. I'm not trying to

Page 123

1  trick you or anything.
2      A. I don't know whether --
3      Q. If you don't, that's fine.
4      A. I don't remember whether it was or it was not,
5  but I would have to look at the previous one. This was
6  done on the --
7      Q. This -- well, and -- well, and let's say after
8  this section was added, would you agree with me that in
9  order -- this Section No. 4 for a detention officer or a
10 jailer, in order to follow this booking section of
11 the -- of the jail and detention procedures --
12     A. Uh-huh.
13     Q. -- he would need some kind of training in order
14 to determine whether a subject was suffering from
15 mental -- mental illness, would you agree with that?
16     A. That they need to have some type of --
17     Q. They would need to have some kind of training in
18 order to comply and follow this section?
19         MR. CHANEY: Objection, form.
20     Q. (By Mr. Ruiz) No. 4?
21     A. No.
22     Q. No?
23     A. Because this section says complete a booking
24 card, detention report, fill according, complete the
25 medical questionnaire, which is what the police

Page 124

1  department Form 23 as well. And then it states on
2  there, inmates requiring medical attention will be seen
3  by an emergency management -- emergency medical
4  specialist.
5      Q. Okay.
6      A. Okay. Not the jailer, an emergency medical
7  specialist and treated accordingly. No inmate will be
8  denied medical attention. Subjects believed to be
9  suffers from mental illness and presenting a danger to
10 themselves or others will be evaluated by a supervisor
11 for possible Section 26.
12     Q. Okay. So let me see if I got you -- if I
13 understand you. So in order to determine whether the
14 detainee required further medical attention by EMS,
15 the --
16     A. Or MHMR.
17     Q. I'm going get there. Or further mental health
18 services --
19     A. Uh-huh.
20     Q. -- in order to determine that, the jailer or
21 detention officer first needs to fill out several
22 documents during the booking process?
23     A. Uh-huh.
24     Q. Is that correct?
25         MR. CHANEY: Objection, form.

Page 125

1          MR. RUIZ: What's your objection?
2          MR. CHANEY: Well, it just -- that's not
3  what it says. It says, do it, it doesn't say first do
4  it.
5          MR. RUIZ: Okay.
6          MR. CHANEY: It's confusing.
7      Q. (By Mr. Ruiz) Chief Martinez, in order for a
8  jailer to determine whether someone who's been arrested,
9  or a detainee, requires medical attention by EMS in
10 accordance with this section you just read --
11     A. Uh-huh.
12     Q. -- okay, the jailer first needs to complete
13 several booking cards and arrest detention reports and a
14 medical questionnaire? Am I understanding you
15 correctly?
16     A. No, sir.
17     Q. No?
18     A. No, sir.
19     Q. Okay.
20     A. If he -- if he assesses the person to be a danger
21 to himself, then he calls in EMS. If he's got cuts on
22 his hands or whatever, the first people that come in is
23 EMS.
24         EMS asks a series of questions for their report,
25 and then -- and then cards will be -- if at that point

32 (Pages 122 to 125)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 126

1  they need to call the supervisor, then the supervisor
2  gets called in.  Then when the person is being booked
3  and is going in to jail is when you fill all of
4  the -- all of the paperwork.
5      Q.  Okay.  Well, then let me ask you this question,
6  in May of 2007 was there a requirement -- and see, I
7  don't know if these -- if these polices -- this policy
8  existed in May of 2007, so I'm just going to ask from
9  what you remember.
10     A.  Yeah, sure.  Sure.
11     Q.  In May of 2007, Chief Martinez, was there a
12 requirement that your jailers or detention officers
13 complete the booking card and arrest detention report
14 fields prior to locking someone up at the Weslaco jail?
15     A.  Yes, sir.
16     Q.  Okay.  In May of 2007, was there a requirement
17 that your Weslaco jailers or detention officers also
18 complete something that was called a booking medical
19 questionnaire or form?
20     A.  A card, a form.  Yeah, not a questionnaire.
21 Medical questionnaire, no, just a form.
22     Q.  Okay.  And you know what, let me do this, let me
23 pull them out so that way we can talk about them, okay?
24     A.  All right.
25         (Plaintiff's Exhibit No. 6 marked.)

Page 127

1      Q.  (By Mr. Ruiz) Chief Martinez, I'm handing you
2  Exhibit No. 6.
3      A.  Okay, sir.
4          MR. CHANEY:  How many pages is No. 6?
5  Should we staple it together?
6          MR. RUIZ:  I think there's 13, but since I'm
7  going to refer him --
8          MR. CHANEY:  Should I staple them together
9  for him?
10         MR. RUIZ:  I'm go to go through each one of
11 them, so maybe at the end when we get done.
12         MR. CHANEY:  Okay.
13     Q.  (By Mr. Ruiz) Are there 13 pages in Exhibit
14 No. 6?
15     A.  Let me see.
16     Q.  How many pages, Chief?
17     A.  Counting the cover page.
18     Q.  Everything, uh-huh.
19     A.  3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and several
20 are repetitious.
21     Q.  Right.
22     A.  Yeah.
23     Q.  But there's 13 in there, right?
24     A.  There's 13 sheets here, yes.
25     Q.  Okay.  And we'll go through.

Page 128

1      A.  Okay.
2      Q.  What is the first page of Exhibit No. 6, Chief
3  Martinez?
4      A.  It's when a call comes in --
5      Q.  Okay.
6      A.  -- from the officer from the field, or from
7  the -- from the -- they get a call of a person, somebody
8  calls in, and they send -- they dispatch.  It's
9  a -- it's a dispatch log is what it is.
10     Q.  Okay.  And so -- and that was going to be my
11 question.  This first page of Exhibit No. 6, this
12 document is generated at what department within the
13 Weslaco Police Department?
14     A.  The communication department.
15     Q.  Communication?
16     A.  Yes, sir.
17     Q.  And do you notice there's a section down here
18 that's called -- that says notes in the middle with
19 dates and times?
20     A.  Yes, sir.
21     Q.  Okay.  Who -- who inputs the data on this report
22 that shows up in this note section?
23     A.  Every time they -- they call in --
24     Q.  Uh-huh.
25     A.  -- and call out it's recorded, so --

Page 129

1      Q.  Does it record automatically?
2      A.  Yeah, automatically.
3      Q.  Okay.  And so this -- like for example, if you
4  look at the note section on page -- on that first page
5  of Exhibit No. 6 --
6      A.  Uh-huh.
7      Q.  -- female wearing white shirt and jeans,
8  barefoot?
9      A.  Yeah.
10     Q.  Who inputted that information?
11     A.  That's -- that's the dispatcher --
12     Q.  Okay.
13     A.  -- is giving the information out to -- to the
14 officer.
15     Q.  And then the dispatcher filled it into a form on
16 her computer?
17     A.  Yes, sir.
18     Q.  Okay.  And then it's recorded, and when it's
19 printed out, these -- whatever she prints out comes out
20 on this note section?
21     A.  She gets a call up here, and it says incident
22 report --
23     Q.  Yes, sir.
24     A.  -- and telephone number, and it says 406
25 Gostadero.

33 (Pages 126 to 129)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e0

Page 130

1     Q. Okay.
2     A. That there's possibly a 10-56 which is public --
3 public intoxication person.
4     Q. Okay.
5     A. And that's when it's given out to the -- to the
6 officer, under the notes it says at 21:06 female wearing
7 white sheet and jeans barefooted. And then again second
8 caller advised female on the road and --
9     Q. And the dispatcher in the communications
10 department types that information, second caller advised
11 female on road?
12     A. Yes, sir.
13     Q. Okay. And if we look at the bottom part of the
14 first page of Exhibit No. 6 it identifies who the
15 dispatchers are, would that be correct?
16     A. Yes, sir.
17     Q. And --
18     A. Dispatcher and officers.
19     Q. Okay. Jesus Garza, was that an officer or a
20 dispatcher?
21     A. He's a dispatcher.
22     Q. Okay. Noe Yanez?
23     A. He's an officer.
24     Q. Okay. Pedro Cortez?
25     A. He's an officer.

Page 131

1     Q. And then we have Jesus Garza, I guess, who was a
2 dispatcher?
3     A. Dispatcher.
4     Q. So if we look at Exhibit No. 6, this first page
5 with respect to the notes section was filled out by
6 dispatcher Jesus Garza?
7     A. Yes, sir.
8     Q. Okay. Can we look at the second page, sir?
9     A. Yes, sir.
10     Q. The second page, this document is generated in
11 what department within the Weslaco Police Department?
12     A. That is done in the -- in the booking department.
13     Q. That is in the booking department, would that
14 mean the jail department?
15     A. Yes, sir.
16     Q. Okay. And I will -- I will ask you to look at
17 the top part of the second page of Exhibit No. 6, the
18 case number in the upper right-hand corner --
19     A. Right uh-huh.
20     Q. -- is 07-10336, is that correct?
21     A. That's correct, sir.
22     Q. And that matches the incident number on the first
23 page of Exhibit No. 6, correct?
24     A. That's correct.
25     Q. Okay. So we're talking about the same incident

Page 132

1 on the same date?
2     A. Yes, sir.
3     Q. Okay. And this -- at the top of -- we're looking
4 at the top card, I guess?
5     A. Uh-huh.
6     Q. States Weslaco Police Department jail card?
7     A. Yes, sir.
8     Q. Who is responsible for filling out this jail
9 card?
10     A. Either/or, the officer making the arrest or
11 sometimes the -- the jailer.
12     Q. Was there a requirement in May of 2007 that this
13 section of the Weslaco Police Department jail card be
14 completed?
15     A. Yes.
16     Q. Was it required?
17     A. Yes.
18     Q. Okay. Always?
19     A. Yes.
20     Q. Okay. Let's turn to -- and this particular jail
21 card was filled out, can you tell by -- does it say who
22 filled out this information, Chief Martinez?
23     A. Noe Yanez. Well, it doesn't say who filled it
24 out --
25     Q. Okay.

Page 133

1     A. -- it just has the people -- the people that
2 are -- and basically this just says the arrest, the
3 charge.
4     Q. Okay.
5     A. And then what he had in his possession.
6     Q. And it identifies the arresting officer in
7 Box 28 --
8     A. Yes, sir.
9     Q. -- Noe Yanez. And the booking officer --
10     A. Yes, sir.
11     Q. -- box 29 --
12     A. Yes, sir.
13     Q. -- with J-4?
14     A. Yes, sir.
15     Q. Do you know whose signature that is for the
16 booking office?
17     A. No, sir. I can't --
18     Q. Okay.
19     A. I can't tell.
20     Q. Okay. Let's look at the third page, I think, is
21 a --
22     A. It's a repeat.
23     Q. It's a repeat?
24     A. Uh-huh.
25     Q. Then --

34 (Pages 130 to 133)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e0!

Page 134

1    MR. CHANEY:  Could we -- is there a way to
2  either mark them like 6-1 through 13, or at least refer
3  to the Bates numbers.
4    MR. RUIZ:  Oh, sure.
5    MR. CHANEY:  As we go so we don't get
6  confused.
7    MR. RUIZ:  Right.
8    Q.  (By Mr. Ruiz) So we've looked at Bates -- at
9  Exhibit 6 Bates No. 448, correct, Chief?  That was the
10  first one?
11    A.  Yes, sir.
12    Q.  Then we've looked at the second page, which is
13  Bate stamped No. 347?
14    A.  Yes, sir.
15    Q.  We're going to skip the third page, Bate stamp
16  No. 456?
17    A.  Yes, sir.
18    Q.  And now let's look at Bate stamp No. 457.
19    A.  Yes, sir.
20    Q.  On the upper half of Bate stamp No. 457 of
21  Exhibit No. 6 --
22    A.  Uh-huh.
23    Q.  -- is this the back part of the jail card that we
24  looked at earlier?
25    A.  Yes, sir.

Page 135

1    Q.  Okay.  And this -- this card, this side of the
2  card, was it -- was there a requirement in May of 2007
3  that this part of the card be filled out completely?
4    A.  No, sir.
5    Q.  Okay.  And the types of questions that are asked
6  in the back part of the jail card --
7    A.  Uh-huh.
8    Q.  -- include, are you under a doctor's care?
9    A.  Right.
10    Q.  Is that correct?
11    A.  That's correct.
12    Q.  Did I read that correctly?
13    A.  Yes, sir.
14    Q.  No. 2, are you currently sick or injured?
15    A.  Yes, sir.
16    Q.  No. 3, are you currently taking any medication?
17    A.  Yes, sir.
18    Q.  Did I read that correctly?
19    A.  That's correct.
20    Q.  Are you a diabetic?
21    A.  Yes, sir.
22    Q.  Do you have epilepsy?
23    A.  Yes, sir.
24    Q.  Do you have any communicable diseases?  If yes,
25  what?  Did I read that correctly?

Page 136

1    A.  Yes, sir.
2    Q.  Seven, when was your last doctor's visit?
3    A.  Uh-huh.
4    Q.  And No. 8, what was the reason for the visit?
5    A.  Yes, sir.
6    Q.  And that's Weslaco PD Form 27 is the little
7  number at the bottom?
8    A.  Yes, sir.
9    Q.  And even though it's a Weslaco Police Department
10  form, your testimony here today is that in May of 2007
11  the jailers were not required to complete these
12  questions, is that correct?
13    A.  They asked the question, but to specifically note
14  them on there, no, sir.
15    Q.  Okay.  So there was a requirement that they ask
16  these questions?
17    A.  Yes, sir.
18    Q.  Okay.
19    A.  They have to ask the question of every --
20    Q.  Okay.
21    A.  Now, why this is not filled out -- I mean,
22  normally it needs to be filled out, why it's not filled
23  out, I'll never know.  I have no idea.
24    Q.  Well -- okay.  In May of 2007 there was a
25  requirement that they ask these questions --

Page 137

1    A.  Yes, sir.
2    Q.  -- to the person that is being booked?
3    A.  Yes, sir.
4    Q.  You're telling me here today --
5    A.  Right before they --
6    Q.  -- that there is no requirement that they
7  actually write down or document the responses of the
8  person arrested, is that correct?
9    A.  That's correct.  And I think that's a change on
10  that amendments also, all the -- all the medical has to
11  be filled out, I think that was a change that was made.
12  I think we can find it.  It's in there.
13    Q.  Because under Exhibit No. 2, under Section 4 it
14  says, complete the booking card and arrest detention
15  report fields accordingly?
16    A.  Uh-huh.
17    Q.  Correct?  Did I read that correctly?
18    A.  Where's --
19    Q.  That would be in there?
20    A.  Oh, yes, sir.  Yes, sir.  That's the -- that's
21  the amended on that thing.
22    Q.  Okay.  So that did not exist in May of 2007?
23    A.  That's right.
24    Q.  So in May of 2007 there was no Weslaco policy
25  that required the jailers or detention officers to

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 138

1  document the answers of the persons arrested when they
2  are asked the questions on the jail card, is that
3  correct?
4      A.  They would ask the questions, but they could fill
5  it out, or you know, there was no -- they were supposed
6  to fill it out.  They're supposed to fill it out, but it
7  was not a -- a policy or a -- under the general order.
8      Q.  Okay.
9      A.  And that's the reason why it was put in there.
10  It was told to them that they need to fill this out.
11     Q.  Are you talking about May of '07?
12     A.  Yes, sir.
13     Q.  Okay.  So what is it that -- what was your
14  understanding what jailers had to do with respect to the
15  Weslaco jail card?
16     A.  They had to fill them out.
17     Q.  Was that a requirement?
18     A.  Well, my requirement.
19     Q.  Okay.
20     A.  That they fill them out.
21     Q.  Okay.  Was there anything in writing that said --
22     A.  No, sir.  Not until --
23     Q.  -- jailer you need --
24     A.  Not until we put it on --
25          MR. CHANEY:  Let him finish his question,

Page 139

1  please.
2          THE WITNESS:  Okay.
3      Q.  (By Mr. Ruiz) Was there a written policy that the
4  jailers could say -- that directed the jailers to ask,
5  and complete, and document the responses of the persons
6  arrested after they've been asked the questions in that
7  jail card?
8      A.  Prior to?
9      Q.  I'm asking about May of 2007?
10     A.  May of 2007, yes, sir.
11     Q.  Yes, sir what?
12     A.  Yes, they had to -- they had to fill it out.
13     Q.  They had to fill it out?
14     A.  Uh-huh.
15     Q.  Now, that policy was not enforced, correct?
16     A.  If -- yeah.  By looking at this, I don't think it
17  is enforced.
18     Q.  Okay.  So did the jailer on May 13th who
19  partially completed this jail card -- you notice on --
20     A.  Uh-huh.
21     Q.  -- Bate stamp No. 457 --
22     A.  Right.
23     Q.  -- he only puts the name of the -- the person
24  arrested, the date of birth, the address, the case
25  number, right?

