## Page 242

1  You've never heard based on your many years in law
2  enforcement --
3        MR. CHANEY: Objection, form.
4    A. Yeah. But do they often?
5    Q. (By Mr. Ruiz) Yeah.
6    A. I have no --
7    Q. Well, let me ask it this way, have you ever heard
8  of someone trying to commit suicide by overdosing on
9  medications?
10    A. Yes, sir.
11    Q. Okay. Is that -- is that something -- is that
12  something serious, that should be taken seriously, when
13  an officer comes across or responds to a call where
14  there's been an overdose of medications?
15    A. Yes, sir.
16    Q. Okay. What exhibit number is that, sir?
17    A. 13.
18    Q. 13.
19        MR. CHANEY: Is it okay if I staple it?
20        MR. RUIZ: Yes, that's fine. I'm sorry, I
21  thought I had gotten it in there.
22        MR. CHANEY: No problem.
23        MR. RUIZ: I'm going to need another one.
24  Can you make me another one?
25        THE REPORTER: 14.

## Page 243

1        MR. RUIZ: 14.
2        (Plaintiff's Exhibit No. 14 marked.)
3    Q. (By Mr. Ruiz) Let me hand you what's been marked
4  as Exhibit No. 14.
5    A. Okay.
6    Q. What is Exhibit No. 14, sir?
7    A. It's an incident report that's made by dispatch
8  on overdose.
9    Q. And that incident report is No. 2006-002308, is
10  that correct?
11    A. That's correct.
12    Q. And the date is January 30th of 2006?
13    A. That's correct.
14    Q. Approximately, a year and a half prior to
15  Ms. Maricela Trevino's hanging at the jail?
16    A. That's correct.
17    Q. Okay. And this report was -- this is -- is this
18  the -- is this the type of report that is completed by
19  your communications department?
20    A. No, this -- yeah, this is communications.
21    Q. Okay. And the -- the communication -- the
22  communications or dispatcher, as shown on this exhibit
23  or on this report, is Israel Trevino, correct?
24    A. Uh-huh.
25    Q. And the offender is there -- is there a section

## Page 244

1  for offender in this?
2    A. The complaint is Chris Villarreal, offender see
3  other parties.
4    Q. Okay. There's nothing in there, right?
5    A. No, no.
6    Q. Does it show the offense?
7    A. The offense of overdose, yeah.
8    Q. Okay. And the -- the assigned officer to this
9  incident report?
10    A. Assigned officer is Yesenia Yarrito.
11    Q. And Officer Yarrito, is she still with the police
12  force at Weslaco?
13    A. No, sir.
14    Q. Do you know where she is now employed?
15    A. I think she's employed with the Harlingen Police
16  Department.
17    Q. Harlingen Police Department, okay. There are
18  other assisting officers, do you see that, sir?
19    A. Maria Ganbi.
20    Q. Okay. Is she still with the Weslaco Police
21  Department?
22    A. I believe so, she's an investigator.
23    Q. David Garcia?
24    A. He's no longer a peace officer.
25    Q. Do you know where he is?

## Page 245

1    A. He's somewhere in school somewhere.
2    Q. And Carlos Cervantes is he still with the --
3    A. Carlos Cervantes he's still with the police
4  department.
5    Q. Weslaco P.D.?
6    A. Uh-huh.
7    Q. Do you know if Israel Trevino is still a
8  dispatcher employed?
9    A. I have no idea.
10    Q. Okay. And Page 2 of that report --
11    A. Report by the officer.
12    Q. That's the report by Officer --
13    A. Yarrito.
14    Q. -- Yesenia Yarrito, right?
15    A. Yes, sir.
16    Q. And she titles it overdose?
17    A. Yes.
18    Q. And she writes, on Monday January 30th, 2006 at
19  about 1:06 p.m. I was dispatched to 815 East America in
20  reference to an overdose?
21    A. Uh-huh.
22    Q. Did I read that correctly, sir?
23    A. Yes, sir.
24    Q. Upon arrival I made contact with Chris
25  Villarreal, I guess that's her date of birth, 01/13/63?