Page 140

1      A.  Right.
2      Q.  The city, Weslaco and the state.  He was required
3  to fill in all the other blanks on this card in May of
4  2007?
5      A.  He had to.  I mean, as far as a written policy, I
6  don't think there was a written policy.  It stated that
7  booking procedures had to be -- the jailers had to make
8  sure that -- that the people that they were booking were
9  assessed and all -- you know.  But as far as -- as far
10  as filling out the card, as far as filling out a
11  requirement, no.
12     Q.  It was not required that they document the
13  answers to the questions on this jail card, am I
14  correct?
15     A.  Nothing --
16     Q.  In May of 2007?
17     A.  Nothing in writing.
18     Q.  Okay.  And verbally?
19     A.  Yes, sir.
20     Q.  They were required?
21     A.  Yes, sir.
22     Q.  And so this jailer on May 13th of 2007 violated
23  the verbal policy that required that he complete this
24  jail card and ask the questions that I just read from
25  one through eight?

Page 141

1      A.  Yes, sir.
2      Q.  Am I correct?
3      A.  Well, that he asked them, I don't know -- I don't
4  know whether he did or he didn't.
5      Q.  Okay.
6      A.  Okay.  I can't answer that unless -- he's the
7  only one that can answer that or whoever was there --
8      Q.  Right.
9      A.  -- the arresting officer.  I can't answer to that
10  because I don't know if he did ask them or I don't know
11  if he --
12     Q.  Okay.
13     A.  -- if he didn't.
14     Q.  Well, but the verbal requirement, or the way the
15  verbal directive was passed on to the jailer in
16  May of '07 was that he asked and document and complete
17  this form?
18     A.  Yes, sir.
19     Q.  Am I understanding you correctly?
20     A.  Yes, sir.
21     Q.  And so my question to you is, did that jailer on
22  May 13th of 2007 violate that verbal directive by not
23  documenting the answers to these questions?
24     A.  Yes, sir.
25     Q.  On this jail card?

36  (Pages 138 to 141)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 142

1    A. Yes, sir.
2    Q. Thank you. Now, if we look at the next page --
3    that's 458, we can skip that one, Chief.
4    A. That's the same one.
5    Q. And then we have a duplicate as well --
6    A. Yes, sir.
7    Q. -- I apologize for that.
8    A. Yes, sir.
9    Q. That was 456.
10   A. Duplicate, yeah.
11   Q. And duplicate again 457, 458. Then the next
12   page, which is 98, also pertains to this arrest of
13   Maricela Trevino on May 13th of '07?
14   A. Uh-huh.
15   Q. Is that correct?
16   A. Yes, sir.
17   Q. And it also shares the same case number as the
18   first page of Exhibit 6?
19   A. Yes, sir.
20   Q. The 10336?
21   A. Yes, sir.
22   Q. Okay. This document is generated by what
23   department of the Weslaco Police Department, sir?
24   A. It's documented there at the -- it's generated by
25   the dispatch office.

Page 143

1    Q. Okay. So this is another communications
2    department document?
3    A. Yes, sir.
4    Q. Okay. And does the dispatchers in that
5    department, do they fill in all this information? Are
6    there fields in a computer or are they -- how does it
7    get filled out, I guess I should ask you?
8    A. This portion at the bottom here is connected with
9    the -- with the computer that's in the -- in the jail.
10   Q. Okay.
11   A. And this information, at the arrestee report, is
12   inputted in there by the jailer.
13   Q. The arrestee report?
14   A. Yeah, arrestee report.
15   Q. Which is?
16   A. Which is gives you the name, the address.
17   Q. Okay.
18   A. Sex, female, whatever.
19   Q. Quick question, Chief, and so does the jailer go
20   to the communications department to fill out that
21   arrestee report section?
22   A. No, sir. He's -- the computer is -- is --
23   Q. They share information?
24   A. It's linked to the dispatch --
25   Q. Okay.

Page 144

1    A. -- to fill this -- this report. This becomes a
2    document that is -- that is kept under the
3    communications.
4    Q. Okay. And so -- but the jailer has access from
5    his booking area at the jail to fill in this section
6    under arrestee report?
7    A. Yes, sir.
8    Q. And --
9    A. And it also goes to DPS, if it needs to go to the
10   to DPS, to the county, if it needs to go to the county.
11   Q. And if there's a request for this particular
12   arrest when it gets printed up, it also prints out the
13   other information that was completed by the dispatcher?
14   A. Yes, sir.
15   Q. Which are the other fields in there, is that
16   correct?
17   A. Yes, sir.
18   Q. And that report is printed out at the dispatch or
19   the communications department?
20   A. Yes, sir.
21   Q. Okay, thank you. The next page is also part of
22   that --
23   A. Yes, sir.
24   Q. -- report, right?
25   A. Uh-huh.

Page 145

1    Q. That's 99?
2    A. Right.
3    Q. 100 is also part of that report?
4    A. Yes, sir.
5    Q. But this is a narrative by the police officer --
6    A. Yes, sir.
7    Q. -- am I correct?
8    A. That's correct.
9    Q. So how does this section, this narrative of the
10   police officer, make it to the communications
11   department? Does he go and does he type it up over
12   there?
13   A. He types it up. He types it up in the -- in the
14   station.
15   Q. Okay.
16   A. The work station and hooks it up there.
17   Q. And then once it -- just like the booking -- just
18   like the jailer and that information --
19   A. Yes, sir.
20   Q. -- it gets routed, I guess --
21   A. Yes, sir.
22   Q. -- to the dispatch department?
23   A. Yes, sir.
24   Q. Okay, thank you. The last page on exhibit -- oh,
25   no, the second to the last page on Exhibit No. 6 --

37 (Pages 142 to 145)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 146

1    A. Uh-huh.
2    Q. -- Chief Martinez is called Weslaco City Jail, do
3  you see that at the top?
4    A. Yes, sir.
5    Q. And it says booking medical sheet 2007, 1003?
6    A. Yes, sir.
7    Q. And the date is May 13th of '07?
8    A. Yes, sir.
9    Q. Is this the same incident we've been talking
10  about since Page 1?
11   A. 5/13 of '07, yes, sir.
12   Q. Okay. And it pertains to Maricela Trevino?
13   A. Yes, sir.
14   Q. Correct?
15   A. Yes, sir.
16   Q. And it has an ID number of 14085, do you see
17  that, on the left-hand corner?
18   A. 14085, yeah.
19   Q. Okay. And at the top -- I don't know if I missed
20  it, but it's called the booking medical sheet?
21   A. Uh-huh.
22   Q. Correct?
23   A. Uh-huh.
24   Q. Who is responsible for filling out this booking
25  medical sheet?

Page 147

1    A. The officer.
2    Q. The police officer?
3    A. Yes, sir.
4    Q. Okay. And this -- even though it says Weslaco
5  City Jail?
6    A. Uh-huh.
7    Q. Okay.
8    A. Yes, sir.
9    Q. Is -- is this information, once it gets typed in
10  from -- it gets typed in at where? Where does the
11  police officer type or respond to these questions?
12   A. From his work station.
13   Q. From his work station, okay. And in order to
14  answer the questions, for example, under visual
15  assessment, right?
16   A. Uh-huh.
17   Q. There's ten questions under that?
18   A. Uh-huh.
19   Q. Is the inmate unconscious? Do you see that, sir?
20  Did I read that correctly?
21   A. Yes, sir. Yes, sir.
22   Q. No. 2, does the inmate have any visible signs of
23  trauma, illness, obvious pain, or bleeding requiring
24  immediate medical attention?
25   A. Yes, sir.

Page 148

1    Q. Did I answer that correctly?
2    A. Yes, sir.
3    Q. Did I read that correctly? I'm sorry.
4    A. Yes, sir.
5    Q. No. 3, is there obvious fever, swollen lymph
6  nodes, jaundice or other evidence of infection that may
7  be contagious? Did I read that correctly?
8    A. Yes, sir.
9    Q. Any signs of poor skin conditions, vermont,
10  rashes or needle marks? Did I read that correctly?
11   A. Yes, sir.
12   Q. No. 5, does the inmate appear to be under the
13  influence of drugs or alcohol? Did I read that
14  correctly?
15   A. Yes, sir.
16   Q. Six, any visible signs of alcohol or drug
17  withdrawal? Did I read that correctly?
18   A. Yes, sir.
19   Q. Seven, does the inmate's behavior suggest the
20  risk of suicide or assault? Did I read that correctly?
21   A. Yes, sir.
22   Q. No. 8, is the inmate carrying medication? Did I
23  read that correctly?
24   A. Yes, sir.
25   Q. No. 9, does the inmate have any physical

Page 149

1  deformities? Did I read that correctly?
2    A. Yes, sir.
3    Q. No. 10, does the inmate appear to have
4  psychiatric problems?
5    A. Yes, sir.
6    Q. Did I read that correctly?
7    A. Yes, sir.
8    Q. On the side of all of those questions, to the
9  left of these questions is a section that's called
10  yes -- and it says yes and no?
11   A. Yes, sir.
12   Q. Is it my understanding that they -- that the
13  police officer, when they're filling out this booking
14  medical sheet, would have to answer yes or no on their
15  computer to each one of these ten questions?
16   A. This is a -- yeah, they would. This is a -- a
17  report that belongs to the police officer. So he gets
18  the information on there, and then he -- he keeps this
19  as part of his -- his report.
20   Q. Okay.
21   A. There's no EMS report on here? I thought --
22   Q. Sir, I've given you everything that I have with
23  respect to that date that I have together.
24   A. There was EMS called in at the time, and there
25  should be a report, and that's reason probably why he

38 (Pages 146 to 149)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Electronically signed by Anica Diaz (001-137-509-0044)

## Page 150

1  didn't fill this out because the same --
2  Q. Well --
3  A. The EMS report is --
4  Q. But Chief Martinez, are you talking about the
5  13th or the 17th?
6  A. I'm talking about the day.
7  Q. The 13th?
8  A. Yes, sir, that's when --
9  Q. See, the date -- the date of the incident is
10 May 17th.
11 A. Well, when she got -- when she got arrested -- I
12 mean, this lady was in and out, supposedly. And there's
13 a possibility that this reports are not the ones
14 that -- that were done when -- when -- on the last
15 arrest. It may be that we have reports here to previous
16 arrests.
17 Q. Correct. This is a -- this is my -- because it's
18 February 13th.
19 A. Okay.
20 Q. I'll represent to that that's not the day that
21 she -- that she hung herself.
22 A. Right.
23 Q. Okay. So this is four days or three days --
24 A. Okay.
25 Q. Three or four days before that.

## Page 151

1  A. Uh-huh.
2  Q. And my question to you, on May 13th of '07, was
3  the police officer who arrested her -- and we can find
4  out by the first page, right?
5  A. Uh-huh.
6  Q. The arrest --
7  A. Uh-huh.
8  Q. The arresting officer was Noe Yanez?
9  A. Right, sir.
10 Q. Or Pedro Cortez, right?
11 A. Right, sir.
12 Q. One of those two police officers had the duty to
13 answer the questions that I just read out in this
14 booking medical sheet, is that correct?
15 A. That's right.
16 Q. Okay. So this medical sheet -- this booking
17 medical sheet also has a bottom part --
18 A. Uh-huh.
19 Q. -- with the continuation of Questions 11 through
20 22.
21 A. Right.
22 Q. In -- on May 13th of 2007, did the arresting
23 police officers, Pedro Cortez or Noe Yanez, did they
24 have a duty to also answer the question -- the medical
25 questions from 11 to 22 that you see Bates No. 292?

## Page 152

1  MR. CHANEY: Objection, form.
2  A. Okay. If -- yeah. If this patient -- or this
3  prisoner was to be sectioned, then yeah, they would
4  answer all of this --
5  Q. (By Mr. Ruiz) Okay.
6  A. -- completely.
7  Q. And --
8  A. Now, if there was no reason for them to -- to
9  think that they needed to -- then again, they call in
10 the supervisor who would --
11 Q. So do you make the --
12 A. -- who would make the assessment.
13 Q. So Chief Martinez, do you make the determination
14 whether -- as a police officer, whether someone needs to
15 be sectioned before filling out this booking medical
16 sheet or do you -- is that a yes?
17 A. Yes, sir.
18 Q. Okay. And if there is a need for sectioning,
19 based on the officer's assessment --
20 A. Yes, sir.
21 Q. -- then at what point does this booking medical
22 sheet become relevant and when does it have to be filled
23 in and completed?
24 A. Well, at the time that they -- that they booked
25 the individual.

## Page 153

1  Q. Okay. And at the time they --
2  A. Now, if they bring them to the -- to the
3  detention center.
4  Q. You mean the --
5  A. The jail.
6  Q. You mean the jail?
7  A. Uh-huh, yes, sir.
8  Q. Okay.
9  A. If they bring them there, and they book them,
10 then they ask this. Now, if they take this person and
11 not book them but take them to -- or release them to the
12 parents, or whatever the case may be, because they
13 figure, you know, she's in and out, in and out, in and
14 out then they don't fill it out.
15 Q. Okay. So let me understand when you can -- when
16 you fill it out.
17 A. Uh-huh.
18 Q. You're saying this needs to be filled out by a
19 police officer?
20 A. Yes, sir.
21 Q. Correct?
22 A. Yes, sir.
23 Q. When that police officer delivers a detainee to
24 the jail?
25 A. Uh-huh.