62  (Pages 242 to 245)

Hill & Romero
Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)

031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 246

1    A. Uh-huh.
2    Q. Who stated her sister had taken an unknown amount
3    of anxiety pills, Lorazepam. When asked Maricela
4    Trevino asked, she took about eight pills. Did I read
5    that correctly?
6    A. That is correct.
7    Q. Maricela Trevino appeared to be highly
8    intoxicated?
9    A. Uh-huh.
10   Q. Hour under the influence of --
11   A. Or, it should have been.
12   Q. Or, she meant, under the influence of medication.
13   She also had slurred speech and unsteady balance.
14   Weslaco EMS transported her to Knapp Medical Center.
15   A. That's correct.
16   Q. Did I read that correctly?
17   A. That's correct.
18   Q. Is this an example where the police officer did
19   an assessment?
20   A. Uh-huh.
21   Q. And took the -- the individual to the nearest
22   medical facility?
23   A. Yes, sir.
24   Q. Okay. Would -- would you -- would you agree with
25   me that as a result of this report in January of 2006

Page 247

1    that the Weslaco Police Department knew that Maricela
2    Trevino was a suicide risk?
3         MR. CHANEY: Objection, form.
4    A. No, sir.
5    Q. (By Mr. Ruiz) Okay, okay.
6         (Plaintiff's Exhibit No. 15 marked.)
7         MR. CHANEY: I'm going to staple the two
8    pages of Exhibit 14 together.
9         MR. RUIZ: Okay. I hate to ask you this,
10   but I need two minutes to locate the rest of my exhibit,
11   if you don't mind. I'm almost -- I'm almost done. Is
12   that okay, Mr. Chaney?
13        THE VIDEOGRAPHER: We're off the record at
14   2:27 p.m.
15        (Discussion off the record.)
16        THE VIDEOGRAPHER: We're back on the record
17   at 2:28 p.m.
18   Q. (By Mr. Ruiz) Chief Martinez, I'm going to hand
19   you Exhibit No. 15.
20   A. Okay.
21   Q. Okay. Chief Martinez, is cutting -- when a
22   person cuts their wrist, is that a way of committing
23   suicide?
24   A. If they cut the main vein, yeah.
25   Q. Okay. And Exhibit No. 15 is a -- is an incident

Page 248

1    report, correct?
2    A. Yeah, uh-huh.
3    Q. And it's an incident report dated November 6th of
4    2006?
5    A. That's correct.
6    Q. Okay. At 8:42 in the morning?
7    A. Uh-huh.
8    Q. Okay. And this first page of Exhibit 15, is that
9    the page that's completed by the dispatcher?
10   A. Uh-huh.
11   Q. Communications department?
12   A. That's right.
13   Q. In this case, it would have been --
14   A. Disorderly conduct.
15   Q. Okay. And who's the dispatcher or the
16   dispatchers who were responsible for creating this
17   report?
18   A. Ernesto, Lydia.
19   Q. Oh, so we have Ernesto Berata?
20   A. Uh-huh.
21   Q. Is that one of the dispatchers?
22   A. Uh-huh.
23   Q. And Lydia Olalde?
24   A. Uh-huh.
25   Q. Is that the other dispatcher?

Page 249

1    A. Yes, sir.
2    Q. The officers who responded to this call?
3    A. Delia Antonio, Yesenia Yarrito and Gerardo Oliva.
4    Q. Okay. So three officers responded to this call,
5    is that correct?
6    A. Uh-huh.
7    Q. And two dispatchers assisted the officers with
8    the call?
9    A. Uh-huh.
10   Q. Is that a yes, sir? I need to --
11   A. Yes, sir, I'm sorry.
12   Q. She needs to take it down?
13   A. Okay.
14   Q. Okay. In this -- in this incident report the
15   call is reported from Celia Trevino at 815 America
16   Street in Weslaco?
17   A. That's correct, sir.
18   Q. Okay. And if you look at the section in the
19   middle on the first page, which is 46, the notes?
20   A. Yes.
21   Q. It reads, the first entry is a -- is a date and
22   time?
23   A. Uh-huh.
24   Q. 8:43 with 43 seconds, you see that?
25   A. Yes, sir.

63  (Pages 246 to 249)

Electronically signed by Anica Diaz (001-137-509-0044)          031a3c36-ed2a-42b4-b528-26a2cacc5e09

## Page 250

1  Q. Then there's the second entry under that is 1787,
2  11-06-2006 8:42 with 45 seconds?
3  A. Uh-huh.
4  Q. And it says REF, ref to daughter?
5  A. Yeah.
6  Q. Disorderly conduct -- DC, disorderly conduct with
7  mother. Did I read that correctly?
8  A. That's correct.
9  Q. And then the line under that says 1771 11-06-2006
10  8:59 with 20 seconds. And then this reads, very short
11  hair, black wind shorts, female left with B from
12  location, does have cut to the wrist. Did I read that
13  correctly?
14  A. Does have cut to the wrist, yeah.
15  Q. Okay. Then the line under that is 1717,
16  11-06-2006, 9:05 a.m. with 38 seconds, did I read that
17  correctly?
18  A. That's correct.
19  Q. Then it says, female possibly ER. What does ER
20  mean?
21  A. Emergency room.
22  Q. Okay. To PD, is that to police department?
23  A. To police department.
24  Q. That would be the Weslaco Police Department?
25  A. Right.