39 (Pages 150 to 153)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e0

Page 154

1    Q.  Correct?
2    A.  That's correct.
3    Q.  And in order to fill this out, you said that they
4  have to go to their -- to a computer in the -- in
5  their -- at their office?
6    A.  Yeah.  Or it's in the jail --
7    Q.  Okay.
8    A.  In the jail system.
9    Q.  And so at the booking area, inside the jail --
10   A.  Uh-huh.
11   Q.  -- the officer --
12   A.  Can.
13   Q.  -- can respond these questions?
14   A.  Yes, sir.
15   Q.  From that computer?
16   A.  Yes, sir.
17   Q.  And the reason I was asking, in order to answer
18  these questions, do you need to have the detainee --
19   A.  Sure.
20   Q.  -- next to you, right?
21   A.  Yeah.
22   Q.  Okay.  And so in -- we know from Exhibit No. 6,
23  based on the jail card, the second page of
24  Exhibit No. 6, that Ms. Trevino was in jail, was
25  arrested on the 13th, right, and she was released from

Page 155

1  the Weslaco jail on May 15th of 2007?
2    A.  Uh-huh.
3    Q.  Is that correct?
4    A.  That's correct.
5    Q.  So when the police officer who arrested her, or
6  the police officers who arrested her on May 13th, 2007
7  and delivered her to the -- to the booking department at
8  the jail, at that point, the police officers were
9  required by policy to complete this medical -- booking
10  medical sheet, is that correct?
11   A.  Yes, sir.
12   Q.  Okay.  Does the jailer have any responsibility
13  for filling out this booking medical sheet, sir?
14   A.  Only if -- if the officer delegates that
15  responsibility to the jailer, if he has to quickly get
16  up, back out on the -- on the road, and he delegates the
17  responsibility to the jailer, then jailer has that
18  responsibility.
19   Q.  Okay.  And this responsibility for the police
20  officer to answer the questions in this booking medical
21  sheet -- and we're looking at the one on May 13th
22  of '07 -- is that written down anywhere?  Or is that
23  another verbal directive that they were told to follow?
24   A.  That was a verbal that was -- that was handed
25  down by the -- I think Captain Walinsky had stated to

Page 156

1  them that they needed to fill out all of this.  And it
2  wasn't until we got the policy in place that's -- that's
3  where we started putting all that in there.
4    Q.  Okay.
5    A.  It used to be verbal and now it's mandatory.
6    Q.  Okay.  So the verbal policy requiring that
7  jailers answer the questions -- the medical questions on
8  the back of the jail card, that was also a verbal
9  directive, right?
10   A.  Yes, sir.
11   Q.  And it was not enforced in May of 2007, correct?
12       MR. CHANEY:  Objection, form.
13       MR. RUIZ:  You can answer.
14   Q.  (By Mr. Ruiz) Was it or was it not enforced?
15   A.  It was not enforced.
16   Q.  Okay.  And the booking medical sheet, there was
17  also a verbal directive by Captain Walinsky --
18   A.  Walinsky.
19   Q.  -- to the police officers?
20   A.  Yes, sir.
21   Q.  To complete and answer the questions on this
22  medical booking sheet, correct?
23   A.  That's correct.
24   Q.  In May of 2007?
25   A.  Yes, sir.

Page 157

1    Q.  But it was not enforced in May of 2007 correct?
2    A.  That's correct.
3    Q.  And so both the requirements as to the jailers to
4  complete the medical questionnaire on the back of the
5  jail card --
6    A.  Uh-huh.
7    Q.  -- and the police officers' duty to complete the
8  booking medical sheet at the time of booking and arrest,
9  was not enforced until after Maricela Trevino hung
10  herself at the Weslaco jail?
11       MR. CHANEY:  Objection, form.
12   Q.  (By Mr. Ruiz) Is that correct?
13   A.  That's -- yeah, it was put on the -- it was
14  revised.  The policy manual was revised.
15   Q.  So --
16   A.  It's supposed to be enforced and it's supposed to
17  be enforced, and I understand that it needs to be
18  enforced.
19   Q.  Okay.
20   A.  I can't answer as to why they didn't fill it out
21  or maybe Captain Walinsky might be more than -- to be
22  able to answer why they didn't fill it out, or even the
23  jailer himself.
24   Q.  Okay.  So the jailer on May 13th who did not
25  completely fill out the jail card, he violated the

40  (Pages 154 to 157)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 158

1  verbal directive to complete that medical questionnaire
2  on the back of that jail card?
3      A. Yes, sir.
4      Q. Is that correct?
5      A. Yes, sir.
6      Q. Okay. The police officers who arrested and who
7  took Maricela Trevino to booking on May 13th of '07
8  violated the verbal directive by not completing the
9  booking medical sheet --
10     A. Yes, sir.
11     Q. -- on May 13th, is that correct?
12     A. They can -- they're the only ones that can -- can
13  answer that because of the fact that my understanding
14  that at the time that it happened that she -- it was
15  quick, it was other people being booked, and there was
16  not time to fill out -- and the agreement was -- I mean,
17  as soon as possible you need to fill it out.
18         Now, if it's a person that is needing to be
19  sectioned, then that takes priority to anything else.
20  Now, if she's been in and out, and has never been
21  detected. And mom calls, mom doesn't say that she is
22  mentally ill, boyfriend calls and doesn't say she's
23  mentally ill, we have no assessment has -- has ever been
24  noted that she is mentally ill, then -- and if it's full
25  and we have over people being arrested, she's placed in

Page 159

1  the women's cell.
2         And she's under arrest, she is placed under
3  arrest on the violation, but then they bring her back
4  out after everything cools down, and they put prisoners
5  in there, and then finish off with the questions that
6  they have.
7         Now, if that was the case that happened, then I
8  can understand why this -- this reports weren't filled.
9      Q. Okay.
10     A. Because they saw -- I think it was 15 minutes we
11  have where they're watching, and dispatch notices
12  her -- can't see her in the -- in the camera, and that's
13  a flag that says, you know, somebody needs to check on
14  her.
15         And then the jailer goes to check, and sees the
16  legs, and that's when he opened the door. So it's -- I
17  can understand whether -- why, perhaps, those forms
18  weren't filled out, it's because she was out of there.
19     Q. Okay.
20     A. She was gone. They didn't have time to ask those
21  questions. If we look at her prior bookings and
22  see -- that's the only thing that I can tell you.
23     Q. Okay.
24     A. Other than that, you'd have to talk to the
25  officer himself or the jailer.

Page 160

1      Q. And my question to you, Chief, was about this
2  May 13th booking medical sheet.
3      A. Uh-huh, yeah.
4      Q. On May 13th, the police officers who were
5  responsible for arresting Maricela Trevino and taking
6  her to the -- to booking, okay?
7      A. Uh-huh.
8      Q. They violated the verbal directive of --
9      A. Yes, sir.
10     Q. -- Captain Walinsky --
11     A. Yes, sir.
12     Q. -- that required that they completely fill this
13  out? Is that a yes?
14     A. Yes, sir.
15     Q. Okay.
16         MR. RUIZ: And can we take a quick break,
17  since I just got done with this exhibit, Mr. Chaney?
18         MR. CHANEY: Sure, no problem.
19         THE VIDEOGRAPHER: We're off the record at
20  12:05 p.m.
21         (Break was taken at 12:03 p.m. - 12:23 p.m.)
22         THE VIDEOGRAPHER: We are back on the record
23  at 12:27 p.m.
24     Q. (By Mr. Ruiz) Chief Martinez, we're back from a
25  quick break, we were talking about the arrest of

Page 161

1  Maricela Trevino on February -- I mean, on May 13th of
2  2007, that was Exhibit No. 6 that we just finished
3  reviewing, is that correct?
4      A. (Witness nods head.)
5         (Plaintiff's Exhibit No. 7 marked.)
6      Q. (By Mr. Ruiz) I'm going to hand you
7  Exhibit No. 7?
8      A. Which my understanding is prior arrests?
9      Q. Exhibit No. 7, I believe, is also an arrest.
10     A. Prior arrests?
11     Q. What -- I don't know what you mean.
12     A. Prior.
13         MR. CHANEY: Prior to the date of the --
14     A. Before.
15     Q. Oh, yes, yes, prior to that, right.
16     A. Okay.
17     Q. Absolutely.
18     A. Yeah, okay.
19     Q. And there are arrest reports for the 13th, the
20  15th and the 17th, and I want to -- I'm going to discuss
21  those three with you.
22     A. Oh, okay.
23     Q. We just got done with the first one.
24     A. Okay.
25     Q. I'll give you an opportunity to review it.

41 (Pages 158 to 161)

Page 162

1    A. Okay. All right, sir.
2    Q. Chief Martinez, Exhibit No. 7 consist of 12
3  pages, is that correct? Did you have an opportunity to
4  count them?
5    A. Yes, sir.
6    Q. And the -- and just for purposes of -- for
7  reference purposes, I'm going to read out the Bate stamp
8  numbers at the bottom --
9    A. Uh-huh.
10    Q. -- that comprise or that make up Exhibit No. 7.
11  It was Bate stamp No. 449, Bate stamp No. 93 --
12    A. Uh-huh.
13    Q. -- Bate stamp No. 94, 95, 96, 97, 291, 345, 346,
14  456, 457 and 458?
15    A. Uh-huh.
16    Q. Is that correct?
17    A. Yes, sir.
18    Q. Okay. The first page of Exhibit No. 7 shows that
19  it -- there has been an arrest, correct?
20    A. (Witness nods head.)
21    Q. And that arrest took place on May 15th, 2007,
22  correct?
23    A. Yes, sir.
24    Q. And this police report, the first page, I think
25  what you told me the last time was generated at the

Page 163

1  communications department?
2    A. Uh-huh.
3    Q. Is that correct?
4    A. Yes, sir.
5    Q. Okay. And it identifies the dispatcher and
6  officers at the bottom of the first page?
7    A. Yes, sir.
8    Q. Is that correct?
9    A. Yes, sir.
10    Q. And the dispatcher on this call was Lydia Olalde?
11    A. Yes, sir.
12    Q. Albert Ponce was the officer?
13    A. Yes, sir.
14    Q. Gabriel Coronado? Was he an officer --
15    A. An officer.
16    Q. -- or dispatcher, sir?
17    A. An officer.
18    Q. And then we see Lydia Olalde's name again?
19    A. Yes, sir.
20    Q. Okay. So would it be fair to say that Lydia
21  Olalde inputed the information that is in this note
22  section --
23    A. Yes, sir.
24    Q. -- on the first page of Exhibit 7?
25    A. Yes, sir.

Page 164

1    Q. Okay. The second page of Exhibit No. 7 is a
2  Weslaco Police Department document, and it shows the
3  number at the top of 2007, 01-0492.
4    A. Yes, sir.
5    Q. Did I read that correctly?
6    A. Yes, sir.
7    Q. And that's consistent with the number -- the
8  incident number on the first page?
9    A. That's correct.
10    Q. Okay. And the offender in this -- as shown in
11  this page is Ms. Maricela Trevino?
12    A. Yes, sir.
13    Q. Is that correct?
14    A. Yes, sir.
15    Q. Okay. The third page is also shows the -- the
16  same incident number, right, 2007?
17    A. Yes, sir.
18    Q. 010492?
19    A. Yes, sir.
20    Q. A quick question, Chief, when you said -- when
21  you testified earlier that the police officer can input
22  some of -- some of the information that's required for
23  his report and the booking officer or the jail or
24  detention officer can also do that from his computer --
25    A. Right.

Page 165

1    Q. -- the dispatcher can also do it from her
2  computer, correct?
3    A. Yes, sir.
4    Q. Can they all share the information?
5    A. No. They have the -- once it's input -- whatever
6  is inputed by the jailer, that's done.
7    Q. Okay.
8    A. What they do is they -- they put in the incident
9  number --
10    Q. Uh-huh.
11    A. -- and it kicks it up, and then it has a -- a
12  portion there for the -- for the report.
13    Q. Okay.
14    A. Which is the officer's report.
15    Q. Right.
16    A. Okay. And then the dispatch. So they all tie in
17  but nobody sees the officer report except the officer --
18    Q. Okay.
19    A. -- and the investigating officer --
20    Q. Okay.
21    A. -- that's going to investigate.
22       Once the information that the jailer inputs,
23  that's -- that's it. He cannot bring it back and
24  up -- back it up again. He inputs it then, and it stays
25  in the computer, and then it goes to the officer, and

42 (Pages 162 to 165)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

## Page 166

1 then the officer to the investigating officer.
2 And then the -- the communications people, would
3 enter their portion of the -- of the incident --
4 Q. Okay.
5 A. -- based on the incident number.
6 Q. And Chief Martinez, would the book -- would the
7 jailer or detention officer have access, or would he be
8 able to access this first sheet from his booking area?
9 A. No, sir.
10 Q. Okay. Would he be able to access the police
11 officer's report from his booking area?
12 A. No, sir.
13 Q. Okay. How about the dispatcher?
14 A. No, sir.
15 Q. Okay. Is -- okay, all right. So the 4th page in
16 this Exhibit No. 7 is a narrative by the police officer,
17 correct?
18 A. Yes, sir.
19 Q. And I think there's a duplicate -- or no, it's a
20 different number, Page 4.
21 A. Yes, sir.
22 Q. But it's the same thing as contained --
23 A. Uh-huh.
24 Q. -- in Page 3?
25 A. Uh-huh.

## Page 167

1 Q. The fifth page is the report by --
2 A. The investigator.
3 Q. Carlos Coronado?
4 A. Yes, sir.
5 Q. Okay. The sixth page is the booking medical
6 sheet?
7 A. Yes, sir.
8 Q. Is that correct?
9 A. Yes, sir.
10 Q. And that booking medical sheet is for -- dated
11 May 15th of 2007?
12 A. Uh-huh.
13 Q. Is that correct?
14 A. Yes, sir.
15 Q. And it pertains?
16 A. At 6:30.
17 Q. At 6:30?
18 A. Uh-huh.
19 Q. And it pertains to Maricela Trevino?
20 A. Yes, sir.
21 Q. And this booking medical sheet that has the
22 questions of the visual assessment --
23 A. Uh-huh.
24 Q. -- and the medical questions --
25 A. Uh-huh.

## Page 168

1 Q. -- is not completed, correct?
2 A. That's correct.
3 Q. Would you agree with me that none of the
4 questions, 1 through 22, were answered by the police
5 officer who arrested her and delivered her to the
6 booking department, is that correct?
7 A. Either/or, the officer or the jailer.
8 Q. Jailer. So -- and in May -- on May 15th of '07,
9 there was a verbal directive that the police officer or
10 the jailer answer these questions set out in this
11 booking medical sheet?
12 A. Yeah. Well, it's -- yeah. On the assessment,
13 they should answer this question, they didn't.
14 Q. Okay. And since they didn't, they violated the
15 verbal directives of Captain Walinsky?
16 A. Yes, sir. Yes.
17 Q. And yourself as chief of police?
18 A. Yes, sir. Well, if they did or didn't, I don't
19 know whether they asked the questions or not. They
20 might have asked questions.
21 Q. Well, it's not --
22 A. Only they can answer that.
23 Q. It's not documented? We can say that, right?
24 The answers are not documented?
25 A. It's not documented, no.