## Page 251

1  Q. To make contact with Judge Farias about
2  Section 28?
3  A. That's correct.
4  Q. Did I read that sentence correctly?
5  A. Yes, sir.
6  Q. So we know that the dispatchers on November 6th,
7  2006 wrote these notes in this section of the report?
8  A. That's correct.
9  Q. Okay. The second page -- the second page is
10  the -- it also identifies the assigned officers Yesenia
11  Yarrito?
12  A. Uh-huh.
13  Q. Assisting officers Jose Rodriguez and Eloy Cano?
14  A. Uh-huh.
15  Q. Is that correct?
16  A. Yes, sir.
17  Q. And the dispatcher is Lydia Olalde?
18  A. Uh-huh.
19  Q. And the call was received by Lydia Olalde?
20  A. Uh-huh.
21  Q. Is that correct?
22  A. Yes, sir.
23  Q. So would you expect Lydia Olalde to have written
24  the notes in the previous section, sir, on Page 1?
25  A. Other parties, yeah.

## Page 252

1  Q. Is that a yes?
2  A. Yes, sir. Yes, sir.
3  Q. Okay. And if we go to the third page of
4  Exhibit No. 15, it's the report by the police officer
5  Yarrito?
6  A. Yes, ma'am -- yes, sir.
7  Q. Yesenia Yarrito.
8  A. Uh-huh.
9  Q. And she titles this Section 26. Now, when you --
10  when she titles this Section 26 and the other reference
11  with a Section 28, that means this is a serious call,
12  correct?
13  A. She made an assessment.
14  Q. Okay.
15  Q. An assessment of a Section 26 means, I'm thinking
16  that she needs to be taken to MHMR for evaluation.
17  Q. Okay. And so that's a serious -- that's a
18  serious call that she responded to, correct?
19  A. Well, she made that assessment.
20  Q. Right?
21  A. She's -- she's saying it, Section 26.
22  Q. Okay.
23  A. She just -- she responded to a disorderly conduct
24  call.
25  Q. Okay.

## Page 253

1  A. By the mother, okay.
2  Q. Okay. And so she's assessing that?
3  A. She made an assessment due to the fact that she
4  cut her wrist.
5  Q. Okay.
6  A. That she needed to be evaluated.
7  Q. Okay.
8  A. To see if she was a suicidal -- if she was
9  suicidal.
10  Q. Okay.
11  A. Okay.
12  Q. Okay. And let's read that, I'll read it for you.
13  A. Okay.
14  Q. It says on -- on this second to the last page,
15  Page No. 145, on Monday, November 6th, 2006 at about
16  10:11 a.m. I was dispatched at 815 America in reference
17  to a suicidal female.
18  A. Uh-huh.
19  Q. Did I read that correctly?
20  A. That's correct.
21  Q. The next paragraph, upon arrival I made contact
22  with Maricela Trevino, 08-18-71?
23  A. Uh-huh.
24  Q. Her date of birth?
25  A. Yes, sir.

64 (Pages 250 to 253)

Electronically signed by Anica Diaz (001-137-509-0044)            031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 254

1    Q. Who stated that she was arguing with her mother,
2 so she cut her left wrist three times. The female was
3 detained under emergency mental health warrant.
4    A. Uh-huh.
5    Q. And transported to Knapp Medical Center.
6    A. Right.
7    Q. Did I read that correctly?
8    A. That's correct.
9    Q. Upon medical clearance, female was transported to
10 Tropical Texas for screening/evaluation?
11    A. That's correct.
12    Q. It says, female was not accepted, she was
13 transported back to 815 America and released to her
14 mother. Did I read that correctly?
15    A. That's correct.
16    Q. Now, Chief Martinez, this emergency mental health
17 warrant.
18    A. Uh-huh.
19    Q. That health warrant was filled out by whom?
20    A. That's a Section 26, that's what it's called.
21    Q. Okay.
22    A. Okay.
23    Q. And so -- okay. And who completes that?
24    A. The officer.
25    Q. Okay.