## Page 169

1 Q. And the directive was that they document the
2 answers --
3 A. Yes, sir.
4 Q. -- of the person arrested, correct?
5 A. Right.
6 Q. In May of '07?
7 A. Right, uh-huh.
8 Q. And just to be sure, they violated -- the
9 jailer -- the jailer on duty on May 15th of '07 at 6:30
10 and the police officer violated that verbal directive?
11 A. Uh-huh.
12 Q. Is that correct?
13 A. That's correct.
14 Q. The following page is also the -- that's Bate
15 stamp number 345, that's the Weslaco Police Department
16 jail card?
17 A. Uh-huh.
18 Q. Is that correct?
19 A. That's correct.
20 Q. And it shows that -- and we're looking at the
21 bottom card.
22 A. Uh-huh.
23 Q. I think they copied two cards on one -- at one
24 time, so the bottom card is the one that shows -- you
25 see the date of arrest May 15th of '07?

43 (Pages 166 to 169)

Hill & Romero
Certified Court Reporters
Electronically signed by Anica Diaz (001-137-509-0044)     031a3c36-ed2a-42b4-b528-26a2cacc5e09

## Page 170

1    A. Yeah, but you have -- you have 07-10639 --
2    Q. Right.
3    A. -- which is the case number, and then you have
4  another case number at the bottom of 07-10492.
5    Q. And the bottom one is the one that corresponds
6  with our arrest on the first page, is that correct?
7    A. 5/15 of '07 -- no, this is 5/17 of '07.
8    Q. Right. I'm directing your attention to the
9  bottom card.
10   A. That's what I'm looking at. It says date of
11 release -- okay. Date of release, okay, is 5-15-07,
12 yes, sir.
13   Q. Date of arrest?
14   A. Date of arrest is 5-15-07.
15   Q. And that case number --
16   A. Yes, sir.
17   Q. -- on that jail card --
18   A. Is the same.
19   Q. -- is the same as the incident number card --
20   A. Yes, sir. Yes, sir.
21   Q. -- on the first page of exhibit --
22   A. Yes, sir.
23   Q. All right. You see the -- and we identify the
24 book -- the arresting officer as Albert Ponce?
25   A. Yes, sir.

## Page 171

1    Q. And the booking officer, we can't tell who
2  that -- who that is, right?
3    A. I can't.
4    Q. J-4 is their designation?
5    A. J-4, that's going to be -- if you look back over
6  here it'll tell you. No, I can't.
7    Q. Okay.
8    A. I can't answer that.
9    Q. And if you -- if I can direct your attention to
10 the following page, which is 346?
11   A. Uh-huh.
12   Q. I believe it's a copy of the back part.
13   A. Of the back part, uh-huh.
14   Q. Okay. And this is the medical questionnaire
15 form.
16   A. Uh-huh.
17   Q. And let me ask you this, is any of that medical
18 questionnaire filled out?
19   A. No, sir.
20   Q. Okay. And the jailer, the jailer J-4 on May 15th
21 of '07 also violated the directive -- the verbal
22 directives of Captain Walinsky --
23   A. Yes, sir.
24   Q. -- and yourself --
25   A. Yes, sir.

## Page 172

1    Q. -- by not completing any of that medical
2  questionnaire, is that correct?
3    A. That's correct.
4    Q. I think the next are some duplicates?
5    A. Duplicates, yes, sir.
6    Q. And I think I've answered -- I think you've
7  answered all the questions concerning this arrest.
8    A. Yes, sir.
9    Q. Thank you.
10       MR. CHANEY: Is it okay if I staple them all
11 together?
12       MR. RUIZ: Yeah, that's okay. Yes, sir. Is
13 that your stapler? That's a cool stapler.
14      (Plaintiff's Exhibit No. 8 marked.)
15   Q. (By Mr. Ruiz) I'm going to hand you
16 Exhibit No. 8.
17   A. Okay.
18   Q. This one has a staple on it, but we'll keep them
19 all together, we'll leave the numbers out.
20      Let me know when you're -- when you're done,
21 Chief, okay?
22   A. Uh-huh. I'm ready.
23   Q. Okay.
24   A. This report -- uh-huh.
25   Q. Chief, what is -- Chief Martinez, what is

## Page 173

1  Exhibit No. 8?
2    A. That's the day of the arrest that booking -- it's
3  got the booking -- the booking sheet.
4    Q. Okay.
5    A. The officer's reports, the offense report,
6  offense report two, which is pretty much the same thing
7  as offense report one, and then the incident --
8  reporting of the incident that was going on, and office
9  reports. It's just office reports and the arrest.
10   Q. Okay.
11   A. Of Maricela Trevino.
12   Q. Maricela Trevino, okay. And I counted 15 pages,
13 Chief.
14   A. Yes, sir.
15   Q. Just to make sure we're on the same page.
16   A. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
17 15, yes, sir.
18   Q. 15. And just to be clear, the 15 pages, the Bate
19 stamp numbers are 87, 88 --
20   A. Uh-huh.
21   Q. -- 89, 90, 91, 92, 290 --
22   A. Uh-huh.
23   Q. -- 345, 346, 432 --
24   A. Okay.
25   Q. -- 433 --

44  (Pages 170 to 173)

Electronically signed by Anica Diaz (001-137-509-0044)          031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 174

1    A. Uh-huh.
2    Q. -- 434, 451, 452 and 447?
3    A. That's correct.
4    Q. Is that correct?
5    A. That's correct.
6    Q. Okay. And like you -- like you said earlier,
7    this pertains to the arrest of Maricela Trevino at
8    approximately --
9    A. 19:40.
10   Q. 19:40, which would be 7:40 in the p.m.?
11   A. The call was -- was made at 19:40.
12   Q. Okay.
13   A. And then dispatch was 19:41, a minute later of
14   the call.
15   Q. That's 7:41, right?
16   A. Yeah.
17   Q. p.m.?
18   A. And the officer arrived there at 19:44 and he
19   completed it at 20:10.
20   Q. And by completion, what does that mean?
21   A. The arrest and all.
22   Q. Oh, the arrest?
23   A. Uh-huh.
24   Q. Okay. He arrested her at approximately
25   8:10 p.m., according to the first page?

Page 175

1    A. Yes, sir.
2    Q. Okay. And -- and we see that the offender is
3    Maricela Trevino, right?
4    A. Yes, sir.
5    Q. And the offense is for criminal trespass?
6    A. Yes, sir.
7    Q. Do you see this section right here, where it says
8    ATT and then comp and then there's a C?
9    A. Uh-huh.
10   Q. What does that stand for, sir? What does that
11   mean?
12   A. I can't answer that.
13   Q. Okay.
14   A. I don't know.
15   Q. All right.
16   A. It's probably something on the computer for the
17   investigator or -- I can't answer that.
18   Q. All right. And what type of a crime is criminal
19   trespass? What classification?
20   A. It's a Class C misdemeanor.
21   Q. Class C misdemeanor. And am I correct in stating
22   that Class C misdemeanors are not jailable offenses?
23   A. Well, it depends on the circumstance.
24   Q. Okay. And under what circumstances are they --
25   A. Speeding, you know, running stop sign, no DL,

Page 176

1    those -- those kinds.
2    Q. Do you know of the circumstances with respect to
3    the offense of criminal trespass that would warrant an
4    individual to be arrested and incarcerated for a Class C
5    misdemeanor?
6    A. It's -- it's an officer's discretion.
7    Q. Okay.
8    A. So and then he needs to follow-up with
9    the -- with the officer's report, and that report is
10   sent up to the DA's office who will -- or the
11   investigator's, and they'll -- they'll either go along
12   with the arrest, or it gets dismissed, one way or the
13   other.
14   Q. And Chief Martinez, are you aware of any state
15   law that allows an arrest for a Class C misdemeanor for
16   the offense of criminal trespass?
17   A. Not if you have substantial evidence that, you
18   know, there was -- like in her case, she jumped the
19   fence, the fence was closed. I mean, that was -- she
20   jumped the fence. It wasn't open where you can just
21   walk in.
22   Q. Okay.
23   A. She jumped the fence, and then I think she was
24   inside -- or by the church, or inside the church or
25   something.

Page 177

1    Q. So the fact that the fence was closed --
2        MR. CHANEY: Can I look at it for a moment?
3        THE WITNESS: Sure.
4    Q. (By Mr. Ruiz) The fact that the fence was closed
5    is what allows a police officer to arrest her for this
6    offense of criminal trespass?
7    A. Yeah.
8    Q. And if the fence would have been open, that would
9    not have warranted an arrest, even though she was -- she
10   would have been inside the premises?
11   A. Again, it depends on -- it depends on the -- what
12   was found at the incident, what was found at the area,
13   what -- depending on -- it's the officer's judgment.
14   Q. Okay. So on -- on May 17th, 2007, there was
15   nothing written in black letter law that required the
16   officer, in this case Officer Ponce, to arrest and jail
17   Maricela Trevino, is that correct?
18   A. Statute?
19   Q. Right.
20   A. There's a statute.
21   Q. Right. But did that statute authorize her
22   incarceration? Because as this -- you testified this is
23   a Class C misdemeanor.
24   A. Uh-huh.
25   Q. And when I read the -- the Criminal Code, a

45 (Pages 174 to 177)

Electronically signed by Anica Diaz (001-137-509-0044)                                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 178

1   Class C misdemeanor is a non-jailable offense, is that
2   correct?
3       A.  Not necessarily.
4       Q.  Okay.
5       A.  I mean, you have -- you can arrest for not even
6   having driver's license.
7       Q.  Okay.  I understand that but --
8       A.  That's a Class C misdemeanor.
9       Q.  But you said it was up to the discretion of the
10  police officer?
11      A.  And I also stated that it depended on what it was
12  that was done.
13      Q.  Right.
14      A.  You're taking into consideration all of that,
15  then the officer makes the call whether he arrests or he
16  doesn't arrest.
17      Q.  Okay.  So if -- if maybe a different officer on
18  May 17th could have had the discretion to make a
19  different call and not arrest her, would that be
20  correct?
21          MR. CHANEY:  Objection, form.
22      A.  That's correct.
23      Q.  (By Mr. Ruiz) So -- and is there a Weslaco Police
24  Department policy that gave that officer on May 17th the
25  discretion to go ahead and arrest Ms. Trevino and

Page 179

1   incarcerate her for a Class C misdemeanor offense?
2       A.  Yeah, there's a policy.
3       Q.  Okay.  Where would I see that policy, Chief
4   Martinez?
5       A.  You would have to go to the general order manual,
6   and under arrests --
7       Q.  Okay.  And do you know the number?
8       A.  No, sir.  It's a big about yay big.  (Witness
9   indicating.)
10      Q.  Okay.  And just so that I can ask for the right
11  section and parts, could you tell me how -- what is that
12  big book?
13      A.  Falls under the -- it's general order.
14      Q.  General order?
15      A.  Uh-huh, general orders, and it's under -- under
16  arrests.
17      Q.  And that's where it's written that a police
18  officer has the discretion to arrest someone for a
19  Class C --
20      A.  For a criminal offense.
21      Q.  Okay.  Well, I'm talking about --
22      A.  Well, a Class C is a criminal offense.
23      Q.  Okay.  It's a criminal offense?
24      A.  Yes, sir.
25      Q.  But it's non-jailable criminal offense?

Page 180

1       A.  Well, it's a jailable or non-jailable, depends on
2   the discretion of the officer.
3       Q.  Okay.
4       A.  Depending on the situation.
5       Q.  And that's what I want to know.  Does that policy
6   in the General Orders, does it say, under these
7   situations, the Class C misdemeanor for criminal
8   trespass is jailable, and under these circumstances the
9   Class C misdemeanor criminal trespass offense is not
10  jailable?
11      A.  You're not going to find that in any -- not even
12  in the Penal Code.
13      Q.  Okay.  And that's why I'm asking because I'm not
14  an officer.
15      A.  You're an attorney, you should know.
16      Q.  Well, I -- I try to do more civil work.
17      A.  Yeah.
18      Q.  But -- okay.  And I was just wondering what to
19  ask for.
20      A.  Yeah.
21      Q.  Because I wanted to know if there's -- if there's
22  something -- if there's a Weslaco policy.  Because
23  remember what you told me, you told me about the
24  requirements for the jailers and the police officers,
25  that it -- you have to follow the rules, right?  I'm

Page 181

1   just trying to find out what rules they had -- were in
2   place on May 17th to find out what they did, okay?
3   That's all I'm trying to --
4       A.  But the authority to arrest comes from the State
5   of Texas.
6       Q.  Okay.  And --
7       A.  Not the -- not the City of Weslaco.
8       Q.  Okay.  And the -- from the State of Texas, you
9   would have to look at the state law in order to find
10  out --
11      A.  The statute.
12      Q.  The statute?
13      A.  Uh-huh.
14      Q.  Whether criminal -- the offense of criminal
15  trespass under the facts on May 17th, 2007 allowed a
16  police officer to arrest or incarcerate Maricela
17  Trevino, is that correct?
18      A.  That's correct.
19      Q.  Okay.  And if the state law does not allow for
20  the incarceration of a Class C misdemeanor --
21          MR. CHANEY:  Do you mind if I -- we -- I'm
22  confused.  Are you saying a police officer can't arrest
23  someone for a Class C misdemeanor?  Or that they can't
24  be sentenced for jail time when they're convicted?
25          MR. RUIZ:  Well, I want to know --

46  (Pages 178 to 181)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 182

1  MR. CHANEY: There's a big difference.
2  MR. RUIZ: I asked if it was a jailable
3 offense.
4  MR. CHANEY: Right.
5  MR. RUIZ: That's was my original question,
6 which if they're -- can we go off the record?
7  MR. CHANEY: I guess, sure.
8  THE VIDEOGRAPHER: We're off the record at
9 12:52 p.m.
10  (Discussion off the record.)
11  THE VIDEOGRAPHER: We're back on at
12 12:53 p.m.
13  Q. (By Mr. Ruiz) Chief Martinez, do we know if --
14 for purposes of punishment, okay, if someone commits a
15 Class C misdemeanor offense, can a judge punish them
16 under a state law to jail time?
17  MR. CHANEY: Objection, form.
18  A. The judge makes that call. We don't -- she's the
19 judge.
20  Q. (By Mr. Ruiz) Okay.
21  A. She can dismiss it if she wants to.
22  Q. Let's look at Exhibit No. 8. The second -- the
23 second page of Exhibit No. 8 shows the -- the case
24 number on top?
25  A. Incident number.