Page 255

1    A. The officer completes that and that's her
2 assessment.
3    Q. Okay.
4    A. And then she takes her to -- to the Tropical
5 Texas for screening and evaluation.
6    Q. Okay.
7    A. And the doctor, the psychologist there --
8    Q. Okay.
9    A. -- did not think that she needed to stay, she
10 wasn't suicidal.
11    Q. Okay. And you know that -- and you know that for
12 a fact?
13    A. Yes, sir. She's the psychiatrist.
14    Q. Okay.
15    A. If he says I'm not accepting her because, you
16 know, she's not suicidal, then we sent her back.
17    Q. And the reason I'm asking, because do you have
18 independent knowledge about this separate than from
19 what's inside here?
20    A. No.
21    Q. Okay.
22    A. All we can going by is, when I told you earlier,
23 we don't -- we only assess. The evaluation is done by a
24 psychiatrist or a physical -- a medical professional.
25    Q. Right. But do you know for a fact, can you

Page 256

1 represent to this jury that there was a psychiatrist on
2 duty on that day?
3    A. I have no idea.
4    Q. Okay.
5    A. I'm assuming that there would be.
6    Q. And then that's why I was -- that's why my
7 question was, with 100 percent certainty, can you tell
8 the ladies and gentlemen of the jury who are going to
9 watch this videotape whether there was a psychiatrist on
10 duty that day?
11    A. I can't.
12    Q. Okay.
13    A. The officer may be able to tell you that.
14    Q. Okay, right. And so -- and do you know with 100
15 percent certainty what the reasons for their releasing
16 her from the Tropical Texas, do you know what they are?
17    A. I'm not a physician, I'm not a doctor.
18    Q. Okay.
19    A. I wouldn't be able to answer that.
20    Q. And I was asking because maybe you spoke
21 Officer Yarrito back in --
22    A. No. I mean, she doesn't have that authority
23 either.
24    Q. Okay.
25    A. The doctor is the only one that can commit --

Page 257

1    Q. Okay.
2    A. -- a person into it.
3    Q. Would you agree with me that you don't know the
4 reason why she was released as you sit here today?
5 Would you agree with that?
6    A. I know that she was not accepted.
7    Q. Okay.
8    A. Which means that she's not -- they didn't think
9 that she was suicidal.
10    Q. Well, and where do you gather that from,
11 Chief Martinez?
12    A. Because if -- in the prior experience you take
13 somebody, and then if they're suicidal, they'll accept
14 them.
15    Q. And the prior --
16    A. If they're not suicidal they won't -- they'll
17 send you back with the individual, and you take her to
18 the parent or you release her. In this case, we
19 released her, we didn't put her in jail.
20    Q. Okay.
21    A. We released her back to her mother.
22    Q. Okay. And based on prior experience, is that
23 prior experience with the chief of the police department
24 of Weslaco?
25    A. This is prior cases that we've had.

65 (Pages 254 to 257)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 258

1    Q. Okay. How many prior cases have you had where
2  people --
3    A. You would have to check that with the MHMR,
4  Tropical Texas.
5    Q. Okay.
6    A. I won't be able to give you a number.
7    Q. How many -- during your tenure as chief, how many
8  times did people attempt to commit suicide inside the
9  Weslaco jail?
10   A. Attempted to commit suicide?
11   Q. Uh-huh.
12   A. That I know, this is -- this is the only.
13   Q. Okay.
14   A. This is the only case.
15   Q. Okay. But if we just look at this report, and
16 you don't have any other independent -- you don't know
17 what the -- what the reasons for her release from
18 Tropical Texas are here today, correct?
19   A. For sure?
20   Q. Yes, for sure.
21   A. I wouldn't know.
22   Q. Okay.
23   A. The doctors are the ones that evaluate that.
24   Q. Okay.
25   A. We don't even -- I keep telling you, we do not

Page 259

1  evaluate, the doctors are the only ones that evaluate.
2    Q. Okay.
3    A. And they make that assessment.
4    Q. Okay.
5    A. We just assess, if they need help then we take
6  them.
7    Q. Okay.
8    A. We feel that they need help but --
9    Q. All you know about this suicide attempt was
10 what's in this report that you're reading, right?
11   A. Yeah, yeah.
12   Q. Okay. And this is the first time you've ever
13 read this report?
14   A. Yes.
15   Q. Okay. And so Officer Yarrito opened -- is there
16 a -- is there a folder where officer Yarrito -- or is
17 there a place where I can find other Section 26
18 documents? Are they stored?
19   A. I'm sure that they are.
20   Q. Okay. What --
21   A. I mean, the officers would have -- would
22 have -- you would probably go to CID, and CID you could
23 find -- you could find reports of people that have been
24 sectioned.
25   Q. And what was CID? What did that stand for also?