Page 183

1  Q. Right, the incident number which is 10639.
2  A. I don't have that, I think -- oh, yeah.
3  Q. The third page is the report by Officer Albert
4 Ponce.
5  A. Uh-huh.
6  Q. That's No. 89.
7  A. Uh-huh. That's repeat.
8  Q. That's a repeat on Page 90, right?
9  A. Uh-huh.
10  Q. And that's a continuation on Page 91?
11  A. Yes, sir.
12  Q. And then we have Page 92, which is the report by
13 Aldino Flores?
14  A. Yes, sir.
15  Q. And then we have the booking medical sheet for
16 5/17/07.
17  A. Uh-huh.
18  Q. Do you see that, sir?
19  A. Yes, sir.
20  Q. And what is the time that is shown on that
21 booking medical sheet?
22  A. 20:25.
23  Q. Which would be around approximately 8:25?
24  A. 8:25.
25  Q. Okay. And this medical booking sheet, it does

Page 184

1 show a different number from the incident number, right?
2 Do you notice that?
3  A. 39 and 25, yeah.
4  Q. Right. Do you know why that would -- why that
5 is?
6  A. I have no idea.
7  Q. Okay. And it does have information pertaining to
8 Ms. Trevino?
9  A. Uh-huh.
10  Q. Like her address?
11  A. Uh-huh.
12  Q. And her date of birth?
13  A. Right.
14  Q. This booking medical sheet is partially filled
15 out, correct?
16  A. Yes, sir.
17  Q. And if we look at the remainder of it, the visual
18 assessment --
19  A. Uh-huh.
20  Q. -- and the medical question segments of this
21 booking medical sheet, it is not complete, correct?
22  A. That's correct.
23  Q. And since it was not completed, officer -- which
24 officer had the responsibility to ask these questions to
25 the -- to Ms. Trevino and to document her answers?

Page 185

1  A. Either/or, either the officer -- arresting
2 officer or the jailer.
3  Q. Okay. And since we don't have any documented
4 answers, would the arresting officer, Albert Ponce,
5 would he have been in violation of the -- of Captain
6 Walinsky's and your verbal directive that they entirely
7 complete these booking medical sheets?
8  A. Yes, sir.
9  Q. Okay. And the jailer, I believe his name is
10 Alfredo Moreno, he was the jailer on duty that evening
11 of May 17th, was he also in violation of your directive
12 and Captain Walinsky's directive --
13  A. Yes, sir.
14  Q. -- to completely fill out the medical -- the
15 booking medical sheet that we're looking at?
16  A. Yes, sir.
17  Q. The next page we have, which is Page 345 Bate
18 stamp number --
19  A. Uh-huh.
20  Q. -- we have -- oh, the top jail card is the jail
21 card for May 17th of '07, correct?
22  A. Yes, sir.
23  Q. And at the top we see the case No. 0710639?
24  A. Yes, sir.
25  Q. And that's consistent with the first page, right?

47 (Pages 182 to 185)

Page 186

1    A. Yes, it is.
2    Q. And if we go to the second page, which would be
3  the back, we see the medical questionnaire that's on the
4  back side of that jail card?
5    A. Right.
6    Q. Is that correct?
7    A. Yes, sir.  We see -- we see the -- again,
8  it's -- it's a -- it's the back of a jail card, I can't
9  tell you that it's the back that belongs to this jail
10  card.
11    Q. Right.  And I don't know either, but I will
12  represent to you that they -- your attorneys produced it
13  in this order.
14    A. Okay.
15    Q. You see the first -- the first page was 345, and
16  then right afterwards it's Bate stamp No. 346.
17    A. 346, okay.
18    Q. I'm assuming it is the back part.  Then the
19  jailer on May 17th of '07, Jailer Moreno, did not
20  complete any of that card out, is that correct?
21    A. Yeah, this card.
22    Q. Right of this card, right?
23    A. Yeah.  Okay.
24    Q. And --
25    A. Or any of the other cards.

Page 187

1    Q. And Jailer Moreno would have been in violation on
2  May 17th, 2007 of Captain Walinsky and your directive to
3  completely document and fill out these medical
4  questionnaires?
5    A. Yes, sir.
6    Q. Is that a yes?
7    A. Yes, sir.
8    Q. Thank you, sir.  The remainder of Exhibit No. 8
9  are some more offense reports?
10    A. Uh-huh.
11    Q. Okay.  And I think I'm -- I think I've asked you
12  all the questions I wanted to ask you on this exhibit,
13  Chief.
14    A. Okay.  He did go to -- he did go -- charge
15  criminal trespass in court county.  So he did go to
16  class B misdemeanor instead of C.
17    Q. What day was that?
18    A. That's the same arrest.  But see, you asked the
19  offense for criminal trespassing is a C, unless it's
20  upgraded to a B because of the jumping the fence and
21  breaking and entering, stuff like that.
22    Q. Okay.
23    A. So it was -- and he did -- looking at this -- his
24  report, he did file the charge criminal trespass and he
25  made it a county, so it's a Class B.

Page 188

1    Q. What page are you looking at, sir?
2    A. I'm looking at 0432.
3    Q. Okay.
4    A. So it's a county court case, so it's a Class B.
5  It's like a DWI, like a --
6    Q. Okay.
7    A. Yeah.
8    Q. But there is an inconsistency between this report
9  that he filled out and the first page of the Exhibit A,
10  right, the number?
11       MR. CHANEY:  Objection, form.
12    Q. (By Mr. Ruiz) The police officer report number?
13    A. Which one are you looking at?
14    Q. Well, if you're saying that on 432 the criminal
15  trespass -- the offense of criminal trespass becomes a
16  Class B?
17    A. Yeah, that's what he filed, a Class B
18  misdemeanor.
19    Q. That means it was going to be considered by a
20  judge and possibly --
21    A. County court.
22    Q. -- a jury in county court at law, correct?
23    A. That's correct.  That's correct.
24    Q. Okay.
25       MR. CHANEY:  It says here it's a Class B.

Page 189

1       THE WITNESS:  Uh-huh.
2       MR. CHANEY:  Or Class C, it can even be a
3  Class A it looks like.
4       THE WITNESS:  And again, it's depending on
5  the circumstances.
6    Q. (By Mr. Ruiz) Chief Martinez, were you
7  responsible for the training that the jailers received
8  during your tenure as police chief?
9    A. I was responsible to give the instruct -- to make
10  sure that they get the training, and that it was passed
11  down to Captain Walinsky.
12    Q. Okay.  So who would actually make -- or who would
13  actually ensure that --
14    A. Captain Walinsky.
15    Q. -- that the jailers would get their training?
16    A. Captain Walinsky.
17    Q. Okay.  Do you know how often the jailers would be
18  sent to training?
19    A. No, it was all in-house.
20    Q. Okay.
21    A. It was in-house, all in-house, and by officers
22  going over by Captain Walinsky.
23    Q. Do you know who were the instructors, the
24  in-house instructors for purposes of training the
25  jailers?

48  (Pages 186 to 189).

Electronically signed by Anica Diaz (001-137-509-0044)                                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 190

1     A. It could have been Lieutenant Kelly.
2     Q. Kelly?
3     A. Kelly, K-E-L-L-Y.
4     Q. Okay.
5     A. And Captain Walinsky also going over policy and
6  procedure and training.
7     Q. Any other police officer?
8     A. I don't believe so.
9     Q. Okay. Did the dispatchers receive any training?
10    A. The dispatchers receive training?
11    Q. Yes.
12    A. On dispatching, yeah.
13    Q. On dispatching? And would those also --
14    A. Had to be certified by TCLEOSE.
15    Q. And the dispatchers that you hired were certified
16  by TCLEOSE?
17    A. When they -- when they're first hired, we can
18  hire an uncertified, but then within the first year they
19  have to go and get certified. It's a 40-hour course,
20  and it's at the DPS headquarters.
21    Q. Like your jailers, did you have some dispatchers
22  who were certify and some that were not in May of 2007?
23    A. That's a possibility, yeah.
24    Q. Okay.
25    A. I would have to go look at their personnel files.

Page 191

1     Q. What was the maximum number of jailers that you
2  would have -- that you had on any shift in May of 2007?
3     A. One per shift.
4     Q. One per shift? And the shift -- in May -- that's
5  also true for May of 2007?
6     A. Yes, sir.
7     Q. And the shift lasts how long, sir?
8     A. It should be eight hours, but sometimes
9  they'll -- they would double up and go 12 hours.
10    Q. Okay. And what are the shift times?
11    A. It's like the regular police officers are 7:00 to
12  11:00 and 11:00 to -- I mean, it's 7:00 to 3:00, 3:00 to
13  11:00, 11:00 to 7:00.
14    Q. So were any jailers sent to TCLEOSE training?
15    A. Jailers to TCLEOSE training, no, sir.
16    Q. That training was done in-house, if any?
17    A. Yeah.
18    Q. Okay. And dispatchers, however, for them to be
19  certified, would have to get training from DPS, a
20  40-hour course?
21    A. That's all stipulated by state law.
22    Q. Okay.
23    A. The jailers are not detention officers, they're
24  just civilian employees.
25    Q. Okay.

Page 192

1     A. That you hire, and then they're bound by policy
2  and procedure.
3     Q. Okay. Now -- and during your time as chief from
4  1997 through 2009, right?
5     A. 2009.
6     Q. Did you take any specialized course on jail
7  administration?
8     A. Well, it's covered under -- it's covered under
9  the leadership -- chief's leadership trainings.
10    Q. Okay.
11    A. They touch a little bit on it and everything.
12    Q. And are those the Bill Blackwood --
13    A. Yeah.
14    Q. -- courses?
15    A. Yes, sir.
16    Q. And those are the only courses that
17  address -- that address jail administration?
18    A. Yes, sir.
19    Q. That you took?
20    A. Yes, sir.
21    Q. Okay.
22       MR. CHANEY: These are two -- he had two of
23  these, and only one of them is stapled as Exhibit 8. Do
24  you know -- do you have an extra or should that be
25  stapled also?

Page 193

1        MR. RUIZ: What's the date? I think it
2  should --
3        MR. CHANEY: It's the same date, 5/17.
4        MR. RUIZ: Oh, yeah, that should all be --
5        THE WITNESS: They're duplicates.
6        MR. CHANEY: They're duplicates?
7        MR. RUIZ: Oh, yeah.
8        THE WITNESS: Yeah, yeah.
9        MR. RUIZ: But it should all be stapled.
10       MR. CHANEY: Yeah, that's what I thought
11  too.
12       MR. RUIZ: Yeah.
13       MR. CHANEY: Can we go off the record for a
14  second?
15       MR. RUIZ: Sure, yes, sir.
16       THE VIDEOGRAPHER: We're off the record at
17  1:06 p.m.
18       (Discussion off the record.)
19       THE VIDEOGRAPHER: We're back on at
20  1:07 p.m.
21    Q. (By Mr. Ruiz) Chief Martinez, what were the
22  inmates supervision requirements in May of 2007?
23    A. They need to do a -- a visual check on them every
24  30 minutes -- yeah, every 30 minutes. They had to make
25  sure they got fed, and then that the paperwork be ready

49 (Pages 190 to 193)

Electronically signed by Anica Diaz (001-137-509-0044)                                   031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 194

1   for in the morning arraignment.
2       Q. Now, the visual check every 30 minutes, once
3   that -- when they completed that visual check every 30
4   minutes, were they required to log that information down
5   on a -- on a jail log?
6       A. I'm not sure if he -- if Captain Walinsky had
7   them log it down, but I know that they had to go and
8   look through the windows, and make a visual check of
9   the -- of everybody.
10      Q. Okay. And let me show you something.
11      A. Of course that's the side of the cameras, you
12  know. Now, if the dispatch would see something out of
13  the ordinary, then they would advise the jailer to go
14  prior to 30 minutes.
15      Q. Okay. And the -- the primary responsibility for
16  doing the --
17      A. Visual.
18      Q. Yeah, the inmate supervisions, who did that rest
19  with? Who was responsible? Was it the jailer or
20  dispatcher?
21      A. The jailer.
22      Q. The jailers, okay.
23      A. Yeah.
24          (Plaintiff's Exhibit No. 9 marked.)
25      Q. (By Mr. Ruiz) I'm going to hand you what's been

Page 195

1   marked as Exhibit No. 9.
2       A. Uh-huh. I can't make his writing.
3       Q. I can't complain, I think mine's worse than that.
4       A. Uh-huh.
5       Q. Now --
6       A. Yeah.
7       Q. Exhibit No. 9 is a jailer daily activity?
8       A. Yes, sir.
9       Q. Is this where -- is this the log where these
10  visual checks were required to be written down?
11      A. Yes.
12          MR. CHANEY: Objection, form.
13      Q. (By Mr. Ruiz) And so Weslaco -- Weslaco -- the
14  Weslaco Police Department in May of 2007 had a policy
15  that required the jailers, upon completion of their
16  visual check, every 30 minutes to come and log that
17  information on a jailer -- daily activity log, is that
18  correct?
19      A. I would have to look at the policy. I don't know
20  that it stated on there that they had to log it in, but
21  there is a jail activity sheet, then I would think yes.
22      Q. Okay. And if you look at the jailer daily
23  activity sheet from May 16th, '07 do you see that?
24      A. Yes, sir.
25      Q. And then you have the jailer initials and the

Page 196

1   time?
2       A. Yes, sir.
3       Q. And the incident, they seem to be written down
4   every 30 minutes?
5       A. Yes, sir.
6       Q. Okay. Do you know whether if there -- do you
7   know whether that policy was enforced, if that was a
8   requirement?
9       A. No, sir. Captain Walinsky might be able to.
10      Q. Okay. Well -- and whether it required -- it was
11  a requirement or not, we can see from this jailer daily
12  activity log on -- which is Exhibit No. 9, we see that
13  there's an -- log activity for May 16th of '07?
14      A. Yes, sir.
15      Q. Correct?
16      A. Yes, sir.
17      Q. And then there's log activity for May 18th?
18      A. 18th, yes, sir.
19      Q. Of 2007?
20      A. Yes, sir.
21      Q. And there is no log activity for the entire day
22  of May 17th, 2007, is that correct?
23      A. That's correct.
24      Q. Okay. As police chief of the Weslaco Police
25  Department, would you have wanted log activity

Page 197

1   documentation of log -- of jailer daily activity for
2   May 17th, 2007?
3       A. If there was --
4           MR. CHANEY: Objection, form.
5       A. If there was no inmate, then it's not necessary.
6       Q. (By Mr. Ruiz) Okay.
7       A. I think --
8       Q. But we --
9       A. The log was instituted so that when they have an
10  inmate, what was your -- that falls back to whether or
11  not they're -- they're taking care of the prisoners.
12      Q. Okay. And if -- do you remember when we looked
13  at one of the other exhibits of the 15th --
14      A. Yes, sir.
15      Q. -- that Ms. Trevino was incarcerated from the
16  15th and released on the 17th?
17      A. Okay.
18      Q. Do you remember that?
19      A. Yeah.
20      Q. Let me show you, Exhibit No. 7, it's Bate stamp
21  No. 456.
22      A. Uh-huh.
23      Q. I think we discussed the times.
24      A. Yeah. He might have gone off and then when she
25  gets arraigned first thing in the morning then she's

50 (Pages 194 to 197)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 198

1 released. There's no --
2    Q. Yeah, but I think what happened was that she was
3 in jail on the 15th, 16th and 17th and she was released
4 in the morning?
5    A. Uh-huh.
6    Q. And --
7    A. On the 17th -- the morning of the 17th?
8    Q. Yes, sir. Look at the time right there at the
9 bottom just because you have my copy.
10    A. Yeah.
11    Q. What time was she released?
12    A. At 10:15 a.m.
13    Q. a.m.
14    A. Uh-huh.
15    Q. And so she -- there was an inmate during the 17th
16 at the jail?
17    A. Uh-huh.
18    Q. So there should have been a daily -- jailer daily
19 log checking on her at least from 12:00 a.m. to 10:00
20 o'clock in the morning?
21       MR. CHANEY: Objection, form.
22    A. But not by this -- but not by this officer. If
23 you look in the -- go and look at the jail logs, I don't
24 know if they looked at the incoming jailer that they may
25 have logged it in there log sheet.