Page 260

1    A. Section 26. What does it stand for?
2    Q. Yeah, CID? What is --
3    A. Oh, Criminal Investigation Division.
4    Q. Criminal -- would you agree with me,
5  Chief Martinez, that on -- in November -- on
6  November 6th, 2006, the Weslaco Police Department was
7  aware that Maricela Trevino was a suicide risk?
8    A. No, sir.
9    Q. Would you say --
10       MR. CHANEY: Is it okay if I staple 15
11 together?
12       MR. RUIZ: Yes, sir.
13       MR. CHANEY: Okay.
14   Q. (By Mr. Ruiz) Would you say, this is the -- this
15 would have been the second call that Officer Yarrito
16 responded to that involved -- that involved a call where
17 Maricela Trevino was transported to a medical facility,
18 would you agree with that?
19   A. I would have to look at the arrest reports.
20   Q. Okay. Well, the one of January 30th of '06
21 stated she was transported to Knapp Medical Center,
22 that's a medical facility, right?
23   A. Oh, yeah. Yeah, that's medical, EMS.
24   Q. Okay.
25   A. And what happened then, I have no idea.

Page 261

1    Q. Well, she went to a hospital?
2    A. Yeah.
3    Q. Right?
4    A. Well, because she stated she had eight pills.
5    Q. And --
6    A. She took eight pills and she was intoxicated, so.
7    Q. And Officer Yarrito responded to that call?
8    A. Yes, sir.
9    Q. She also responded to the call of November 6th
10 when she was -- when Maricela -- thank you. When
11 Maricela Trevino was taken to another hospital Tropical
12 Texas?
13   A. Uh-huh.
14   Q. Is that correct?
15   A. Yes, sir.
16   Q. Would you agree with me, Chief Martinez, that
17 based on those two instances, Weslaco police officer
18 Yarrito was aware that Maricela Trevino was a suicide
19 risk?
20   A. No, sir.
21   Q. Okay. Would you agree with me that based on
22 Exhibit No. 15, the call of November 6th, 2006 that
23 dispatcher Lydia Olalde --
24   A. Uh-huh.
25   Q. -- was aware that Maricela Trevino was a suicide

Hill & Romero
Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)                                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 262

1  risk?
2  A. No, sir.
3  Q. Okay. And if you could refer to Exhibit No. 8,
4  Chief Martinez.
5  A. Right there.
6  MR. CHANEY: It should be up --
7  THE WITNESS: 8, yeah, they're not in order.
8  MR. CHANEY: Okay.
9  A. Okay.
10  Q. (By Mr. Ruiz) Exhibit No. 8 is the incident
11  report --
12  A. 5-17.
13  Q. -- of May 17th, 2007 --
14  A. Yes, sir.
15  Q. -- when Maricela Trevino --
16  A. Yes, sir.
17  Q. -- attempted suicide by hanging?
18  A. Yes, sir.
19  Q. Is that correct? Who was the dispatcher on duty?
20  A. By choking, she didn't hang herself. She tied
21  something around her neck.
22  Q. Okay. Well, she -- what did she hang around her
23  neck?
24  A. She didn't hang anything around there, she tied.
25  Q. Okay. What did she tie around her --

Page 263

1  A. A leg bandage.
2  Q. An Ace bandage?
3  A. An Ace bandage.
4  Q. Okay. Who -- let me ask you this, who was
5  the -- who was the call received by?
6  MR. CHANEY: You mean the dispatcher?
7  Q. (By Mr. Ruiz) The dispatched call was received by
8  who?
9  A. Jose Ferrer.
10  Q. And --
11  A. And call received by dispatcher and call received
12  by Lydia Olalde.
13  Q. So Lydia Olalde was on duty as a dispatcher
14  during the incident six months earlier?
15  A. Uh-huh.
16  Q. In November of '06? And she's also on duty on
17  May 17th, 2007?
18  A. Uh-huh.
19  Q. Would you agree with me, Chief Martinez, that
20  dispatch Olalde was aware that Ms. Trevino was a suicide
21  risk on May 17th, 2007?
22  A. No, sir.
23  Q. Okay. Do you -- and the documentation for
24  November -- for January of '06, which is the Exhibit 14
25  and Exhibit 15 of November 6th, 2006, that documentation

Page 264

1  was readily available to the supervisor on duty on
2  May 17th, 2007, correct?
3  A. Yes.
4  Q. Sergeant Mesa?
5  A. Sure, should be.
6  Q. And Sergeant Mesa, if he wanted to, he could
7  have -- he had authority and he had the ability to go
8  back into these police records and evaluate whether
9  Maricela Trevino was a suicide risk, correct?
10  A. Could assess, he can't evaluate.
11  Q. Could have assessed?
12  A. Yes.
13  Q. Okay. And also, the -- on May 17th, 2007, when
14  Maricela Trevino was booked at the Weslaco jail, she was
15  discovered to have found she had cuts on her wrist, is
16  that your understanding?
17  A. Cuts or scrapes?
18  Q. Cuts?
19  A. Then EMS was called in.
20  Q. Okay. Does that sound correct to you?
21  A. Yeah. I mean --
22  Q. So she had cuts on her wrists on May 17?
23  A. She had abrasions on her wrist.
24  Q. Okay.
25  A. From climbing the fence.