Page 199

1    Q. (By Mr. Ruiz) But there's only one jailer per
2 shift you testified earlier?
3    A. Yes, yes.
4    Q. So would it be that the jailer during the
5 morning, during the hours from 12:00 a.m. to 10 o'clock
6 a.m. --
7    A. Uh-huh.
8    Q. -- should that jailer, should he have --
9    A. Yeah.
10    Q. Should he have logged in, and logged in May 17th,
11 '07 checked on inmate on this sheet?
12       MR. CHANEY: objection, form.
13    A. Sure.
14    Q. (By Mr. Ruiz) Is that a yes?
15    A. I would think so, yes.
16    Q. Okay. And so we really can't tell what the
17 morning jailer, what he did or who he monitored, would
18 you agree with that?
19    A. That's correct.
20    Q. And that also would be a violation of the rules
21 of Captain Walinsky and yourself?
22       MR. CHANEY: Objection, form.
23    A. No.
24    Q. (By Mr. Ruiz) No?
25    A. No.

Page 200

1    Q. Okay. So there was no -- so to -- so there was
2 no written or verbal directive that required jailers to
3 record their daily activity during May of 2007, is that
4 correct?
5       MR. CHANEY: Objection, form.
6    A. No, I can't answer that. Captain Walinsky may be
7 more apt to answer that.
8    Q. (By Mr. Ruiz) Were you aware of any, sir, as the
9 police chief?
10    A. Not -- not that they have to or didn't have to,
11 it just depends on what his instructions to them was.
12    Q. And so sitting here today, with all your
13 education, and your training, and background in law
14 enforcement, would you have wanted your jailers, back in
15 May --
16    A. Oh, most definitely.
17    Q. -- of 2007 --
18       MR. CHANEY: He hasn't finished his
19 question, would you have wanted your jailers to --
20 you've got the wait until he --
21       THE WITNESS: Okay.
22       MR. CHANEY: The end of the question, wanted
23 to what?
24       THE WITNESS: Okay, okay.
25       MR. CHANEY: So let him finish, okay?

Page 201

1    Q. (By Mr. Ruiz) Based on your experience, education
2 and training in law enforcement, Chief Martinez, would
3 you have wanted your jailers back on May 17th of 2007,
4 to have recorded and documented the -- their daily
5 activity as it pertains to monitoring of the detainees?
6       MR. CHANEY: Objection, form.
7    Q. (By Mr. Ruiz) You can answer.
8    A. Yes.
9    Q. So on -- on May 17th of 2007, Chief Martinez,
10 there were no female detention officers or jailers
11 employed by the City of Weslaco, is that correct?
12    A. That's correct.
13    Q. And so if there were no female jailers or
14 detention officers on May 17th, 2007 then there would
15 not have been someone to perform a thorough pat down of
16 Maricela Trevino when she was admitted into the jail the
17 evening of May 17th of '09?
18    A. Pat down was not done, but just brisk pat down.
19    Q. And --
20    A. Checking the pockets and that's it.
21    Q. Okay. And what type of a -- is that the type of
22 pat down that the -- that the policy is required?
23    A. For -- for males and females, yes.
24    Q. Okay. So the policy for a male jailer booking
25 and patting down a female detainee was a brisk pat down,

51 (Pages 198 to 201)

Electronically signed by Anica Diaz (001-137-509-0044)                                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 202

```
 1     is that correct?
 2        A.  Females.
 3        Q.  And this is in May of '07?
 4        A.  Yes.
 5        Q.  Okay.  Is that written down anywhere, sir?
 6        A.  No, it's not written down anywhere.
 7        Q.  Is that a verbal directive policy?
 8        A.  Yes, it is.
 9        Q.  And you approved of that policy as chief in
10     May of '07?
11        A.  Yes, sir.
12        Q.  Okay.  And the policies that Captain Walinsky had
13     set out the verbal directives concerning the
14     completion -- the completion and the documentation of
15     the -- of the medical questionnaire on the back side of
16     the jail card, that was a policy that you approved of as
17     well in May of '07, correct?
18        A.  Captain Walinsky?
19        Q.  Yes.
20        A.  I can't answer that, unless you -- verbal
21     policies, you would have to talk to Captain Walinsky
22     about verbal policies.
23        Q.  Did they have -- his policies had your blessings,
24     right, as the -- as your --
25        A.  Well, I understand that.  But if it was a verbal,
```

Page 203

```
 1     I mean, he went ahead and to the best of his ability --
 2        Q.  Okay.
 3        A.  -- gave them a directive or a verbal directive to
 4     do stuff.
 5        Q.  So you were --
 6        A.  And I wouldn't -- I mean, as long as the -- the
 7     jail system was running smoothly, you know, based on
 8     him, I have to rely on the captain to -- to be doing his
 9     job.
10        Q.  Well, and if that was his policy, you had no
11     problem with it?
12        A.  No.
13        Q.  Correct?
14        A.  That's correct.
15        Q.  And you also didn't have any problem with Captain
16     Walinsky's policy as it pertains to officers or jailers
17     completing the medical booking sheet as well, is that
18     correct?
19        A.  That's correct.
20        Q.  Okay.  I'm sorry, Chief, give me a second to
21     catch -- Chief, in May of 2007, what were the intake
22     procedures to determine immediate medical needs of a
23     detainee?
24        A.  The assessments made by the officer at -- on the
25     scene.
```

Page 204

```
 1        Q.  I'm sorry?
 2        A.  On the scene.
 3        Q.  On the scene?
 4        A.  The officer assessment.
 5        Q.  Okay.  Chief, in May of 2007, what were
 6     the -- before -- well, on May 17th, 2007, what were the
 7     intake procedures to determine immediate policies
 8     regarding custodial supervision of a detainee?
 9            MR. CHANEY:  Objection, form.
10        A.  Would you repeat the -- I don't understand the
11     question.  What are you asking?
12        Q.  (By Mr. Ruiz) Sure.  If someone -- if someone
13     requires -- was there ever a situation where someone
14     required constant supervision at the -- at the Weslaco
15     jail during your tenure?
16        A.  Not constant supervision, but like your public
17     intoxicated persons that -- because we were a holdover
18     for DPS also.
19        Q.  Okay.
20        A.  That were highly intoxicated and they needed to
21     be looking at them to make sure that they weren't
22     passing out.
23        Q.  Okay.  And so if you had a -- and so your -- in
24     May of 2007, before May 17th of 2007, your policy was to
25     monitor these detainees every 30 minutes, correct?
```

Page 205

```
 1        A.  Unless told by the officer -- pointed out by the
 2     officer, you need to watch him because he's had too much
 3     to drink, or you need to watch him because he's violent.
 4        Q.  Okay.
 5        A.  Or let me know if he starts hurting himself, so
 6     you know.
 7        Q.  Okay.  And under what circumstances would
 8     you -- like let's say somebody was hurting themselves?
 9        A.  Uh-huh.
10        Q.  What type of supervision would be afforded that
11     detainee upon knowing that?
12        A.  Okay.  Then every 15 minutes they would have to
13     check with them, and then constant -- we would lock in
14     the -- the camera to that particular cell.
15        Q.  Okay.
16        A.  And then monitor the rest.
17        Q.  And if someone was highly intoxicated, what type
18     of monitoring would --
19        A.  The same.
20        Q.  Would be required?
21        A.  The same, sir.
22        Q.  That would be every 15 minutes?
23        A.  Every 15 minutes and then constant visual --
24        Q.  Okay.
25        A.  -- on the camera.
```

Hill & Romero
Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 206

1     Q. Okay. So it would be the jail detention officer
2  or jailer going to the cell every 15 minutes?
3     A. Yes.
4     Q. If there is a person who is highly intoxicated or
5  on drugs?
6     A. Right.
7     Q. If there is a -- at the same time, you would also
8  have video monitoring?
9     A. Dispatch -- alert dispatch to be looking at them
10 and let you know if anything out of the ordinary is
11 happening.
12    Q. Okay. And how would dispatch know, who
13 was -- who was responsible for letting dispatch know
14 that this prisoner, we need -- we need you to constantly
15 be video monitoring him?
16    A. The officer.
17    Q. The police officer?
18    A. The police officer.
19    Q. Not the jailer?
20    A. Not the jailer.
21    Q. Okay. Now, so we have an example of a detainee,
22 this is prior to May 17th, okay --
23    A. Uh-huh.
24    Q. -- of 2007, my hypothetical.
25    A. Okay.

Page 207

1     Q. You have an individual who is hurting himself,
2  okay, this is an example you gave.
3     A. Uh-huh.
4     Q. The requirement that the jailer was supposed to
5  follow was that he would monitor that individual every
6  15 minutes, correct?
7     A. Yeah. Up until the point that he starts hurting
8  himself.
9     Q. Okay. And at the same time, the officer would
10 have been responsible to advise the dispatcher to -- to
11 have constant monitoring on that particular cell or
12 detainee?
13    A. Uh-huh.
14    Q. Is that correct?
15    A. That's correct.
16    Q. Okay. Any type of situation that would require
17 monitoring, like constant monitoring? Can you think of
18 any, sir?
19    A. I mean, the dispatch monitors anybody and
20 everybody that are in the cells.
21    Q. Okay.
22    A. But if they -- if an officer would request that
23 that person be -- be constantly monitored for whatever,
24 an assessment would have to be redone, and perhaps maybe
25 have him looked by a doctor.

Page 208

1        We call in an EMS to kind of give them -- ask him
2  the questions, and check his vitals, and check his
3  purchase, or check whatever they do as an EMS. And then
4  the officer, arresting officer, together with the
5  supervisor, would reevaluate or reassess.
6        And if -- if at -- if they felt that he needed to
7  go to MHMR for whatever, because he's continuing to hurt
8  himself, he's going to hurt himself, then at that point
9  they -- they get him out of the cell and they took him
10 to MHMR.
11    Q. Okay. And just to be clear, so the level of
12 video monitoring 15 minutes -- of the 15-minute level --
13 let me start over, maybe that was a bad question.
14       If I understand you correctly, Chief Martinez, it
15 would be the arresting police officer who would advise
16 the dispatcher whether constant monitoring was going to
17 be needed for a detainee?
18    A. That's correct.
19    Q. This is prior to May 17th of '07?
20    A. That's correct.
21    Q. Did that policy change after May 17th of 2007?
22    A. No, sir, it's still -- it's still in place. I
23 mean, they monitor everybody.
24    Q. Okay.
25    A. But if you have -- there's a -- there's a feature

Page 209

1  in the computer that brings up just that cell, and you
2  can -- the other ones rotate.
3     Q. Okay.
4     A. From the man cell, to the drunk tank, to the
5  juvenile cell. And it --
6     Q. Okay.
7     A. But you would have that feature that would lock
8  in on that particular cell, and you would always
9  constantly be monitoring that cell.
10    Q. And that would have been the dispatcher?
11    A. That would have been --
12    Q. Who would be monitoring, right?
13    A. Yeah, that would have been the dispatcher. And
14 if there was any -- anything out of the ordinary, their
15 job was to call jail -- jailer, jailer calls the
16 officer -- arresting officer, the arresting officer
17 comes in and reassesses.
18    Q. Okay. And so a lot depends on the arresting
19 police officer's assessment and evaluation of the person
20 detained, correct?
21    A. That's correct.
22    Q. And in order for the arresting police officer to
23 communicate when there's a need for video -- constant
24 video monitoring, that all depends on the type of
25 training that that police officer has obtained with

53 (Pages 206 to 209)

Electronically signed by Anica Diaz (001-137-509-0044)                                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 210

1  respect to medical and mental health issues, would you
2  agree with that?
3       MR. CHANEY: Objection, form.
4       A. And years of experience.
5       Q. (By Mr. Ruiz) And years of experience, you said,
6  right?
7       A. Uh-huh.
8       Q. And I'm sorry, I think Mr. Chaney objected.
9       A. Uh-huh.
10      Q. That also -- his training in medical and mental
11  health issues would be very important for that arresting
12  officer in order to make that call, whether the
13  dispatcher needs constant monitoring of this individual
14  by video, is that correct?
15      A. Uh-huh.
16      Q. Is that a yes?
17      A. Yes.
18      Q. Okay. Chief Martinez, if -- would you agree with
19  me that if a jailer would have completed the screening,
20  the booking medical sheet, and depending on the answers
21  to the booking medical sheet that the detainee provided,
22  would you agree with -- with me that whatever the
23  detainee responds to, that would dictate the level of
24  monitoring or surveillance that should be provided to
25  that detainee?

Page 211

1       MR. CHANEY: Objection, form.
2       A. I can't agree on anything that -- that is in his
3  mind. I don't know what he was thinking about at that
4  time. I don't know if -- if he figured that -- you
5  know, I know what the assessment that needs to take
6  place by the police officer.
7       Q. (By Mr. Ruiz) Right.
8       A. Be as far as the jailer is concerned -- I mean,
9  unless he were to tell me, you know, I think he did
10  this, I think she needs this, then otherwise I can't
11  agree to say that, yeah, that's what he would have done.
12      Q. Well, then let me ask you this question, because
13  one of the questions for the -- for the jailer to answer
14  is --
15      A. Uh-huh.
16      Q. -- does the inmate's behavior suggest the risk of
17  suicide or assault? What happens when the arresting
18  officer doesn't feel like there's a need to have
19  constant monitoring, okay, but the jailer does believe
20  that the inmate's behavior suggests the risk of suicide
21  or assault?
22      A. Then he calls --
23      Q. What happens then?
24      A. He calls the officer back in and tells him why he
25  feels that there's that need, then the officer

Page 212

1  reassesses or calls in the supervisor, which is Captain
2  Walinsky, and says, look, my assessment is this, but the
3  jailer has seen this and that, and I think we need to
4  come together on -- on an agreement, and let's -- I
5  think if he needs to go to MHMR, then that's when they
6  take him to MHMR.
7       Q. In your opinion, Chief Martinez, do you think
8  that the questions that are written down on this booking
9  medical sheet 1 through 22, how important are the
10  answers to these questions, based on your education,
11  training and experience?
12      A. They're important.
13      Q. Okay. And they should always be completed,
14  correct?
15      A. My opinion, yes.
16      Q. Okay. And the same goes for the medical
17  questionnaire on the back of the jail card, correct?
18      A. Yes, sir.
19      Q. They should always be completed because they're
20  very important?
21      A. My opinion, yes, sir.
22      Q. You said that there was some internal trainings
23  that were provided to the jailers or detention officers
24  earlier?
25      A. Yes, sir.