Page 265

1  Q. And if she had cuts on her wrists, that's
2  consistent with the same type of cut that she had --
3  A. I think it was on her forearm.
4  Q. On November --
5  A. I think it's the forearm that she was --
6  Q. Are you sure?
7  A. -- jumping the fence.
8  Q. Are you sure?
9  A. I think so. Let me -- let me read the report.
10  Q. Sure.
11  A. The report will tell you. Okay. Noticed that
12  she was bleeding from the right forearm.
13  Q. And which is the forearm?
14  A. Forearm, here.
15  Q. Okay. That's the inside of her --
16  A. Yeah.
17  Q. That's the --
18  A. Okay.
19  Q. And the medical examiner noted that there were
20  cuts on both wrists, okay?
21  A. Previously?
22  Q. After this incident.
23  A. Not that I know of.
24  Q. Okay. Well, but if she has cuts on her wrists on
25  May 17th, 2007, it's the same thing, the same type of

67 (Pages 262 to 265)

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 266

1    injury that she had six months earlier in November of

2    2006, based on that other report, would you agree?

3        A.  That was the disorderly conduct that was cleared,

4    she was -- she was -- procedure was followed by the

5    officer and was cleared by the medical authorities.

6             MR. RUIZ:  I'm going to object as

7    nonresponsive.

8        Q.  (By Mr. Ruiz) Let me ask you, what types of cuts

9    did Ms. Trevino have on her wrists during -- in November

10   of 2006?

11       A.  I have no idea.

12       Q.  Based on Exhibit No. 15 that you have right

13   there?

14       A.  Well, it says that she had cuts on her wrist.

15       Q.  Okay.

16       A.  Now, I didn't see the cuts and I wouldn't be able

17   to tell you --

18       Q.  Okay.

19       A.  -- how deep they were or --

20       Q.  Right.  I was just asking you about the type

21   of -- they were cuts on her wrist, correct?  Is that

22   your understanding from reading that exhibit --

23       A.  Yes, sir.

24       Q.  -- that report in November of 2006?

25       A.  Yes, sir.

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

1    Q.  And then -- and that's when Lydia Olalde was a

2    dispatcher on duty, correct?

3    A.  That's correct.

4    Q.  Okay.  And she's also a dispatcher on duty on

5    May 17th, 2007?

6    A.  That's correct.

7    Q.  Correct?

8    A.  Yes, sir.

9    Q.  And the type of cuts that were treated by EMS at

10   the Weslaco jail that they treated the Maricela Trevino

11   for were also cuts on her wrists?

12          MR. CHANEY:  Objection.  He's answered that

13   question several times.  He said forearm, and you can

14   ask it a bunch of times, the answer is going to be the

15   same.

16          MR. RUIZ:  Okay.  Give me a second I'm

17   trying to --

18          MR. CHANEY:  We've been going about six

19   hours.

20          MR. RUIZ:  I'm trying to finish too soon

21   here.

22   A.  It said EMS attended to what she calls small

23   superficial cuts.  Once at the station EMS attended to

24   what he called small superficial cuts.

25   Q.  (By Mr. Ruiz) Albert Ponce -- on Page 3 of

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

1    Exhibit No. 8.

2       A.  Uh-huh.

3       Q.  Towards the bottom it reads -- and once at the

4    station EMS attended to what he called small superficial

5    cuts, right?

6       A.  Uh-huh.

7       Q.  Did I read that correctly?

8       A.  Well, not --

9       Q.  Once at the station EMS --

10      A.  Yeah, attended to what he called small

11   superficial cuts.  This is EMS attendant.

12      Q.  Correct.  Did I read that sentence correctly?

13      A.  Yes.

14      Q.  Okay.  Then it says, I noticed that they were

15   cleaning blood from her left wrist, did I -- did I read

16   that correctly?

17      A.  From the small superficial cuts.

18      Q.  I'm just asking you about the second sentence,

19   Chief Martinez.  I'm asking you --

20      A.  Well, you've got to read the entire --

21      Q.  Well, I did already.  Okay.  But let me read

22   you --

23      A.  Okay.

24      Q.  -- the second part --

25      A.  All right.

Electronically signed by Anica Diaz (001-137-509-0044)       031a3c36-ed2a-42b4-b528-26a2cacc5e09

1    Q.  -- that says, I noticed that they were cleaning

2    blood from her left wrist, did I read correctly?

3    A.  That's correct.

4    Q.  And this report contains what happened the

5    evening of May 17th of '07, right?

6    A.  Yes, sir.

7    Q.  So on May 17th of '07 and on November of 2006,

8    Maricela Trevino, according to these exhibits and

9    reports, had cuts on her wrist, is that correct?