Page 213

1       Q. Do you know whether any of that training focused
2  on how to determine if a detainee is suffering from
3  mental illness and presents a danger to himself or
4  herself and others?
5       A. No, sir, not -- not -- not unless I looked at the
6  training --
7       Q. Okay. Was that something --
8       A. -- records.
9       Q. -- that Captain Walinsky would be --
10      A. Yes, sir.
11      Q. -- be a better person to ask?
12      A. Yes, sir.
13      Q. Okay. The information that's con -- the
14  information on this booking medical sheet, Chief
15  Martinez?
16      A. Uh-huh.
17      Q. Is -- are there fields on the computer for the
18  jailer to answer them in? Or is it -- do you have to
19  answer them with a pen and pencil -- pen or pencil?
20      A. I'm not familiar with the -- with the -- the
21  fields on the computer. It's -- you would have to ask
22  Captain Walinsky or the ID tech.
23      Q. Okay.
24      A. We had an ID tech that worked there.
25      Q. Okay. And who was the ID tech during --

54 (Pages 210 to 213)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 214

1    A. Freddy Hinojosa.
2    Q. Freddy Hinojosa. He's a civilian, I take it?
3    A. Yes, sir.
4    Q. Do you know if he's still employed by the City of
5  Weslaco?
6    A. I don't think he's employed with the City of
7  Weslaco.
8    Q. Okay. Chief Martinez, what kind of policies and
9  practices were in place by the City of Weslaco Police
10 Department in May of 2007 to prevent detainees from
11 committing suicide?
12       MR. CHANEY: Objection, form.
13       MR. RUIZ: What's your --
14       MR. CHANEY: All of -- what he's talked
15 about all day.
16       MR. RUIZ: Well, I can rephrase the
17 question.
18       MR. CHANEY: Okay.
19       MR. RUIZ: If you want me to.
20       MR. CHANEY: I mean, that's what we've been
21 talking about for --
22    Q. (By Mr. Ruiz) Chief Martinez, were there -- was
23 there a specific group of policies in May -- prior to
24 May 17th of 2007 that were tailored to prevent detainees
25 from committing suicide inside the Weslaco jail?

Page 216

1    Q. So to check on --
2    A. But to prevent -- to prevent them from becoming
3  suicidal, I mean, only that person is going to -- if the
4  assessment is not made up front, then --
5    Q. Okay. Well, then let me see if I understand, let
6  me give you the list, okay? The policies that were in
7  place prior to May 17th of 2007 to prevent detainees
8  from committing suicide at the Weslaco Police Department
9  rested primarily on the arresting officer's assessment
10 of the individual at the scene?
11    A. That's correct.
12    Q. And that arresting officer's authority and
13 ability to transfer that individual to a hospital or
14 medical or mental health facility?
15    A. Uh-huh.
16    Q. Is that correct?
17    A. Uh-huh.
18    Q. The other policy that was in place or policies
19 involved the jailer daily check of the inmates?
20    A. Yes, sir.
21    Q. Okay. And what else, sir? I only caught those
22 two.
23    A. The video cameras.
24    Q. Oh, and the video cameras -- video monitoring by
25 the communications dispatchers, is that correct?

Page 215

1    A. Well, the assessment that was -- the assessment
2  primarily would prevent -- even the arrest, you know, of
3  the individual.
4       So if we had knowledge, or if the officer
5  assessed the suspect to be a mental health patient, then
6  he wouldn't even be arrested. He would be taken before
7  MHMR, and then, you know, let MHMR make that evaluation,
8  and perhaps maybe would have to go to some placed
9  hospital where you take them up to San Antonio, Waco
10 or --
11    Q. And so if I'm understanding your answer,
12 Chief Martinez, the tool available to prevent suicides
13 was the authority that an arresting officer had to
14 involuntarily commit someone?
15    A. Right.
16    Q. Is that correct?
17    A. That's correct.
18    Q. Is there anything else that was written?
19    A. Well, you -- you have the -- it alerts you, it
20 doesn't prevent it, but you have video cameras that you
21 look at, and then you have the 15 minute -- 30 minute
22 check on the prisoners to insure, make sure that they're
23 not --
24    Q. Okay.
25    A. They're not --

Page 217

1    A. Well, I mean, they would alert us to what's going
2  on, whether they prevent suicide.
3    Q. Right. And I'm just trying to find out what you
4  had in place in order to -- would you say minimize the
5  risk, would that be better?
6    A. Well, it would minimize the risk, yeah.
7    Q. And have I understood everything that was in
8  place on May 17th of 2007?
9    A. Yes, sir.
10    Q. And before?
11    A. Yes, sir.
12    Q. Okay. Were there any -- on -- prior -- on
13 May 17th, 2007, Chief Martinez, were there any written
14 policies and practices that addressed suicide prevention
15 techniques for your jailer, let's say?
16    A. No, sir.
17    Q. For your police officers?
18    A. No, sir.
19    Q. For your dispatchers?
20    A. No, sir.
21    Q. And let me see if I understand you correctly, I
22 might give you an example, assume with me that you
23 have -- this is prior to May 17th of '07. That you have
24 a -- a person, a detainee who states that she wants to
25 kill herself, okay, during the booking process, and --

55 (Pages 214 to 217)

Electronically signed by Anica Diaz (001-137-509-0044)                                           031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 218

1   what are the procedures that the Weslaco jailer or the
2   arresting officer should follow after hearing that
3   statement?
4           MR. CHANEY: Objection, form.
5       A. Okay. If we're assuming, then it's not actual.
6   If you're asking me what I would do, I can tell you, but
7   I mean assuming is -- can be anything. I mean,
8   assuming -- I can assume that they're not suicidal.
9       Q. (By Mr. Ruiz) Okay.
10      A. And you're asking me to assume that they're
11  suicidal and what was the policy, we don't deal with
12  assume -- assumptions, we deal with facts and we deal
13  with what actually is going on, what's happening.
14      Q. Okay. And my question was, what if the detainee
15  during booking states that she wants to kill herself?
16  What --
17      A. Then they call the arresting officer back in.
18      Q. Who does?
19      A. The jailer --
20      Q. Okay.
21      A. -- calls the officer back in, and tells the
22  officer exactly what she has said. The officer then
23  reassesses, and if he has a problem, then he calls the
24  supervisor and then that's -- they go from there.
25      Q. Okay.

Page 219

1       A. That's assuming that she wants to kill herself.
2       Q. Well, and -- okay. If she states it or assumes
3   it, that's what they would do?
4       A. If she assumes that's -- we're going to -- that's
5   what we would do. If she states, then we'll do the
6   actual call.
7       Q. Well, I'm a little confused but I'll ask it
8   again.
9       A. Well, I mean --
10      Q. What was a jailer supposed to do --
11      A. If she states --
12      Q. Can I finish my question that way --
13      A. Sure.
14      Q. -- we can be on the same page.
15      A. Sure.
16      Q. During the booking process, Chief Martinez, prior
17  to May 17th of '07, what was the jailer supposed to do
18  upon hearing that the detainee wants to kill himself or
19  herself? What does he do?
20      A. Then they call --
21      Q. Take me step by step.
22      A. Then they call the officer.
23      Q. Okay.
24      A. The officer reassesses by talking to them, asking
25  questions, looking at prior -- I mean getting --

Page 220

1   investigating, look at prior arrests, what has been
2   her -- and then if he has a problem with reaching a -- a
3   conclusion, then he calls the -- the supervisor, which
4   would be Captain Walinsky.
5       Q. And the looking at prior arrests, you can -- that
6   would require looking at an individual's complete arrest
7   history?
8       A. Well, you would -- yeah. Who was the arresting
9   officer on prior cases? And then ask the arresting
10  officer on prior cases what assessment did you make when
11  you arrested her? And then you go from there, you do an
12  investigation.
13      Q. Would you look at the arrest records also?
14      A. Sometimes, sometimes you don't. Sometimes you go
15  by the -- by what the other officer tells you.
16      Q. Okay. And when this officer is called back, he
17  has access to prior arrest records for a person,
18  correct?
19      A. Only if he goes through the officer that made the
20  report.
21      Q. Okay.
22      A. In the incident report, only the officer that
23  makes that report has the authority to pull that report
24  out.
25      Q. Would Captain Walinsky --

Page 221

1       A. Captain Walinsky would.
2       Q. So --
3       A. Because he's the supervisor.
4       Q. Okay.
5       A. He's got his password.
6       Q. Okay. And this was -- this was prior the
7   May 17th of '07, right?
8       A. Yes, sir.
9       Q. Okay. So Captain Walinsky would have the
10  authority and the clearance, I guess, to look back at
11  this detainee's arrest history to determine either a
12  medical condition, or any past abnormal behavior, or
13  even suicide attempts, would that be correct?
14      A. That's correct.
15      Q. Okay. And that was a policy that had your
16  blessing prior to May 17th of '07?
17          MR. CHANEY: Objection, form. When you say
18  "that," what do you mean?
19      Q. (By Mr. Ruiz) The policy of involving
20  Captain Walinsky -- the arresting officer and
21  Captain Walinsky and looking at jail -- past jail
22  records and past arrest records in order to inform their
23  judgment about what to do, that's what I meant. Is that
24  a yes?
25      A. Yeah.

56 (Pages 218 to 221)

Electronically signed by Anica Diaz (001-137-509-0044)                          031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 222

1    Q. In the mean time, what is the jailer supposed to
2 do with the detainee while this is done, Chief Martinez?
3    A. What do you mean?
4    Q. Well --
5    A. What is he supposed to do? He just turned him
6 over to the police officer.
7    Q. Okay. And the arresting officer, what does he
8 do?
9    A. Takes custody again --
10    Q. Okay.
11    A. -- of the inmate.
12    Q. Uh-huh.
13    A. And then when the officer and the Captain are
14 done, they turn him back over to the jailer, which takes
15 custody of them again, and places him in the cell.
16    Q. Okay. And taking custody means that they're with
17 the --
18    A. Yes.
19    Q. -- detainee 100 percent of the time?
20    A. Yes, yes.
21    Q. Okay. I wasn't sure, that's why I was asking.
22    A. Yes.
23    Q. Okay. Now, on -- it seems -- I think you stated
24 earlier, I think, prior to one of your breaks that on
25 May 17th, 2007, the dispatcher at the communications

Page 223

1 department was unable to fully see Ms. Trevino inside of
2 her cell, am I -- did I understand you correctly?
3    A. No, I didn't say that.
4    Q. Okay. I thought I had written down --
5    A. No.
6    Q. -- dispatcher can't see her from her camera?
7    A. I said if -- if the dispatcher is not able to see
8 a prison, a prisoner. Not necessarily Maricela Trevino.
9    Q. Okay.
10    A. That she would call the jailer and say, look, I
11 can't see her, maybe she's hiding, what is she doing?
12 Is she under the bed or whatever.
13    Q. Okay.
14    A. So then the jailer goes and takes a look in the
15 cell and finds out where this person is.
16    Q. Okay. Thank you for clarifying that.
17    A. Uh-huh.
18    Q. And if someone is in the booking department
19 getting booked, a detainee, and that -- going back to
20 the example, the detainee that states that he or she
21 wants to kill himself or herself, do you think that's a
22 basis for constant monitoring of that detainee?
23    A. If she says she's going to kill herself?
24    Q. Yes.
25    A. Is that a basis for constant monitoring.

Page 224

1    Q. Yes, sir. In your --
2    A. Yes.
3    Q. Okay.
4    A. Most definitely.
5    Q. And was that a basis for constant monitoring back
6 in -- prior to May 17th of '07?
7    A. Yes, sir.
8    Q. Okay. And should a supervisor be called in?
9    A. That's up to the -- to the arresting officer.
10    Q. Okay.
11    A. If he feels that he needs the supervisor to come
12 in.
13    Q. Should a medical provider be called in?
14    A. If the supervisor feels that -- if there's blood
15 in her hands, she hurts himself or herself, then you
16 call an EMS person. If you -- the assessment is made
17 that he needs an evaluator, then they take him to MHMR,
18 and over there they would evaluate them.
19    Q. Okay, thank you. Now, Officer, you've been a DPS
20 trooper, you've been a -- an Hidalgo County reserve
21 officer and you've been a police chief.
22       The types of persons who law enforcement comes in
23 contact with on a daily basis, would they include
24 homeless people?
25    A. Sure.

Page 225

1    Q. Would they include gang members?
2    A. Sure.
3    Q. Juveniles?
4    A. Yes, sir.
5    Q. Pregnant ladies?
6    A. Yes, sir.
7    Q. How about people with physical ailments?
8    A. Yes, sir.
9    Q. How about people with communicable diseases?
10    A. Yes, sir.
11    Q. People with psychiatric problems?
12    A. Yes, sir.
13    Q. People with behavioral problems?
14    A. Yes, sir.
15    Q. People with relationship problems, with family
16 and loved ones?
17    A. Family violence, yes, sir.
18    Q. People with emotional problems?
19    A. Yes, sir.
20    Q. And people with drug addiction and psychiatric
21 problems?
22    A. Yes, sir.
23    Q. And these persons, these types of people that law
24 enforcement comes in contact with on a daily basis,
25 these are also the types of persons that are arrested by

57 (Pages 222 to 225)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 226

1    law enforcement at times?
2    A. Yes, sir.
3    Q. So it wouldn't surprise you, and it would be, in
4    fact, common to have to arrest someone with a drug
5    addiction and psychiatric problems?
6    A. Yes, sir.
7    Q. Someone who's going through emotional problems?
8    A. Yes, sir.
9    Q. Someone who's going through relationship problems
10   with family and loved ones?
11   A. Yes, sir.
12   Q. Behavioral issues?
13   A. Yes, sir.
14   Q. Psychiatric issues?
15   A. Yes, sir.
16   Q. And physical ailments?
17   A. Yes, sir.
18   Q. Okay. So it's foreseeable for a law enforcement
19   department such as the Weslaco Police Department and
20   their officers, and jailers, and dispatchers, it's
21   foreseeable that they're going to come in contact with
22   mentally unstable persons who may be suicidal?
23         MR. CHANEY: Objection, form.
24   Q. (By Mr. Ruiz) Is that a yes?
25   A. Sure.