10   A.  That's correct.  But this explains that she

11   jumped the fence, and in jumping the fence she had

12   superficial cuts to her forearm and the wrist that she

13   was jumping the fence.

14            MR. RUIZ:  I'm going to object to the

15   nonresponsiveness --

16            THE WITNESS:  Okay.

17            MR. RUIZ:  -- of the answer.

18            MR. CHANEY:  Do you have another topic?

19   He's not a doctor.

20   Q.  (By Mr. Ruiz) I'm looking for another section.

21   Chief Martinez, despite knowing -- well, strike that

22   question.

23       Chief Martinez, on May 17th, 2007 communications

24   dispatcher Lydia Olalde did nothing to eliminate the

25   risk of Maricela Trevino committing suicide, would you

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

```
 1    agree with that?
 2        A.  That's not her responsibility.
 3                MR. RUIZ:  Objection, nonresponsive.
 4        Q.  (By Mr. Ruiz) Do you agree with that statement
 5    that I --
 6        A.  No, sir, I don't.
 7        Q.  Okay.  After this incident you testified earlier
 8    that -- that Captain -- you had Captain Walinsky
 9    investigate?
10        A.  Captain Walinsky and Captain Vallejo.
11        Q.  And Captain Vallejo, they investigated the
12    incident of May 17th, 2007?
13        A.  They had -- they brought in additional personnel
14    from Criminal Investigation Division to assist them in
15    the investigation of what had happened.
16            They brought in Adan Sanchez, who's a
17    corporal -- a sergeant, I'm sorry.  Sergeant CID.  They
18    brought in Corporal Dido, who is also a CID
19    investigator.
20        Q.  Okay.
21        A.  Supervisors in the Criminal Investigation
22    Division.  Captain Vallejo oversees the Criminal
23    Investigation Division.  So together they investigated
24    the --
25        Q.  And Chief, as a result of their investigation,
```

Hill & Romero
Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

1        were there any disciplinary measures taken against

2        jailer Alfredo Moreno?

3            A.   He was -- he was placed on administrative leave.

4            Q.   Okay.

5            A.   Pending --

6            Q.   How long was that, sir?

7            A.   I'm not sure.  I'd have to go back and look.

8            Q.   Okay.  Were there any disciplinary measures taken

9        against communications dispatcher Lydia Olalde?

10           A.   No.

11           Q.   Okay.  Any disciplinary measures taken against

12       Officer Ponce?

13           A.   No.

14           Q.   Were there any disciplinary measures taken

15       against any other individual?

16           A.   No, sir.

17           Q.   And what was -- what were the reasons for placing

18       Alfredo Moreno the jailer on suspension, did you say?

19           A.   No, no, administrative leave with pay.

20           Q.   With pay, okay.  Well, tell me why.

21           A.   You get him away from the scene, because he was

22       the -- he was the jailer that was there.

23           Q.   Okay.

24           A.   And was exposed to all of this, okay.

25           Q.   Okay.

Hill & Romero
Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)                          031a3c36-ed2a-42b4-b528-26a2cacc5e09

1     A.  And so he could recollect himself, and then bring

2  him back on so that he's on task again.

3     Q.  So it's for his -- the benefit of his --

4     A.  It's for his benefit.

5     Q.  -- mental health and wellbeing?

6     A.  For his own benefit, yeah.

7     Q.  Okay.

8     A.  It was with pay.  It wasn't a disciplinary

9  action, it was just administrative leave.

10    Q.  Okay.  Well, were any disciplinary actions taken

11 against anybody?

12    A.  None, none.

13    Q.  Okay.

14          MR. RUIZ:  I think that's all I have for

15 now.  I pass the witness.

16          MR. CHANEY:  We'll reserve ours questions

17 until the time of trial.

18          THE VIDEOGRAPHER:  We're off the record at

19 2:54 p.m.

20          (End of proceedings.)

21

22

23

24

25

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 273

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:_____ DATE OF DEPOSITION:_____

3    PAGE    LINE    CHANGE                   REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

                        Hill & Romero
                   Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 274

1          I, JOHN DANIEL MARTINEZ, have read the foregoing

2     deposition and hereby affix my signature that same is

3     true and correct, except as noted above.

4

5

6                          _____

7                          JOHN DANIEL MARTINEZ

8     THE STATE OF TEXAS)

9     COUNTY OF HIDALGO)

10          Before me, _____, on this

11     day personally appeared JOHN DANIEL MARTINEZ, known to

12     me (or proved to me under oath or through

13     _____) (description of identity card or

14     other document) to be the person whose name is

15     subscribed to the foregoing instrument and acknowledged

16     to me that they executed the same for the purposes and

17     consideration therein expressed.