Page 227

1    Q. Okay. And it's foreseeable that they're going to
2    come -- Weslaco PD officers, jailers and dispatcher are
3    going to come in contact with persons suffering from
4    depression who are suicidal?
5         MR. CHANEY: Objection, form.
6    A. (Witness nods head.)
7    Q. (By Mr. Ruiz) Is that a yes?
8    A. Yes, sir.
9    Q. And it's also foreseeable for Weslaco PD
10   officers, jailers and dispatchers to come in contact
11   with emotional disturbed persons who are suicidal?
12         MR. CHANEY: Objection, form.
13   A. Yes, sir.
14   Q. (By Mr. Ruiz) And lastly, you can -- it's also
15   foreseeable for Weslaco PD officers, jailers and
16   dispatchers to come in contact with persons under the
17   influence of drugs, who are also suicidal?
18         MR. CHANEY: Objection, form.
19   A. Yes, sir.
20   Q. (By Mr. Ruiz) And Chief, along the same lines,
21   would you agree with me that it is common for Weslaco
22   Police Department jailers and detention officers to
23   handle detainees with mental health issues?
24         MR. CHANEY: Objection, form.
25   Q. (By Mr. Ruiz) Who aggravate their conditions by

Page 228

1    consuming drugs or alcohol?
2         MR. CHANEY: Objection, form.
3    Q. (By Mr. Ruiz) You can answer.
4    A. No.
5    Q. No?
6    A. The assessment is done by the officer, and the
7    jailers don't handle that.
8    Q. Okay. Would you agree with me, Chief Martinez,
9    that Weslaco Police Department jailers encounter usual
10   and recurring situations where detainees express the
11   desire to kill themselves during their incarceration at
12   the Weslaco jail?
13         MR. CHANEY: Objection, form.
14   A. It's possible.
15         MR. CHANEY: Did you say it's common?
16         MR. RUIZ: I said it's usual and recurring.
17         MR. CHANEY: That it's usual and -- would
18   you repeat the question?
19         MR. RUIZ: Sure.
20   Q. (By Mr. Ruiz) Would you agree with me,
21   Chief Martinez, that Weslaco jailers encounter usual and
22   recurring situations where detainees express a desire to
23   kill themselves during their incarceration at the
24   Weslaco jail?
25   A. No.

Page 229

1    Q. No?
2    A. No.
3    Q. Okay. Let me stop right there.
4         THE VIDEOGRAPHER: Counsel, may I change
5    tapes?
6         MR. RUIZ: Oh, you need to change tapes?
7    Okay, let's change types, sure.
8         THE WITNESS: Off the record at 1:49 p.m.
9         (Break was taken at 1:47 p.m. - 1:51 p.m.)
10        THE VIDEOGRAPHER: We're back on the record
11   at 1:53 p.m.
12        (Plaintiff's Exhibit No. 10 marked.)
13   Q. (By Mr. Ruiz) Chief, I'm going to hand you what
14   I've marked as Exhibit No. 10, if you can please take a
15   look at that.
16   A. Okay, sir.
17   Q. What is Exhibit No. 10, sir? Have you had a
18   chance to review Exhibit No. 10, Chief Martinez?
19   A. That's what I'm doing right now.
20   Q. Oh, okay, I'm sorry. Okay.
21   A. Okay, sir.
22   Q. Okay. What is Exhibit No. 10?
23   A. It is a jailer daily activity sheet.
24   Q. And that jailer daily activity log is for
25   February 5th, 2006?

58 (Pages 226 to 229)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Electronically signed by Anica Diaz (001-137-509-0044)

Page 230

1    A. Yes, sir.
2    Q. To February 6th, 2006?
3    A. Yes, sir.
4    Q. And I'll direct your attention to the top entry,
5    under incident, at 8:30 it says, 95 Coronado was pepper
6    sprayed and then I helped trooper put 95 in cell No. 2.
7    Water was then sprayed on Coronado's face for
8    decontamination.  Subject Coronado was placed in Cell
9    No. 2 where he continued to be aggressive by banging on
10   door.
11   A. Uh-huh.
12   Q. Kicking door and hitting it with his head.  A
13   10-minute watch was placed on this subject due to
14   stating that he was going to kill himself.
15   A. Uh-huh.
16   Q. Did that read that correctly?
17   A. That's correct.
18   Q. Okay.  So here we have one instance where a
19   detainee expressed that he was going to kill himself?
20   A. Uh-huh.
21   Q. I'm going to provide you with another one, okay?
22   A. Okay.  This is -- okay.
23       (Plaintiff's Exhibit No. 11 marked.)
24   Q. (By Mr. Ruiz) I'm going to hand you
25   Exhibit No. 11.

Page 231

1    A. Uh-huh.
2    Q. What is Exhibit No. 11?
3    A. It's also a jailer daily activity log.
4    Q. Okay.  For what date, sir?
5    A. 9/7.
6    Q. September of '07?
7    A. 9/7/05.
8    Q. Oh, of '05, okay.  And I'm trying to find my
9    copy.  But do you see in that Exhibit No. 11 where the
10   jailer has written down in the incident report section
11   suicide?
12   A. Right here, uh-huh.
13   Q. Do you see that?  And if I could see that here
14   with you.
15   A. Uh-huh.
16   Q. And it says 10-4, female suicidal with a bunch of
17   asterisks, do you see that, sir?
18   A. Uh-huh.
19   Q. Okay.  So those are at least two instances where
20   detainees have expressed -- have expressed that they
21   want to kill themselves?
22   A. Uh-huh.
23   Q. Is that a yes?
24   A. Yeah.
25   Q. Okay.  So if I ask you this question, would you

Page 232

1    agree with me that Weslaco jailers encounter usual and
2    recurring situations where detainees express a desire to
3    kill themselves during their incarceration at the
4    Weslaco jail?
5    A. One is in '05 and the other one is '06, that's a
6    year apart.
7    Q. Okay.
8    A. So that is not reoccurring.
9    Q. Okay.
10   A. Okay.  It's a year apart.
11   Q. Okay.
12   A. That we do have them, yeah, I will agree that we
13   do have people.
14   Q. Okay.
15   A. But not reoccurring.
16       (Plaintiff's Exhibit No. 12 marked.)
17       MR. CHANEY:  That's DPS, not ours.
18   Q. (By Mr. Ruiz) Okay.  Does the Weslaco Police
19   Department have -- does Weslaco Police Department
20   officers encounter usual and recurring situations where
21   subjects express a desire to kill themselves?
22       MR. CHANEY:  You've asked that question now
23   about three times, and he's answered the same way.
24       MR. RUIZ:  That's a different question, but
25   what's --

Page 233

1        MR. CHANEY:  Weslaco Police Department?
2        MR. RUIZ:  Right.  The other ones were --
3    the other ones were limited to people who were detained.
4        MR. CHANEY:  Okay.  Now, I just
5    misunderstood your question, I apologize.
6        MR. RUIZ:  Okay.
7        MR. CHANEY:  Would you ask it again?
8        MR. RUIZ:  Sure.
9    Q. (By Mr. Ruiz) Would you agree with me that
10   Weslaco Police Department officers encounter usual and
11   recurring situations where subjects express a desire to
12   kill themselves?
13   A. Yes, sir.
14   Q. Okay.  In fact, I'm going to hand you
15   Exhibit No. 12.
16   A. Okay.
17   Q. And I'll direct your attention, this is an
18   internal police department memo?
19   A. Yeah.
20   Q. Correct?  And it's from you, Chief JD Martinez,
21   chief of police.  Are those your initials?
22   A. Yes, sir.
23   Q. To city manager Anthony Covacevich?
24   A. Uh-huh.
25   Q. And it's dated June 9th, 2008?

59 (Pages 230 to 233)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 234

1    A. Uh-huh.
2    Q. And the subject is the Advocacy, Inc. document
3  review?
4    A. Uh-huh.
5    Q. And towards the bottom of the last paragraph you
6  write, to Weslaco Police Department deals with suicidal
7  subjects Section 26/28 apprehensions with and without
8  warrant for mental health?
9    A. Uh-huh.
10   Q. On a regular basis in order to get professional
11 help to those in need of mental health.
12   A. Yeah.
13   Q. Did I read that correctly?
14   A. On a regular basis, in order to get professional
15 help to those who need mental health services,
16 Section 26 and 28.
17   Q. Did I --
18   A. That's what I'm talking about.
19   Q. Did I read that section correctly?
20   A. Yeah, but whether you're -- you're understanding
21 it correctly is --
22   Q. Well, my question -- and I can make it real
23 simple. Does the Weslaco Police Department, prior the
24 May 17th of 2007, did it on a regular basis deal with
25 suicidal subjects Section 26 and 28 apprehensions, in

Page 235

1  order to get professional help to those in need of
2  mental health services?
3    A. Yeah.
4    Q. What number was that, Chief?
5    A. That's No. 12.
6    Q. Chief, on May 17th, 2007 did you -- were you
7  contacted by any of your assistant police officers?
8    A. Yes, sir.
9    Q. Okay. Were you in Weslaco at the time?
10   A. No, sir.
11   Q. Where were you, sir?
12   A. I was at a conference at the Island.
13   Q. Okay. And what was the name of that conference?
14   A. I wouldn't be able to tell you. It involved the
15 city manager, the mayor, the commissioners, and some
16 department heads.
17   Q. Was it a conference for purposes of law
18 enforcement training?
19   A. It was a conference that dealt with city staff.
20   Q. Okay. Was it just -- was it just for -- so no,
21 it was not a law enforcement conference that related --
22   A. It was not a law enforcement conference, no, sir.
23   Q. Okay.
24   A. It was for public officials.
25   Q. Okay. And were you required to attend this

Page 236

1  conference?
2    A. I was asked to attend by the city manager and
3  mayor.
4    Q. And who was the city manager and mayor at that
5  time?
6    A. Anthony Covacevich.
7    Q. Okay. And the mayor?
8    A. The mayor was Buddy De La Rosa.
9    Q. Okay. And what -- what did they tell you when
10 you -- who contacted you?
11   A. The captain, Captain Walinsky.
12   Q. Okay. And what did he tell you during that
13 conversation?
14   A. He stated to me that there was an attempt -- a
15 suicide attempt.
16   Q. Okay.
17   A. The person was revived, taken to the hospital,
18 later died at the hospital.
19   Q. Okay. Did he tell you -- did you give him any
20 directives at that time?
21   A. Yes, sir. I told him to make sure that we get
22 statements from everybody that was involved, paramedics,
23 if there were paramedics used, police officers, anybody
24 that was in contact, dispatchers, jailers. And then
25 make sure that -- that they checked up on her, continue

Page 237

1  to see whether she was surviving or not surviving.
2    Q. Did you at any point get directly involved with
3  that investigation?
4    A. No, sir.
5    Q. Okay. And did Captain Walinsky assign somebody
6  else to conduct -- to do what you asked him, or was it
7  his duty to comply with your orders?
8    A. You would have to ask him.
9    Q. Okay. And what do you recall that he did?
10   A. Both captains came in, so I'm assuming that
11 Captain Walinsky got the assistance of Captain Vallejo.
12   Q. Vallejo, okay. Is that Raul Vallejo?
13   A. Raul Vallejo. And there was a sergeant that was
14 on duty that was in charge of the patrol that evening,
15 which was Sergeant Mesa. And then there was a corporal
16 who was in charge of the shift personnel, which was
17 Corporal Badileo Castillo. And the CID officer on-call
18 and in the office was -- I can't think of the names
19 of -- I know --
20   Q. Well, quick question --
21   A. Yeah.
22   Q. -- here, Chief, who was responsible -- who would
23 have been the jailer's direct supervisor on May 17th of
24 2007?
25   A. The Sergeant Mesa --

60 (Pages 234 to 237)

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 238

1  Q. Okay. Sergeant Mesa?
2  A. -- who was the on-duty supervisor.
3  Q. And by --
4  A. Followed by the corporal.
5  Q. And followed by Badileo Castillo?
6  A. Badileo Castillo the corporal.
7  Q. Okay. Now -- and when you mean by on-duty, does
8  that mean that Sergeant Mesa was at the premises of the
9  Weslaco Police Department?
10  A. Yes, sir.
11  Q. And jail?
12  A. Yes, sir.
13  Q. Okay.
14  A. Albino is the -- Albino.
15  Q. Flores?
16  A. Flores is the on-call investigator and was there.
17  Q. So Jailer Alfredo Moreno's -- if he were -- if he
18  needed to call a supervisor, who would he have called on
19  that day?
20  A. Sergeant Mesa.
21  Q. Sergeant Mesa?
22  A. Yeah.
23  Q. Okay.
24      MR. RUIZ: If I can review my notes and take
25  a look at where I'm at on my outline, which I'm towards

Page 239

1  the end, I can --
2      MR. CHANEY: Go right ahead.
3      MR. RUIZ: Thank you.
4      MR. CHANEY: Not a problem.
5      THE VIDEOGRAPHER: We're off the record at
6  2:07 p.m.
7      (Break was taken at 2:05 p.m. - 2:13 p.m.)
8      THE VIDEOGRAPHER: We're back on record at
9  2:15 p.m.
10      (Plaintiff's Exhibit No. 13 marked.)
11  Q. (By Mr. Ruiz) Chief Martinez, I'm going to hand
12  you what I've marked as Exhibit No. 13, can you please
13  take a look at that, sir?
14  A. Yes, sir.
15  Q. And earlier you testified that Ms. Maricela
16  Trevino was, quote, in and out of the Weslaco jail?
17  A. Yeah.
18  Q. What is Exhibit No. 13?
19  A. It's a -- it's a record of incidents that
20  Maricela Trevino was --
21  Q. And these incidents start in 2007 on the first
22  page, right?
23  A. 2007.
24  Q. And there are incidents for 2006 and 2005 on that
25  first page as well, right?

Page 240

1  A. Yes, sir.
2  Q. And they go back as far as 2003 on the second
3  page, right?
4  A. Yes, sir.
5  Q. Okay. So the jailers, dispatchers and police
6  officers of the Weslaco Police Department were very
7  familiar with local resident Ms. Maricela Trevino?
8      MR. CHANEY: Objection, form.
9  A. That is correct.
10  Q. (By Mr. Ruiz) In May of 2007?
11  A. That's correct. Familiar with, as far as arrests
12  are concerned.
13  Q. Correct. And she had been -- how many arrests do
14  you see on that first page, Chief?
15  A. 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17,
16  18, 19, 20, 21, 22. Okay.
17  Q. How many did you count?
18  A. Released 22 -- see, this is the -- this is the
19  list of offenses that she was -- now we have to go over
20  here see if she was released.
21  Q. Okay.
22  A. She was booked, it tells you right there that she
23  was booked on this date and then released and sentenced
24  over here on the -- on the last column.
25  Q. And how many times was she booked on -- as shown

Page 241

1  by that first page of Exhibit 13?
2  A. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
3  15, 16, 17, 18, 19, 20, 21, 22.
4  Q. 22. And once you're booked, you're incarcerated,
5  right?
6  A. Yes, sir.
7  Q. And on the second page, how many -- how many
8  times was she booked?
9  A. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
10  15, 16, 17.
11  Q. 17?
12  A. Yeah.
13  Q. 17 and 22, we have a total of 39 times?
14  A. Uh-huh.
15  Q. That she was booked and incarcerated at the
16  Weslaco Police Department lockup between 2007 and 2003?
17  A. Yes.
18  Q. Would that be correct?
19  A. Yes, sir.
20  Q. Chief, is it -- strike that question, Chief.
21      Do people often overdose on prescription
22  medication as a -- as a way of committing suicide?
23      MR. CHANEY: Objection, form.
24  A. I have no idea.
25  Q. (By Mr. Ruiz) You don't know? Would -- okay.

61 (Pages 238 to 241)

Hill & Romero
Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09