18          Given under my hand and seal of office this

19     _____ day of _____, 2010.

20

21                          _____

22                          Notary Public in and for

23                          The State of Texas

24

25

Hill & Romero
Certified Court Reporters

Page 275

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         MCALLEN DIVISION

 3       JUAN ESTRADA, JR., ROSA ESTRADA,      )
         CRISELDA VILLARREAL, ADMINISTRATRIX)
 4       OF THE ESTATE OF MARICELA TREVINO    )
         AND AS NEXT FRIEND OF S.M.L.,        )
 5       N.T.L. AND R.L., JR., AND FRANCISCO)
         TREVINO,                             )
 6                                            )
                      PLAINTIFFS,             )       CIVIL ACTION NO:
 7       VS.                                  )           09-158
                                              )
 8       CITY OF WESLACO, ALFREDO MORENO,     )
         JR., ALBERT PONCE, WESLACO POLICE    )
 9       CHIEF JOHN DANIEL MARTINEZ, ONE      )
         UN-NAMED WESLACO EMS MEDIC, ALEX     )
10       CAVAZOS AND CHRISTOPHER CUELLAR,     )
                                              )
11           DEFENDANTS.                      )
         *************************************************************
12                    REPORTER'S CERTIFICATION
                   DEPOSITION OF JOHN DANIEL MARTINEZ
13                         June 8, 2010

14          I, Anica Diaz, Certified Shorthand Reporter in
         and for the State of Texas, hereby certify to the
15       following:

16          That the witness, JOHN DANIEL MARTINEZ, was duly
         sworn by the officer and that the transcript of the oral
17       deposition is a true record of the testimony given by
         the witness;

18
            That the deposition transcript was submitted on
19       _____July_____, 2010 to the witness or to the
         attorney for the witness for examination, signature and
20       return to Hill & Romero by _____August 16____, 2010;

21          That the amount of time used by each party at the
         deposition is as follows:

22
            MR. MAURO RUIZ          - 05 Hours:  03 minutes
23          MR. MITCHELL C. CHANEY  - 00 Hours:  00 minutes

24

25
```

Hill & Romero
Certified Court Reporters

Electronically signed by Anica Diaz (001-137-509-0044)                                    031a3c36-ed2a-42b4-b528-26a2cacc5e09

1          That pursuant to information given to the
deposition officer at the time said testimony was taken,
2    the following includes counsel for all parties of
record:
3
4          MR. MAURO RUIZ
RUIZ LAW FIRM, L.L.P.
200 East Cano
5          Edinburg, Texas 78539

6          MR. MITCHELL C. CHANEY
COLVIN, CHANEY, SAENZ & RODRIGUEZ, L.L.P.
7    1201 East Van Buren Street
Brownsville, Texas 78522
8
9          I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorney in the action in which this proceeding was
10   taken, and further that I am not financially or
otherwise interested in the outcome of the action.
11
12         Further certification requirements pursuant to
Rule 203 of TRCP will be certified to after they have
occurred.
13
14         Certified to by me this ___15th___ day of
___July___, 2010.
15

16

17

18

19         Anica Diaz, Texas CSR 8021
Expiration Date:  12-31-11
20   Hill & Romero
Firm Registration No.:  313
21   Certified Court Reporters
10225 North Tenth, Suite B
22   McAllen, Texas 78504
(956) 287-8898
23

24

25

Electronically signed by Anica Diaz (001-137-509-0044)                                          031a3c36-ed2a-42b4-b528-26a2cacc5e09

Page 277

1              FURTHER CERTIFICATION UNDER RULE 203 TRCP

2              The original deposition was/was not returned to

3      the deposition officer on _____;

4              If returned, the attached Changes and Signature

5      page contains any changes and the reasons therefor;

6              If returned, the original deposition was

7      delivered to _____,

8      Custodial Attorney;

9              That $_____ is the deposition officer's

10     charges to the Plaintiffs for preparing the original

11     deposition transcript and any copies of exhibits;

12             That the deposition was delivered in accordance

13     with Rule 203.3, and that a copy of this certificate was

14     served on all parties shown herein on and filed with the

15     Clerk.

16             Certified to by me this _____ day of

17     _____, 2010.

18

19

20

21                          _____
                            Anica Diaz, Texas CSR 8021
                            Expiration Date:  12-31-11
22                          Hill & Romero
                            Firm Registration No.:  313
23                          Certified Court Reporters
                            10225 North Tenth, Suite B
24                          McAllen, Texas 78504
                            (956) 287-8898
25

Electronically signed by Anica Diaz (001-137-509-0044)                    031a3c36-ed2a-42b4-b528-26a2cacc5e09